IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:

CIV - DIMITROULEAS

06 - 60839

MICHAEL BRAUSER, )
)
Plaintiff, )
)
v. )
)
EQUIFAX INC., )
)
Defendant. )
_____ /

## COMPLAINT FOR DECLARATORY RELIEF AND A STAY

Plaintiff, Michael Brauser ("Brauser"), by and through undersigned counsel, files his

Complaint for Declaratory Relief and a Stay against Defendant, Equifax Inc. ("Equifax"), and states:

## NATURE OF THE ACTION

1.      Brauser seeks this Court's intervention to resolve issues raised by Equifax's

filing of an improper and overbroad Amended Demand for Arbitration, all relating to the sale of

Naviant, Inc. ("Naviant") to Equifax.

2.      On August 15, 2002, Equifax agreed to acquire all of the outstanding shares

of Naviant in a transaction valued at approximately One Hundred Thirty-five Million and No/100ths

Dollars ($135,000,000.00).  In connection with that transaction, the former shareholders and option

holders of Navinat, through a series of written agreements, appointed Softbank Capital Partners, LP

("Softbank") to act as the "Shareholders' Representative" on their behalf for certain limited

purposes, principally including Softbank's administration of an approximately Ten Million and



No/100ths Dollars ($10,000,000.00) escrow fund (the "Escrow") to settle certain post-closing claims. The escrow arrangements were specified in the Agreement and Plan of Merger by and among Equifax, Armagh Acquisition Corporation ("Armagh"), and Softbank as Shareholders' Representative, dated August 15, 2002 (the "Merger Agreement"). (A true and correct copy of the Merger Agreement is attached hereto as Exhibit A). The Merger Agreement provided for arbitration of certain classes of claims, including indemnification claims under the Merger Agreement by Equifax and/or Naviant. In connection with such indemnification claims, Softbank agreed to act on behalf of the former shareholders and option holders up to the full amount of the Escrow. Brauser is a former shareholder.

3.      On September 2, 2005, Equifax and Naviant filed their Amended Demand for Arbitration (the "Amended Demand for Arbitration") with the American Arbitration Association (the "AAA"), naming as "respondents" Brauser, Softbank, individually and as Shareholders Representative and all of the other former shareholders and option holders of Naviant. Brauser is neither a signatory nor a party to the Merger Agreement. Softbank as the Shareholders Representative is a party to and signatory of the Merger Agreement for certain limited purposes. (*See* Merger Agreement, Preamble ¶ 4).

4.      In the Amended Demand for Arbitration, Equifax purports to asset claims for violations of <u>Florida</u> <u>Statute</u>, § 517, <u>et</u> <u>seq</u>., fraud and intentional misrepresentation. Through these claims Equifax seeks damages far in excess of the Escrow.

5.      Not only do the claims brought by Equifax exceed the limited claims that can be pursued in arbitration under the Merger Agreement, but Brauser and Equifax are parties to a separate Selling Shareholders Agreement by and among Equifax, Armagh and the Selling

Shareholders of Naviant, dated August 15, 2002 (the "Selling Shareholders Agreement"). That agreement, executed in connection with the sale of Naviant to Equifax, lacks any arbitration provision at all. To the contrary, the Selling Shareholders Agreement requires Equifax, to the extent Equifax pursues a claim for knowing misrepresentations arising out of the Merger Agreement against these signatories to that agreement, to "plead with particularity in any *complaint*" the "precise and specific facts that evidence that such Shareholder had Actual knowledge that the representations and warranties of the Merger Agreement were not correct," and such knowledge must be proved by Equifax pursuant to a higher standard of proof - "by clear and convincing evidence." (Selling Shareholders Agreement ¶ 1.7). Further, the Selling Shareholders Agreement requires "that each of [Equifax] and [Naviant] agree to stipulate to the foregoing pleading and proof standards in any claim, action, proceeding or *trial* related to or arising out of this representation . . ." (*Id.* ¶ 1.7 (emphasis added)). (A true and correct copy of the Selling Shareholders Agreement is attached hereto as Exhibit B). By pursuing arbitration before the AAA, Equifax seeks to prejudice Brauser by avoiding the filing of any "complaint" or proceeding with a "trial."

6.      Through its Amended Demand for Arbitration, Equifax seeks to expand the scope of the arbitration provision contained in the Merger Agreement, contravene and to avoid Brauser's right to a "complaint" and a "trial" as required by the Selling Shareholders Agreement. Accordingly, through this action, Brauser seeks declaratory relief and a stay to determine (a) the scope of the arbitration provision set forth in the Merger Agreement and (b) whether Brauser must be forced to participate in an arbitration for claims for fraud and other intentional misconduct that are expressly not subject to any arbitration agreement and, indeed, are the subject of the Selling Shareholders Agreement with procedural safeguards that Equifax seeks to avoid.

-3-

## THE PARTIES

7.      Brauser previously owned approximately fifteen percent (15%) of the outstanding shares (on a fully diluted basis) of Naviant.  Brauser is a resident of Fort Lauderdale, Broward County, Florida.

8.      Equifax is a corporation incorporated under the laws of the State of Georgia with its principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.  Equifax is a global information company that enables and secures global commerce through its information management, marketing services, direct to consumer, commercial and authentication businesses.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Brauser and Equifax and the amount in controversy exceeds the sum or value of Seventy-five Thousand and No/100ths Dollars ($75,000.00), exclusive of interest and costs.

10.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in this district.

## THE FACTUAL ALLEGATIONS

Background

11.      Naviant was founded in 1997.  Naviant's primary business was marketing via electronic mail ("e-mail") to consumers who "opted-in" to receive such solicitations.  Naviant also produced a service to large companies that helped them to identify their customers' e-mail addresses.

-4-

12.     In 2002, Equifax expressed an interest in acquiring Naviant. Equifax and the management of Naviant negotiated the sale of the business, during which time Equifax and its outside consultants were given an opportunity to perform due diligence on Naviant. Ultimately, Equifax agreed to acquire Naviant.

The Sales Transaction

13.     On August 15, 2002, Equifax agreed to acquire Naviant for approximately One Hundred Thirty-five Million and No/100ths Dollars ($135,000,000.00).

14.     The interested parties to the sale of Naviant to Equifax entered into a series of agreements to consummate that transaction. The agreements relevant to this Complaint are:

(a)     The Merger Agreement, entered into by and among Equifax, Armagh, Naviant and Softbank as Shareholders' Representative (which identified, among other things, the consideration for the transaction, certain representations by Naviant to Equifax and Armagh, and provided for limited indemnification by the Shareholders and Option Holders);

(b)     The Selling Shareholders Agreement entered into by and among Equifax, Armagh, and the Shareholders of Naviant (which, among other things, identified which representations were made specifically by which selling shareholders to Equifax and Armagh); and

(c)     the various agreements between Naviant and the Option Holders of Naviant (in which, among other things, the option holders agreed to the appointment of a Sharerholders' Representative).

The Merger Agreement

15.     The Merger Agreement was executed by Equifax, Armagh, Naviant and Softbank, solely as Shareholders' Representative. Brauser is not a party to, or signatory of, the Merger Agreement.

-5-

16.     In Article 6 of the Merger Agreement, Naviant, and only Naviant, made various representations and warranties concerning the disclosure of information to Equifax, the accuracy and completeness of Naviant's books and records, the validity of Naviant's accounts receivable, the propriety of Naviant's contractual obligations and various other matters affecting Naviant's financial statements and financial condition as of August 15, 2002.

17.     The Merger Agreement contains no representations or warranties by the Shareholders or the Option Holders.

18.     In Article 11 of the Merger Agreement, the Shareholders' Representative, on behalf of the Shareholders and Option Holders and pursuant to the authority granted to it in the Selling Shareholders Agreement and the individual agreements of the Option Holders, agreed to indemnify Equifax for losses arising out of certain enumerated events.

19.     Paragraph 11.1 entitled "Indemnification" provides that:

> [I]n accordance with the subject to the further provisions of this Article 11, the [] Shareholders and Former Option Holders in consideration of their receipt of any Merger Consideration (each, an "Indemnitor", and collectively the "Indemnitors") will, jointly and severally, indemnify and hold harmless [Equifax] and its Affiliates (which shall include with effect from the Closing, Company [Naviant] and each Subsidiary thereof) . . . (collectively, "Indemnitees"), from and against and in respect of any and all loss, damage, liability, costs and expense, including reasonable attorneys' fees and amounts paid in settlement (collectively, the "Indemnified Losses"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:
>
> (a)     any misrepresentation, breach of warranty or breach of nonfulfillment of any agreement of [Naviant] contained in this Agreement, the Disclosure Memorandum, or in anyu other certificate, schedule, instrument or document delivered to [Equifax] by or

-6-

> on behalf of [Naviant] pursuant to the provisions of this Agreement and any Excess Expenses to the extent not deducted from the Merger Consideration at Closing.

20.    Paragraph 11.1 identifies fourteen (14) other specific events that could give rise to an Indemnified Loss.

21.    The parties to the Merger Agreement did not agree to include as Indemnified Losses, either in the identification of indemnified items or elsewhere, claims arising out of fraud, intentional misrepresentation or willful misconduct.

22.    The Merger Agreement specifies the process that Equifax must follow to seek indemnification.  Paragraph 11.2 entitled "Indemnification Claims" provides:

> In order to seek indemnification under this Article 11, an Indemnitee shall give written notification (a "Claim Notice") to the Shareholders' Representative on behalf of the Indemnitors which contains (I) a description and the amount (the "Claimed Amount") of any Indemnified Loss incurred or reasonably expected to be incurred by the Indemnitee, (ii) a statement that the Indemnitee is entitled to indemnification under this Article 11 for such Indmnified Loss and a reasonable explanation of the basis therefor, and (iii) a demand for payment (in the manner provided in paragraph (b) below) in the amount of such Indemnified Loss.  The Indemnitee shall also deliver a copy of the Claim Notice to the Escrow Agent.

23.    Any Shareholders' and Option Holders' liability for Indemnified Losses is limited in at least two significant ways by Section 11.4 of the Merger Agreement:

> Other than in respect of claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct (in which case [Equifax] shall have all remedies available at law or in equity) any and all claims for Indemnified Losses made pursuant to Article 11 of this Agreement or for breaches of the representations and

-7-

> warranties made by [Naviant] herein shall be satisfied solely out of the Escrow Fund (which includes interst and earnings thereon) and no Indemnitee shall have personal recourse against any [Naviant] Shareholder for any claims for Indemnified Losses made pursuant to this Article ii or for breaches of the representations and warranties made by [Naviant] herein.

24.     Thus, for "claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct," those claims are to be pursued by Equifax separately, and Equifax "shall have all remedies available at law or in equity." Further, for such "claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct," those claims are *not* limited to the amounts maintained in the Escrow. To satisfy Indemnified Losses, Equifax agreed to limit its recovery to the Escrow.

25.     The Merger Agreement contains an arbitration clause. Paragraph 14.4 entitled "Dispute Resolution," provides that:

> Any and all disputes other than with respect to the Closing Balance Sheet or the calculation of the Closing Net Working Capital arising out of or in connection with the execution, interpretation, performance or nonperformance of this Agreement (each, a "Disputed Matter") will be arbitrated and settled by the procedures established in this Paragraph 14.4.

The Selling Shareholders Agreement

26.     As a condition to entering into the Merger Agreement, Equifax, Armagh and among others, Brauser entered into the Selling Shareholders Agreement. The Selling Shareholders Agreement contains a number of provisions, including direct representations and warranties by the Shareholders and the appointment of Softbank as the Shareholders' Representative to perform certain limited functions in connection with the transaction.

-8-

27.     Under Paragraph 1.7 of the Selling Shareholders Agreement, each Shareholder represented and warranted to Equifax and Armagh, among other things, that "[t]o the Actual Knowledge of such Shareholder, the representations and warranties of [Naviant] set forth in the Merger Agreement are correct and complete."

28.     The Selling Shareholders Agreement defines "Actual Knowledge" as:

> those facts, circumstances or events that are within the actual current conscious knowledge as of the date hereof of any natural person who currently is employed by or is an officer or director of such Shareholder and who currently serves as, or who has served as, a director or officer of [Naviant] or any of is Subsidiaries . . . without any obligation to perform any investigation, inquiry or review.

29.     The Selling Shareholders Agreement makes clear that the parties did not agree to submit disputes concerning or claims arising out of this agreement to arbitration. Not only is there no arbitration clause in the selling Shareholders Agreement, but the parties to the Selling Shareholders Agreement also agreed that any claim against a Shareholder for a breach of this representation must be pled with specificity in a "complaint" and proved by an elevated burden of proof at a "trial", which standards must be "stipulated" in connection with such proceeding. Thus:

> with respect to pursuing any claim against such Shareholder for an alleged breach of this representation by such Shareholder, [Equifax] shall be required to (a) plead with particularity in any complaint related to an alleged breach of this representation by such Shareholder the precise and specific facts that evidence that such Shareholder had Actual Knowledge that the representations or warranties of the Company in the Merger Agreement were no correct, and (b) prove by clear and convincing evidence that such Shareholder in fact had Actual Knowledge of the specific and precise facts as of the date of the execution and delivery of this Agreement that the representations and warranties of [Naviant] set forth in the Merger Agreement were not correct; *provided, further,*

-9-

> that each of [Equifax] and [Naviant] agrees to stipulate to the
> foregoing pleading and proof standards in any claim, action,
> proceeding or trial related to or arising out of this
> representation and not to raise any defenses or objections to
> the enforceability or applicability of such standards.

30.     The Selling Shareholders Agreement does not contain an arbitration

agreement and instead provides, under Paragraph 5.1, that each Shareholder:

> Irrevocably and unconditionally consents and submits to the
> personal jurisdiction or any state o federal court sitting in
> Dade County, Florida, and each Shareholder also expressly
> consents and submits to and agrees that venue in any such
> Action is proper in said courts and county, and each
> Shareholder hereby expressly waives any and all personal
> rights under applicable law or in equity to object to the
> jurisdiction and venue of said courts and county.  The
> jurisdiction and venue of the courts and county consented and
> submitted to and agreed upon in this Paragraph 5.1 are not
> exclusive, but are cumulative and in addition to the
> jurisdiction and venue of any other court under any applicable
> law or in equity.

31.     Following the closing of the merger, Equifax submitted several demands for

indemnification to Softbank, as Shareholders' Representative, arising out of a variety of Indemnified

Losses.  Softbank administered these claims and authorized the payment of most of them without

contest.

32.     On December 30, 2003, Equifax delivered a demand for indemnity (the

"Indemnity Claim") to Softbank, as Shareholder's Representative.  In its Indemnity Claim, Equifax

alleged:

> 1.2.1.  Equifax has determined that is was fraudulently or
> negligently induced to acquire Naviant on the basis of
> materially false and misleading information furnished to
> Equifax in connection with the acquisition, including but not
> limited to, Naviant's financial statements, and on the basis of

-10-

materially false and misleading omissions and representations made to Equifax in connection with the acquisition, including many of the representations and warranties in Article 6 of the Merger Agreement.

1.2.2. Naviant's pre-acquisition financial condition and results of operations were misstated as a result of spurious transactions involving the purchase and sale of email marketing campaigns and the purchase and sale of consumer data. In addition, material misrepresentations were made to Equifax concerning the volume and pricing of Naviant's Cost Per Thousand email marketing campaigns.

33.     The Indemnity Claim enclosed a purported demand for arbitration (the December 30 Arbitration Demand") that named the 42 former Shareholders and Option Holders of Naviant as respondents.  Equifax did not file the December 30 Arbitration Demand with the AAA and did not provide it to any of the named respondents other than Softbank.  Although no amount was specified in the Indemnity Letter, it appears that the amounts sought are in excess of the Escrow.

34.     The Indemnity Claim and the December 30 Arbitration Demand failed to comply with the conditions precedent stated in the Merger Agreement, which required Equifax to provide a written description of its claim and a reasonable explanation of why it was entitled to indemnification and which provided the Shareholders' Representative with thirty days to respond in writing to a claim for indemnity before Equifax could initiate arbitration proceedings.

35.     In a letter dated January 29, 2004, Softbank Capital Partners informed Equifax that its demands were deficient under the Merger Agreement and the Selling Shareholders Agreement.

36.     On September 2, 2005, Equifax filed its Amended Demand for Arbitration with the AAA.

37.     Equifax's Amended Demand for Arbitration purports to include counts for

relief.

(a)     Count I seeks rescission of Equifax's acquisition of
        Naviant, alleging Equifax relied on false and
        misleading material factual misrepresentations in their
        acquisition of Navian;

(b)     Count II seeks indemnification for breach of the
        representations and warranties in Article 6 of the
        Merger Agreement; and

(c)     Count III seeks damages, alleging fraud, deceit and
        misrepresentations on the part of some or all of the
        Shareholders and Option Holders.

38.     In the Amended Demand for Arbitration, Equifax requests that the

arbitrators(1) rescind Equifax's purchase of Naviant's stock effective August 15, 2002, or

alternatively, (2) enter a decision in favor of Equifax and Naviant and against Naviant's former

Shareholders and Option Holders, jointly and severally, on all claims for money damages, and (3)

award Equifax and Naviant their costs of arbitration, including arbitrators' fees and attorneys' fees.

## FIRST CAUSE OF ACTION
### (Declaratory and Injunctive Relief Regarding
the Arbitrability of Claims for Fraud, Intentional Misrepresentation,
Willful Misconduct and for Amounts Beyond the Escrow Fund)

39.     Brauser repeats and realleges the allegations of Paragraphs 1 through 38, as

is fully set forth herein.

40.     Paragraph 14.4(a) of the Merger Agreement, entitled "Dispute Resolution",

provides:

> Any and all disputes other than with respect to the Closing
> Balance Sheet or the calculation of the Closing Net working

-12-

> Capital arising out of or in connection with the execution, interpretation, performance or nonperformance of this Agreement (each, a "Disputed Matter") will be arbitrated and settled by the Procedures established in this Paragraph 14.4.

41.     Paragraph 11.1 of the Merger Agreement defines Indemnified Losses to include any losses "arising out of any misrepresentation, breach of warrant or breach or nonfulfillment of any agreement of [Naviant]..."

42.     Brauser did not agree that Indemnified Losses under the Merger Agreement included claims for fraud, intentional misrepresentation or willful misconduct. For "claims arising out of fraud, intentional misrepresentation or willful misconduct or criminal conduct," Paragraph 11.4 of the Merger Agreement provides that "[Equifax] shall have all remedies available at law or in equity."

43.     Equifax filed the September 2, 2005 Amended Demand for Arbitration which includes claims for fraud, intentional misrepresentation and willful misconduct.

44.     The only parties to the Merger Agreement, which contains the arbitration clause at issue, are Equifax, Armagh, Naviant and Softbank, solely as Shareholders' Representative and for limited purposes.

45.     Equifax filed the September 2, 2005 Amended Demand for Arbitration pursuant to the arbitration clause of the Merger Agreement against Brauser and other non-parties to that agreement.

46.     The Merger Agreement provides that it is governed by Florida Law.

47.     Florida law requires that the court determine the cope of an arbitration agreement and the arbitrability of claims purportedly brought pursuant to such an agreement.

48.    An actual controversy exists between Brauser and Equifax as to the scope of

the arbitration clause and the parties that are bound by that arbitration clause.

49.    Brauser seeks a judicial declaration as to the scope of the arbitration clause

and a stay of the arbitration pending pursuant to September 2, 2005 Amended Demand for

Arbitration against Brauser and other non-signatories to the Merger Agreement and on claims other

than indemnification for the Indemnified Losses against the Escrow Fund.

## SECOND CAUSE OF ACTION
### (Declaratory Relief Regarding Paragraph 1.7 of the Selling Shareholders Agreement)

50.    Brauser repeats and realleges the allegations of Paragraph 1 through 49 as if

fully set forth herein.

51.    The Merger Agreement does not contain any representations and warranties

by Brauser.

52.    To the contrary, the only representations made to Equifax by Brauser is

through Section 1 of the Selling Shareholders Agreement.  In paragraph 1.7 of that agreement,

Brauser represented and warranted that, among other things, "[t]o the Actual Knowledge of such

Shareholder, the representations and warranties of [Naviant] set forth in the Merger Agreement are

correct and complete."

53.    Actual Knowledge means:

> those facts, circumstances or events that are within the actual
> current conscious knowledge as of the date hereof of any
> natural person who currently is employed by or is an officer
> or director of such Shareholder and who currently serves as,
> or who has served as, a director or officer of [Naviant] or any
> of its Subsidiaries...without any obligation to perform any
> investigation, inquiry or review.

-14-

Case 0:06-cv-60839-WPD   Document 1   Entered on FLSD Docket 06/14/2006   Page 15 of 83

54.     Equifax may not maintain a direct action against Brauser for any alleged misrepresentation in connection with the Merger Agreement because he did not make any representations in that agreement. Equifax may only proceed against Brauser by bringing an action alleging breach of Section 1.7 of the Selling Shareholders Agreement.

55.     Equifax has named Brauser as a respondent in the September 2, 2005 Amended Demand for Arbitration, which contains no claims under the Selling Shareholders Agreement.

56.     An actual controversy exists between Brauser and Equifax regarding whether Equifax may sue Brauser directly under the Merger Agreement.

57.     Brauser seeks a judicial declaration of those rights and liabilities.

### THIRD CAUSE OF ACTION
**(Declaratory Relief Stating that Plaintiffs Did Not Have
Actual Knowledge that Representations and Warranties of Naviant Were Untrue)**

58.     Brauser repeats and realleges the allegations of Paragraphs 1 - 57, as if fully set forth herein.

59.     In Paragraph 1.7 of the Selling Shareholders Agreement, Brauser represented and warranted that "[t]o the Actual Knowledge of such Shareholders, the representations and warranties of [Naviant] set forth in the Merger Agreement are correct and complete."

60.     Actual Knowledge means:

> those facts, circumstances or events that are within the actual current conscious knowledge as of the date hereof of any natural person who currently is employed by or is an officer or director of such Shareholder and who currently serves as, or who has served as, a director or officer of [Naviant] or any of its Subsidiaries...without any obligation to perform any investigation, inquiry or review.

-15-

61.    Brauser, as of the date of making such representation, did not possess Actual Knowledge that the representations and warranties of Naviant in the Merger Agreement were untrue.

62.    Equifax cannot prove by clear and convincing evidence, as it is contractual obligated to do, that Brauser possessed Actual Knowledge that the representations and warranties of Naviant in the Merger Agreement were untrue.  Nonetheless, Equifax has brought its September 2, 2005 Amended Demand for Arbitration naming Brauser as respondent including claims that Brauser committed fraud.

63.    The September 2, 2005 Amended Demand for Arbitration necessarily implicates the Selling Shareholders Agreement because it names Brauser as respondent for claims alleging fraud, for which the Merger Agreement provides no cause of action against Brauser.

64.    An actual controversy exists between Brauser and Equifax regarding whether Brauser possessed Actual Knowledge that the representations and warranties of Naviant in the Merger Agreement were untrue.

65.    Brauser sees a judicial declaration that he did not possess Actual Knowledge as defined in the Selling Shareholders Agreement.

WHEREFORE, Brauser respectfully requests that this Court enter judgment:

(a)    Declaring that claims by Equifax of intentional misrepresentation and securities violations, are not subject to the arbitration provision of the Merger Agreement and that the non-signatories to the Merger Agreement are not bound by the arbitration provision;

(b)    Staying Equifax from proceeding in arbitration against Brauser (with the exception that Equifax may proceed against Softbank for Indemnified Losses capped at the amount in the Escrow as set forth in the Merger Agreement);

-16-

      (c)      Declaring that Equifax may not sue Brauser for claims of fraud, intentional misrepresentation, or willful misconduct relating to the Merger Agreement but must maintain such claims under the Selling Shareholders Agreement;

      (d)      Declaring Brauser did not breach Section 1.7 of the Selling Shareholders Agreement and that Brauser, individually, did not have "Actual Knowledge" as defined in the Selling Shareholders Agreement;

      (e)      Awarding Brauser his costs in this action, including reasonable attorneys' fees; and

      (f)      Granting such other and further relief as this Court may deem appropriate.

Dated: June 13, 2006.

Respectfully submitted.

Gregg W. McClosky
Florida Bar No. 343 927

McClosky, D'Anna & Dieterle, LLP
2300 Glades Road
Suite 400 - East Tower
Boca Raton, Florida 33431
Telephone: (561) 368-9200
Facsimile:  (561) 395-7050

H:\LIBRARY\05015001\Pleading\32Y168\ComplaintDeclaratoryRelief.lch.wpd

# AGREEMENT AND PLAN OF MERGER

by and among

## EQUIFAX INC.,

## ARMAGH ACQUISITION CORPORATION,

## NAVIANT, INC.

and

## SOFTBANK CAPITAL PARTNERS LP,
as Shareholders' Representative

August 15, 2002

**KILPATRICK STOCKTON LLP**
1100 Peachtree Street
Atlanta, Georgia 30309

Table of Contents

Page

1.    CERTAIN DEFINITIONS; INDEX OF DEFINITIONS; INTERPRETATION...............2
      1.1    Certain Definitions.....................................................................................2
      1.2    Index to Definitions ...................................................................................7
      1.3    Interpretation ...........................................................................................10
2.    THE MERGER .....................................................................................................10
      2.1    The Merger...............................................................................................10
      2.2    The Effective Time ..................................................................................10
      2.3    Effect of the Merger ................................................................................11
3.    THE SURVIVING CORPORATION. ..................................................................11
      3.1    Articles .....................................................................................................11
      3.2    Bylaws......................................................................................................11
      3.3    Board of Directors....................................................................................11
      3.4    Officers ....................................................................................................11
4.    MERGER CONSIDERATION; CONVERSION OF COMPANY SHARES ..................11
      4.1    Conversion of Company Shares................................................................11
      4.2    Conversion of Merger Sub Shares ...........................................................13
      4.3    Company Options. ....................................................................................13
      4.4    Preliminary Allocation of Consideration .................................................14
      4.5    Dissenting Shares.....................................................................................14
      4.6    Exchange of Shares. .................................................................................15
      4.7    Adjustments After the Closing.................................................................17
      4.8    Payments on Account of Adjustments ......................................................18
      4.9    Shareholders' Representative. ..................................................................19
      4.10   Escrow Arrangement. ...............................................................................21
      4.11   Contingent Payment .................................................................................21
      4.12   No Further Rights .....................................................................................22
      4.13   Closing of Transfer Books .......................................................................22
      4.14   Further Action ..........................................................................................22
      4.15   Taxes.........................................................................................................22
5.    CLOSING; DELIVERIES .................................................................................22
      5.1    Closing .....................................................................................................22
      5.2    Transactions and Documents at Closing...................................................22
      5.3    Additional Action.....................................................................................24
6.    REPRESENTATIONS, WARRANTIES OF COMPANY ...............................24
      6.1    Organization; Qualifications; Corporate Power........................................24
      6.2    Authorization ...........................................................................................25
      6.3    Subsidiaries and Affiliates .......................................................................25
      6.4    Ownership of Capital Stock. ....................................................................25

i

Table of Contents
(continued)

Page

6.5    No Conflicts ...............................................................................27
6.6    No Consent or Approval Required ........................................27
6.7    Financial Statements; No SEC Filings..................................27
6.8    Absence of Changes.................................................................28
6.9    Absence of Undisclosed Liabilities ......................................30
6.10   Contracts and Commitments ..................................................30
6.11   Protection of Intellectual Property. .....................................31
6.12   Compliance; Licenses and Permits. .....................................32
6.13   Litigation and Other Proceedings ........................................33
6.14   Insurance ..................................................................................34
6.15   Title to Assets and Properties ...............................................34
6.16   Receivables ...............................................................................34
6.17   Intentionally Omitted..............................................................35
6.18   Real Property. ...........................................................................35
6.19   Labor Matters............................................................................36
6.20   Tax Matters. ..............................................................................37
6.21   Environmental Laws.................................................................38
6.22   Employee Benefit Plans; ERISA. ..........................................39
6.23   Employment; No Conflicting Agreements ...........................41
6.24   Transactions with Related Parties .........................................41
6.25   Certain Transactions ...............................................................41
6.26   Customers and Suppliers.........................................................41
6.27   Bank Accounts ..........................................................................42
6.28   Books and Records. ..................................................................42
6.29   Directors and Officers.............................................................42
6.30   Takeover Statutes and Charter Provisions ..........................42
6.31   Brokers; No Existing Discussions .........................................42
6.32   Disclosure .................................................................................43
7.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF EFX AND MERGER
       SUB..............................................................................................43
7.1    Organization..............................................................................43
7.2    Authorization; No Inconsistent Agreements........................43
7.3    No Violation; Compliance with Laws ..................................43
7.4    Consents.....................................................................................44
7.5    Merger Consideration ..............................................................44
8.     COVENANTS RELATING TO CONDUCT OF BUSINESS PENDING CLOSING......44
8.1    Conduct of Business Pending Closing. .................................44
8.2    No Solicitation of Third Party Interest..................................46
9.     ADDITIONAL COVENANTS .................................................................47
9.1    Access and Inspection..............................................................47

Table of Contents
(continued)

Page

9.2     Cooperation .................................................................................................47
9.3     Expenses ....................................................................................................48
9.4     Publicity ....................................................................................................48
9.5     Shareholder Approval ................................................................................48
9.6     Certain Governmental Filings ...................................................................49
9.7     Additional Information ..............................................................................49
9.8     Update of Information ...............................................................................49
9.9     State Takeover Laws .................................................................................50
9.10    Termination of Agreements .......................................................................50

10.    CONDITIONS PRECEDENT TO CLOSING .......................................................50

10.1    Conditions to Obligations of EFX and Merger Sub to Close ....................50
10.2    Conditions to Obligations of Company to Close .......................................53

11.    INDEMNIFICATION ............................................................................................54

11.1    Indemnification .........................................................................................54
11.2    Indemnification Claims; Payment .............................................................56
11.3    Defense of Claims .....................................................................................56
11.4    Limitation on Liability ..............................................................................58
11.5    Threshold ..................................................................................................58
11.6    No Contribution by the Surviving Corporation or any Subsidiary .............58
11.7    No Waiver .................................................................................................59

12.    SURVIVAL ..........................................................................................................59

12.1    Survival .....................................................................................................59

13.    TERMINATION ...................................................................................................59

13.1    Termination for Certain Causes .................................................................59
13.2    Procedure on and Effect of Termination ....................................................60

14.    MISCELLANEOUS ..............................................................................................60

14.1    Notices ......................................................................................................60
14.2    Counterparts ..............................................................................................62
14.3    Entire Agreement .......................................................................................62
14.4    Dispute Resolution ....................................................................................62
14.5    Successors and Assigns ..............................................................................63
14.6    Partial Invalidity and Severability .............................................................63
14.7    Waiver .......................................................................................................64
14.8    Governing Law ..........................................................................................64
14.9    Time of Performance .................................................................................64
14.10   No Third Party Beneficiaries .....................................................................64

## LIST OF EXHIBITS

| Exhibit | |
|---|---|
| A-1 | Articles of Merger |
| A-2 | Plan of Merger |
| B | First Amendment to Reorganization Agreement |
| C | First Amendment to Asset Purchase Agreement |
| D | Employee Agreement |
| E | Escrow Agreement |
| F | Transition Services Agreement |
| G | Release |
| H | Employment Agreement |
| I | Legal Opinion |

## AGREEMENT AND PLAN OF MERGER

*THIS AGREEMENT* is made and entered into as of the 15th day of August, 2002, by and among:

(1)     EQUIFAX INC., a corporation incorporated under the laws of the State of Georgia ("**EFX**");

(2)     ARMAGH ACQUISITION CORPORATION, a corporation incorporated under the laws of the State of Florida and wholly-owned subsidiary of EFX ("**Merger Sub**");

(3)     NAVIANT, INC., a corporation incorporated under the laws of the State of Florida ("**Company**"); and

(4)     SOFTBANK CAPITAL PARTNERS LP, a limited partnership organized under the laws of the State of Delaware solely in its capacity as Shareholders' Representative (as defined herein), and solely for the purpose set forth in **Paragraphs 4.7, 4.8, 4.9, 14.1, 14.4, 14.5, 14.6, 14.7, 14.8, and Article 11** ("**Softbank**").

### W I T N E S S E T H:

*WHEREAS*, EFX, Merger Sub and Company intend to effect the merger of Merger Sub with and into Company (the "**Merger**"; other capitalized terms used in this Agreement being defined either in **Paragraph 1.1** or in those paragraphs of this Agreement identified in **Paragraph 1.2**) in accordance with the Florida Business Corporation Act (the "**FBCA**") and on the terms and subject to the conditions set forth in this Agreement, and upon consummation of the Merger, Merger Sub will cease to exist and Company will become a wholly-owned subsidiary of EFX; and

*WHEREAS*, the board of directors of Company has unanimously (i) determined that the Merger is fair to, and in the best interest of Company and its shareholders, (ii) approved this Agreement, the Merger and the other transactions contemplated hereby, and (iii) resolved to recommend to the shareholders of Company that they adopt and approve this Agreement, the Merger and the other transactions contemplated hereby;

*WHEREAS*, as a condition and an inducement to EFX and Merger Sub to enter into this Agreement, contemporaneously with the execution and delivery of this Agreement certain shareholders of Company have entered into a Selling Shareholders Agreement, dated as of the date hereof with EFX and Merger Sub (the "**Selling Shareholders Agreement**"); and

*WHEREAS*, as a condition and an inducement to EFX and Merger Sub to enter into this Agreement, contemporaneously with the execution and delivery of this Agreement certain shareholders of Company have entered into a Voting Agreement, dated as of the date hereof with EFX (the "**Voting Agreement**"), pursuant to which, among other things, such shareholders have granted a proxy in favor of EFX with respect to all of the shares of the capital stock of Company they own, subject to the terms and conditions contained therein;

*NOW, THEREFORE*, for and in consideration of the premises and the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.      CERTAIN DEFINITIONS; INDEX OF DEFINITIONS; INTERPRETATION

      1.1      **Certain Definitions.** For purposes of this Agreement, the following capitalized terms will have the meanings specified below (all terms used in this Agreement which are not defined in this **Paragraph 1.1** but defined elsewhere in this Agreement, will have for purposes of this Agreement the meanings set forth elsewhere in this Agreement):

      "Acquisition Indebtedness" means the maximum aggregate amount of consideration payable by Company pursuant to paragraphs (b), (c) and (d) of Section 2.4 of the 24/7 Asset Purchase Agreement.

      "Action" means any action, suit, complaint, counter-claim, claim, petition, set-off or administrative proceeding, whether at law, in equity or otherwise, and whether conducted by or before any Government or other Person.

      "Affiliate" of any Person means any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with the former Person. A Person will be deemed to control another Person if that Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise.

      "Aggregate Participation Amount" shall mean the Net Merger Consideration less the Aggregate Series B Preference Amount.

      "Aggregate Series B Preference Amount" shall mean the product of (x) the Series B Preference and (y) the number of Series B Shares outstanding immediately prior to the Effective Time.

      "Articles of Incorporation" means the Second Amended and Restated Articles of Incorporation of Company.

      "Business" means all of the businesses as presently conducted and as presently proposed to be conducted by Company and each Subsidiary thereof, including the provision of on-line direct marketing products and services, the collection of opt-in consumer data, the management of email lists, the management of a database which aggregates permission-based email addresses and related preference, demographic and lifestyle information, and the brokerage of third-party email lists.

      "Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in either Atlanta, Georgia or New York, New York are required or authorized to be closed.

      "Bylaws" means the Amended and Restated Bylaws of Company.

2

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligation" shall mean, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Common Shares" means shares of Company's Common Stock, $0.01 par value per share.

"Company Group" means any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations included in Section 1504(b) of the Code) that, at any time on or before the Effective Time, includes or has included Company, any Subsidiary, or any predecessor of or successor to Company or such Subsidiary (or another such predecessor or successor), or any other group of corporations that, at any time on or before the Effective Time, files or has filed Tax Returns on a combined, consolidated or unitary basis with Company or any Subsidiary or any predecessor of or successor to Company or any Subsidiary (or another such predecessor or successor).

"Company Option" means each unexpired option to acquire Common Shares issued or granted pursuant to the Option Plan, whether vested or unvested at the date of this Agreement, or issued or granted subsequently to the date hereof but prior to the Effective Time.

"Company Shareholders" means the holders of Company Shares immediately prior to the Closing.

"Company Shares" means the Common Shares, Series A Shares, and Series B Shares.

"Contingent Payment" means a conditional amount calculated in accordance with Paragraph 4.11, which shall in no event, exceed $3,500,000, which is the maximum amount of Acquisition Indebtedness.

"Escrowed Amount" means an amount equal to $10,000,000.

"Forum" means any national, provincial, municipal, local or foreign court, governmental agency, administrative body or agency, tribunal, private alternative dispute resolution system, or arbitration panel.

"Funded Indebtedness" means, without duplication (a) any liability of Company or any Subsidiary thereof created or assumed by Company or any Subsidiary thereof, (i) for borrowed money or for the deferred purchase price of property, including the Acquisition Indebtedness and Overdue Payables, (ii) for reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured but excluding obligations with respect to the letters of credit described in item 40 of Schedule 6.10 and item 2 of Schedule 6.27 of the Disclosure Memorandum, (iii) evidenced by a note, bond, debenture or similar instrument, (iv) in respect of or under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender

under such agreement in the event of default are limited to repossession or sale of such property), (v) for any Capital Lease Obligation, (vi) for any obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (vii) for any obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, and (viii) the aggregate amount of cash paid or payable by Company pursuant to the Employee Agreements listed on Schedule 1.1 of this Agreement as an inducement to, and in consideration of, the execution and delivery of such agreements by the other Persons party thereto (the "<u>Termination Payments</u>"), (b) any liability of others described in the preceding clause (a) guaranteed as to payment of principal or interest by Company or any Subsidiary thereof or in effect guaranteed by Company or any Subsidiary thereof through an agreement, contingent or otherwise, to purchase, repurchase or pay the related Indebtedness or to acquire the security therefor, (c) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by Company or any Subsidiary thereof, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (d) any amendment, renewal, extension, revision or refunding of any such liability or obligation.

"<u>GAAP</u>" means United States generally accepted accounting principles, consistently applied, as in effect from time to time.

"<u>Government</u>" means any national, provincial, state, municipal, local or foreign government or any ministry, department, commission, board, bureau, agency, authority, instrumentality, unit, or taxing authority thereof.

"<u>Improvements</u>" means all buildings, structures and other improvements of any and every nature located on the real property and all fixtures attached or affixed, actually or constructively, to the real property or to any such buildings, structures or other improvements.

"<u>Knowledge of Company</u>" or "<u>Company's Knowledge</u>" means any fact, circumstance, event or other matter that (a) any of Michael Brauser, Rick Schell, Scott Hirsch, Derek Dubner, Rodger Berman, Richard Kaufman, Steven Stowell, or any director of Company actually knows, or (b) any of the individuals referred to in the preceding clause (a) should know or would reasonably be expected to know in the normal discharge of his assigned duties and responsibilities.

"<u>Law</u>" means all national, provincial, state, municipal, local or foreign constitutions, statutes, rules, regulations, ordinances, acts, codes, legislation, treaties, conventions and similar laws and legal requirements, as in effect from time to time.

"<u>Liability</u>" means any liability or obligation whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due.

"**Lien**" means any claim, mortgage, pledge, hypothecation, security interest, encumbrance, lien or charge of any kind, or any rights of others, however evidenced, created or arising (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, or any lease having a similar effect or result).

"**Material Adverse Change**" means any event, change, effect or occurrence that, individually or together with any other event, change, effect or occurrence, (a) is, or could reasonably be expected to be, materially adverse to the business, assets, capitalization, properties, operations, prospects, condition (financial or otherwise), actual or anticipated results of operations or liabilities (contingent or otherwise) of the Business, Company or any Subsidiary thereof, (b) prevents or materially delays the performance by Company of its obligations under this Agreement or (c) has or could reasonably be expected to have, a material adverse effect on the ability of EFX to operate the Business immediately after the Effective Time.

"**Merger Consideration**" shall mean $135,000,000.

"**Net Merger Consideration**" means the Merger Consideration less (a) Funded Indebtedness, (b) the Series B Warrant Consideration, (c) Excess Expenses, and (d) the Shareholders' Representative Fund.

"**Net Participation Amount**" means the Aggregate Participation Amount less the Escrowed Amount.

"**Orders**" means all orders, writs, judgments, decrees, rulings and awards of any Forum or Government.

"**Outstanding Company Shares**" means the aggregate number of (i) Company Shares outstanding immediately prior to the Effective Time and (ii) Common Shares subject to Company Options immediately prior to the Effective Time, but in each case, before cancellation thereof by operation of the Merger.

"**Overdue Payables**" means any liability of Company or any Subsidiary thereof created or assumed by Company or any Subsidiary thereof for obligations to trade creditors incurred in the ordinary course of business that are overdue by more than two (2) months which is not being contested in good faith.

"**Per Share Contingent Payment**" means the quotient obtained by dividing (a) the Contingent Payment by (b) the Outstanding Company Shares.

"**Per Share Escrow Amount**" means the quotient obtained by dividing (a) the Escrow Fund by (b) the Outstanding Company Shares.

"**Per Share Net Participation Amount**" means the quotient obtained by dividing (a) the Net Participation Amount by (b) the Outstanding Company Shares.

"**Person**" means and include an individual, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any legal or juridical entity, the equivalent of any of the foregoing under any Law, and any Government.

5

"Preferred Shares" means the Series A Shares and Series B Shares.

"Pro Rata Share" means, in respect of any (a) Company Shareholder, the percentage that the total number of Company Shares registered in such Company Shareholder's name bears to all of the Outstanding Company Shares, or (b) holder of Company Options cancelled in exchange for the consideration set forth in Paragraph 4.3, the percentage that the total number of Company Shares that such holder could have purchased had such holder exercised such Company Options in full immediately prior to the consummation of the Merger bears to all of the Outstanding Company Shares.

"Representative" of a party means that party's directors, officers, partners, employees, agents, accountants, lenders, lawyers, investment bankers, merchant bankers, and other financial or professional advisors or consultants.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A Shares" means shares of Company's Series A Preferred Stock, $0.01 par value per share.

"Series B Shares" means shares of Company's Series B Preferred Stock, $0.01 par value per share.

"Series B Preference" means $6.48.

"Series B Warrant" means the warrant to acquire Series B Shares issued as of December 19, 2001 to Comerica Bank-California.

"Series B Warrant Consideration" means an amount equal to $400,000.

"Subsidiary" means, with respect to any Person, (a) any corporation or other entity of which an aggregate of more than fifty percent (50%) of the outstanding Stock having ordinary voting power to elect a majority of the board of directors (or comparable governing body) of such entity (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person and/or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of fifty percent (50%) or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner.

"Tax" or "Taxes" means any past, present or future taxes, levies, imposts, duties, fees, deficiencies, customs, assessments, deductions, withholdings or other charges or similar assessments or liabilities in the nature of a tax, including income, gross receipts, ad valorem, premium, value-added, excise, severance, stamp, occupation, windfall profits, real property, personal property, sales, use, transfer, transfer gains, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, profits, license, lease, service, service use, and franchise taxes, now or

hereafter imposed or levied by any state, local or foreign Government or by any department, agency or other political subdivision or taxing authority thereof or therein and all interests, fines, penalties, assessments, additions to tax, and other similar liabilities resulting from, attributable to, or incurred in connection with any items described in this paragraph or any contest or dispute thereof, and any items described in this paragraph that are attributable to another person but that the Company or any Subsidiary is liable to pay by law, by contract, or otherwise.

"<u>Withholding Taxes</u>" means any withholding, payroll, employment or similar Taxes required to be withheld or paid by EFX or Company with respect to any amounts payable or contemplated hereunder, but not including any Taxes payable by EFX or Company in respect of any employer portion of Medicare Taxes, or any payments to current or former employees or consultants.

"<u>24/7 Asset Purchase Agreement</u>" means that certain Asset Purchase Agreement dated as of April 30, 2002 among Company, 24/7 Mail, Inc., and 24/7 Real Media, Inc.

1.2    **Index to Definitions.** The definitions for the following defined terms used in this Agreement can be found as follows:

| Defined Term | Paragraph or Reference |
|---|---|
| Acquisition Proposal | 8.2 |
| Actual Overdue Payables | 4.7(b) |
| Additional Agreement(s) | 5.2(b) |
| Adjusted Closing Net Working Capital | 4.7(b) |
| Adjusted Net Merger Consideration | 4.7(e) |
| Affiliated Person | 6.24 |
| Agreed Amount | 11.2(b) |
| Answer Period | 11.2(e) |
| Arbitral Body | 14.4(c) |
| Arbitrator | 4.7(c) |
| Articles of Merger | 2.2 |
| Asset Purchase Agreement | 4.1(f) |
| Audited Financial Statements | 6.7 |
| Balance Sheet | 6.7 |
| Balance Sheet Date | 6.7 |
| BERJ | 4.1(e) |
| BERJ Special Holdback | 4.1(e) |
| Cash Option Consideration | 4.3(a) |
| Certificates | 4.6(a) |
| Claim Notice | 11.2(a) |
| Claimed Amount | 11.2(a) |
| Closing | 5.1 |
| Closing Date | 5.1 |
| Closing Balance Sheet | 4.7(a) |
| Closing Net Working Capital | 4.7(a) |
| Closing Net Working Capital Adjustment | 4.7(b) |

| Defined Term | Paragraph or Reference |
|---|---|
| Company | Preamble |
| Conditional Option Consideration | 4.3(a) |
| Confidentiality Agreement | 9.1 |
| Contracts | 6.10 |
| Covered Expenses | 4.7(b) |
| Databases | 6.12(c) |
| Database Information | 6.12(c) |
| Disclosure Memorandum | 6 |
| Dispute Notice | 4.7(c) |
| Disputed Matter | 14.4(a) |
| Dissenting Shares | 4.5 |
| Effective Time | 2.2 |
| EFX | Preamble |
| EFX's Auditor | 4.7(a) |
| Employee Agreement | 4.6(f) |
| Employee Benefit Plan | 6.22(a) |
| Employment Agreement | 5.2(b) |
| Environmental Laws | 6.21(a) |
| ERISA | 6.22(a) |
| ERISA Affiliate | 6.22(c) |
| ERISA Plans | 6.22(a) |
| Escrow Agent | 4.10(a) |
| Escrow Agreement | 4.10(a) |
| Escrow Fund | 4.10(a) |
| Excess Expenses | 9.3 |
| Exchange Agent | 4.6(a) |
| Exchange Fund | 4.6(a) |
| Expenses | 9.3 |
| FBCA | Preamble |
| Final Allocation Schedule | 4.4 |
| Financial Statements | 6.7 |
| First Amendment to Asset Purchase Agreement | 4.1(f) |
| First Amendment to Reorganization Agreement | 4.1(e) |
| Former Option Holder | 4.6(a) |
| Indemnitor(s) | 11.1 |
| Indemnitee(s) | 11.1 |
| Indemnified Losses | 11.1 |
| Intellectual Property Rights | 6.11(a) |
| Investment | 6.3 |
| Hazardous Substances | 6.21(b) |
| HSR Filing | 9.6 |
| Merger | Preamble |
| Merger Documents | 2.2 |
| Merger Sub | Preamble |
| Most Recent Balance Sheet | 6.7 |

8

| Defined Term | Paragraph or Reference |
|---|---|
| Net Working Capital Deficiency | 4.8 |
| NMSI | 4.1(e) |
| Old SweepsClub | 4.1(f) |
| Option Consideration | 4.3(a) |
| Option Plan | 4.3(a) |
| Options | 6.4(b) |
| Pension Benefit Plans | 6.22(a) |
| Plan of Merger | 2.2 |
| Preliminary Allocation Schedule | 4.4 |
| Preliminary Net Merger Consideration | 4.8 |
| Proprietary Technology | 6.11(a) |
| PWC | 4.7(b) |
| Real Property | 6.18(b) |
| Real Property Lease | 6.18(b) |
| Record | 6.12(c) |
| Release | 5.2(b) |
| Reorganization Agreement | 4.1(e) |
| Requisite Shareholder Approval | 9.5 |
| Response | 11.2(b) |
| Returns | 6.20(a) |
| Rules | 14.4(c) |
| Selling Shareholders Agreement | Preamble |
| Settlement Date | 4.11 |
| SFAS No. 5 | 6.9 |
| Shareholders' Representative | 4.9(a) |
| Shareholders' Representative Fund | 4.9(a) |
| SunTrust | 4.6(a) |
| Survival Period | 12.1 |
| Surviving Corporation | 2.1 |
| SweepsClub Special Holdback | 4.1(f) |
| Target Net Working Capital | 4.7(b) |
| Termination Date | 8.2 |
| Transition Services Agreement | 5.2(b) |
| Unaudited Financial Statements | 6.7 |
| Valid and Unique Record | 6.12(c) |
| Voting Agreement | Preamble |
| Warrants | 6.4(b) |
| Welfare Plans | 6.22(d) |
| 24/7 Escrow Fund | 4.11 |

9

     **1.3   Interpretation.**   In interpreting this Agreement, the following rules of construction shall apply:

        (a)   The headings of particular provisions of this Agreement are inserted for convenience only and will not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement.

        (b)   Where the context requires, the use of the singular form in this Agreement will include the plural, the use of the plural will include the singular, and the use of any gender will include any and all genders.

        (c)   The word "including" (and, with correlative meaning, the word "include") means that the generality of any description preceding such word is not limited, and the words "shall" and "will" are used interchangeably and have the same meaning.

        (d)   References in this Agreement to "Articles", "Paragraphs", or "Exhibits" shall be to Articles, Paragraphs or Exhibits of or to this Agreement unless otherwise specifically provided.

        (e)   References to any agreement or contract are to such agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

        (f)   References to any statute and related regulation shall include any amendments of the same and any successor statutes and regulations.

        (g)   References to any Person include the successors and permitted assigns of such Person.

        (h)   References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.

        (i)   Unless otherwise specified in this Agreement, all accounting terms used in this Agreement shall be interpreted in accordance with GAAP.

## 2.   THE MERGER

     **2.1   The Merger.**   At the Effective Time (as defined in **Paragraph 2.2**), upon and subject to the terms and conditions of this Agreement and in accordance with Section 607.1101 of the FBCA, Merger Sub shall be merged with and into the Company, the separate corporate existence of Merger Sub shall cease, and Company shall continue as the surviving corporation. Company as the surviving corporation after the Merger is sometimes referred to in this Agreement as the "<u>Surviving Corporation</u>".

     **2.2   The Effective Time.**   The Merger shall become effective at such time as Company and Merger Sub file the Articles of Merger in substantially the form attached hereto as **Exhibit A-1** (the "<u>Articles of Merger</u>"), including the Plan of Merger in substantially the form of **Exhibit A-2** (the "<u>Plan of Merger</u>;" the Articles of Merger and the Plan of Merger are

sometimes hereinafter collectively referred to as the "**Merger Documents**") in accordance with Section 607.1105 of the FBCA with the Department of State of the State of Florida, or such later time as Company and Merger Sub shall specify in the Articles of Merger (the "**Effective Time**").

      2.3    **Effect of the Merger.** At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Merger Documents and Section 607.1106 of the FBCA. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all rights, privileges, immunities, franchises and powers of the Company and Merger Sub shall vest in Surviving Corporation, and all duties, liabilities, debts and obligations of Company and Merger Sub shall become the duties, liabilities, debts and obligations of the Surviving Corporation.

## 3.    THE SURVIVING CORPORATION.

      3.1    **Articles.** The Articles of Incorporation of Merger Sub as in effect immediately prior to the Effective Time shall be the articles of incorporation of the Surviving Corporation immediately following the Effective Time, until thereafter amended in accordance with applicable Law and the articles of incorporation and bylaws of the Surviving Corporation, except that the name of the corporation set forth therein shall be changed to the name of Company and the identity of the incorporator shall be deleted.

      3.2    **Bylaws.** The bylaws of Merger Sub as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with applicable Law, the articles of incorporation of the Surviving Corporation, and such bylaws.

      3.3    **Board of Directors.** The directors of Merger Sub immediately prior to the Effective Time shall be the initial board of directors of the Surviving Corporation, each of such directors to serve until his or her successor is duly elected and qualified.

      3.4    **Officers.** The officers of Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Corporation, in their respective positions as with Merger Sub, each of such officers to serve until the earlier of their resignation, removal or until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## 4.    MERGER CONSIDERATION; CONVERSION OF COMPANY SHARES

      4.1    **Conversion of Company Shares.**

      (a)    **Common Shares.** As of the Effective Time, each Common Share that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares (as defined in **Paragraph 4.5**) will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be cancelled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount; and (iii) a conditional amount of cash equal to the Per Share Contingent Payment.

11

(b)  <u>Series A Shares</u>.  As of the Effective Time, each Series A Share that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be cancelled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount; and (iii) a conditional amount of cash equal to the Per Share Contingent Payment.

(c)  <u>Series B Shares</u>.  As of the Effective Time, each Series B Share that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be cancelled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Series B Preference, without interest; (ii) an amount in cash equal to the Per Share Net Participation Amount, without interest; (iii) a conditional amount in cash equal to the Per Share Escrow Amount; and (iv) a conditional amount of cash equal to the Per Share Contingent Payment.

(d)  <u>Company Treasury Shares</u>.  Each Company Share held in Company's treasury immediately prior to the Effective Time and each Company Share owned beneficially by EFX or Merger Sub, will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be cancelled and retired without payment therefor, and all rights in respect thereto shall cease to exist.

(e)  <u>BERJ Special Holdback</u>.  Notwithstanding the portion of the Net Participation Amount otherwise payable pursuant to this **Paragraph 4.1** to BERJ, LLC, a Delaware limited liability company and successor to BERJ, Inc., a Delaware corporation formerly known as Naviant, Inc. ("<u>BERJ</u>"), EFX shall direct the Exchange Agent to withhold and deduct an amount in cash equal to $4,000,000 (the "<u>BERJ Special Holdback</u>") from the portion of the Net Participation Amount to be delivered by EFX to the Exchange Agent at the Closing for the benefit of BERJ, such amount to be distributed to Company by the Exchange Agent to be held in accordance with and for the purpose of securing the indemnification obligations of BERJ pursuant to the terms of the Agreement and Plan of Reorganization and Liquidation dated as of November 26, 2001 among Company, BERJ and a wholly-owned subsidiary of BERJ formerly named Naviant Marketing Solutions, Inc. ("<u>NMSI</u>"), as amended by that certain First Amendment to the Agreement and Plan of Reorganization and Liquidation (the "<u>First Amendment to Reorganization Agreement</u>") dated as of the date of this Agreement among Company, BERJ and NMSI in the form attached to this Agreement as **Exhibit B** (the "<u>Reorganization Agreement</u>").

(f)  <u>SweepsClub Special Escrow</u>.  Notwithstanding the portion of the aggregate Net Participation Amount otherwise payable pursuant to this **Paragraph 4.1** to SweepsClub.com, Inc., a Florida corporation ("<u>Old SweepsClub</u>"), EFX shall direct the Exchange Agent to withhold and deduct an amount in cash equal to $463,500 (the "<u>SweepsClub Special Holdback</u>") from the portion of the Net Participation Amount to be delivered by EFX to the Exchange Agent at the Closing for the benefit of Old SweepsClub, such amount to be distributed to Company by the Exchange Agent to be held in accordance with and for the purpose of securing the offset and indemnification obligations of Old SweepsClub under the

Asset Purchase Agreement dated as of February 2, 2002 among Company, Old SweepsClub, SweepsClub Latino, Inc. and Rhino Rewards.com, Inc., as amended by that certain First Amendment to this Asset Purchase Agreement (the "<u>First Amendment to Asset Purchase Agreement</u>") dated as of the date of this Agreement among Company, Old SweepsClub, SweepsClub Latino, Inc. and Rhino Rewards.com, Inc. in the form attached to this Agreement as Exhibit C (the "<u>Asset Purchase Agreement</u>").

4.2     **Conversion of Merger Sub Shares.**  Each share of common stock, $0.01 par value per share, of Merger Sub issued and outstanding immediately prior to the Effective Time will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of the Surviving Corporation.

4.3     **Company Options.**

(a)     Company shall take all action necessary to ensure that, pursuant to Company's 2002 Stock Option/Stock Issuance Plan (the "<u>Option Plan</u>"), all Company Options shall be fully vested and exercisable in full immediately prior to the consummation of the Merger and all Company Options that are not exercised prior to the consummation of the Merger will be cancelled as of the Effective Time in exchange for the consideration described in this **Paragraph 4.3**.  Subject to the reduction in the cash payment for amounts specified in **Paragraphs 4.3(b) and 4.3(c)**, each Company Option that is outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive, as of the Effective Time, (i) an amount of cash per share subject to the Company Option equal to the Per Share Net Participation Amount, without interest (the "<u>Cash Option Consideration</u>"), and (ii) a conditional amount equal to (A) the Per Share Escrow Amount and (B) the Per Share Contingent Payment (the "<u>Conditional Option Consideration</u>"; together with the Cash Option Consideration, the "<u>Option Consideration</u>").   Thereafter, without impairing the rights of the holders of Company Options to receive cash payments to the extent set forth herein, the holders of Company Options shall, as of the Effective Time, cease to have any further right or entitlement to acquire any Company Common Shares or any shares of capital stock of EFX or the Surviving Corporation under the cancelled Company Options.

(b)     EFX will direct the Exchange Agent to withhold from the cash payments made with respect to Company Options held by employees of the Company or any Subsidiary, in lieu of paying the withheld amounts to those holders of Company Options, all Withholding Taxes, such amounts to be disbursed to the Surviving Corporation by the Exchange Agent.  After the Closing, EFX will timely file, or will cause the Surviving Corporation to timely file, any related returns of such Withholding Taxes and will timely remit, or cause the timely remission of, these withheld amounts to the taxing authorities entitled to receive the same.  It is the express intention of the parties hereto that the Cash Option Consideration allocable to a holder of Company Options shall be reduced to the extent of any Withholding Taxes, which, to the extent withheld from such amount, shall not be treated as a liability of Company for purposes of the Closing Balance Sheet (as defined in **Paragraph 4.7(b)**).  Company and the Shareholders' Representative (as defined in **Paragraph 4.9(a)**) agree to provide EFX with such information as it may reasonably require in order to calculate any Withholding Taxes.

13

(c)     To the extent that Company has permitted any Company Options to be cancelled in exchange for cash payments, the cash payments to be received pursuant to Paragraph 4.3(a) by the holder of those Company Options shall be reduced by the applicable aggregate exercise price not paid in cash by such holder to the extent that payment of such aggregate exercise price has not otherwise effectively been waived by Company.

(d)     Company agrees to take all other actions necessary or appropriate so that, as of the Effective Time and as a result of the Merger, (i) no options, warrants or other rights to acquire any Company Shares or any securities, debt or other rights convertible into or exchangeable or exercisable for shares of Company's capital stock are outstanding, and (ii) no person other than the holders of Company Shares, the holders of Company Options and the holder of the Series B Warrant, prior to the Closing, shall have any right, title or interest in or to the ownership of Company or the Surviving Corporation or any securities issued by Company or the Surviving Corporation, and (iii) the holders of Company Shares and the holder of the Series B Warrant shall, on and after the Closing, have no right, title or interest in or to Company or the Surviving Corporation or any securities of Company or the Surviving Corporation, other than the right to payments of cash in the manner described herein, and (iv) no person holding Company Shares or Company Options or rights to acquire Company Shares or Company Options shall by virtue of any such securities have any right to acquire any securities of EFX.

4.4     **Preliminary Allocation of Consideration.** Company has prepared a preliminary summary of the allocation of consideration payable to holders of Company Shares and Company Options contemplated by this **Article 4**, which is attached to this Agreement as **Annex A** (the "**Preliminary Allocation Schedule**"), based on, among other things, Company's allocation of preferences set forth in **Paragraph 4.1**, certain assumptions concerning the exercise of Company Options, and estimates of the adjustments to the Merger Consideration required under this Agreement as of the Effective Time, but excluding any assumptions concerning (i) estimated Withholding Taxes, (ii) the adjustments, if any, described in **Paragraphs 4.7 and 4.8**, or (iii) any claims against the Escrow Fund (as defined in **Paragraph 4.10(a)**). The parties acknowledge and agree that Company and EFX will jointly amend **Annex A** as of the Effective Time to (i) reflect the actual adjustments and allocation of proceeds then required by the applicable provisions of this Agreement and the respective applicable rights, preferences and privileges of the Company Shares, (ii) reflect Withholding Taxes and (iii) to instruct the Exchange Agent as to the portion of the Exchange Fund payable as of the Effective Time to specific holders of Company Shares and Company Options (the "**Final Allocation Schedule**"). The parties acknowledge that the aggregate dollar amount allocated to holders of Company Shares and Former Option Holders at the Closing may differ from the Preliminary Allocation Schedule based upon (i) final amounts allocated to the Expenses, the Shareholders' Representative Fund, Withholding Taxes, and adjustments based on the Closing Balance Sheet, (ii) the number of Company Shares issued or deemed issued as of the Effective Time pursuant to Company Options and other outstanding securities of the Company convertible into or exercisable for Company Shares, and (iii) other applicable provisions of this Agreement.

4.5     **Dissenting Shares.** Notwithstanding anything in this Agreement to the contrary, Company Shares held by holders thereof who are entitled to vote on the Merger and who have not voted such Company Shares in favor of the adoption of this Agreement and the Merger and with respect to which dissenters' rights shall have been properly exercised and perfected in

accordance with Section 607.1320 of the FBCA (the "<u>Dissenting Shares</u>"), shall not be converted into or represent the right to receive the Merger Consideration which the holders of Outstanding Company Shares are entitled to receive pursuant to **Paragraph 4.1**, and holders of such Dissenting Shares shall be entitled to receive only the payment provided for by Section 607.1320 of the FBCA, unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to demand payment under the FBCA. If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares shall thereupon be deemed to have been converted into and have become exchangeable for, as of the Effective Time, as described in **Paragraph 4.1**, the right to receive the Merger Consideration set forth in such provisions, without any interest thereon. Company shall give EFX (i) prompt notice of any demands for payment for Dissenting Shares pursuant to Section 607.1320 of the FBCA received by Company, withdrawals of such demands, and any other instruments served pursuant to the FBCA and received by Company and (ii) the opportunity to direct all negotiations and proceedings with respect to demands for payment pursuant to Section 607.1320 of the FBCA. Company shall not, except with the prior written consent of EFX or as otherwise required by applicable law, make any payment with respect to any such demands for payment or offer to settle or settle any such demands.

4.6     Exchange of Shares.

(a)     Prior to the Effective Time, EFX will designate SunTrust Bank, a Georgia banking corporation ("<u>SunTrust</u>"), as agent (the "<u>Exchange Agent</u>") for (i) the holders of Company Shares and to receive the funds necessary to make payments to such holders pursuant to **Paragraphs 4.1** upon surrender of certificates held by Company Shareholders that, immediately prior to the Effective Time, represented Outstanding Company Shares converted into the Merger Consideration pursuant to **Paragraph 4.1** ("<u>Certificates</u>"), and (ii) the holders of Company Options to receive the payment of any Option Consideration provided for in **Paragraph 4.3** (each, a "<u>Former Option Holder</u>") upon surrender and cancellation of the Company Options. On the Closing Date, EFX shall deliver to the Exchange Agent, in trust for the benefit the Company Shareholders and holders of Company Options, a wire transfer in an amount equal to $121,274,000.00 (the "<u>Exchange Fund</u>").

(b)     If such Certificates are not surrendered at Closing by the registered holders thereof as contemplated by **Paragraph 5.2(a)**, as soon as practicable after the Effective Time (but in no event later than five (5) Business Days thereafter), EFX shall cause the Exchange Agent to send a notice and a transmittal form to each such Company Shareholder advising such holder of the effectiveness of the Merger and the procedure for surrendering to the Exchange Agent Certificates in exchange for the Merger Consideration payable pursuant to **Paragraph 4.1**. Each Company Shareholder, upon proper surrender thereof to the Exchange Agent in accordance with **Paragraph 5.2** or the instructions in such notice, shall be entitled to receive in exchange therefor (subject to any taxes required to be withheld and without interest) the Merger Consideration payable to such holder pursuant to **Paragraph 4.1**. Until properly surrendered, each Certificate shall be deemed for all purposes to evidence only the right to receive the Merger Consideration payable pursuant to **Paragraph 4.1**. Company Shareholders shall not be entitled to receive the Merger Consideration to which they would otherwise be entitled until such Certificates are properly surrendered. No interest will be paid or accrue on the Merger Consideration.

(c)       If any Merger Consideration is to be delivered to a person other than the person in whose name the Certificate surrendered in exchange therefor is registered, it shall be a condition to the delivery of such Merger Consideration that (i) the Certificate so surrendered shall be transferable, and shall be properly assigned, endorsed (or accompanied by appropriate stock powers) with signatures guaranteed by a commercial bank or by a member firm of the New York Stock Exchange, (ii) such transfer shall otherwise be proper and (iii) the person requesting such transfer shall pay to the Exchange Agent any transfer or other taxes payable by reason of the foregoing or establish to the satisfaction of the Exchange Agent that such taxes have been paid or are not required to be paid.  Notwithstanding the foregoing, neither the Exchange Agent nor any Party shall be liable to a holder of Company Shares for any Merger Consideration payable to such holder pursuant to **Paragraph 4.1** that are delivered to a public official pursuant to applicable abandoned property, escheat or similar Laws.

(d)       If any Certificate shall have been lost, stolen or destroyed, upon the receipt of (i) an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed, (ii) such indemnity as EFX may reasonably require, and (iii) any other documents or instruments necessary in the reasonable opinion of the Exchange Agent, to evidence and effect the bona fide exchange thereof, the Exchange Agent shall deliver in exchange for such lost, stolen or destroyed Certificate the Net Merger Consideration payable in exchange therefor pursuant to **Paragraph 4.1**.

(e)       Except to the extent provided in **Paragraph 4.6(f)**, any portion of the Exchange Fund which remains undistributed to the holders of Company Shares and Former Option Holders for six (6) months after the Effective Time, shall be delivered to EFX, upon demand, and any holder of Company Shares who has not previously complied with this **Paragraph 4.6** shall thereafter look only to EFX, as a general unsecured creditor, for payment of its Merger Consideration pursuant to **Paragraph 4.1**.

(f)       EFX and the Surviving Corporation will cause the Exchange Agent to pay the amount of Cash Option Consideration payable to each Former Option Holder as soon as reasonably practicable after the Effective Time against delivery of an Employee Agreement in the form attached hereto as **Exhibit D** (the "**Employee Agreement**") that was delivered by such Former Option Holder to EFX or the Exchange Agent at or prior to the Closing.  Any portion of the Exchange Fund allocable to Former Option Holders who fail to deliver an Employee Agreement at the Closing shall be forfeited by such Person immediately upon the Effective Time, and the Exchange Agent shall thereafter deliver such amounts to EFX upon demand.  The portion of the Exchange Fund allocable to any Person party to an Employee Agreement having the right thereunder to rescind any waiver set forth therein for a period after execution and delivery of such Employee Agreement shall not be disbursed by the Exchange Agent prior to expiration of such period.  Any such Person who rescinds the wavier set forth therein after the Closing and prior to expiration of such period, shall forfeit the right to receive the portion of the Exchange Fund allocable to such Person upon the effectiveness of such rescission, and the Exchange Agent shall thereafter deliver such amounts to EFX upon demand.

4.7    Adjustments After the Closing. The Net Merger Consideration shall be subject to adjustment as follows:

(a)    Not later than 90 calendar days after the Closing Date, Company shall deliver to the Shareholder's Representative a balance sheet of Company and its Subsidiaries as of the Closing Date showing the Closing Net Working Capital (the "**Closing Balance Sheet**"). The Closing Balance Sheet shall be audited by Ernst & Young LLP ("**EFX's Auditor**") and shall be prepared in accordance with GAAP consistently applied in accordance with Company's past practices, *provided, however,* that to the extent such past practices diverge from GAAP, GAAP shall prevail. The cost of the preparation of the Closing Balance Sheet shall be paid by EFX. For purposes of this Agreement, "**Closing Net Working Capital**" shall mean the total consolidated current assets of the Company and each Subsidiary thereof minus the total consolidated current liabilities of Company and each Subsidiary thereof (including in current assets all cash and cash equivalents, accounts receivable, unbilled receivables, inventory, prepaid expenses, and other current assets, and excluding from current assets all income tax assets, and including in current liabilities accounts payable, accrued expenses, and deferred revenue, and excluding from current liabilities income tax liabilities).

(b)    The Closing Balance Sheet delivered pursuant to **Paragraph 4.7(a)** above shall be accompanied by (i) relevant backup materials and schedules, in detail reasonably acceptable to Shareholders' Representative and Pricewaterhouse Coopers LLP ("**PWC**"), (ii) copies of all accounting work papers relevant to the preparation of the Closing Balance Sheet, (iii) a statement setting forth the amount of Overdue Payables determined on the basis of the Closing Balance Sheet (the "**Actual Overdue Payables**"); and (iv) (A) if the Adjusted Closing Net Working Capital is less than $8,550,000 (the "**Target Net Working Capital**"), a statement setting forth the amount, if any, by which the Adjusted Closing Net Working Capital is less than the Target Net Working Capital, (B) if the Adjusted Closing Net Working Capital is equal to Target Net Working Capital, a statement to that effect, or (C) if the Adjusted Closing Net Working Capital Amount is greater than the Target Amount, a statement setting forth the amount, if any, by which the Adjusted Closing Net Working Capital is greater than the Target Net Working Capital. The amount of any difference referred to in **clauses (iv)(A) or (C)** of this **Paragraph 4.7(b)**, if any, as it may be adjusted pursuant to the resolution of any disputes resolved pursuant to **Paragraph 4.7(c)** below, is defined as the "**Closing Net Working Capital Adjustment**". For purposes of this Agreement, "**Adjusted Closing Net Working Capital**" shall mean the amount of Closing Net Working Capital shown on the Closing Balance Sheet, as adjusted by EFX's Auditor to exclude (i) as liabilities of Company, (A) up to $200,000 of the Expenses incurred by Company to be borne by EFX pursuant to **Paragraph 9.3** (the "**Covered Expenses**"), (B) up to a maximum of $150,000 of Excess Expenses, and (C) accounts payable which were (I) assumed by Company pursuant to the Reorganization Agreement and (II) constitute Funded Indebtedness to the extent deducted from the Merger Consideration; and (ii) as an asset of Company accounts receivable acquired by Company pursuant to the Reorganization Agreement.

(c)    If the Shareholders' Representative disputes the Closing Balance Sheet or the calculation of the Closing Net Working Capital Adjustment, the Shareholders' Representative shall notify EFX in writing (the "**Dispute Notice**") of the amount, nature and basis of such dispute, within 30 calendar days after delivery of the Closing Balance Sheet. In the

17

event of such a dispute, EFX and the Shareholders' Representative shall first use their diligent good faith efforts to resolve such dispute between themselves. If the parties are unable to resolve the dispute within 30 calendar days after delivery of the Dispute Notice, then any remaining items in dispute shall be submitted to an independent nationally recognized accounting firm selected in writing by the Shareholders' Representative and EFX or, if the Shareholders' Representative and EFX fail or refuse to select a firm within 10 calendar days after written request therefor by the Shareholders' Representative or EFX, such an independent nationally recognized accounting firm shall be selected in accordance with the rules of the Miami office of the American Arbitration Association (the "**Arbitrator**"). All determinations pursuant to this **Paragraph 4.7(c)** shall be in writing and shall be delivered to the Parties. The determination of the Arbitrator as to the resolution of any dispute shall be binding and conclusive upon all parties. A judgment on the determination made by the Arbitrator pursuant to this **Paragraph 4.7** may be entered in and enforced by any court having jurisdiction thereon.

(d)     The fees and expenses of the Arbitrator in connection with the resolution of disputes pursuant to **Paragraph 4.7(c)** above shall be shared equally by the Company Shareholders and EFX; *provided, however,* that if the Arbitrator determines that one party has adopted a position or positions with respect to the Closing Balance Sheet or the calculation of the Closing Net Working Capital that is frivolous or clearly without merit, the Arbitrator may, in its discretion, assign a greater portion of any such fees and expenses to such party.

(e)     Immediately upon the expiration of the 30-day period for giving the Dispute Notice, if no Dispute Notice is given, or upon notification by the Shareholders' Representative to EFX that no Dispute Notice will be given, or immediately upon the resolution of disputes, if any, pursuant to this **Paragraph 4.7**, the Net Merger Consideration shall be adjusted as follows (as so adjusted, the "**Adjusted Net Merger Consideration**"):

(i)     If the Closing Net Working Capital Adjustment is negative, such deficiency shall be deducted from the Net Merger Consideration to obtain the Adjusted Net Merger Consideration.

(ii)     If the Closing Net Working Capital Adjustment is zero or greater, the Adjusted Net Merger Consideration shall be equal to the Net Merger Consideration.

**4.8     Payments on Account of Adjustments.**     If the Adjusted Net Merger Consideration is less than the Net Merger Consideration set forth on the Final Allocation Schedule (the "**Preliminary Net Merger Consideration**"), the Company Shareholders party to the Selling Shareholders Agreement shall, in accordance with the Selling Shareholder Agreement, pay the difference (the "**Net Working Capital Deficiency**") to EFX upon the expiration of the 30-day period for giving the Dispute Notice, if no Dispute Notice is given, or upon notification by EFX to the Shareholders' Representative that no Dispute Notice will be given, or immediately upon final resolution of any dispute in connection with the determination of the Adjusted Net Merger Consideration.

4.9     Shareholders' Representative.

(a)     In order to efficiently administer the transactions contemplated hereby, including (i) the determination of the Closing Net Working Capital Adjustment and the Adjusted Net Merger Consideration, (ii) the waiver of any condition to the obligations of the Company to consummate the transactions contemplated hereby, and (iii) the defense or settlement of any claims for which the Company Shareholders and Former Option Holders may be required to indemnify any Indemnitee (as defined in **Paragraph 11.1**) pursuant to **Article 11** hereof, the Company Shareholders, by approval and adoption of this Agreement, and Former Option Holders, pursuant to the terms of the Employee Agreements, shall designate Softbank as their representative (the "**Shareholders' Representative**"). The parties acknowledge that Company and the Shareholders' Representative will, prior to the Closing, direct by joint written notice(s) to EFX and the Exchange Agent that, on the Closing Date (i) a portion of the Merger Consideration, not to exceed $100,000 (the "**Shareholders' Representative Fund**"), shall be withheld and paid directly by the Exchange Agent to an account designated in such notice, as a fund for the fees and expenses of the Shareholders' Representative incurred in connection with this Agreement, with any balance of the Shareholders' Representative Fund not incurred for such purposes to be returned to the Company Shareholders and Former Option Holders in proportion to their interests in the Escrow Fund, and in such manner that the Shareholders' Representative and Company may prior to the Closing agree in writing, and (ii) the Excess Expenses shall be deducted from the Merger Consideration and shall be paid directly by the Exchange Agent to certain financial and professional advisors and legal counsel for all fees and expenses incurred by Company or any Subsidiary thereof in connection with the negotiation among the parties, and the authorization, preparation, execution and performance of the Agreement and the transactions contemplated hereby, in amounts to be set forth in such joint written notice.

(b)     The Company Shareholders, by approval and adoption of this Agreement authorize, and the Former Option Holders, pursuant to the terms of the Employee Agreements will authorize, the Shareholders' Representative (i) to make all decisions relating to the determination of the Closing Net Working Capital Adjustment and the Adjusted Net Merger Consideration, (ii) to take all action necessary in connection with the waiver of any condition to the obligations of Company to consummate the transactions contemplated hereby, or the defense or settlement of any claims for which the Company Shareholders and Former Option Holders may be required to indemnify EFX or the Surviving Corporation pursuant to **Article 11** hereof, (iii) to give and receive all notices required to be given under the Agreement, and (iv) to take any and all additional action as is contemplated to be taken by or on behalf of the Company Shareholders by the terms of this Agreement.

(c)     In the event that the Shareholders' Representative dies, becomes unable to perform his or her responsibilities hereunder or resigns from such position, the Company Shareholders and Former Option Holders owning or having the right to acquire, prior to the Closing, a majority of the Outstanding Company Shares (on an as-converted basis) are authorized to and shall select another representative to fill such vacancy and such substituted representative shall be deemed to be the Shareholders' Representative for all purposes of this Agreement and the documents delivered pursuant hereto.

19

(d)     All decisions and actions by the Shareholders' Representative, including without limitation any agreement between the Shareholders' Representative and EFX relating to the determination of the Closing Net Working Capital Adjustment and the Adjusted Net Merger Consideration, or the defense or settlement of any claims for which the Company Shareholders and Former Option Holders may be required to indemnify any of the Indemnitees pursuant to Article 11 hereof, shall be binding upon all of the Company Shareholders and Former Option Holders, and no Company Shareholder shall have the right to object, dissent, protest or otherwise contest the same.

(e)     The Shareholders' Representative shall not have any liability to any of the parties hereto or the Company Shareholders and Former Option Holders for any act done or omitted hereunder as Shareholders' Representative while acting in good faith and in the exercise of reasonable judgment, and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith.  The Company Shareholders and Former Option Holders shall severally indemnify the Shareholders' Representative and hold him harmless against any loss, liability or expense incurred without gross negligence or bad faith on the part of the Shareholders' Representative and arising out of or in connection with the acceptance or administration of his duties hereunder.

(f)     By his, her or its approval of the Merger, this Agreement, and the Escrow Agreement, each of the Company Shareholders and Former Option Holders agrees, in addition to the foregoing, that:

(i)     EFX shall be entitled to rely conclusively on the instructions and decisions of the Shareholders' Representative as to the determination of the Closing Net Working Capital Adjustment and the Adjusted Net Merger Consideration, or the settlement of any claims for indemnification by any of the Indemnitees pursuant to Article 11 hereof, or any other actions required or permitted to be taken by the Shareholders' Representative hereunder, and no party hereunder shall have any cause of action against EFX for any action taken by EFX in reliance upon the instructions or decisions of the Shareholders' Representative;

(ii)     all actions, decisions and instructions of the Shareholders' Representative shall be conclusive and binding upon all of the Company Shareholders and Former Option Holders and no Company Shareholder or Former Option Holder shall have any cause of action against the Shareholders' Representative for any action taken, decision made or instruction given by the Shareholders' Representative under this Agreement, except for fraud or willful misconduct by the Shareholders' Representative in connection with the matters described in this Paragraph 4.9;

(iii)     the provisions of this Paragraph 4.9 are independent and severable, are irrevocable and coupled with an interest and shall be enforceable notwithstanding any rights or remedies that any Company Shareholder or Former Option Holder may have in connection with the transactions contemplated by this Agreement;

(iv)     remedies available at law for any breach of the provisions of this Paragraph 4.9 are inadequate; therefore, EFX shall be entitled to temporary and permanent

injunctive relief without the necessity of proving damages if EFX brings an action to enforce the provisions of this **Paragraph 4.9**; and

(v)   the provisions of this **Paragraph 4.9** shall be binding upon the executors, heirs, legal representatives, personal representatives, successor trustees and successors of each Company Shareholder and Former Option Holder, and any references in this Agreement to a Company Shareholder or Former Option Holder or the Company Shareholders or Former Option Holders shall mean and include the successors to the Company Shareholder's rights hereunder, whether pursuant to testamentary disposition, the laws of descent and distribution or otherwise.

4.10   **Escrow Arrangement.**

(a)   On the Closing Date, EFX will deliver to SunTrust (the "<u>Escrow Agent</u>") by wire transfer of immediately available funds, an amount equal to the Escrowed Amount, which amount shall be withheld from the Net Merger Consideration and shall be deposited with the Escrow Agent for the purpose of securing the indemnification obligations of the Company Shareholders and Former Option Holders set forth in this Agreement (together with all accrued interest thereon, except as provided in the Escrow Agreement, the "<u>Escrow Fund</u>"). The Escrow Fund shall be held by the Escrow Agent pursuant to the terms of the agreement among the Escrow Agent, EFX and the Shareholders' Representative in the form attached to this Agreement as **Exhibit E** (the "<u>Escrow Agreement</u>"). The portion of the Escrow Fund contributed on behalf of each Company Shareholder and Former Option Holder shall be proportionate to his, her or its Pro Rata Share.

(b)   The Escrow Fund shall be held as a trust fund and shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any party, and shall be held and disbursed solely for the purposes and in accordance with the respective terms thereof.

(c)   The adoption of this Agreement and the approval of the Merger by the Company Shareholders and holders of the Company Options (pursuant to the Employee Agreement) shall constitute approval of the Escrow Agreement and of all of the arrangements relating thereto, including without limitation the placement of the Escrowed Amount in escrow in accordance with the terms thereof.

4.11   **Contingent Payment.** On the Settlement Date, each Company Shareholder and Former Option Holder shall, in accordance with **Paragraphs 4.1 and 4.3**, be entitled to receive from EFX, his, her or its Pro Rata Share of an amount in cash (which may be $0.00) equal to $3,500,000 less the aggregate amount paid by Company pursuant to paragraphs (b), (c) and (d) of Section 2.4 of the 24/7 Asset Purchase Agreement in full satisfaction of all Liabilities of Company pursuant to the 24/7 Asset Purchase Agreement. For purposes of this **Paragraph 4.11**, "<u>Settlement Date</u>" shall mean the earlier to occur of (a) February 3, 2006, and (b) the date on which Company receives a written release of all its obligations pursuant to the 24/7 Asset Purchase Agreement. If the Settlement Date shall not have occurred within 90 days of the Closing Date, then EFX shall, upon receipt of a written request from the Shareholders' Representative, deposit an amount equal to the Acquisition Indebtedness with the Escrow Agent,

to be held for purposes of securing the obligations of EFX to make the Contingent Payment, if any, hereunder (the "**24/7 Escrow Fund**").  The 24/7 Escrow Fund shall be held and disbursed by the Escrow Agent in a manner consistent with the provisions of this Agreement relating to the Contingent Payment, on terms and conditions substantially similar to those of the Escrow Agreement.  The portion of the 24/7 Escrow Fund contributed on behalf of each Company Shareholder and Former Option Holder shall be proportionate to his, her or its Pro Rata Share.

     **4.12    No Further Rights.**  From and after the Effective Time, no Company Shares shall be deemed to be outstanding, and holders of certificates formerly representing Company Shares shall cease to have any rights with respect thereto except as provided herein or by law.

     **4.13    Closing of Transfer Books.**  At the Effective Time, the stock transfer books of Company shall be closed and no transfer of Company Shares shall thereafter be made.  If, after the Effective Time, certificates or instruments formerly representing Company Shares or the right to acquire Company Shares effective at the Closing are presented to EFX or the Surviving Corporation, they shall be cancelled and exchanged for the right to receive Merger Consideration in accordance with **Paragraph 4.1**, subject to **Paragraph 4.10** and to applicable law in the case of Dissenting Shares.

     **4.14    Further Action.**  If, at any time after the Effective Time, any such further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Surviving Corporation with full right, title and possession to all assets, property, rights, privileges, powers and franchises of Company and Merger Sub, the officers and directors of Company and Merger Sub immediately prior to the Effective Time are fully authorized in the name of their respective corporations or otherwise to take, and will take, all such lawful and necessary action.

     **4.15    Taxes.**  Notwithstanding any other provision in this Agreement, EFX shall have the right to withhold Taxes from any payments to be made hereunder (including any payments to be made under the Escrow Agreement) if such withholding is required by law and to collect Forms W-8 or W-9, as applicable, from any of the Company Shareholders or Former Option Holders.  For Tax Purposes, Former Option Holders shall be deemed on the Closing Date to receive the Option Consideration.

**5.    CLOSING; DELIVERIES**

     **5.1    Closing.**  Subject to termination of this Agreement pursuant to **Article 13** and satisfaction of the conditions set forth herein, the consummation of the Merger and the other transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Kilpatrick Stockton LLP, 200 South Biscayne Boulevard, Suite 2000, Miami, Florida, at 10:00 a.m., Miami time, on the second Business Day after all the conditions set forth in **Article 10** hereof have been satisfied or waived ("**Closing Date**").

     **5.2    Transactions and Documents at Closing.**

        (a)    At the Closing:

           (i)    Company and Merger Sub will file the Merger Documents with the Department of State of the State of Florida to effect the Merger;

(ii)     EFX will deliver an amount which shall be equal to the sum of the Series B Warrant Consideration, the Excess Expenses, the Shareholders' Representative Fund, the Termination Payments, the Aggregate Series B Preference Amount, the Net Participation Amount, and the Covered Expenses to the Exchange Agent in accordance with **Paragraph 4.6**;

(iii)    EFX will cause the Shareholders' Representative Fund and the Excess Expenses to be paid by the Exchange Agent from the Exchange Fund, pursuant to the written directions received by EFX under **Paragraph 4.9(a)**, and EFX will cause the Covered Expenses to be paid by the Exchange Agent from the Exchange Fund to the professionals entitled thereto as identified by written notice given to EFX prior to the Closing by the Shareholders' Representative;

(iv)    The Exchange Agent shall distribute to Company an aggregate amount from the Exchange Fund equal to the sum of (A) the BERJ Special Holdback, (B) the SweepsClub Special Holdback, and (C) any applicable Withholding Taxes;

(v)     EFX will deposit an aggregate amount equal to the Escrowed Amount with the Escrow Agent in accordance with **Paragraph 4.10**;

(vi)    Comerica Bank – California shall surrender the Series B Warrant for cancellation pursuant to the terms and subject to the conditions of that certain letter agreement dated as of August 9, 2002 among Comerica Bank-California, Comerica Incorporated and Company, free and clear of any and all Liens, duly endorsed for transfer, accompanied by all necessary transfer taxes and revenue stamps to EFX together with such documents and other instruments of transfer and conveyance as EFX and its legal counsel shall reasonably request in order to cancel and retire the Series B Warrant; and EFX shall direct the Exchange Agent to deliver an amount from the Exchange Fund equal to the Series B Warrant Consideration in cash to Comerica Bank – California; and

(vii)   each Company Shareholder shall surrender the Certificates representing such Company Shareholder's Company Shares, free and clear of any and all Liens.

(b)     At the Closing, the relevant Persons shall, in addition to the other documents, agreements, papers, instruments, consents, authorizations and approvals required to be executed and delivered under or pursuant to this Agreement, execute and deliver the following documents, agreements, instruments and papers (all of which are collectively referred to herein as the "**Additional Agreements**" and individually as an "**Additional Agreement**"):

(i)      an Employee Agreement;

(ii)     the Escrow Agreement;

(iii)    the First Amendment to Reorganization Agreement;

(iv)    the First Amendment to Asset Purchase Agreement;

(v)     a Transition Services Agreement between Seisint and Company in the form attached to this Agreement as **Exhibit F** (the "**Transition Services Agreement**");

(vi)    EFX shall have received from each of the Persons identified on Schedule 5.2(b)(vi) attached hereto an executed release in the form attached hereto as Exhibit G (a "<u>Release</u>"); and

(vii)   an Employment Agreement between Company and Michael Brauser in the form attached hereto as Exhibit H ("<u>Employment Agreement</u>").

(c)    All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

5.3    **Additional Action.**  The Surviving Corporation may, at any time and from time to time from and after the Effective Time, take any action, including executing and delivering any document, in the name and on behalf of either Company or Merger Sub, in order to consummate and give effect to the transactions contemplated by this Agreement.

6.    REPRESENTATIONS, WARRANTIES OF COMPANY

Contemporaneously with the execution and delivery of this Agreement, Company has delivered to EFX and Merger Sub a disclosure memorandum dated as of the date of this Agreement and signed by Company's Chief Executive Officer (the "<u>Disclosure Memorandum</u>") setting forth certain information regarding Company, each Subsidiary thereof and the Business.  The disclosures set forth in the Disclosure Memorandum qualify only those representations and warranties specifically referenced and referred to in the Disclosure Memorandum as relating to such disclosures and a disclosure related to any particular representation and warranty shall not qualify any other representation unless so expressly stated; *provided, however,* that if it is readily apparent from the text of the disclosure that an item disclosed in one section or subsection of the Disclosure Memorandum is omitted from another section or subsection where such disclosure would be appropriate, such item shall be deemed to have been disclosed in such section or subsection of the Disclosure Memorandum from which such item is omitted.  To induce EFX and Merger Sub to enter into and perform this Agreement, Company represents and warrants to EFX and Merger Sub that except as set forth in the Disclosure Memorandum, each of the representations, warranties and statements in the following Paragraphs of this **Article 6** is true and correct as of the date of this Agreement:

6.1    **Organization; Qualifications; Corporate Power.**  Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of Florida and has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as presently proposed to be conducted by Company and has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as presently proposed to be conducted by Company. Each Subsidiary of Company is a corporation duly organized, validly existing and in good standing in its jurisdiction of incorporation as identified in the Disclosure Memorandum. Company and each Subsidiary thereof is qualified or licensed to do business as a foreign corporation in all jurisdictions identified in the Disclosure Memorandum, which represent each such jurisdiction where such qualification or licensing is required except where the failure to be

so qualified has not had or would not have a Material Adverse Change. Each Subsidiary of Company has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as presently proposed to be conducted by such Subsidiary and has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as presently conducted and as presently proposed to be conducted by such Subsidiary. Company has provided EFX with true, complete and accurate copies of (i) the minutes and other similar records of meetings or consent actions of the shareholders and the board of directors (and committees thereof), which contain all records of meetings and consent actions taken in lieu thereof by such shareholders and such directors (and committees of the board of directors), and show all corporate actions taken by such shareholders and such directors, and any committees thereof, for the Company and each Subsidiary thereof, (ii) the share transfer records, which reflect fully all issuances, transfers and redemptions of the capital stock of Company and each Subsidiary thereof, in each case since the date of its incorporation; and (iii) articles of incorporation and bylaws, in each case, as amended and as in effect on the date hereof of Company and each Subsidiary thereof.

6.2     **Authorization.** Company has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and, subject to the adoption of this Agreement and the approval of the Merger by holders of at least a majority of the outstanding Preferred Shares and Common Shares, voting together as a single class on an as converted basis, the performance by Company of this Agreement and the consummation by Company of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Company. Without limiting the generality of the foregoing, the Board of Directors of Company, at a meeting duly called and held, by the unanimous vote of all directors (i) determined that the Merger is fair and in the best interests of Company and its shareholders, (ii) adopted this Agreement in accordance with the provisions of the FBCA, and (iii) directed that this Agreement and the Merger be submitted to the shareholders of Company for their adoption and approval and resolved to recommend that the shareholders of Company vote in favor of the adoption of this Agreement and the approval of the Merger. This Agreement and the Additional Agreements to which Company is or will be a party have been duly and validly executed and delivered by Company and constitute (or will constitute) the valid and binding obligations of Company, enforceable against Company in accordance with their respective terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

6.3     **Subsidiaries and Affiliates.** Neither Company nor any Subsidiary thereof owns or has any interest, direct or indirect, or any commitment to purchase or otherwise acquire, any Investment, direct or indirect, in any Person, other than 24/7 Mail, Inc., a Florida corporation. For purpose of this Paragraph 6.3, "Investment" shall mean loans, capital stock, partnership interests, other equity interests and other debt and equity instruments.

6.4     **Ownership of Capital Stock.**

(a)     The authorized capital stock of Company consists of (i) 15,000,000 Common Shares, and (ii) 11,604,000 Preferred Shares, of which (A) 2,300,000 shares have been designated as Series A Preferred Stock, (B) 4,652,000 shares have been designated as Series B

25

Preferred Stock, and (C) 4,652,000 shares have been designated as Series B-1 Preferred Stock. As of the date of this Agreement, 1,312,000 Common Shares are issued and outstanding, 2,000,000 Common Shares are reserved for issuance pursuant to the Option Plan, 2,300,000 Series A Shares are issued and outstanding, 4,632,000 Series B Shares are issued and outstanding and 20,000 Series B Shares are reserved for issuance pursuant Series B Warrant. Of the 2,000,000 Common Shares reserved for issuance pursuant to the Option Plan, as of the date of this Agreement, no Common Shares have been issued pursuant to the exercise of Company Options, and Company Options to purchase 1,998,540 Company Shares are outstanding. No shares of Company capital stock are held in the treasury of Company. Each Preferred Share is convertible into one Common Share.

(b)    The Disclosure Memorandum sets forth a complete and accurate list of (i) all shareholders of Company, indicating the number and class or series of Company Shares held by each Company Shareholder and (for shares other than Common Shares) the number of Common Shares (if any) into which such Company Shares are convertible, the state of residence or jurisdiction of incorporation or organization of each Shareholder, and (ii) all outstanding Company Options to purchase Company Shares pursuant to the Option Plan or otherwise ("Options") and warrants to purchase Company Shares other than Options ("Warrants"), indicating (A) the holder thereof, the state of residence or jurisdiction of incorporation or organization of such holder and whether such holder is or was an employee of Company or any Subsidiary thereof and if the holder of such rights is no longer an employee of Company or any Subsidiary thereof, the date such holder's rights to purchase shares expires under the agreement evidencing or granting such rights, (B) the number and class or series of Company Shares subject to each such Option and Warrant and (for Company Shares other than Common Shares) the number of Common Shares (if any) into which such Company Shares are convertible, (C) the exercise price, date of grant, vesting schedule and expiration date for each Option or Warrant, and (D) any terms regarding the acceleration of vesting, (iii) any stock or equity-related plans of Company, and (iv) any other agreements, convertible securities or other commitments pursuant to which Company is or may become obligated to issue any shares or other securities of Company. All of the Options and Warrants will terminate and be of no further force or effect immediately after the Effective Time, and none of Company, EFX, Merger Sub or the Surviving Corporation shall, thereafter, have any liability or obligation, including any obligation to pay any Merger Consideration, with respect thereto.

(c)    All of the issued and outstanding Company Shares are, and all Company Shares that may be issued upon exercise of Options or Warrants will be (upon issuance in accordance with their terms), duly authorized, validly issued, fully paid, and nonassessable. No Person has, and immediately upon consummation of the Merger and the other transactions contemplated by this Agreement, no Person will have, any preemptive or similar rights to purchase or otherwise acquire any capital stock or other security of Company pursuant to any provision of Law or any agreement to which Company or any Subsidiary thereof is a party or to which it may be subject or by which it may be bound. To Company's Knowledge, there are no Liens in respect of any Company Shares other than created by Federal or State Securities Laws. All of the issued and outstanding Company Shares and all other capital or other securities previously issued and outstanding of Company, any Subsidiary thereof or any of their respective predecessors, were offered, issued and sold in accordance with all applicable securities Laws. Company is not subject to any obligation to repurchase or otherwise acquire or retire any of its

26

capital stock, and Company has no Liability for dividends declared or accrued, but unpaid, with respect to its capital stock.   Neither Company nor any Subsidiary thereof has purchased or redeemed any of its capital stock, and has not paid any dividend or made any other payment to its stockholders within the past year other than compensation paid in the ordinary course of the Business, consistent with past practices.   Other than the Options and Warrants listed in the Disclosure Memorandum, there are no outstanding or authorized options, warrants, rights, agreements or commitments to which Company is a party or which are binding upon the Company providing for the issuance or redemption of any of its capital stock.   There are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to Company.   There are no agreements to which Company is a party or by which it is bound with respect to the voting (including without limitation voting trusts or proxies), registration under the Securities Act, or any foreign securities Law, or sale or transfer (including without limitation agreements relating to preemptive rights, rights of first refusal, co-sale rights, or "drag-along" rights) of any securities of Company, nor any Actions relating thereto.   To the Knowledge of Company, there are no agreements among other parties, to which Company is not a party and by which it is not bound, with respect to the voting (including without limitation voting trusts or proxies) or sale or transfer (including without limitation agreements relating to rights of first refusal, co-sale rights or "drag-along" rights) of any securities of Company other than the Voting Agreement.

(d)   All of the outstanding shares of capital stock of each Subsidiary of Company are duly authorized, validly issued, fully paid, nonassessable and free of preemptive rights.   All shares of each Subsidiary that are held of record or owned beneficially by either Company or any Subsidiary are held free and clear of any restrictions on transfer, Liens, options, warrants, rights, claims, pledges, agreements, and limitation on Company's voting rights.

6.5   **No Conflicts.**   The execution, delivery and performance of this Agreement and the Additional Agreements to which Company is a party and the consummation of the transactions contemplated hereby and compliance with the provisions hereof by Company will not (a) violate any Law applicable to Company or any Subsidiary thereof or any of its respective properties or assets or (b) with due notice or lapse of time, or both, conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default (or give rise to any right of termination, cancellation or acceleration) under, any note, indenture, mortgage, lease agreement or other material oral or written contract, agreement or instrument to which Company or any Subsidiary thereof is a party or by which it or any of their respective properties or assets is bound or affected, or result in the creation of any Lien upon any shares of capital stock of Company or any Subsidiary thereof or any of the properties or assets of Company or any Subsidiary thereof under its articles of incorporation and bylaws.

6.6   **No Consent or Approval Required.**   No consent of any Person and no consent, approval or authorization of, or declaration to or filing with, any court or any Government is required of Company or any Subsidiary thereof for the valid authorization, execution and delivery of this Agreement, or for the consummation of the transactions contemplated hereby, other than the HSR Filing and the filing of the Merger Documents.

6.7   **Financial Statements; No SEC Filings.**   The Disclosure Memorandum contains the consolidated audited financial statements of Company and each Subsidiary thereof,

consisting of a balance sheet (the "**Balance Sheet**") and the related statements of operations, changes in stockholders' equity, and of cash flows, together with any related notes and schedules for the periods as at and ending December 31, 2001 and the report thereon of PWC (the "**Balance Sheet Date**") (the "**Audited Financial Statements**").   The Audited Financial Statements have been prepared in accordance with GAAP consistently applied, present fairly the consolidated financial condition of Company and its Subsidiaries as at the respective dates thereof and the results of its operations and cash flows for the periods then ended, and are complete and consistent with the books and records of Company and each Subsidiary thereof. The Disclosure Memorandum contains the consolidated unaudited financial statements of the Company and its Subsidiaries as at and ending at the conclusion of (a) each fiscal quarter following December 31, 2001, and at March 31, 2002 and June 30, 2002 and (b) an unaudited balance sheet as of July 31, 2002 (the "**Most Recent Balance Sheet**") as at such date (the "**Unaudited Financial Statements**"; together with the Audited Financial Statement, the "**Financial Statements**").  The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied (except for the absence of required footnotes and subject to normal and recurring year-end audit adjustments not material in amount), present fairly the financial position and the results of operations of the Business as conducted by Company and its Subsidiaries for the periods as at and then ended, and are complete and consistent with the books and records of Company and each Subsidiary thereof.   Neither Company nor any Subsidiary thereof has ever been required to file any forms, notifications or reports with the SEC which it has not filed.  The Closing Net Working Capital as of July 31, 2002 is set forth in Annex 6.7 of the Disclosure Memorandum.

6.8     **Absence of Changes.**  Since the Balance Sheet Date:

(a)            there has been no Material Adverse Change;

(b)            neither Company nor any Subsidiary thereof has entered into any material transaction which was not in the ordinary course of business;

(c)            neither Company nor any Subsidiary thereof has changed or amended in any material respect any material contract by which Company or any Subsidiary thereof or any of its assets or properties (which for purposes of this **Paragraph 6.8(c)** does not include any contracts with any Company Shareholder, holder of options, or any Affiliate of Company or any Company Shareholder), are bound or subject, except as contemplated by this Agreement;

(d)            there has been no mortgage, pledge, sale, assignment or transfer of any tangible or intangible assets of Company or any Subsidiary thereof, except, with respect to tangible assets, in the ordinary course of business consistent with past practices;

(e)            there has been no damage, destruction or loss (whether or not covered by insurance) affecting the Business, assets, properties, operations or condition (financial or otherwise), or results of operations of Company or any Subsidiary thereof, in any material respect;

(f)            there has been no issuance of any bonds, notes or other securities of Company or any Subsidiary thereof, or any agreement or commitment therefor (including options, warrants or rights or agreements or commitments to purchase such securities or grant such options, warrants or rights);

(g)            there has been no declaration or payment of a distribution on, or other distribution with respect to, or any direct or indirect redemption or acquisition of, any of the capital stock or other securities of Company or any Subsidiary thereof, or any agreement or commitment therefor;

(h)            there has been no payment or credit to, or by and between, Company or any Subsidiary thereof on the one hand and any Affiliated Person on the other, other than for compensation paid in the ordinary course and reimbursement of expenses in the ordinary course, nor has there been, or is there, any agreement or commitment therefore;

(i)            neither Company nor any Subsidiary thereof has materially changed any compensation arrangement or agreement with any of its employees, officers or independent contractor or materially changed the rate of pay and provision of employee benefits and perquisites of its employees and independent contractors as a group;

(j)            there has been no resignation or termination of employment of any key officer, employee or independent contractor of Company or any Subsidiary thereof and Company does not know of any impending resignation or termination of employment of any such officer, employee or independent contractor;

(k)            there has been no change, except in the ordinary course of business, in the contingent obligations of Company or any Subsidiary thereof (nor in any contingent obligation of Company or any Subsidiary thereof regarding any of its respective officers, directors, employees, independent contractors or shareholders) by way of guaranty, endorsement, indemnity, or warranty;

(l)            there have been no loans made by Company or any Subsidiary thereof to any of its respective officers, employees, independent contractors or shareholders or their immediate family members, or any agreement or commitment therefor (except for advances in the ordinary course of business and consistent with past practice and generally applicable Company policy);

(m)            there has been no waiver or loss of any material right of Company or any Subsidiary thereof, or the cancellation of any debt, claim or contract or other agreement held by Company or any Subsidiary thereof (which for purposes of this **Paragraph 6.8(m)** does not include any debt, claim or contract with any Company Shareholder, holder of options, or any Affiliate of Company or any Company Shareholder);

(n)            there has not been any satisfaction or discharge of any Lien or any payment of any obligation by Company or any Subsidiary thereof, except in the ordinary course of business and consistent with past practices and which is not material to the Business, assets, properties, operations or condition (financial or otherwise), or results of operations of Company or any Subsidiary thereof; or

29

(o)                    there has not been any change in the accounting methods, practices or policies followed by Company or any Subsidiary thereof or any change in depreciation or amortization policies or rates theretofore adopted.

6.9    **Absence of Undisclosed Liabilities.**  As of the date of the Most Recent Balance Sheet, (a) neither Company nor any Subsidiary thereof had any Liabilities which were not provided for or disclosed on the Most Recent Balance Sheet except Liabilities for Actions disclosed on Schedule 6.13 of the Disclosure Memorandum and (b) all liability reserves which were required to be reserved or disclosed in accordance with GAAP were so reserved or disclosed on the Most Recent Balance Sheet.  At the date of the Most Recent Balance Sheet, there were no loss contingencies (as such term is used in Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") issued by the Financial Accounting Standards Board in March 1975) which were not adequately provided for in the Most Recent Balance Sheet as required by said SFAS No. 5.  Since the date of the Most Recent Balance Sheet, neither Company nor any Subsidiary thereof has incurred any Liabilities except current Liabilities incurred in the ordinary course of business, consistent with past practices, none of which involves a Liability for breach of contract, breach of warranty, infringement of intellectual property rights, tortious conduct or violation of Law.

6.10    **Contracts and Commitments.**  Neither Company nor any Subsidiary thereof is a party to any written or oral contract not made in the ordinary course of business and regardless of whether made in the ordinary course of business, neither Company nor any Subsidiary thereof is a party to any written or oral (a) contract with any labor union; (b) contract for the future purchase of fixed assets or for the future purchase of materials, supplies or equipment in excess of normal operating requirements; (c) contract for the employment of any officer, individual employee or other Person on a full-time basis or any contract with any Person on a consulting basis; (d) agreement or indenture relating to the borrowing of money or to the placing of an Lien on any asset or property of Company or any Subsidiary thereof; (e) guaranty of any obligation for borrowed money; (f) lease or agreement under which Company or any Subsidiary thereof is lessee of or holds or operates any property, real or personal, owned by any other Person; (g) lease or agreement under which Company or any Subsidiary thereof is lessor of or permits any Person to hold or operate any property, real or personal, owned or controlled by Company or any Subsidiary thereof; (h) agreement or other commitment for capital expenditures in excess of $50,000 for any single project or series of related projects]; (i) contract, agreement or commitment under which Company or any Subsidiary thereof is obligated to pay any broker's fees, finder's fees or any such similar fees, or any Expense to any Person; (j) any agreement relating to the holding, sale or other transfer, voting or registration under the Securities Act of the capital stock or other securities of Company or any Subsidiary thereof; or (k) any other contract, agreement, arrangement or understanding which is material to the Business (collectively, the "Contracts").  The Disclosure Memorandum sets forth a true, correct and accurate list of the Contracts.  Each Contract constitutes the valid and binding obligation of Company or Subsidiary, as appropriate, and, to the Knowledge of Company, the other parties thereto, enforceable in accordance with its terms, except as enforcement may be limited by general principles of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally, and neither Company or the relevant Subsidiary nor, to the Knowledge of Company, any other party thereto is in default of any material obligation thereunder and, there exists no condition, event or act which constitutes, or which after notice, lapse of time or both, would

constitute, a default by Company or, to the Knowledge of Company, by any other party thereunder of any material obligation thereunder.

**6.11   Protection of Intellectual Property.**

(a)    The Disclosure Memorandum sets forth a true, complete and accurate list and summary description of all material intellectual property rights, including all Proprietary Technology (other than for processes, trade secrets and know-how), patents, patent applications, trademarks, trademark applications, trade names and service marks, service mark applications, copyrights and copyright applications, and licenses  (collectively, "**Intellectual Property Rights**"), necessary for the conduct of the Business as presently conducted and as presently proposed to be conducted, together with a complete list of all licenses granted by or to Company or any Subsidiary thereof with respect to any of the above.  As used in this Agreement, "**Proprietary Technology**" means all source and object code, algorithms, architecture, structure, display screens, layouts, processes, inventions, trade secrets, know-how, development tools and other proprietary rights owned by Company or any Subsidiary thereof and pertaining to any product or service manufactured, marketed or sold, or to the Knowledge of Company proposed to be marketed or sold (as the case may be), by Company or any Subsidiary thereof, and all documentation and media constituting, the above, including manuals, memoranda, notebooks and records.

(b)    Prior to today's date, Company has delivered to EFX true, correct and complete copies of all trademarks, trademark applications, patents, patent applications, copyrights and copyright applications evidencing Intellectual Property Rights. Either Company or a Subsidiary owns legally enforceable rights to use or is licensed to use by a Person which, to the Company's Knowledge, has legally enforceable rights to license, all of the Intellectual Property Rights employed in the operation of or otherwise material to its Business as now conducted and as currently proposed to be conducted by Company, with no infringement or violation of, or conflict with, the rights of any Person respecting any Intellectual Property Rights owned by Company or any Subsidiary thereof, or to the Company's Knowledge, respecting any Intellectual Property Rights licensed to Company or any Subsidiary thereof.  Company or a Subsidiary has made all filings and recordations required to protect and maintain its interest in its respective Intellectual Property Rights or has otherwise taken commercially reasonable steps to otherwise protect any such Intellectual Property Rights.

(c)    The operation of the Business as now conducted or as currently proposed to be conducted by Company does not infringe, violate or conflict with any Intellectual Property Rights of any Person.  There are no agreements, understandings, instruments, contracts, judgments, orders, writs or decrees to which Company or any Subsidiary thereof is a party, or by which its assets would be bound, which involve indemnification by Company or a Subsidiary with respect to infringements or other violations of any Intellectual Property Rights other than those contained in license and distribution agreements entered into in the ordinary course of business by Company or a Subsidiary.

(d)    Neither Company nor any Subsidiary thereof is obligated to make any payments by way of royalties, fees or otherwise to any owner, licensor of, or other

31

claimant to any Intellectual Property Rights or other intangible asset, with respect to the use thereof outside of the ordinary course of business.

(e)         Neither Company nor any Subsidiary thereof has received any written communications alleging that it has violated or, by conducting its Business as currently proposed by Company, would violate any of the Intellectual Property Rights of any Person, nor to the Knowledge of Company, is there any basis for the foregoing.

(f)         The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby will not constitute a breach of any license or other agreement involving any Intellectual Property Rights to which Company or any Subsidiary thereof is a party, nor will it cause or give a right of forfeiture or termination of any such Intellectual Property Rights.

(g)         To the Knowledge of Company, there is no unauthorized use, infringement or misappropriation of any of the Intellectual Property Rights by any Person, including any employee, former employee, independent contractor or consultant of Company or any Subsidiary thereof. Company and each Subsidiary thereof has taken reasonable and practicable steps designed to safeguard and maintain the secrecy and confidentiality of, and the proprietary rights in, the Intellectual Property Rights owned by it. All officers, directors, employees and consultants of Company or any Subsidiary thereof having access to, or developing any Intellectual Property Rights owned or used by Company or any Subsidiary thereof have executed and delivered an agreement regarding the protection of the proprietary information of Company or any Subsidiary thereof, and a license or assignment to Company or any Subsidiary thereof of all Intellectual Property Rights arising from the services performed by such persons to the extent not already provided for under applicable law. Neither Company nor any Subsidiary thereof has received any written notice that any current or prior officer, employee, or consultant of Company or any Subsidiary thereof claims or has a right to claim an ownership interest in any Intellectual Property Rights as a result of having been involved in the development or licensing of any such Intellectual Property Rights while employed by or consulting to Company or any Subsidiary thereof.

**6.12   Compliance; Licenses and Permits.**

(a)    Company and each Subsidiary thereof has complied in all material respects with all Laws applicable to Company's Business as presently or previously conducted, including all federal state and local privacy laws, rules and regulations, and all other applicable Laws of similar tenor and effect. None of the Fair Credit Reporting Act, the Consumer Credit Protection Act, the Truth in Lending Act, the Fair Credit Billing Act, the Equal Credit Opportunity Act, the Fair Debt Collections Practices Act, the Graham-Leach-Bliley Act, nor any federal regulatory rules and regulations promulgated pursuant to these laws are applicable to the Business. Company and each Subsidiary thereof has obtained all material federal, state, local and foreign governmental licenses and permits which are required for the conduct of the Business presently or proposed to be conducted by Company and each Subsidiary thereof, which licenses and permits are in full force and effect and no material violations are outstanding or uncured with respect to any such licenses or permits and no proceeding is pending or, to the Knowledge of Company, threatened to revoke or limit any thereof. The Disclosure

Memorandum lists all material federal, state, local and foreign governmental licenses and permits of Company and each Subsidiary thereof which are used in or relate to the Business. Company has furnished to EFX true and correct copies of all licenses and permits required for or used in the Business.

(b)     The Disclosure Memorandum sets forth the consumer privacy policies that have been adopted by Company and each Subsidiary thereof in connection with the Business and that are currently in effect for Company and each Subsidiary thereof. Company and each Subsidiary thereof has complied in all material respects with all such consumer privacy policies and any applicable privacy policies posted on its web sites. Company and each Subsidiary thereof has taken commercially reasonable steps to protect and maintain the confidential nature of the personal information provided to Company or any Subsidiary thereof by Persons who do not consent to the disclosure of such information or have expressly requested that Company or any Subsidiary thereof not disclose such information. All personally identifiable information collected by Company or any Subsidiary thereof has been used in accordance with the applicable privacy policy at the time of such collection.

(c)     All information (the "**Database Information**") contained in the databases maintained by Company and any Subsidiary thereof (the "**Databases**") has been at all times (i) collected in substantial compliance with fair information collection practices (including but not limited to (a) the guidelines promulgated by the Online Privacy Alliance; (b) the standards promulgated by the Direct Marketing Association, and (c) all applicable Federal, state and other laws, rules and regulations including but not limited to those relating to the use or collection of information collected from or about consumers) so that, at a minimum and prior to submitting any information to Company or its agents, Internet users received notice of how the information will be used and a choice whether to submit such information; and (ii) stored, maintained and used in accordance with such notices and all Federal, state and local laws, rules and regulations. Company has the sole and exclusive right to use and commercially exploit the Database Information, free of consideration to any third party. The Databases contain, at a minimum, 65,000,000 Valid and Unique Records. For purposes of this Agreement, a "**Valid and Unique Record**" is (i) a Record with an e-mail address that accepts delivery of email transmissions (*i.e.*, emails are not rejected as "undeliverable"); and (ii) a subject Record is not duplicative of other Records contained in any of the Databases. For purposes of this Agreement, a "**Record**" is a set of information consisting of: (i) one "opt-in" or "permission-based" e-mail address, and (ii) the first and last name of the e-mail user that uses such e-mail address. In determining whether there are 65,000,000 Valid and Unique Records, a duplicative Record will be counted only once.

**6.13   Litigation and Other Proceedings.**     There is no action, proceeding or investigation pending or, to Company's Knowledge, threatened, against Company or any Subsidiary thereof or any of its respective directors, officers, agents, employees or stockholders, or to Company's Knowledge, any reasonable basis therefor:   (1) which might result, either individually or in the aggregate, in (a) any Liability to Company or any Subsidiary thereof, or (b) any material impairment of the right or ability of Company or any Subsidiary thereof to carry on its Business as now conducted or to the Knowledge of Company, as proposed to be conducted by Company, or (2) which questions the validity of this Agreement or any action taken or to be taken in connection herewith, including in each case, actions pending or threatened involving the prior employment (whether as an employee, independent contractor or otherwise) of any

33

directors, officers, employees, agents or independent contractors of Company or any Subsidiary thereof, the use in connection with the Business of any information or techniques allegedly proprietary to any of the former employers of such employees or independent contractors or their obligations under any agreements with prior employers. Neither Company nor any Subsidiary thereof is a party to or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by Company or any Subsidiary thereof currently pending or which Company or any Subsidiary thereof currently intends to initiate.

6.14   **Insurance.**  The Disclosure Memorandum contains a complete list of all policies of insurance maintained by Company or any Subsidiary thereof, all of which are in full force and effect.  Company has delivered or made available to EFX a true, correct and complete copy of each such insurance policy (including any exhibits, schedules, riders, amendments or modifications thereof).  All premiums due thereon have been paid and neither Company nor any Subsidiary thereof has received any written notice of default or cancellation with respect thereto. The Disclosure Memorandum lists and describes all occurrences which to the Knowledge of Company, may form the basis for a material claim by or on behalf of Company or any Subsidiary thereof under any such policy; and Company and each Subsidiary thereof, as appropriate, has timely given notice of all such occurrences to the appropriate insurer and has not waived (either intentionally or inadvertently) its right to make the related claim under any such policy.  There are no provisions in any of such policies which provide for retrospective premium adjustments or other experience-based liability on the part of Company or any Subsidiary thereof.

6.15   **Title to Assets and Properties.**  Company and each Subsidiary thereof has good and marketable title to (or in the case of assets or properties leased or licensed, Company and each Subsidiary, as the case may be, has an enforceable leasehold or license interest in) all its respective properties and assets used, useful or necessary to conduct its Business as currently being conducted and as conducted during the periods covered by the Financial Statements, in each case free and clear of Liens.  All machinery, equipment, vehicles and other material items of tangible personal property which are owned or leased by Company or any Subsidiary are in good condition and repair, normal wear and tear excepted, suited for the use intended and are and have been operated in conformity with all applicable Laws and all leases of real or personal property to which Company or any Subsidiary thereof is a party, are fully effective in accordance with their respective terms, afford company or such Subsidiary, as the case may be, peaceful and undisturbed possession of the subject matter of the lease.  To the Knowledge of Company, all lessors of machinery, equipment or other tangible personal property leased by Company or any Subsidiary have performed and satisfied their respective duties and obligations under such leases in all material respects.  Company has not brought or threatened any Action against any such lessor for failure to perform and satisfy its duties and obligations thereunder.

6.16   **Receivables.**  All notes and accounts receivable shown on the Most Recent Balance Sheet and all such receivables now held by Company or any Subsidiary are valid and collectible obligations and were not and are not subject to any offset or counterclaim, except for amounts reserved against such receivables which are reflected on the Most Recent Balance Sheet and with respect to notes and accounts receivable arising after the date of the Most Recent Balance Sheet and now outstanding, except for a percentage thereof equal to the percentage which said reserved amounts on the Most Recent Balance Sheet constituted of the aggregate of

notes and accounts receivable on the Most Recent Balance Sheet. Except for the accounts receivable acquired pursuant to the Reorganization Agreement, all of such notes and accounts receivable arose in the ordinary course of business from the sale of goods or the rendition of services and represent bona fide obligations of the account debtor thereof.

6.17   Intentionally Omitted.

6.18   Real Property.

(a)   Neither Company nor any Subsidiary thereof owns or has at any time owned, any real property.

(b)   Each parcel or tract of real property which is used by Company or any Subsidiary thereof in the Business (the "Real Property") is subject to a written lease or sublease to which Company or any Subsidiary thereof is a party as lessee or sublessee (individually a "Real Property Lease"). All such Real Property Leases are valid and in full force and effect in accordance with their terms. Company has previously furnished EFX with true, correct and complete copies of all Real Property Leases. There is not, with respect to any Real Property Lease (i) any default by Company or any Subsidiary thereof, or any event of default or event which with notice or lapse of time, or both, would constitute a default by Company or any Subsidiary thereof or (ii) to Company's Knowledge, any existing default by any other party to any Real Property Lease, or event of default or event which with notice or lapse of time, or both, would constitute a default by any other party to any Real Property Lease.

(c)   To the Knowledge of Company, all of the Real Property is free from development, use or occupancy restrictions, except those imposed by applicable Law, and from special taxes or assessments, except those generally applicable to other properties in the tax districts in which the Real Property is located. To the Knowledge of Company, no options have been granted to others to purchase, lease or otherwise acquire any interest in the Real Property or any part thereof. To the Knowledge of Company, Company and each Subsidiary thereof has the exclusive right of possession of each tract or parcel comprising its Real Property.

(d)   The present use, occupancy and operation of the Real Property, and to the Knowledge of Company, all aspects of the improvements to the Real Property are in compliance, in all material respects, with all Laws and private restrictive covenants of record, and to the Knowledge of Company, there has not been any proposed change thereto that would affect any of the Real Property or its use, occupancy or operation. There exists no conflict or dispute with any Government or other Person relating to any Real Property or the activities thereon. To the Knowledge of Company, no portion of the Real Property is subject to any classification, designation or preliminary determination of any Government or pursuant to any Law which would restrict its use, development, occupancy or operation in connection with the Business. All Improvements are in good condition and repair, and are suited for the operation of the Business.

(e)   Neither Company or any Subsidiary nor to the Knowledge of the Company any other Person has caused any work or improvements to be performed upon or made to any of the Real Property for which there remains outstanding any payment obligation

35

that would or might serve as the basis for any Lien in favor of the Person who performed the work.

(f)               All requisite certificates of occupancy and other permits and approvals required with respect to the Real Property or the Improvements and the use, occupancy and operation thereof have been obtained and paid for and are currently in effect and free of restrictions.

### 6.19    Labor Matters.

(a)     The Disclosure Memorandum sets forth a true, complete and correct list of each employee, independent contractor, agent and consultant of Company or any Subsidiary thereof who on the date of this Agreement performs services on a regular basis in the business operations of or for Company or any Subsidiary thereof, together with each such person's job title, current compensation amounts and current forms of special fringe benefits or amounts, and forms of special compensation for the preceding 12-months. All employees and independent contractors may be terminated at will by Company or such Subsidiary. No such employees, independent contractor, agent or consultant has terminated his or her employment, nor, to the Knowledge of Company, plans to terminate employment after the Closing Date. The Disclosure Memorandum sets forth a true, complete and correct list of all employment agreements or other compensation or benefit arrangements to which Company or any Subsidiary thereof is a party and any other commitments (oral or written) made by Company or any Subsidiary thereof to any employee, agent, independent contractor or consultant with respect to job security or tenure.

(b)     No complaint against Company or any Subsidiary thereof has been filed or threatened in writing to be filed with or by any Forum that regulates labor or employment practices, and there is no grievance filed or to the Knowledge of the Company threatened to be filed against Company or any Subsidiary thereof by any employee. There are no material controversies pending or threatened between Company or any Subsidiary thereof and its respective employees, and no labor union or other organization represents or claims to represent any of such employees' interests. Company and each Subsidiary thereof has complied in all material respects with all Laws relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar Taxes, occupational safety and health, and plant closing. Neither Company nor any Subsidiary thereof is delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by them in any capacity to the date hereof or amounts required to be reimbursed to such employees. Company is not liable for the payment of any compensation, damages, Taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of such Laws. None of the employees of Company or any Subsidiary thereof are represented by any union or association and there are no pending or threatened representational questions or labor disputes concerning any employees or former employees of Company or any Subsidiary thereof.

(c)     The Disclosure Memorandum sets forth a true, complete and correct list of all employee manuals, policies, procedures, and work related rules of Company and each Subsidiary thereof, true and complete copies of which have been provided to or made available to EFX.

6.20   Tax Matters.

(a)              Company and each Subsidiary thereof has timely filed all Federal, state, local and foreign tax or information returns, declarations of estimated tax, tax reports, information returns and statements (collectively, the "Returns") for all years and periods (and portions thereof) required to be filed by it prior to the Closing (other than those for which extensions shall have been granted prior to the Closing) relating to any Taxes with respect to any income, properties or operations of Company or any Subsidiary thereof prior to the Closing. All Tax Returns were complete and correct in all material respects.

(b)              Company and each Subsidiary thereof has paid all Taxes that have or may have become due pursuant to such Returns or otherwise, or pursuant to any assessment received and is not delinquent in the payment of any Taxes. The charges, accruals, and reserves with respect to Taxes on the Financial Statements are respective books of Company and each Subsidiary thereof are, and will on the Closing Date be, adequate (determined in accordance with GAAP) and are, and will on the Closing Date be, at least equal to the Liability of Company and each Subsidiary thereof for Taxes. All Taxes that Company and each Subsidiary thereof is or was required by any Law to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Government or other Person.

(c)              Neither Company nor any Subsidiary thereof has requested any extension of time within which to file any Return, which Return has not since been filed. No claim has ever been made by an authority in a jurisdiction where Company or any Subsidiary thereof does not file Tax returns that it is or may be subject to taxation by that jurisdiction.

(d)              Company and each Subsidiary has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(e)              Neither Company nor any Subsidiary thereof expects any authority to assess any additional Taxes for any period for which Tax returns have been filed. There is no dispute or claim concerning any Taxes of Company or any Subsidiary thereof claimed or raised by any authority in writing. No Tax return of Company or any Subsidiary thereof currently is the subject of audit. Company has delivered to EFX correct and complete copies of all examination reports, and statements of deficiencies assessed against or agreed to by Company or any Subsidiary thereof with respect to the five (5) tax years preceding the date hereof.

(f)              Neither Company nor any Subsidiary thereof has filed a consent under Paragraph 341(f) of the Code concerning collapsible corporations. Company has not made any payments, is not obligated to make any payments, or is not a party to any agreement that could obligate it to make any payments that will not be deductible under Section 280G of the Code. Neither Company nor any Subsidiary thereof has any adjustment to income pursuant to Section 481 of the Code that will be taken into account in any taxable year ending after the Closing Date. Neither Company nor any Subsidiary thereof has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the

37

applicable period specified in Section 897(c)(1)(A)(ii) of the Code. Company and each Subsidiary thereof has disclosed on its federal income tax returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Section 6662 of the Code. Neither Company nor any Subsidiary thereof is or has ever been a party to any Tax allocation or sharing agreement. Neither Company nor any Subsidiary thereof (i) has been a member of an affiliated group filing a consolidated federal income Tax return (other than a group the common parent of which was Company), or (ii) has any Liability for the Taxes of any Person (other than any of Company or any Subsidiary thereof) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise. Neither Company nor any Subsidiary thereof has (i) any recognized gain deferred pursuant to Treasury Regulations section 1.1502-13 or (ii) any "excess loss accounts" as determined pursuant to Treasury Regulations sections 1.1502-14 and 1.1502-32.

(g)          No Tax Liens have been filed and no deficiency or addition to Taxes, interest or penalties for any Taxes with respect to any income, properties or operations of Company or any Subsidiary thereof has been proposed, asserted or assessed in writing against Company or any Subsidiary thereof.

(h)          Neither Company nor any Subsidiary thereof has waived any statutes of limitation in respect of Taxes or agreed to or granted any extension of time with respect to any Return or other Tax claim with respect to any income, properties or operations of Company or any Subsidiary thereof or a Tax assessment or deficiency.

(i)          Neither Company nor any Subsidiary thereof has at any time elected to be an S corporation.

(j)          Neither Company nor any Subsidiary thereof has, during the five-year period preceding the date hereof, been a personal holding company within the meaning of Section 542 of the Code.

6.21   Environmental Laws.

(a)          Company and each Subsidiary thereof (x) is in substantial compliance with any and all applicable Laws relating to the protection of human health and safety or emissions, discharges, releases, threatened releases, removal, remediation or abatement of pollutants, contaminants, chemicals or industrial, hazardous or toxic substances or wastes into or in the environment (including air, surface water, ground water or land) or otherwise used in connection with the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous or toxic substances or wastes, as defined under such applicable Laws ("Environmental Laws"), (y) has received all permits, licenses or other approvals known by Company to be required of it under applicable Environmental Laws to conduct its Business and (z) is in compliance with all terms and conditions of any such permit, license or approval.

(b)          To the Knowledge of Company, there is no substance designated a "Hazardous Substance" by any Environmental Law, including asbestos, petroleum,

38

urea formaldehyde insulation and petroleum by-products ("Hazardous Substance") present at any of the real property currently owned or leased by Company or any Subsidiary thereof, and with respect to such real property, to the Knowledge of Company, there has not occurred (x) any release or any threatened release of a Hazardous Substance or (y) any discharge or threatened discharge of any Hazardous Substance into the ground, surface or navigable waters, which discharge or threatened discharge violates any Laws concerning water pollution.

(c)     Neither Company nor any Subsidiary thereof has disposed of, transported or arranged for the transportation or disposal of any Hazardous Substance where such disposal, transportation or arrangement would give rise to liability pursuant to any Environmental Law.

6.22    Employee Benefit Plans; ERISA.

(a)     The Disclosure Memorandum lists all "employee benefit plans" (the "ERISA Plans") within the meaning of Section 3(3) of Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to which Company or any Subsidiary thereof contributes or is required to contribute and all other practices, commitments, arrangements and agreements pursuant to which Company or any Subsidiary thereof provides, directly or indirectly, any compensation or benefits for employees or former employees, directors, consultants, independent contractors, or leased employees of Company or any Subsidiary thereof or their dependents (collectively, with the ERISA Plans, the "Employee Benefit Plans"). Neither Company nor any Subsidiary thereof is required to contribute, and has never been required to contribute, to any multi-employer plan within the meaning of Section 3(37)(A) of ERISA or a multiple employer welfare plan within the meaning of Section 3(40) of ERISA. True correct and complete copies of all Employee Benefit Plans, together with related trusts, insurance contracts, summary plan descriptions, annual reports, actuarial reports, nondiscrimination documentation and Form 5500 filings for the past three years, have been made available to EFX. "Nondiscrimination documentation" refers to any documentation of nondiscrimination testing that has been prepared for or with respect to an ERISA Plan, including average deferral percentage testing, average contribution percentage testing, and Code Section 410(b) coverage testing.

(b)     Each Employee Benefit Plan has been operated and administered in all material respects in accordance with its terms and all applicable Laws, including ERISA and the Code. Neither Company nor any Subsidiary thereof, nor any of their respective directors, officers, employees or agents, nor to the Knowledge of Company, any "party in interest" or "disqualified person" (as such terms are defined in Section 3(14) of ERISA and Section 4975 of the Code) has been engaged in or been a party to any "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code), nor has any such person been involved in or caused an ERISA Plan to be involved in a breach of fiduciary duty under Section 404 of ERISA. Each ERISA Plan that is a group health plan within the meaning of Section 607(1) of ERISA and Section 4980B of the Code has complied with and is in material compliance with the continuation coverage requirements of Section 601 of ERISA and Section 4980B of the Code. There are no Actions or audits pending or, to the Knowledge of Company, threatened, by or against any of the ERISA Plans by any employee or beneficiary covered under such ERISA Plan, or by any Government or otherwise involving such ERISA Plan or any of its fiduciaries (other than for routine claims for benefits).

(c)             There are no and have never been any "employee pension benefit plans" as defined in Section 3(2) of ERISA covering employees (or former employees) employed in the United States, maintained or contributed to by Company, any Subsidiary thereof or any ERISA Affiliate (as hereinafter defined), or to which Company or any ERISA Affiliate contributes or is obligated to make payments thereunder or otherwise may have any liability (collectively, "**Pension Benefit Plans**").  For purposes of this Agreement, "**ERISA Affiliate**" shall mean any person (as defined in Section 3(9) of ERISA) that is a member of any group of persons described in Section 414(b), (c), (m) or (o) of the Code, of which Company or any Subsidiary thereof is a member.  Each Pension Benefit Plan that is intended to be a qualified plan within the meaning of Section 401(a) of the Code is so qualified, the trust thereunder is exempt from federal income tax under Section 501(a) of the Code, and each such plan either (i) has received a favorable determination letter from the Internal Revenue Service and Company is not aware of any circumstances likely to result in the revocation of any such favorable determination letter, or (ii) is within the applicable filing deadline for submitting a request for such determination letter and is not aware of any reason why such determination letter would not be issued by the Internal Revenue Service.  All Company, Subsidiary and employee contributions required to be made to each Pension Benefit Plan, if any, have been made in a timely manner.  Neither Company nor any Subsidiary thereof contributes to, nor in the past 5 years has Company or any Subsidiary thereof contributed to, any Company Pension Plan that is subject to Title IV of ERISA.

(d)             Company has not and has never had any "welfare benefit plans" (as defined in Section 3(1) of ERISA) covering employees (or former employees) employed in the United States, maintained or contributed to by Company or any Subsidiary thereof and, to the extent covering employees (or former employees) employed in the United States, any plans, policies, programs, agreements, understanding or arrangements providing compensation or other benefits to employees and former employees, including all stock bonus, stock option, restricted stock, stock appreciation right, stock purchase, bonus, incentive, deferred compensation, severance and vacation plans maintained or contributed to by Company or any Subsidiary thereof (collectively, "**Welfare Plans**").

(e)             Except for benefits payable under a Pension Benefit Plan, neither Company nor any Subsidiary thereof is bound to provide, and neither Company nor any Subsidiary thereof provides, benefits, including death, health or medical benefits (whether or not insured), with respect to current or former employees of Company or any Subsidiary thereof beyond their retirement or other termination of service with Company or any Subsidiary thereof other than as required by the continuation coverage requirements of Part 6 of Title I of ERISA and Section 4980B of the Code.  Neither this Agreement nor any transaction contemplated hereby will entitle any current or former employee, officer or director of Company or any Subsidiary thereof to severance pay, unemployment compensation or any similar payment.  The consummation of the transactions contemplated by this Agreement shall not result in an increase in the amount of compensation or benefits payable to any current or former employee nor accelerate the vesting or timing of payment of such compensation or benefits.

(f)             Each Employee Benefit Plan may be amended, revised or terminated by the Company.

(g)              All contributions or premiums required to be made on or before the Effective Time by the Company or any Subsidiary under the terms of each Employee Benefit Plan have been made in a timely fashion in accordance with all applicable Laws and the terms of the Employee Benefit Plan, or are shown as a Liability on the Financial Statement.

6.23   **Employment; No Conflicting Agreements.**   None of the officers and Key Employees of Company or any Subsidiary thereof is obligated under any contract (including licenses, covenants, or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would conflict with his or her obligation to use his or her best efforts to promote the interests of Company or any Subsidiary thereof or that would conflict with the Business as presently or proposed to be conducted.

6.24   **Transactions with Related Parties.**   In the past 12 months, except for arm's length transactions in the ordinary course of business with Affiliates of TL Ventures, SoftBank and Austin Ventures (as such terms are defined in the Selling Shareholders Agreement, (a) neither Company nor any Subsidiary thereof has been a party to any contract, agreement or lease with, or any other commitment to, or has not at any time, directly or indirectly, purchased, leased or otherwise acquired any property or obtained any services from, or sold, leased or otherwise disposed of any property or furnished any services to (i) any Person owning, or formerly owning, beneficially or of record, directly or indirectly, any of the shares of or other equity interest in Company nor any Subsidiary thereof, (ii) any Affiliate of such Person, (iii) any director or officer of Company or any Subsidiary thereof, (iv) any Person in which any of the foregoing Persons has, directly or indirectly, at least a twenty percent (20%) beneficial interest in the capital stock or other type of equity interest of such Person, (v) any partnership in which any of the foregoing Persons is a general partner or has at least a twenty percent (20%) beneficial interest, or (vi) any family member of any stockholder or any other Person that, directly or indirectly, alone or together with others, controls, is controlled by or is under common control with Company or any Company Stockholder or any family member of any stockholder (the Persons listed in this clause (a) being referred to herein collectively as "<u>Affiliated Persons</u>" and individually as an "<u>Affiliated Person</u>"); (b) neither Company nor any Subsidiary thereof owes any amount to any Affiliated Person; and (c) no Affiliated Person owes any amount to Company or any Subsidiary thereof and no part of the property or assets of any Affiliated Person is used by Company or any Subsidiary thereof in the conduct or operation of its business.

6.25   **Certain Transactions.**   Neither Company nor any Subsidiary thereof is indebted, directly or indirectly, to any Affiliated Person, in any amount whatsoever; and no Affiliated Person is indebted to Company or any Subsidiary thereof or has any direct or indirect ownership interest in any firm or corporation with which Company or any Subsidiary thereof is affiliated or with which Company or any Subsidiary thereof has a business relationship. No such Affiliated Person is, directly or indirectly, interested in any contract with Company or any Subsidiary thereof. Neither Company nor any Subsidiary thereof is a guarantor or indemnitor of any indebtedness of any Affiliated Person.

6.26   **Customers and Suppliers.**   Neither Company nor any Subsidiary thereof has received any notice, nor does Company have any Knowledge, that any material customer or supplier of Company or any Subsidiary thereof has taken or contemplates taking, any steps that

41

would be reasonably likely to disrupt the business relationship of Company with such customer or supplier, or could result in a diminution in the value of Company or the Business.

6.27   **Bank Accounts.**   The Disclosure Memorandum identifies each account that Company or any Subsidiary thereof maintains or has control with any financial institution and the identity of the Persons entitled to act on their behalf in respect thereto.

6.28   **Books and Records.**

(a)   The minute books of Company and each Subsidiary thereof provided to EFX contain a complete summary of all meetings of directors, committees thereof, and shareholders since the time of its organization and reflect all transactions referred to in such minutes accurately in all material respects.

(b)   The books, records and accounts of Company and its Subsidiaries (i) are accurate and complete in all material respects and have been maintained in accordance with good business practices on a basis consistent with prior years, (ii) are stated in reasonable detail and accurately and fairly reflect the transactions and dispositions of the respective assets of the Company and each Subsidiary thereof and (iii) accurately and fairly reflect the basis for the Financial Statements.

(c)   Company and each Subsidiary thereof has implemented and maintained a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP consistently applied and (B) to maintain accountability for assets; and (iii) the amount recorded for assets on the respective books and records of the Company and the subsidiaries is compared with the existing assets at reasonable intervals in connection with the preparation of annual audits of the Company's financial statements and appropriate action is taken with respect to any differences.

6.29   **Directors and Officers.**   The Disclosure Memorandum identifies by name, business address and title, each director and officer of Company and Subsidiary as of the date of this Agreement.

6.30   **Takeover Statutes and Charter Provisions.**   To Company's Knowledge, no state takeover statutes or charter or bylaw anti-takeover provisions are applicable to the Merger, this Agreement, the Voting Agreement, the Selling Shareholder Agreement, and the transactions contemplated hereby and thereby.

6.31   **Brokers; No Existing Discussions.**   No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or its affiliates.   Neither Company, any Subsidiary, nor any of their respective Representatives, is engaged, directly or indirectly, in any negotiations or discussions with any Person with respect to an Acquisition Proposal.

42

6.32   **Disclosure.**  Neither this Agreement, the Disclosure Memorandum (including the Financial Statements) nor any certificate delivered by or on behalf of Company or any Subsidiary thereof in connection with the Closing of the transactions contemplated hereby or thereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, viewed as a whole, in light of the circumstances under which they were made, not misleading.  To the Knowledge of Company, there is no fact which materially and adversely affects the business, assets, properties, operations, prospects, condition (financial or otherwise), results of operations or liabilities of Company or any Subsidiary thereof that has not been set forth or disclosed in this Agreement or in such other or certificates.  Company has delivered or made available true and complete copies of each material document (to the extent such documents exist), or true and complete summaries thereof, requested by EFX in writing prior to the date of this Agreement.

7.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF EFX AND MERGER SUB

As an inducement to Company to enter into and perform this Agreement, and to consummate the transactions contemplated by this Agreement, EFX and Merger Sub jointly and severally represent and warrant to Company, and covenant and agree as of the date hereof and again as of the Closing Date, as follows:

7.1    **Organization.**  EFX is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia. Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.

7.2    **Authorization; No Inconsistent Agreements.**  Each of EFX and Merger Sub has full corporate power and authority to make, execute and perform this Agreement and the Additional Agreements and the transactions contemplated by this Agreement and the Additional Agreements.  This Agreement and any Additional Agreement and all transactions required hereunder and thereunder to be performed by EFX and Merger Sub have been duly and validly authorized and approved by all necessary corporate action on their part prior to the Closing Date. This Agreement and each of the Additional Agreements to which EFX or Merger Sub is a party has been duly and validly executed and delivered on behalf of EFX, and/or Merger Sub, as the case may be, by its duly authorized officers, and this Agreement and each of the Additional Agreements to which EFX or Merger Sub is a party constitutes the valid and binding obligation of EFX and/or Merger Sub, as the case may be, enforceable, subject to general equity principles, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar Laws affecting the rights of creditors generally.  Neither the execution and delivery of this Agreement nor the consummation of the Merger and the other transactions contemplated by this Agreement, will constitute a violation or breach of the articles of incorporation or bylaws of EFX.

7.3    **No Violation; Compliance with Laws.**  Neither EFX nor Merger Sub is in default under or in violation of (a) its articles of incorporation, or (b) any Order or Law, and their respective operations have been conducted, in all material respects, in accordance with, and are in compliance with, all applicable Laws.  Neither EFX nor Merger Sub has received any

43

notification of any asserted present or past failure by any of them to comply with any Order or Laws.

**7.4    Consents.** Except for the HSR Filing and filing of the Merger Documents, the execution and delivery by EFX and Merger Sub of this Agreement, the consummation of the transactions contemplated in this Agreement, and its performance under or pursuant to this Agreement, do not require the consent, approval or action of, or any filing with or notice to, any Government or other Person.

**7.5    Merger Consideration.** EFX has sufficient cash or cash equivalents available to pay the Merger Consideration.

## 8.    COVENANTS RELATING TO CONDUCT OF BUSINESS PENDING CLOSING.

**8.1    Conduct of Business Pending Closing.**

(a)    **Affirmative Covenants.**  Company covenants and agrees that, except as may otherwise be provided or permitted in this Agreement, without the prior written consent of EFX, between the date of this Agreement and the earlier of the Closing Date or the termination of this Agreement, the Business will be conducted only in the ordinary and usual course and consistent with prior practices, without the creation of any Funded Indebtedness or the creation or sufferance of any Lien on the assets of Company or any Subsidiary thereof or on the Business. Without limiting the generality of the foregoing, Company covenants, agrees and undertakes as follows:

(i)    the Business shall be carried out exclusively in the ordinary course of business, in a manner consistent with past practices and professional usage applicable to the Business, including but not limited to (i) keeping available the services of the present employees of Company and each Subsidiary thereof, and (iii) using best efforts to maintain the goodwill associated with Company and each Subsidiary thereof, including but not limited to preserving the relationships of customers, suppliers and others having business dealings with Company and each Subsidiary thereof,

(ii)    EFX will be kept fully and regularly informed of the progress of the business of Company and each Subsidiary thereof,

(iii)    no significant action or decision affecting or likely to affect in a material manner the Business or the capital structure of Company or any Subsidiary thereof shall be taken without EFX's prior approval, and

(iv)    Company and each Subsidiary thereof will maintain the Business in good condition.

(b)    **Negative Covenants.**  Except as contemplated by this Agreement, neither Company nor any Subsidiary thereof will, during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Effective Time, directly or indirectly do, or propose to do, any of the following without the prior written consent of EFX:

44

(i)    cause or permit any amendments to the Restated Articles or Bylaws or any equivalent documents of any Subsidiary of Company;

(ii)    create or permit to be created any Lien on any share of capital stock or assets of Company or any Subsidiary thereof nor will Company allow to be created a situation pursuant to which the above is likely to occur, or acknowledge or consent to any Lien on any shares of capital stock of Company or any Subsidiary thereof,

(iii)    incur any Liability or assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other Person, other than in the ordinary course of business,

(iv)    vary the terms or conditions of any material agreement nor default or remain in default in the performance thereof,

(v)    vote in favor of or make any distributions, or commit or become obligated to do so,

(vi)    issue, sell or deliver or agree or commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) or authorize the issuance, sale or delivery of, or redeem or repurchase, any stock or other securities of Company or any Subsidiary thereof, or any rights, warrants or options to acquire any such stock or other securities (except pursuant to the conversion or exercise of Preferred Shares or Company Options or Warrants outstanding on the date hereof), or, except to the extent necessary to give effect to the arrangements contemplated by **Paragraph 4.3**, amend any of the terms of (including without limitation the vesting of) any such Company Options, *provided,* that nothing in this **Paragraph 8.1(b)(vi)** shall prevent, prohibit, limit or otherwise restrict Company's ability to amend any options, warrants or other rights to purchase or otherwise acquire securities of the Company outstanding on the date hereof to permit the early exercise or acceleration of any such options, warrants or other rights to purchase,

(vii)    change its historical accounting methods or practices, and its financial statements shall be prepared in accordance with GAAP, as to depreciation and amortization,

(viii)    exercise puts and calls with respect to any futures contract, derivative or similar financial product and more generally modify its current portfolio thereof without prior notice to and written approval of EFX,

(ix)    take any action which constitutes or may constitute a default under a material agreement or omit to take such action as may be required to prevent such a default,

(x)    acquire, enter into any binding obligation to acquire, or enter into a letter of intent seeking to acquire (by merger, consolidation, or acquisition of stock or assets) any corporation, partnership or other business organization or division thereof;

45

(xi)    sell, pledge, dispose of or encumber any assets of Company or any Subsidiary thereof, or sell, assign, transfer, license or grant to any Person any rights to the Intellectual Property Rights of Company or any Subsidiary thereof,

(xii)    fail to maintain its books, accounts and records in accordance with good business practices,

(xiii)    fail to maintain in full force and effect all its insurance currently in effect,

(xiv)    increase the compensation payable or to become payable to any director, officer, employee or agent of Company or any Subsidiary thereof, make any bonus or profit sharing payment or other arrangement (whether current or deferred) with a director, officer, employee or agent except normal individual increases in compensation to directors, offers, employees or agents consistent with past practice, or as required by Law or agents;

(xv)    hire any officer, director or employee, or retain any consultant or agent will be retained, in each case, at a salary or fee in excess of US $100,000, or terminate any existing employment, severance, consulting or other compensation agreement or arrangement;

(xvi)    enter into, terminate or amend any material contract or agreement;

(xvii)    authorize any capital expenditures or purchase of fixed assets in excess of $50,000 per transaction and outside of the ordinary course of business;

(xviii)    pay, discharge, settle or satisfy any claims, litigation or any Lien, in each case, involving amounts in excess of $10,000;

(xix)    establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, welfare, employee benefit, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any current or former directors, officers or employees, except, in each case, as may be required by Law, or

(xx)    enter into or amend any contract, agreement, commitment or arrangement to effect any of the matters prohibited by this **Paragraph 8.1(b)** or take any other action which will materially alter the organization, capitalization, or financial structure, practices or operations of Company or any Subsidiary thereof or the Business.

8.2    **No Solicitation of Third Party Interest.** From and after the date hereof until the earlier of (i) the Closing Date or (ii) the termination or expiration of this Agreement pursuant to **Article 13** (the "**Termination Date**"), Company agrees that it shall not, nor shall it permit any Subsidiary thereof, nor any of their respective shareholders, members, partners, officers, directors, employees, or agents, directly or indirectly (a) negotiate or discuss with any other Person this Agreement, the terms contained in this Agreement, or any of the transactions contemplated by this Agreement, (b) negotiate or discuss with any other Person any other transaction involving a merger of Company, or the sale of all or any of the capital stock of Company, or the sale of any assets of Company, or any other business combination involving

46

Company, (c) reveal the terms of this Agreement to any Person except for the express purpose of carrying out the transactions contemplated in this Agreement or any Additional Agreement, or (d) solicit, encourage, consider, entertain, negotiate, discuss or accept any offer, bid or proposal from any other Person respecting any transaction involving a merger of Company, the sale of any of the shares in Company, the sale of any assets of Company, or any other business combination involving Company (an "Acquisition Proposal"). If any Acquisition Proposal is received prior to the Termination Date, then Company will immediately notify EFX of the receipt of such proposal and will promptly provide EFX with a copy of the proposal (or if the proposal is not in writing, a written summary of its terms).

9.    ADDITIONAL COVENANTS

    9.1    Access and Inspection.  Company will provide EFX, Merger Sub and their respective Representatives full access (at all reasonable times, and in a manner so as not to interfere with the normal business operations of Company) during normal business hours from and after the date of this Agreement until the Closing, to all of the Representatives, employees, books and records of Company and each Subsidiary thereof (including the right to make copies and extracts), and shall use its best efforts to provide such access to the independent contractors, customers and suppliers of Company and each Subsidiary thereof, and will furnish any and all information concerning Company and each Subsidiary thereof as EFX, Merger Sub and their respective Representatives may reasonably request, in each case for the purpose of making a continuing investigation of Company and the Business.  Company shall not provide any other Person with similar access or information between the date of this Agreement and the earlier of the Closing Date or the termination of this Agreement pursuant to Article 13.  No investigation made before or after the date of this Agreement by or on behalf of EFX will limit or affect in any way the representations, warranties, covenants, conditions, agreements and indemnities of Company and any Company Shareholders or any holders of Company Options under or pursuant to this Agreement, the Selling Shareholders Agreement, or any other written agreement by or among some or all of the parties to this Agreement and any or all of the Company Shareholders, each of which will survive any investigation and the Closing.  All information obtained pursuant to this Paragraph 9.1 shall be kept confidential in accordance with the Mutual Confidentiality Agreement, dated as of January 28, 2002, as amended prior to the date hereof, between EFX and Company, as amended (the "Confidentiality Agreement").

    9.2    Cooperation.  The parties will cooperate fully with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and all parties will use their best efforts to consummate the transactions contemplated by this Agreement and to fulfill their obligations under this Agreement, including causing to be fulfilled at the earliest practical date the conditions precedent to the obligations of the parties to consummate the Merger and the other transactions contemplated by this Agreement.  Without the prior written consent of the other parties, no party to this Agreement may take any intentional actions, or intentionally omit to take any actions, that would cause the conditions precedent to the obligations of the parties to this Agreement not to be fulfilled, including intentionally taking or causing to be taken any action which would cause the representations and warranties made by a party in this Agreement not to be true, correct and complete as of the Closing.

47

9.3     Expenses.  All expenses incurred by EFX and Merger Sub in connection with the negotiations among the parties, and the authorization, preparation, execution and performance of this Agreement, the Selling Shareholders Agreement, the Additional Agreements and the documents, agreements and instruments and the transactions contemplated hereby and thereby, including all fees and expenses of their Representatives, will be paid by EFX.  All expenses incurred by Company, any Subsidiary thereof, and any or all of the Company Shareholders in connection with the negotiations among the parties, and the authorization, preparation, execution and performance of this Agreement, the Selling Shareholders Agreement, the Additional Agreements and the documents, agreements and instruments and the transactions contemplated hereby and thereby, including all fees and expenses of their Representatives (the "Expenses") will be the responsibility of, and paid by, Company.  Notwithstanding the foregoing, (x) EFX agrees to bear one-half of all HSR Filing fees, and all transfer, sales and use Taxes, recording fees and similar governmental charges and taxes in connection with the Merger, and Company agrees to bear one-half of all HSR Filing fees, and all transfer, sales and use Taxes, recording fees and similar governmental charges and taxes in connection with the Merger, and (y) if the Merger and the other transactions contemplated by this Agreement are consummated, and Company and any Subsidiary thereof incur more than aggregate of $200,000 in fees and expenses in connection with the negotiations among the parties hereto, and the authorization, preparation, execution, and performance of this Agreement, the Additional Agreements, the Merger, and the other transactions contemplated hereby and thereby (exclusive of any HSR Filing Fees), any fees and expenses incurred by Company and any Subsidiary thereof in connection with the negotiations among the parties hereto, and the authorization, preparation, execution, and performance of this Agreement, the Additional Agreements, the Merger, and the other transactions contemplated hereby and thereby in excess of $200,000 (exclusive of any HSR Filing Fees) (the "Excess Expenses") shall be deducted from the Merger Consideration payable to the Company Shareholders at Closing, and paid directly to the professional advisors listed in Schedule 9.3 of the Disclosure Memorandum in accordance with the provisions of Paragraphs 4.9(a) and 5.2(a)(iii).

9.4     Publicity.  Except to the extent required by applicable Law, the listing requirements of the New York Stock Exchange, NASDAQ or any other stock exchange, or the requirements of any other regulatory authority, all press releases and other public announcements respecting the subject matter of this Agreement or any Additional Agreement will be made only with the mutual agreement of Company and EFX, which agreement will not be unreasonably withheld, delayed or conditioned.

9.5     Shareholder Approval.  Company shall use its best efforts to obtain, as promptly as practicable, unanimous shareholder approval of this Agreement, the Merger and the other transactions contemplated hereby (the "Requisite Shareholder Approval") either at a special meeting of shareholders or pursuant to a written shareholder consent, all in accordance with the applicable requirements of the FBCA, the Articles of Incorporation, and the Bylaws.  In connection with such special meeting of shareholders or written shareholder consent, Company shall provide to its shareholders a written proxy or consent statement which includes (i) a copy of this Agreement (including the Disclosure Memorandum, the Preliminary Allocation Schedule, and each Exhibit attached to this Agreement) and (ii) a statement that Company Shareholders are or may be entitled to assert dissenters' rights under the Section 607.1302 of the FBCA and a copy of Sections 607.1301, 607.1302 and 607.1320 of the FBCA.  If the Requisite Shareholder

Approval is obtained by means of a written consent, the Company shall comply with Section 607.0704 of and other applicable provisions of the FBCA, including, without limitation, Section 607.1320(b), and shall promptly inform EFX of the date on which such notice was sent. Company shall include in the proxy or written consent the unanimous recommendation of its Board of Directors that the shareholders of the Company vote in favor of the adoption of this Agreement and the approval of the Merger. Company shall also use its best efforts to have any contract, agreement or other arrangement, including those entered into in connection with this Agreement, the Merger and the other transactions contemplated hereby, that may result in a parachute payment under the federal Tax Laws, approved by such percentage of Company's outstanding voting securities as is required by the terms of Section 280G(b)(5)(B) of the Code, and to cause such shareholder approval to have been obtained in a manner which satisfies all applicable requirements of Section 280G(b)(5)(B) of the Code and the proposed Treasury Regulations thereunder, including (without limitation) Q-7 of Section 1.280G-1 of such proposed regulations. Company shall ensure that any disclosure document provided to Company Shareholders in connection with such approval does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (provided that the Company shall not be responsible for the accuracy or completeness of any information concerning the business or affairs of EFX or Merger Sub furnished by EFX in writing for inclusion in such document).

   9.6   **Certain Governmental Filings.** The parties will make, or cause to be made, all filings and submissions required to be made to any Government in connection with the transactions contemplated by or resulting from this Agreement. The parties acknowledge that prior to the date hereof, they have each filed a Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice (the "**HSR Filing**"). Each of the parties will furnish to the other parties any and all necessary information and reasonable assistance as another party may reasonably request in connection with its preparation of necessary filings or submissions to any Government.

   9.7   **Additional Information.** Company shall use its best efforts to ensure that each of the members of the board of directors of Company, any Subsidiary thereof and each Company Shareholder shall provide, in response to any request by EFX or its Representatives, all material information known to it, her or him or which on due inquiry ought to be known to it, her or him, relating to the Business or Company or otherwise as EFX may reasonably require for the purpose of complying with any applicable Law or the requirements of the New York Stock Exchange.

   9.8   **Update of Information.** At all times prior to Closing, Company shall promptly provide EFX and its Representatives with written notification of any material fact, event, occurrence or other information of any kind whatsoever of which Company is aware and which affects, or may affect, the continued truthfulness, correctness or completeness of any representation, warranty, or statement made by or on behalf of Company in this Agreement, any Additional Agreements, the Disclosure Memorandum or any document, agreement, instrument, certificate or writing furnished to EFX or its Representatives pursuant to or in connection with this Agreement or any Additional Agreement, or which affects or may affect the continued truthfulness, correctness or completeness of any thereof through the date of the Closing.

Company shall also promptly provide EFX and its Representatives with written notice of any failure of the Company to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. Each such written notification shall specifically identify all representations, warranties, or statement affected or potentially affected by the fact, event, occurrence or information that necessitated the giving of such notice; *provided, however,* that the delivery of any notice pursuant to this **Paragraph 9.8** shall not limit or otherwise affect the remedies available hereunder to EFX. In furtherance thereof, prior to the Closing, Company shall prepare and deliver to EFX updates to the Disclosure Memorandum, in form satisfactory to EFX, which shall only if accepted by EFX in writing, be deemed to supplement the disclosures made in the Disclosure Memorandum.

9.9     **State Takeover Laws.** If any fair price, business combination, or control share acquisition statute or other similar statute or regulation shall become applicable to the transactions contemplated hereby or in the Voting Agreement or the Selling Shareholders Agreement, EFX and Company and their respective boards of directors shall use their reasonable best efforts to grant such approvals and take such actions as are necessary so that the transactions contemplated hereby and thereby may be consummated as promptly as practicable on the terms contemplated hereby and thereby and otherwise act to minimize the effects of any such statute or regulation on the transactions contemplated hereby and thereby.

9.10     **Termination of Agreements.** Except for the Voting Agreement, Company shall terminate, or cause to be terminated, to the reasonable satisfaction of EFX, effective immediately prior to the Effective Time, (i) the Options, Company Options, Series B Warrant, all agreements with Company and any of its securityholders or optionholders including the Company Options, or among any Company securityholders or optionholders, providing for the granting of options, registration rights, rights of first refusal, rights of co-sale, board observation, information covenants, or relating to the voting of Company securities or requiring the Company to obtain the consent or approval of any such securityholders prior to taking or failing to take any action and (ii) all agreements set forth on Schedule 9.10 hereof (including the employment and consulting agreements specified therein).

## 10.     CONDITIONS PRECEDENT TO CLOSING

10.1     **Conditions to Obligations of EFX and Merger Sub to Close.** The obligations of EFX and Merger Sub under this Agreement to consummate the Merger and the other transactions contemplated by this Agreement are subject to the fulfillment and satisfaction of each and every one of the following conditions on or prior to the Closing, any or all of which may be waived in writing in whole or in part by EFX:

(a)     **Proceedings and Documents Satisfactory.** All proceedings taken in connection with the consummation of the transactions contemplated herein and all documents and papers reasonably required in connection therewith, shall be reasonably satisfactory to EFX and its counsel, and EFX and its counsel shall have timely received copies of such documents and papers, all in form and substance reasonably satisfactory to EFX and its counsel, as reasonably requested by EFX or its counsel in connection therewith.

(b)     **Representations and Warranties.**   Each of the representations and warranties contained in this Agreement and the Selling Shareholders Agreement and in any certificate, instrument, schedule, agreement or other writing delivered by or on behalf of, or in respect of, the Business and Company or any Subsidiary thereof and the Company Shareholders that is not qualified by materiality or "Material Adverse Change" shall have been true and correct in all material respects as of the date when made and on the Closing Date as though made again at and as of the Closing Date, and will be true and correct at and as of the Closing Date, and each of the representations and warranties contained in this Agreement and the Selling Shareholders Agreement and in any certificate, instrument, schedule, agreement or other writing delivered by or on behalf of, or in respect of, the Business and Company or any Subsidiary thereof and the Company Shareholders that is qualified by materiality or "Material Adverse Change" shall have been true and correct in all respects as of the date when made and on the Closing Date as though made again at and as of the Closing Date.

(c)     **Compliance with Covenants and Conditions.**   Company and each Subsidiary thereof shall have performed and complied with all covenants and agreements and satisfied all conditions required by this Agreement to be performed or complied with, or satisfied by them prior to or on the Closing Date.

(d)     **Requisite Shareholder Approval.**   This Agreement, the Merger and the transactions contemplated herein shall have been approved and adopted by the affirmative unanimous vote (in person, by proxy or by consent) of the holders of all of the Common Shares, Series A Shares and Series B Shares.

(e)     **Closing Certificates.**   Company and each Company Shareholder will have delivered to EFX certificates, executed by their appropriate officers or other Representative, dated as of the Closing Date, certifying in such detail as EFX and Merger Sub may request as to the fulfillment and satisfaction of the conditions specified in **Paragraphs 10.1(b) and 10.1(c)** and the Selling Shareholder Agreement.

(f)     **Government Consents.**   EFX, Merger Sub and Company shall have received all material authorizations, consents and approvals of any Government necessary or desirable for the execution, delivery and performance of this Agreement and the transactions contemplated hereby, all such authorizations, consents and approvals shall be in full force and effect, and all notices required to be given to any Government shall have been given and all applicable waiting periods shall have expired.

(g)     **Consents.**   Company shall have delivered to EFX as soon as practical on or before the Closing Date all registrations, permits, filings, applications, notices, consents, approvals, orders, qualifications, and authorizations of all Persons from which such consents are required for the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and none of such authorizations, consents or approvals shall be subject to any restrictions or conditions given that require any payment to the consenting or approving party by EFX or Company or that materially adversely affect the Business, the assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects.

51

(h)     **Resolutions.**  EFX and Merger Sub shall have received duly adopted resolutions of the board of directors of Company, certified by the Secretary of Company, authorizing and approving the execution of this Agreement and all other documents executed by them, and the taking of any and all other actions necessary to enable Company to comply with the terms hereof and to consummate the Merger and the transactions contemplated in this Agreement.

(i)     **Intentionally Omitted.**

(j)     **Legal Opinion.**  EFX shall have received from Akerman, Senterfitt & Eidson, P.A., legal counsel to Company and the Company Shareholders, a legal opinion addressed to EFX dated the Closing Date in the form annexed hereto as **Exhibit I.**

(k)     **No Inconsistent Requirements.**  No Action will have been commenced by any Government or Person seeking to enjoin or prohibit the transactions contemplated by this Agreement or any Additional Agreement, or claim threatened by any Person that such Person is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any capital stock, or any other voting, equity, or ownership interest in, Company or any Subsidiary thereof, or is entitled to all or any portion of the consideration payable for the Company Shares.

(l)     **No Injunction.**  No temporary restraining order, preliminary or permanent injunction or other order by any court of competent jurisdiction which prohibits the consummation of the transactions contemplated in this Agreement will have been issued and remain in effect on the Closing Date; *provided, however,* that the parties to this Agreement will use all reasonable efforts to have each and every relevant Order or injunction vacated or reversed prior to the Closing Date.

(m)     **Diligence Investigation.**  EFX shall have concluded (through its Representatives) an investigation of the condition (financial and otherwise), properties, assets, prospects, technical aspects, operations and affairs of the Business and Company and each Subsidiary thereof, and shall be satisfied, in its sole discretion, with the results thereof.

(n)     **No Material Adverse Change.**  No Material Adverse Change shall have occurred after the date of this Agreement.

(o)     **Additional Agreements and Closing Documents.**  EFX will have received duly executed and delivered execution counterpart originals of each Additional Agreement, signed by each relevant Person.

(p)     **Resignations.**  Each director and officer of Company and each Subsidiary thereof shall have tendered their written resignation in respect of his or her positions with Company and each Subsidiary thereof.

(q)     **Performance of Selling Shareholders and Voting Agreements.**  All the terms, covenants and conditions of each of the Selling Shareholders Agreement and the Voting

52

Agreement to be complied with and performed by certain shareholders of Company on or before the Closing Date shall have been fully complied with and performed.

(r)     **Termination of Agreements.**   All the agreements described in **Paragraph 9.10** and listed on Schedule 9.10 hereof shall have been terminated in their entirety to the satisfaction of EFX.

(s)     **Expenses Certificate.**   One Business Day prior to Closing, EFX shall have received a certificate in form and substance satisfactory to EFX and executed by Company's Chief Executive Officer or Chief Financial Officer, setting forth and certifying Company's aggregate Liability for Expenses through the Closing Date, including all amounts paid through such date, which shall be accompanied by such supporting information and calculations as are necessary for EFX to verify and determine such amount as of the Closing Date.

**10.2   Conditions to Obligations of Company to Close.**  The obligations of Company under this Agreement to consummate the Merger and the other transactions contemplated by this Agreement are subject to the fulfillment and satisfaction of each and every one of the following conditions on or prior to the Closing, any or all of which may be waived in writing in whole or in part by Company:

(a)     **Representations and Warranties.**   The representations and warranties contained in this Agreement, the Additional Agreements and in any certificate, instrument, schedule, agreement or other writing delivered by or on behalf of, EFX and Merger Sub in connection with the transactions contemplated by this Agreement or the Additional Agreements shall have been true and correct as of the date when made and will be deemed to be made again at and as of the Closing Date and will be true and correct at and as of the Closing Date.

(b)     **Compliance with Covenants and Conditions.**   EFX and Merger Sub shall have performed and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by them prior to or on the Closing Date.

(c)     **Closing Certificates.**   EFX and Merger Sub will have delivered to Company certificates, executed by their appropriate officers or other Representative, dated as of the Closing, certifying in such detail as Company may request as to the fulfillment and satisfaction of the conditions specified in **Paragraphs 10.2(a) and 10.2(b).**

(d)     **Government Consents.**   EFX, Merger Sub and Company shall have received all authorizations, consents and approvals of any Government necessary or desirable for the execution, delivery and performance of this Agreement, the Merger and the other transactions contemplated hereby, all such authorizations, consents and approvals shall be in full force and effect, and all notices required to be given to any Government shall have been given and all applicable waiting periods shall have expired.

(e)     **No Injunction.**   No temporary restraining order, preliminary or permanent injunction or other order by any court of competent jurisdiction which prohibits the consummation of the transactions contemplated in this Agreement will have been issued and remain in effect on the Closing Date; *provided, however,* that the parties to this Agreement will

use all reasonable efforts to have each and every relevant order or injunction vacated or reversed prior to the Closing Date.

## 11:   INDEMNIFICATION

    **11.1   Indemnification.**   If a Closing occurs, in accordance with and subject to the further provisions of this Article 11, the Company Shareholders and Former Option Holders in consideration of their receipt of any Merger Consideration (each, an "Indemnitor", and collectively, the "Indemnitors") will, jointly and severally, indemnify and hold harmless EFX and its Affiliates (which shall include with effect from the Closing, Company and each Subsidiary thereof) and their respective officers, directors, agents, employees and stockholders, other than any officer, director, agent or employee who immediately prior to the Closing was a Company Shareholder or an officer, director, agent or employee of a Company Shareholder (collectively, "Indemnitees"), from and against any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts paid in settlement (collectively, the "Indemnified Losses"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:

        (a)    any misrepresentation, breach of warranty or breach or nonfulfillment of any agreement of Company (without regard to any materiality or Company Material Adverse Change qualifications contained therein) contained in this Agreement, the Disclosure Memorandum, or in any other certificate, schedule, instrument or document delivered to EFX by or on behalf of Company pursuant to the provisions of this Agreement and any Excess Expenses to the extent not deducted from the Merger Consideration at the Closing;

        (b)    the failure of any Company Shareholder to have good and valid title to the Company Shares issued in the name of such Company Shareholder, free and clear of all Liens;

        (c)    any claim by a shareholder or former shareholder of Company, or any other Person seeking to assert, or based upon: (i) ownership or rights to ownership of any shares of stock of Company; (ii) any rights of a shareholder (other than the right to receive consideration pursuant to this Agreement), including any option, preemptive rights or rights to notice or to vote; (iii) any rights under the Articles of Incorporation or Bylaws; or (iv) any claim that his, her or its shares or rights to purchase shares of the Company's capital stock were wrongfully repurchased or cancelled by Company;

        (d)    any claim by a shareholder or former shareholder of BERJ, Inc. or its Affiliates, or any other Person, relating to (i) the transactions contemplated in the Reorganization Agreement, or (ii) the investment by any shareholder or former shareholder of BERJ, Inc. or its Affiliates in Company;

        (e)    any and all obligations and Liabilities of Company or any Subsidiary thereof resulting from or arising out of (i) (A) any increase in Taxes of Company, any Subsidiary thereof, EFX or any Affiliate relating to periods on or prior to the Closing Date, or (B) all Taxes imposed on Company or any Subsidiary thereof, or for which Company or any Subsidiary thereof may otherwise be liable, as a result of having been a member of a Company Group, or (ii) the offer, issue and sale of any debt or equity securities of Company, any Subsidiary thereof

or any predecessor of either Company or any Subsidiary thereof (including the grant or issuance of any options to acquire shares of the capital stock of Company, any Subsidiary thereof or any predecessor of either Company or any Subsidiary thereof) prior to the date of this Agreement;

(f)     any exercise of dissenters' rights pursuant to Section 607.1320 of the FBCA (in which case EFX shall be entitled to recover the amount by which the "fair value" of any Dissenting Shares as finally determined pursuant to the FBCA exceeds the Per Share Participation Amount, together with all expenses arising out of the determination adjudication or settlement of such claims);

(g)     the matters disclosed in:  Schedule 6.11(e); items 1, 2, 3, 4, 10, 16, 18, 19 and 20 of Schedule 6.13; and Schedule 6.20 of the Disclosure Memorandum;

(h)     any Actual Overdue Payables to the extent in excess of the amount of Funded Indebtedness shown on the Final Allocation Schedule;

(i)     any uncollected accounts receivable acquired by Company pursuant to the Reorganization Agreement and Liability for accounts payable assumed pursuant to the Reorganization Agreement, without duplication of any amounts recovered in respect of such uncollected accounts receivable acquired by Company pursuant to the Reorganization Agreement or Liability for accounts payable assumed pursuant to the Reorganization Agreement;

(j)     any claims relating to Company's waiver of the requirement to pay the exercise price of any Company Option cancelled pursuant to **Paragraph 4.3**;

(k)     any claims relating to the termination of any agreements referred to in **Paragraph 9.10** or listed on Schedule 9.10;

(l)     any Liability or claim arising out of or relating to Company's failure to provide any notices or obtain any of the waivers, consents or approvals referred to or set forth in Schedule 6.6 of the Disclosure Memorandum, other than for the consent of H.E.C., LTD.;

(m)     any Working Capital Deficiency to the extent not recovered pursuant to **Paragraph 4.8**;

(n)     any claim against Company pursuant to the Asset Purchase Agreement dated February 15, 2002, as amended, among Company, and incorporators of DataOne Marketing, Inc.; and

(o)     any and all Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid any Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses or to oppose the imposition of any Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses, or in enforcing the provisions of this **Paragraph 11.1**.

11.2    Indemnification Claims; Payment.

(a)    In order to seek indemnification under this **Article 11**, an Indemnitee shall give written notification (a "**Claim Notice**") to the Shareholders' Representative on behalf of the Indemnitors which contains (i) a description and the amount (the "**Claimed Amount**") of any Indemnified Loss incurred or reasonably expected to be incurred by the Indemnitee, (ii) a statement that the Indemnitee is entitled to indemnification under this **Article 11** for such Indemnified Loss and a reasonable explanation of the basis therefor, and (iii) a demand for payment (in the manner provided in paragraph (b) below) in the amount of such Indemnified Loss. The Indemnitee shall also deliver a copy of the Claim Notice to the Escrow Agent.

(b)    Within 30 days after delivery of a Claim Notice, the Shareholders' Representative shall deliver to the Indemnitee a written response (the "**Response**") in which the Shareholders' Representative shall: (i) agree that the Indemnitee is entitled to receive all of the Claimed Amount in which case EFX, the Indemnitee and the Shareholders' Representative shall deliver to the Escrow Agent, within 2 Business Days following the delivery of the Response, a written notice executed by such parties instructing the Escrow Agent to disburse the Claimed Amount to EFX, (ii) agree that the Indemnified Party is entitled to receive part, but not all, of the Claimed Amount (the "**Agreed Amount**") in which case EFX, the Indemnitee and the Shareholders' Representative shall deliver to the Escrow Agent, within 2 Business Days following the delivery of the Response, a written notice executed by such parties instructing the Escrow Agent to disburse the Agreed Amount to EFX, or (iii) dispute that the Indemnitee is entitled to receive any of the Claimed Amount, in which case, subject to the provisions of **Paragraph 11.3**, (A) after a final, non-appealable judgment has been rendered or a settlement has been reached in respect of a third party claim or Action, or (B) in the case of a claim for Indemnified Losses arising other than pursuant to a third party claim or Action, after a final resolution or a settlement has been reached, Indemnitees shall be entitled to proceed immediately against the Escrow Fund in accordance with the Escrow Agreement.

11.3    Defense of Claims.

(a)    If any Action by a third party arises after the Closing for which Indemnitors may be liable pursuant to this **Article 11**, then the Indemnitees will notify Indemnitors in accordance with the provisions of this **Article 11** and this Agreement, and will give Indemnitors a reasonable opportunity:

(i)    to conduct and control any proceedings or negotiations in connection with the Action and necessary or appropriate to defend the Indemnitees;

(ii)    to take all other required steps or proceedings to settle or defend any Action; and

(iii)    to employ counsel reasonably acceptable to Indemnitees to contest any Action in the name of the Indemnitees or otherwise.

The expenses of all proceedings, contests or lawsuits with respect to the Actions will be borne by Indemnitors.

(b)     Notwithstanding **Paragraph 11.3(a)**, if (A) an Indemnitee reasonably determines in good faith that there is a reasonable probability that an Action may adversely affect Indemnitees and their respective Affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, (B) the Action seeks injunctive or similar equitable relief, (C) it is an Action (other than with respect to a tax matter referred to in **Paragraph 11.3(g)**) brought or initiated by a Government, or (D) the aggregate amount of monetary damages sought, or which could reasonably be presumed in good faith to exceed the lesser of (i) the available Escrow Fund and (ii) $10,000,000, an Indemnitee may, by notice to the Indemnitors, assume the exclusive right to defend, compromise or settle any such Action other than the litigation referred to as item 2 in Section 6.13 of the Disclosure Memorandum.  The Indemnitors shall be obligated to bear the legal fees, costs and expenses of that defense, judgment or settlement, but shall not be required to bear the cost of more than one counsel for Indemnitees.

(c)     If Indemnitors do not assume the defense of, or if after so assuming the Indemnitors fail to defend, any Action, then the Indemnitees may defend against any claim or Action in the manner they may deem appropriate and the Indemnitees may settle any claim or Action on the terms they deem appropriate, and Indemnitors will promptly reimburse the Indemnitees for the amount of all expenses, legal and otherwise, reasonably and necessarily incurred by the Indemnitees in connection with the defense against and settlement of any claim or Action, but shall not be required to bear the cost of more than one counsel for Indemnitees.  If no settlement of any claim or Action is made, Indemnitors will satisfy any judgment rendered with respect to any claim or in any Action, before the Indemnitees are required to do so, and pay all expenses, legal or otherwise, reasonably and necessarily incurred by the Indemnitees in the defense of any claim or Action, but shall not be required to bear the cost of more than one counsel for Indemnitees.

(d)     If a judgment is rendered against any of the Indemnitees in any Action covered by the indemnification under this Agreement, or any Lien in respect of any judgment attaches to any of the assets of any of the Indemnitees, Indemnitors will immediately upon any entry or attachment pay the relevant judgment in full or discharge the relevant Lien unless, at the expense and direction of Indemnitors, an appeal is taken under which the execution of the judgment or satisfaction of the Lien is stayed.  If and when a final judgment is rendered in any action, Indemnitors will forthwith satisfy any judgment or discharge any Lien before any of the Indemnitees is compelled to do so.

(e)     Any notice required to be given to Indemnitors pursuant to **Paragraph 11.3(a)(i)** shall be given as soon as is reasonably practicable but in no event later than five Business Days before the answer or other response to the Action is required to be made (the "**Answer Period**").  Indemnitors shall assume the defense of any Action, if at all, by notice to Indemnitees given as promptly as is practicable, but in no event later than two Business Days prior to the date by which an answer or other response to the Action is required to be made.  Indemnitors' failure to notify Indemnitees as contemplated by this **Article 11** shall be conclusively deemed an election by Indemnitors not to assume such defense.  Any failure by Indemnitees to give the requisite notice as contemplated by this **Article 11** will not relieve Indemnitors of the obligation to indemnify Indemnitees pursuant to this **Article 11** except to the extent that the defense of any Action is materially prejudiced by the delay.

57

(f)     The Indemnitors or the Indemnitees, as appropriate, to the extent that the defense of such Action was not undertaken or assumed pursuant to **Paragraph 11.3** by such Indemnitor or Indemnitee, as appropriate, shall have the right to participate in the defense of any Action related to an Indemnified Loss at its sole cost and expense and the cost and expense of that participation shall not be an Indemnified Loss.

(g)     For purposes of this **Paragraph 11.3**, any references to the Indemnitors (except provisions relating to an obligation to make or a right to receive any payments) shall be deemed to refer to the Shareholders' Representative. The Shareholders' Representative shall have full power and authority on behalf of each Company Shareholder to take any and all actions on behalf of, execute any and all instruments on behalf of, and execute or waive any and all rights of, the Company Shareholders under this **Article 11**. The Shareholders' Representative shall have no liability to any Company Shareholder for any action taken or omitted on behalf of the Company Shareholders pursuant to this **Article 11**.

11.4    **Limitation on Liability.**  Other than in respect of claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct (in which case EFX shall have all remedies available at law or in equity) any and all claims for Indemnified Losses made pursuant to Article 11 of this Agreement or for breaches of the representations and warranties made by Company herein shall be satisfied solely out of the Escrow Fund (which includes interest and earnings thereon) and no Indemnitee shall have personal recourse against any Company Shareholder for any claims for Indemnified Losses made pursuant to this **Article 11** or for breaches of the representations and warranties made by Company herein. For the avoidance of doubt, the limitations set forth in this **Paragraph 11.4** shall be inapplicable to any Person party to the Selling Shareholders Agreement for purposes of such Person's Liability, if any, for breach of any representations and warranties made by such Person thereunder.

11.5    **Threshold.**  Other than in respect of claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct or those pursuant to (x) **Paragraph 11.1(a)** relating to a breach of the representations and warranties set forth in **Paragraphs 6.1, 6.2, 6.4, 6.16 and 6.20** or (y) **Paragraphs 11.1(b), 11.1(c), 11.1(d), 11.1(e) and 11.1(f)** (as to which the limitations set forth in this **Paragraph 11.5** shall be inapplicable), the Indemnitors shall have no obligation (i) to indemnify the Indemnitees under this **Article 11** for a breach of any representation or warranty, or (ii) otherwise, pursuant to or in connection with this Agreement, unless and until the aggregate amount of all Indemnified Losses arising therefrom equals or exceeds $100,000 and at such time as the aggregate amount of such Indemnified Losses equals or exceeds $100,000, the Indemnitees may assert all such prior and all future Indemnified Losses against the Indemnitors.

11.6    **No Contribution by the Surviving Corporation or any Subsidiary.**  Neither the Surviving Corporation nor any Subsidiary thereof will have any Liability to any Indemnitor as a result of any misrepresentation or breach of representation or warranty contained in this Agreement or any certificate, schedule, instrument, agreement or other writing delivered by or on behalf of, or in respect of, Company or any Subsidiary thereof pursuant to this Agreement, the Disclosure Memorandum or in connection with the transactions contemplated this Agreement, or the breach of any covenant or agreement of Company contained in this Agreement, the Disclosure Memorandum or any certificate, schedule, instrument, agreement or other writing by

58

or on behalf of, or in respect of, Company or any Subsidiary thereof pursuant to the terms of this Agreement, the Disclosure Memorandum or in connection with the transactions contemplated by this Agreement. No Indemnitor will have any right of indemnification or contribution against the Surviving Corporation or any Subsidiary thereof on account of any event or condition occurring or existing (x) prior to or on the date hereof or (y) on or before the Closing Date.

     **11.7   No Waiver.**  If on the date of execution of this Agreement or the Closing Date, EFX or any of its Representatives, has any knowledge of any breach of any representation, warranty, covenant or agreement made by Company under this Agreement, the Disclosure Memorandum, any Exhibit, or Additional Agreement, such knowledge shall not constitute a waiver of any claims for Indemnified Losses which EFX may make under this **Article 11** or estop EFX from making any such claims.

**12.   SURVIVAL**

     **12.1   Survival.**  The representations, warranties, covenants, agreements and indemnities of Company contained in this Agreement, the Disclosure Memorandum, or in any certificate, instrument, schedule, agreement or other writing delivered pursuant to the provisions of this Agreement and any representations, warranties and certifications by the Company Shareholders with respect to the representations and warranties contained in this Agreement in the Selling Shareholder Agreement, will survive the Merger and the consummation of the other transactions contemplated in this Agreement, or in any writing delivered pursuant to the provisions of this Agreement, and will continue in full force and effect for a period of twenty-four (24) full calendar months, measured from the Closing Date (the "**Survival Period**"). Notwithstanding the immediately preceding sentence, the Survival Period in respect of any claim for an Indemnified Loss shall be extended until final resolution of such claim provided that notice of such claim describing in particularity shall have been received by the Shareholders' Representative prior to the expiration of the Survival Period. The right to indemnification under **Article 11**, payment of Indemnified Losses, or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any (x) investigation of the affairs of the Business or Company prior to, on or subsequent to the date of this Agreement made by EFX or Merger Sub or their respective Representatives, (y) knowledge acquired (or capable of being acquired) as to the accuracy of any such representation, warranty or certification, or compliance with any such covenants or obligation, or (x) waiver by EFX of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation in this Agreement.

**13.   TERMINATION**

     **13.1   Termination for Certain Causes.**

     This Agreement may be terminated at any time prior to or on the Closing Date by EFX, or by Company, upon written notice to the other parties as follows:

          (a)    By EFX, if a Material Adverse Change has occurred.

          (b)    By EFX, if the terms, covenants or conditions of this Agreement to be complied with or performed by Company at or before the Closing Date have not been complied

with or performed, or any other condition to the obligations of EFX to consummate the Merger, or the other transactions contemplated by this Agreement required to be satisfied at or before the Closing Date has not been complied with or satisfied, and any noncompliance or nonperformance has not been waived in writing by EFX.

(c)     By Company, if the terms, covenants or conditions of this Agreement to be complied with or performed by EFX at or before the Closing Date have not been complied with or performed and any noncompliance or nonperformance has not been waived by Company.

(d)     By EFX or Company, if any Action will have been instituted or threatened against any party to this Agreement to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement or the consummation of the transactions contemplated in this Agreement, which, in the reasonable and good faith opinion of any party, makes consummation of the transactions contemplated in this Agreement inadvisable.

(e)     By mutual written consent of EFX and Company.

(f)     By EFX or Company if the Closing has not occurred on or before August 31, 2002.

    13.2    **Procedure on and Effect of Termination.**

(a)     Written notice of termination will be given to the other parties by the party electing to terminate, and this Agreement will terminate upon the giving of notice, without further action by any of the parties to this Agreement.

(b)     If this Agreement is terminated by any party for any reason other than pursuant to **Paragraph 13.1(f),** or if for any reason on the Closing Date there has been nonfulfillment of an undertaking by or condition precedent for EFX on the one hand and Company on the other not waived in writing by or on behalf of the party in whose favor the undertaking or condition runs, the non-breaching party or the party in whose favor the undertaking or condition runs, if applicable, in addition to any other right or remedy available to it for breach or non-performance of this Agreement or any Additional Agreement, may refuse to consummate the transactions contemplated by this Agreement without Liability or obligation on its part whatsoever and shall have the right to pursue any legal remedies available to such non-breaching party.

## 14.    MISCELLANEOUS

    14.1    Notices.

(a)     All notices, demands or other communications required or permitted to be given or made under this Agreement will be in writing and (i) delivered personally, or (ii) sent by an internationally recognized express courier service to the intended recipient of the notice, demand or other communication at its address set forth below. Any notice, demand or communication will be deemed to have been duly given (x) immediately if personally delivered, or (y) on the second Business Day after delivery to an internationally recognized express courier service, if sent next day delivery, and in proving the giving of any

notice, demand or other communication, it will be sufficient to show that the envelope containing the notice, demand or other communication was duly addressed (as evidenced by the courier receipt). The addresses of the parties for purposes of this Agreement are:

| | | | |
|---|---|---|---|
| (i) | If to EFX: | | Equifax Inc.<br>1550 Peachtree Street, N.W.<br>Atlanta, Georgia 30309<br>Tel: 404-885-8009<br>Fax: 404-885-8988<br>Attn: Kent E. Mast, Chief Development<br>Officer and General Counsel |
| | with a copy, which shall not constitute notice: | | Kilpatrick Stockton LLP<br>1100 Peachtree Street<br>Suite 2800<br>Atlanta, Georgia 30309<br>Tel: 404-815-6500<br>Fax: 404-815-6555<br>Attn: Gregory K. Cinnamon |
| (ii) | If to Company: | | |
| | (A) | prior to the Closing: | Naviant, Inc.<br>999 Yamato Road, Suite 300<br>Boca Raton, Florida 33421<br>Tel: 561-893-8200<br>Fax: 561-893-8250<br>Attn: Chief Executive Officer |
| | (B) | after the Closing: | Softbank Capital Partners LP<br>1188 Centre Street<br>Newton Center, Massachusetts 02459<br>Tel: 617-928-9300<br>Fax: 617-928-9301<br>Attn: Steven J. Murray |
| | with a copy, which shall not constitute notice: | | Sullivan & Cromwell<br>1870 Embarcadero Road<br>Palo Alto, California 94303<br>Tel: 650-461-5600<br>Fax: 650-461-5700<br>Attn: John L. Savva |

61