IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 06-60839-CIV-DIMITROULEAS

MICHAEL BRAUSER,      )
                      )
    Plaintiff,        )
                      )
v.                    )
                      )
EQUIFAX INC.,         )
                      )
    Defendant.        )

**NIGHT BOX FILED**

JUL - 5 2006

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

### INTRODUCTION

Effective August 15, 2002, as a result of a reverse triangular merger, Equifax acquired all of the stock of Naviant, Inc. ("Naviant"), a Florida-based e-mail marketing company. Pursuant to a merger agreement,[1] the former "Company Shareholders" and "Former Option Holders" of Naviant disposed of their stock and option rights in exchange for cash. In total, Equifax paid $135 million in "Merger Consideration" to consummate the merger.

Plaintiff, Michael Brauser, Naviant's former President and Chief Executive Officer, is both a former Company Shareholder and Former Option Holder. He received more than $14 million in gross Merger Consideration.

In March 2004, Equifax and Naviant filed a demand for arbitration with the American Arbitration Association against all of Naviant's former equity holders, including Mr. Brauser, claiming that Equifax had been defrauded in connection with the merger (the "Arbitration"). Equifax sought, under the Florida Securities and Investor Protection Act, a return of the Merger Consideration paid to each former Company Shareholder and Former Option Holder under the

---

[1] This is the Agreement and Plan of Merger by and among Equifax, Armagh Acquisition Corporation, Naviant and Softbank Capital Partners, LP, as Shareholders' Representative, dated August 15, 2002 (the "Merger Agreement"), a copy of which is attached as Exhibit A to plaintiff's Complaint for Declaratory Relief and a Stay.



Merger Agreement.  Alternatively, pursuant to Article 11 of the Merger Agreement, Equifax and Naviant sought indemnification from Naviant's former Company Shareholders and Former Option Holders, jointly and severally, for losses resulting from breaches of Naviant's representations and warranties in the Merger Agreement.  Equifax also asserted claims for common law fraud and punitive damages, among other claims, against individual former equity holders believed to have perpetrated the fraud.[2]

Now, more than two years after the Arbitration began, Mr. Brauser is seeking to challenge arbitrability and to raise certain merits issues under the guise of challenging arbitrability.  But this lawsuit by Mr. Brauser is merely an attempt to re-litigate issues this very Court already has resolved in Equifax's favor – vis-à-vis identically-situated former Company Shareholders and Former Option Holders – in two other proceedings, including a preservation-of-claims lawsuit in which Equifax and Mr. Brauser are parties.[3]  For reasons that apply fully to Mr. Brauser, this Court has ruled *twice* that Naviant's former equity holders are bound by the Merger Agreement and that Equifax's claims are subject to arbitration.  See Softbank Capital Partners L.P., et al. v. Equifax Inc., et al., Order at 14-22, Case No. 04-20994-CIV-GRAHAM (S.D. Fla. Mar. 31, 2005) (dismissing a complaint virtually identical to the one just filed by Mr. Brauser) (Exhibit A hereto); Equifax Inc. v. Austin Ventures VII, L.P., et al., Order Compelling

---

[2] In September 2005, Equifax and Naviant amended their arbitration demand to identify eight respondents, including Mr. Brauser, who, together with others known and unknown to Equifax and Naviant, perpetrated the fraud in issue.

[3] As set forth more fully in Section II.D.2, Equifax filed a lawsuit against Naviant's former equity holders to preserve its claims against potential statutes of limitation in the event any of them were found not to be arbitrable.  This Court granted Equifax's motion to stay the litigation pending arbitration.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

Arbitration and Staying Action at 11-13, Case No. 04-80754-CIV-PAINE (S.D. Fla. June 20, 2005) (staying preservation suit pending arbitration) (Exhibit B hereto). Mr. Brauser's Complaint surprisingly omits any reference to these other proceedings or to Mr. Brauser's failure to challenge arbitrability for two years, either in court or before the Arbitrators, who also have rejected arbitrability challenges by other former equity holders of Naviant.

Mr. Brauser is attempting to preclude Equifax from arbitrating disputes under the Merger Agreement. All three counts of his Complaint are premised on the proposition that Naviant's former equity holders are not required to arbitrate Equifax's claims, except for claims for indemnification against the Escrow Fund.[4]

A single issue is determinative: whether the former Company Shareholders and Former Option Holders, including Mr. Brauser, are bound by the Merger Agreement. If so, then all of Equifax's claims before the AAA are arbitrable, both because of the unambiguously broad scope of the arbitration clause and because the arbitration clause expressly invokes arbitration rules that commit any disputes about the scope of the arbitration clause to the arbitrators.

Mr. Brauser contends, as others have in prior proceedings, that he is not bound by the Merger Agreement because he did not sign it. As a matter of basic contract law, signing a contract is but one of several ways for a party to manifest assent to it. This Court already has ruled that Naviant's former equity holders assented to and are bound by all the provisions of the Merger Agreement. They manifested their assent by (1) their acceptance and retention of the

---

[4] Notably, while the Complaint focuses primarily on Equifax's claims for indemnification and the interplay of the Merger Agreement and a separate Selling Shareholders Agreement, under which Equifax has not sought any relief in the arbitration, Equifax has dismissed its claims for indemnification as a result of a settlement consummated the same day that Mr. Brauser filed this lawsuit. As a term of settlement, the entire Escrow Fund has been paid to Equifax and Naviant.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

benefits of the Merger Agreement (e.g., the Merger Consideration), (2) their approval of and participation in the drafting of the Merger Agreement, (3) their appointment of Softbank Capital Partners, LP, as Shareholders' Representative, to administer and consummate the transactions contemplated by the Merger Agreement, (4) the former Company Shareholders' express adoption and approval of the Merger Agreement in an "Unanimous Written Consent of the Shareholders of Naviant, Inc." that each of them, including Mr. Brauser, signed in connection with the merger and (5) the inclusion in the Merger Agreement of express undertakings by all of the former equity holders to indemnify Equifax and by express acknowledgments of their adoption and approval of the Merger Agreement. See infra Section II.A.3.

All of these grounds for assent are present here, and any one of them would be sufficient to establish that Mr. Brauser is bound by the Merger Agreement and, therefore, by the arbitration clause. Accordingly, the Complaint should be dismissed, both because Mr. Brauser should not be allowed to re-litigate threshold issues this Court already has decided in Equifax's favor, and because Mr. Brauser is bound the Merger Agreement in any event.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Merger Agreement and the Merger

#### 1.    The Merger Transaction and Representations

In 2002, Equifax decided to acquire Naviant. Naviant provided direct and web-based marketing services, including developing and delivering e-mail campaigns that identified and targeted customers who had consented to receive marketing information by e-mail.

As with most acquisitions, Equifax's decision to acquire Naviant was based on representations made to Equifax that the books and records of Naviant, together with other

4

documents and disclosures made to Equifax prior to and at the closing, were accurate and truly reflected Naviant's financial condition and history.  The Merger Agreement, particularly Article 6, set forth and reaffirmed these representations.  See, e.g., § 6.32 (representing that Financial Statements and other documents did not contain any untrue statement of material fact or material omission); § 6.28(b) (representing that books, records, and accounts of Naviant were accurate and complete in all material respects); § 6.16 (stating that receivables shown on balance sheet were valid and collectible).  The details of these and other representations in the Merger Agreement are set forth in Equifax's Amended Arbitration Demand,[5] but are not pertinent here.

On August 15, 2002, Equifax acquired Naviant through a merger that effectively resulted in Equifax owning all of Naviant's stock.  The Merger Agreement was signed by Equifax, Equifax's "merger sub," Naviant and "Shareholders' Representative: Softbank Capital Partners LP."  See Merger Agreement (Exhibit A to the Complaint).  According to Paragraph (4) on page 1 of the Merger Agreement, Softbank Capital Partners LP, as Shareholders' Representative, entered into the Merger Agreement "solely for the purposes set forth in Paragraphs 4.7, 4.8, 4.9, 14.1, 14.4, 14.5, 14.6, 14.7, 14.8, and Article 11."  Paragraph 14.4 is the arbitration clause.

## 2.   The Merger Consideration

Before the merger, the former Company Shareholders owned Naviant's stock and the Former Option Holders held options that were converted into the right to receive cash as a result of the merger.  Under the merger, Naviant's equity holders were entitled to the "Merger Consideration," which originally consisted of $135,000,000.  Merger Agreement ¶ 1.1, p. 5;

---

[5] A copy of Equifax's and Naviant's Amended Demand for Arbitration is attached as Exhibit 1 to the Declaration of Gregory K. Cinnamon ("Cinnamon Dec.") (Exhibit C hereto).

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

Article 4.  As shown by Annex A to the Merger Agreement (Cinnamon Dec. Ex. 6),[6] various adjustments reduced the Merger Consideration to $130,054,880, and $10,000,000 of this was retained in an Escrow Fund, such that $120,054,880 was available to be distributed to the Naviant equity holders.   Mr. Brauser personally received $14,316,365 in gross Merger Consideration.  Cinnamon Dec. ¶ 10.

The Merger Agreement and the Exchange Agreement (Cinnamon Dec. Ex. 5) were the *only* documents that provided for the former Company Shareholders to turn in their stock certificates or for them to be paid anything for doing so.  The Merger Agreement was the *only* document pursuant to which Naviant's former equity holders received the Merger Consideration. Cinnamon Dec. ¶ 10.

### 3.    Mr. Brauser's Assent to and Adoption of the Merger Agreement

Although Mr. Brauser did not sign the Merger Agreement, he assented to it and adopted it in at least five ways:

First, Mr. Brauser received, accepted and retained more than $14,000,000 in Merger Consideration paid pursuant to the Merger Agreement.  See Cinnamon Dec. ¶ 10.

Second, attorneys who represented Mr. Brauser were intimately involved with drafting the Merger Agreement, and many changes were made in response to their comments.  Cinnamon Declaration ¶ 7.  Without the former Company Shareholders' approval, the Merger Agreement could not have been signed or implemented.

---

[6] Annex A to Merger Agreement specified how the funds were disbursed.  A separate Exchange Agreement also provided the details as to the disbursement of the funds.  Cinnamon Dec. ¶ 8, Ex. 5.  Annex A to the Merger Agreement was copied as Attachment A to the Exchange Agreement and is in the record as Cinnamon Dec. Ex. 6.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami ● West Palm Beach

Third, Mr. Brauser executed an Employee Agreement,[7] by which he appointed the Shareholders' Representative as his agent to consummate the merger:

> In order to efficiently administer the transactions contemplated by the Merger Agreement, the shareholders of the Company [Naviant] will designate a representative (the "<u>Shareholders Representative</u>"), and *Employee acknowledges such appointment as his representative as well with respect to certain provisions of the Merger Agreement which affect him. . . ."*

<u>See</u> Employee Agreement (Cinnamon Dec. Ex. 4) ¶¶ 1, 4(a) (underline in original; italics added); <u>see also</u> <u>id.</u> ¶4(a)(iv) (authorizing Shareholders' Representative to "*take any and all additional action as is contemplated to be taken by or on behalf of Employee by the terms of this Agreement and the Merger Agreement*") (emphasis added).

Fourth, the Merger Agreement itself (as approved and performed by Naviant's former equity holders, including Mr. Brauser) contains several express undertakings by the former shareholders and option holders. One of them is the indemnity clause in Paragraph 11.1:

> **11.1 Indemnification**. If a Closing occurs, in accordance with and subject to the further provisions of this Article 11, the Company Shareholders and Former Option Holders in consideration of their receipt of any Merger Consideration . . . will, jointly and severally, indemnify and hold harmless EFX [Equifax] . . . from and against and in respect of any and all loss, damage, liability, cost and expense, including reasonable attorneys fees and amounts paid in settlement (collectively, the "**Indemnified Losses**"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:
>
> (a) any misrepresentation, breach of warranty or breach or nonfulfillment of any agreement of Company [Naviant] . . . contained in this Agreement, the Disclosure Memorandum, or in any other certificate, schedule, instrument or document delivered to EFX by or on behalf of Company pursuant to the provisions of this Agreement. . . .

---

[7] Notably, the Employee Agreement itself was made "in consideration of the consummation of the Merger" and was "conditioned upon the closing of the transactions contemplated by the Merger Agreement." <u>Id.</u> Third Whereas Clause, ¶ 1.

7

As a result of Equifax's recent dismissal of its claims for indemnification, specifics about the former equity holders' indemnification obligations are now irrelevant (and disputes about those matters go to the merits in any event). The point here is that the Merger Agreement contains an express undertaking by the former Company Shareholders and Former Option Holders themselves.

Importantly, Paragraph 11.1 specifically states that Naviant's former equity holders, including Mr. Brauser, were binding themselves to the indemnification provisions "in consideration of their receipt of any Merger Consideration." This is a direct contractual acknowledgement linking Mr. Brauser's entitlement to and acceptance of the Merger Consideration to his undertakings in Paragraph 11.1.[8]

The fifth way Mr. Brauser assented to and adopted the Merger Agreement was in a document he signed – the "Unanimous Written Consent of the Shareholders of Naviant, Inc.," which provides in the third to last paragraph on page 1 "that the Shareholders . . . hereby adopt and approve the Merger Agreement and Plan of Merger. . . ." Cinnamon Dec., Ex. 3.

## B.   The Fraud

After the merger, Mr. Brauser and certain other principals remained as employees and officers of Naviant. After Mr. Brauser left Naviant in April 2003, Equifax discovered the fraud

---

[8] Also, Paragraph 4.9 of the Merger Agreement, which describes the role of the Shareholders' Representative, contains repeated references to the former Company Shareholders' "approval and adoption of this Agreement [the Merger Agreement]": "the Company Shareholders, by approval and adoption of this Agreement, . . . shall designate Softbank as their representative. . . ." (Merger Agreement ¶ 4.9(a)); "The Company Shareholders, by approval and adoption of this Agreement authorize . . . the Shareholders' Representative. . . ." (Id. ¶ 4.9(b)); "By his, her or its approval of the Merger, this Agreement, and the Escrow Agreement, each of the Company Shareholders . . . agrees. . . ." (Id. ¶ 4.9(f)). As a Company Shareholder, Mr. Brauser, adopted "this Agreement" – the whole Merger Agreement, not just parts of it.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

that was perpetrated in connection with the merger, the specifics of which are summarized in the Amended Demand for Arbitration.  Cinnamon Dec., Ex. 1.

### C.   Equifax's Arbitration Claims

Presently pending in the Arbitration are Equifax's claims under the Florida Securities and Investor Protection Act and its claims for common law fraud and punitive damages.  These claims, and the recently-settled claims for indemnification, are all subject to arbitration pursuant to the broad arbitration clause in the Merger Agreement:

> Any and all disputes . . . [9] arising out of or in connection with the execution, interpretation, performance or nonperformance of this Agreement (each a "**Disputed Matter**") will be arbitrated and settled by the procedures established in this **Paragraph 14.4**.
>
> Disputed Matters will be solely and finally settled by arbitration, which will be conducted in Miami by a panel of three arbitrators. . . .  The parties renounce all recourse to litigation and agree that the award of the arbitrators will be final and subject to no judicial review. . . .

Merger Agreement ¶ 14(a), (b) (emphasis in original).

The arbitration clause also provides that the arbitrators will conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA Rules"), except insofar as those rules may conflict with the provisions of the Merger Agreement.  Id. ¶ 14.4(c).  Rule 7(a) of the AAA Rules expressly reserves to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

---

[9] Omitted from the text are exceptions that are clearly inapplicable here.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami ● West Palm Beach

D.   **The Federal Rulings Compelling Arbitration**

1.   **The Venture Capital Shareholders' Declaratory Judgment Action**

In April 2004, in <u>Softbank Capital Partners LP, et al. v. Equifax, Inc., et al.</u>, Case No. 04-20994-CIV-GRAHAM (S.D. Fla.), eleven former shareholders of Naviant, all but one of whom were Venture Capital firms that had invested in Naviant prior to the merger (hereinafter collectively the "Venture Capital Shareholders"), filed suit in federal court, seeking to block the arbitration. The Venture Capital Shareholders claimed that only claims for indemnification against the Escrow Fund were arbitrable, and that they themselves were not required to arbitrate any claims because they were not parties or signatories to the Merger Agreement. Each side filed dispositive motions relative to the claims; the parties stipulated that proceedings in the Arbitration would be stayed while the motions were pending.

On March 31, 2005, Judge Graham ruled that the Venture Capital Shareholders were bound by the arbitration clause in the Merger Agreement, even though they did not sign the agreement themselves, and dismissed their claims. <u>See</u> Order at 14-20, 22 (emphasizing their appointment of Softbank as Shareholders' Representative to implement the merger transaction and their acceptance and retention of benefits under the Merger Agreement) (Exhibit A).

Mr. Brauser is in the same position as the Venture Capital Shareholders vis-à-vis the binding effect of the Merger Agreement, and the Court's reasoning applies equally to him.[10]

---

[10] The Venture Capital Shareholders appealed. As part of a recent settlement, Equifax, Naviant and the Venture Capital Shareholders moved to dismiss the appeal. Mr. Brauser sought to intervene, but the Eleventh Circuit denied his motion and dismissed the appeal with prejudice. <u>See</u> Order (Exhibit D).

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami ● West Palm Beach

## 2. Equifax's Preservation-of-Claims Lawsuit

On August 13, 2004, in <u>Equifax Inc. v. Austin Ventures VII, L.P., et al.</u>, Case No. 04-80754-CIV-PAINE (S.D. Fla.), Equifax filed suit to protect certain claims against possible statute-of-limitation bars in the event any of them were found not to be arbitrable.[11]  Equifax named as defendants all of Naviant's former equity holders.

In its Complaint, Equifax explained that the limited purpose of the lawsuit was to preserve its claims against the running of applicable statutes of limitation.  After serving all but one of the defendants, Equifax moved to stay the entire lawsuit pending arbitration.

Two defendants, Seisint, Inc. (a former Company Shareholder), and Scott Hirsch (a Former Option Holder), opposed Equifax's motion on the grounds they had not signed the Merger Agreement and were not bound by the arbitration clause and because the requested stay would be indefinite as to time.  Mr. Brauser, who is both a former Company Shareholder and a Former Option Holder and a defendant in the case, did not oppose Equifax's motion to stay.

Judge Paine entered an order staying the case until an arbitration award is entered.  <u>See</u> Order Compelling Arbitration and Staying Action at 13 (finding that Mr. Hirsch and Seisint had authorized the Shareholders' Representative to act on their behalf in effecting the merger and concluding that this is a dispute arising under or relating to the Merger Agreement) (Exhibit B).[12]

---

[11] In addition to certain of the claims then pending in the Arbitration, Equifax asserted claims against Mr. Brauser and Seisint, Inc., another former Company Shareholder, for breach of the Actual Knowledge representation in the Selling Shareholders Agreement.

[12] Among the claims stayed pending arbitration were Equifax's claims against Seisint, Inc. and Michael Brauser for breach of the "Actual Knowledge" representation in Paragraph 1.7 of the Selling Shareholders Agreement.  Equifax has not asserted any such claims in the Arbitration; Equifax merely asserted them in the preservation suit to prevent them from becoming time-barred.  In support of its motion to stay, Equifax explained that these claims are derivative of and

11

## ARGUMENT AND AUTHORITY

**A.   Mr. Brauser Is Estopped from Challenging Arbitrability Because this Court Already Has Decided the Issue of Arbitrability**

Under the issue preclusion or collateral estoppel doctrine, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause involving a party (or privy) to the prior litigation." 18 James Wm. Moore et al., Moore's Federal Practice § 132.01 (3d ed. 1997).  Issue preclusion serves to "prevent, or estop, relitigation of the same issues in a subsequent case.  Id.  It also precludes subsequent litigation involving non-parties that are subject to the binding effect or benefit of the first action.  18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4416 (2d ed. 2002).

Issue preclusion applies where:  (1) the issue in the previous action is identical to the issue in the present action; (2) the issue was actually litigated in the prior action; (3) resolution of the issue in the prior action was necessary to the prior judgment; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior action.   Christo v. Padgett, 223 F.3d 1324, 1339 (11th Cir. 2000) (citing Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998)); see also Christo, 223 F.3d at 1339-40 (noting finality of judgment requirement is less stringent for issue preclusion than claim preclusion and giving preclusive effect to order where issue was raised and determined).

---

dependent on the claims asserted in the Arbitration and that unless and until the arbitrators determine the Merger Agreement contains false representations and warranties, no one possibly could face liability on these claims for Actual Knowledge of the falsity.  Equifax also explained that depending on the resolution of its claims in the Arbitration, Equifax could be made whole by an arbitral award, thereby rendering its claims for breach of the Selling Shareholders Agreement unnecessary.  Mr. Brauser did not oppose Equifax's motion to stay.

12

The essential prerequisites for issue preclusion are met here. First, both Judge Graham and Judge Paine have found, for reasons that apply to Mr. Brauser, that Naviant's non-signatory former equity holders are bound by the Merger Agreement's arbitration clause. Next, the non-signatory issue was litigated in the federal actions, including the preservation-of-claims suit in which Mr. Brauser is a defendant. An issue is "properly litigated" when the "issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Christo, 223 F.3d at 1339 (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)). Mr. Hirsch and Seisint raised the non-signatory issue when they opposed Equifax's motion to stay. Although Mr. Brauser chose to remain silent, he had every opportunity to be heard when the issue arose.

Accordingly, because this issue already has been decided in two earlier actions, including one in which Mr. Brauser himself is a party, Mr. Brauser is foreclosed from re-litigating the binding effect of the Merger Agreement or the arbitrability of Equifax's claims pursuant thereto.

**B.   Mr. Brauser Is Bound by the Merger Agreement's Arbitration Clause**

Florida law governs whether Mr. Brauser entered into an arbitration agreement; federal law mandates enforcement of an arbitration agreement and a broad interpretation of that agreement in favor of arbitrability. Employers Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir. 2001).

### 1.   Non-Signatories Who Assent to a Contract Are Bound by Its Terms

"Non-signatories may be bound by an arbitration agreement if dictated by ordinary principles of contract law and agency." Martha A. Gottfried, Inc. v. Paulette Koch Real Estate, Inc., 778 So. 2d 1089, 1090 (Fla. 4th DCA 2001) (non-signatory was "bound by her agreement

13

to arbitrate, as having accepted the economic and professional benefits of Hoffpauer's membership with the board"). In H.W. Gay Enterprises, Inc. v. John Hall Electrical Contracting, Inc., 792 So. 2d 580, 581 (Fla. 4th DCA 2001), the court held that Florida law "requires only that an arbitration clause be in writing, not that both parties sign it." The opinion explains: "One purpose of a signature on a contract is to evidence the signer's intent to be bound by its terms. Here, the parties' assent to the terms of the written contract was established by their words and conduct." Id.; see also Valero Ref., Inc. v. M/T Lauberhorn, 813 F.2d 60, 63-64 (5th Cir. 1987) ("It is established that a party may be bound by an agreement to arbitrate even in the absence of his signature"); accord Interpool Ltd. v. Through Transp. Mut. Ins. Ass'n, 635 F. Supp. 1503, 1505 (S.D. Fla. 1985).

Assent is what binds a party to a contract; a signature is but one way in which a party can assent. Here, Mr. Brauser assented to the Merger Agreement with his conduct, by knowingly accepting the monetary and other benefits of the contract, by his knowledge, approval and participation in the drafting of the Merger Agreement, by the inclusion in the Merger Agreement of the express undertaking to indemnify Equifax, by the repeated express acknowledgment of his adoption and approval of the Merger Agreement and by expressly appointing the Shareholders' Representative to consummate the merger transaction.

Hornbook law recognizes these principles:

Ordinarily one of the acts forming part of the execution of a written contract is the signing of it . . . . However, the signatures of one or both parties are not always essential to the binding force of an agreement, and a written agreement may be effective even if both parties have not signed, if the parties otherwise demonstrate an intent to have a contract.

14

The object of a signature is to show mutuality of assent, and while some form of assent to the terms of a contract is necessary, assent may be shown in other ways, as, for example, by the acts or conduct of the parties . . . .

In the absence of a statute or arbitrary rule to the contrary, an agreement need not be signed to be binding, provided it is either accepted and acted on, delivered and acted on, or delivered and acquiesced in.  So, a written contract, although unsigned by a party, is binding if the party accepts or performs under it or accepts the benefits thereunder.

17 C.J.S. Contracts § 75 (footnotes omitted).

### 2. Mr. Brauser's Acceptance of the Benefits of the Merger Agreement Binds Him to Its Obligations, including the Arbitration Clause

Mr. Brauser accepted the benefits of the Merger Agreement when he received his Merger Consideration.  "The law is too well settled to admit of controversy that one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places upon him." Warren v. Tampa Mortg. Investors' Co., 150 So. 738, 741 (Fla. 1933); accord Lyle Cashion Co. v. McKendrick, 204 F.2d 609, 612 (5th Cir. 1953) ("One may not retain the benefits of a contract, and at the same time reject its burdens;" party estopped to deny existence of a contract for joint venture although existence of contract was in dispute); Ocwen Fin. Corp. v. Holman, 769 So. 2d 481, 483 (Fla. 4th DCA 2000) ("Ocwen is a 'party' within the meaning of the arbitration clause because it received rights and accepted obligations under the asset purchase agreement."); see also Employers Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1323 (11th Cir. 2001) (although Wausau did not sign an agreement containing an arbitration clause or sign any agreement to "specifically obligate Wausau to any contractual provisions previously negotiated" in the agreement that contained an arbitration clause, Wausau was bound to arbitrate because Wausau evinced an intent to affirm the contract containing the arbitration clause, by admitting it had rights and by exercising rights under that contract).

15

Having negotiated the Merger Agreement and accepted the Merger Consideration, to which he was entitled only under the Merger Agreement, and having acknowledged that he adopted and approved the Merger Agreement, Mr. Brauser cannot now escape its obligations. Mr. Brauser is asking this Court to recognize his rights under the Merger Agreement while ignoring the correlative duties therein.

**C.**   **Whether the Arbitration Clause Covers Equifax's Claims under FSIPA and for Fraud and Punitive Damages Is an Issue Assigned to the Arbitrators under the AAA Rules Specified in the Merger Agreement.**

Paragraph 14.4(c) of the Merger Agreement states:  "The arbitrators will conduct the [sic] in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association. . . ."  Rule 7 of those Rules provides that "[t]he arbitrator shall have the power to rule on . . . any objections with respect to the . . . scope . . . of the arbitration agreement." (Cinnamon Dec. Exhibit 7).  Adoption of a forum's rules in an arbitration agreement, combined with a forum rule providing for the arbitrator to rule on the scope of the arbitration agreement, is sufficient to require arbitration and to preclude a judicial determination of whether a particular dispute is covered by the arbitration clause.  Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc., 203 F.R.D. 677, 683-84 (S.D. Fla. 2001) (upholding arbitrator determination of arbitrability where agreement provided that any arbitration shall be conducted under auspices of AAA), aff'd on other grounds, 312 F.3d 1349 (11th Cir. 2002); see also Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989) ("[p]arties may ... agree to allow the arbitrator to decide both whether a particular dispute is arbitrable as well as the merits of the dispute;" provision for "binding arbitration 'in accordance with the rules of arbitration of the

International Chamber of Commerce'" placed arbitrability decision in the hands of the arbitrator, because ICC rules provided for arbitrator to make decision).[13]

As Judge Paine found, "[p]lainly, this case is a dispute arising under or relating to the Merger Agreement. . . ." Order Compelling Arbitration and Staying Action at 12 (Exhibit B). Paragraph 14.4(a) of the Merger Agreement provides that "[a]ny and all disputes ... arising out of or in connection with the execution, interpretation, performance or nonperformance of this Agreement . . . will be arbitrated. . . ." This certainly encompasses Equifax's claims based on fraud committed in connection with the merger.

Moreover, anyone deciding whether Equifax's claims are covered by the arbitration clause is bound by the rule of construction favoring arbitration. "The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). The Supreme Court recently reaffirmed "our presumption in favor of arbitration" in Pacificare Health Systems, Inc. v. Book, 538 U.S. 401, 407 n.2 (2003). "Arbitration is a preferred method of dispute resolution; therefore, any doubt regarding the scope of an arbitration clause should be resolved in favor of arbitration." Martha A. Gottfried, Inc. v. Paulette Koch Real Estate, Inc., 778 So. 2d 1089, 1090 (Fla. 4th DCA 2001) (citing other cases).

---

[13] Florida courts are in accord. See Rintin Corp., S.A.. v. Domar, Ltd., 766 So. 2d 407, 409 (Fla. 3d DCA 2000) ("In the instant case, although the parties did not include specific language indicating that the issue of arbitrability of a dispute will be submitted to an arbitral panel, they did include a specific reference to the FIAA [Florida International Arbitration Act] which contains such a provision. The inclusion of this reference is 'clear and unmistakable' evidence of the parties' intent to be governed by the FIAA and its provision requiring the submission of the issue of arbitrability of a dispute to the arbitral panel.").

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

**D.**   **Because Mr. Brauser Is Bound by the Arbitration Clause, All Three Purported Causes of Action in his Complaint Must Be Dismissed**

In his first two causes of action, Mr. Brauser seeks a declaration that Equifax's claims for indemnification are capped at the amount of the Escrow Fund and that Equifax may not proceed against him under the Merger Agreement, but instead may only seek relief from him under the Selling Shareholders Agreement.  See Complaint ¶¶ 39 – 57.

The first cause of action is said to be for "Declaratory and Injunctive Relief Regarding the Arbitrability of Claims for Fraud, Intentional Misrepresentation, Willful Misconduct and for Amounts Beyond the Escrow Fund."  This claim, which Mr. Brauser took from Count Two of the Complaint the Venture Capital Shareholders filed in the action that Judge Graham dismissed, is keyed to a "merits" dispute about the scope of the former equity holders' indemnity obligations under Article 11 of the Merger Agreement and the interplay between the Merger Agreement and the Selling Shareholders Agreement.  This merits issue is now moot because Equifax is no longer pursuing any claim for indemnification against Mr. Brauser in the Arbitration.  See Claimants' Dismissal Without Prejudice of Count Two of Amended Demand as to Certain Respondents (Cinnamon Dec. Exhibit 2).[14]

The problems with the first cause of action merge into the second cause of action, which seeks "Declaratory Relief Regarding Paragraph 1.7 of the Selling Shareholders Agreement."  Here, Paragraph 54 of Mr. Brauser's Complaint alleges that:

---

[14] In addition to dismissing its claims for indemnification, Equifax has entered into an Escrow Resolution Agreement with the Shareholders' Representative, pursuant to which Equifax has covenanted not to pursue Mr. Brauser for any claim for indemnification under Article 11 of the Merger Agreement.  See Escrow Resolution Agreement ¶ 7.D (Exhibit E hereto); see also id. ¶ 10 (making Mr. Brauser a third-party beneficiary of the agreement).

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami ● West Palm Beach

> Equifax may not maintain a direct action against Brauser for any alleged misrepresentation in connection with the Merger Agreement because he did not make any representations in that agreement. Equifax may only proceed against Brauser by bringing an action alleging breach of Section 1.7 of the Selling Shareholders Agreement.

Mr. Brauser is endeavoring to have this Court resolve the merits of the parties' now-moot dispute about the proper interpretation of Paragraph 11.4 of the Merger Agreement under the guise of "arbitrability." Were the issue not moot, adopting Mr. Brauser's elaborate arbitrability construct would predetermine contract interpretation disputes that are clearly relegated to arbitration by Paragraph 14.4(a)'s inclusion of "[a]ny and all disputes . . . arising out of or in connection with the execution, interpretation, performance or non-performance of this Agreement."

The third cause of action is said to be for "Declaratory Relief Stating that Plaintiffs (sic) Did Not Have Actual Knowledge that Representations and Warranties of Naviant Were Untrue." Paragraph 65 of the Complaint states that "Brauser seeks a judicial declaration that he did not possess Actual Knowledge as defined in the Selling Shareholders Agreement." This third cause of action does not state a claim on which relief can be granted for two reasons.

First, the alleged controversy does not, as a matter of law, exist. Equifax has not asserted any claim in the Arbitration under the Selling Shareholders Agreement. Moreover, in the preservation suit, Judge Paine properly stayed claims against Seisint and Mr. Brauser under the Selling Shareholders Agreement, over Seisint's objection, because, as Equifax explained in its briefing, those claims involve the same operative facts and are derivative of and dependent on the claims Equifax has asserted in the Arbitration. It thus made perfect sense for Judge Paine to stay the entire preservation suit, including Equifax's claims under the Selling Shareholders Agreement, because the resolution of the claims in the Arbitration will directly impact, and could

19

completely obviate, any claims under the Selling Shareholders Agreement.  Notably, Mr. Brauser did not oppose Equifax's motion to stay the preservation suit in any respect.

Second, even if there were a justiciable controversy, it would be improper for this Court to get involved in it if its only import pertained to whether Equifax had a claim against Mr. Brauser under the Merger Agreement – an issue relegated to arbitration.  The Complaint reveals that this improper reason is why Mr. Brauser seeks an adjudication under his third cause of action:  "The September 2, 2005 Amended Arbitration necessarily implicates the Selling Shareholders Agreement because it names Brauser as respondent for claims alleging fraud, for which the Merger Agreement provides no cause of action against Brauser."  Complaint ¶ 63.  Again, Mr. Brauser is attempting to have this Court rule that he is not liable under the Merger Agreement on the basis of his moot assertions about the Selling Shareholders Agreement – an "interpretation . . . of this [Merger] Agreement" issue expressly relegated to arbitration.  Therefore, the third cause of action should be dismissed.

## CONCLUSION

Based on the citations to authority and the arguments presented, Equifax respectfully requests that the Court grant Defendant's Motion to Dismiss, dismiss this matter in its entirety and for any further relief that the Court deems just and appropriate.

RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN, P.A.
Miami • West Palm Beach

Respectfully submitted,

RICHMAN GREER WEIL BRUMBAUGH
MIRABITO & CHRISTENSEN, P.A
*Counsel for Equifax Inc.*
One Clearlake Center
250 Australian Avenue South, Suite 1504
West Palm Beach, Florida   33401
Telephone: (561) 803-3500
Facsimile: (561) 820-1608


_____
GERALD F. RICHMAN
Florida Bar Number 066457
JOHN R. WHITTLES
Florida Bar Number 0178802

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of this Memorandum of Law in

Support of Defendant's Motion to Dismiss was served by first class U.S. Mail to all parties on

the attached Service List this ____ day of July 2006.


_____
JOHN R. WHITTLES

## <u>SERVICE LIST</u>

**<u>Counsel for Brauser</u>**
Gregg W. McClosky, Esquire
McClosky, D'Anna & & Dieterle, LLP
2300 Glades Road, Suite 400, East Tower
Boca Raton, Florida 33431
Telephone (561) 368-9200
Fax (561) 395-7050
gwm@mdd-law.com



# United States District Court
## Southern District of Florida

---

**NOTICE:** A few Judges do not participate in FaxBack, and thus require litigants to accompany motions with envelopes. Visit the court's website at: www.flsd.uscourts.gov or call the Help Line (305) 523-5212 for an updated listing of participating Judges.

---

### CM/ECF COMING EARLY 2006

The United States District Court for the Southern District of Florida is planning to implement the Case Management/Electronic Case Files (CM/ECF) system. CM/ECF will provide electronic noticing via e-mail and user-friendly electronic case filing features. CM/ECF will replace FaxBack noticing; therefore attorneys will be asked to register for CM/ECF at some point later this year. To keep current with CM/ECF developments please view our website at www.flsd.uscourts.gov.

---

## Notice of Orders or Judgments

**Date:**    04/01/05

**To:**    Michael E. Brooks (aty)
1100 Peachtree Street NE
Suite 2800
Atlanta, GA  30309

**Re: Case Number:**    1:04-cv-20994    **Document Number:**    34

NOTE: **If you are no longer an attorney in this case, please disregard this notice.**
Be sure to promptly notify the Clerk of Court in writing of any changes to your name, address, law firm, or fax number. This notification should be sent for each of your active cases.
If this facsimile cannot be delivered as addressed, or you have ANY problems with this fax transmission, please call the Help Line (305) 523-5212 and the problem will be rectified. Since this transmission originated from the Clerk's Office, JUDGES CHAMBERS SHOULD NOT BE CONTACTED.

**Number of pages including cover sheet:**    24

Exhibit 

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
Case No. 04-20994-CIV-GRAHAM

**CLOSED**
**CIVIL**
**CASE**

SOFTBANK CAPITAL PARTNERS L.P.
SOFTBANK CAPITAL ADVISORS, L.P.
SOFTBANK CAPITAL L.P. AUSTIN
VENTURES VII, L.P., AUSTIN
VENTURES VIII, L.P., TL VENTURES II L.P.,
TL VENTURES IIII INTERFUND L.P.,
TL VENTURES II OFFSHORE L.P.,
TL VENTURES IV L.P., TL VENTURES
IV INTERFUND L.P. and BERJ, L.L.C,



FILED by _____ D.C.

MAR 31 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

    Plaintiffs,

vs.

EQUIFAX, INC. and NAVIANT, INC.

    Defendants.
_____/

## ORDER

**THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss (D.E. 25) and Plaintiffs' Motion for Partial Summary Judgment (D.E. 11).

**THE COURT** has considered the Motion, the pertinent portions of the record, and is otherwise duly advised in the premises.

## I. INTRODUCTION

This action arises from Equifax's acquisition of Naviant pursuant to a merger agreement. After the merger, Equifax concluded that it had been defrauded in connection with representations made by Naviant in the merger agreement. Relying on the arbitration clause in the merger agreement, Equifax filed claims for recision and indemnification against Naviant's former shareholders and others before the American Arbitration Association. The former shareholders,

who are not signatories to the merger agreement, brought this action for declaratory relief to prevent Equifax from submitting its disputes against the shareholders to arbitration.  The parties stipulated to a stay of the arbitration pending a decision from this Court regarding the arbitrability of Equifax's claims against the shareholders.  The Court now concludes that Equifax's claims can proceed before an arbitration panel because a valid arbitration agreement exists that binds the shareholders to arbitrate certain disputes, and Equifax's claims for recision and indemnification against the shareholders fall within the scope of the arbitration agreement.

## II. **BACKGROUND**

Naviant, Inc. is a Florida corporation engaged in the business of providing marketing services via email directed to consumers who opt-in to receive email solicitations.  Plaintiffs are former shareholders of Naviant (the "Shareholders") who, prior to August 15, 2002, collectively owned approximately 60% of Naviant's outstanding shares.  Equifax, Inc. is a global information company that enables and secures global commerce through its information management and marketing services.

In August of 2002, Equifax acquired Naviant by merging Equifax's wholly-owned subsidiary, Armagh Acquisition Corporation (the "Merger Sub") into Naviant and leaving Naviant as the surviving corporation. Several agreements were executed in connection with the merger.  The agreements pertinent to the issues before the Court are: (1) the Unanimous Written Consent of the Shareholders of Naviant, Inc.; (2)

2

the Plan of Merger and Merger Agreement; and (3) the Selling
Shareholders Agreement.

## A.    **The Unanimous Consent Agreement**

On August 13, 2002, the Shareholders executed a Unanimous Written
Consent of the Shareholders of Naviant (the "Unanimous Consent
Agreement").   In that Agreement the Shareholders acknowledged that
they had been presented with the Merger Agreement and Plan of Merger
(the "Merger Agreement") for approval, that they believed that the
merger was in the best interest of Naviant and that the Shareholders
thereby "approved, adopted and ratified" the Merger Agreement "in all
respects."  In addition, the Shareholders designated Softbank Capital
Partners LP, also a Naviant shareholder, to act as a representative
of all the Shareholders (the "Shareholders' Representative") in
administering the transactions necessary to consummate the merger in
accordance with the Merger Agreement.

## B.    **The Merger Agreement**

On August 15, 2002, Equifax and Naviant officially merged
pursuant to the Merger Agreement.  The four signatories to the Merger
Agreement are:  Equifax, the Merger Sub, Naviant, and Softbank Capital
Partners LP in its capacity as the Shareholders' Representative.
According to the Merger Agreement, the Shareholders' Representative
was to act "solely for the purpose set forth in paragraphs 4.7,
4.8,4.9,14.1,14.4,14.5,14.6,14.7,14.8 and Article 11" of the Merger
Agreement.  See Merger Agreement at p. 1, ¶ 4 (emphasis omitted).

Article 4 of the Merger Agreement makes references to the

3

Shareholders.  In paragraph 4.8, the Shareholders are obligated to pay Equifax the net working capital deficiency in the event that the Adjusted Net Merger Consideration is less than the Net Merger Consideration.  See id at p. 18, ¶ 4.8.  In paragraph 4.9, the Shareholders agreed, among other things, that by his or her approval of the Merger Agreement, they would: (1) designate the Shareholders' Representative to administer the transactions contemplated by the Merger Agreement and act on their behalf, (2) authorize the Shareholders' Representative to make certain decisions and take all actions as is contemplated to be taken by the Shareholders under the terms of the Merger Agreement, and (3) be bound by all decisions and actions of the Shareholders' Representative.  See id. at p. 19, ¶4.9(a)-(c).  In addition, the Shareholders, by his or her approval of the Merger Agreement, agreed that "[Equifax] shall be entitled to rely conclusively on the instructions and decisions of the Shareholders' Representative as to . . . any . . . actions required or permitted to be taken by the Shareholders' Representative . . ." and "all actions, decisions and instructions of the Shareholders' Representative shall be conclusive and binding upon all of the Company Shareholders. . ."  See id. at p. 20, ¶ 4.9(f)(ii).

In paragraph 4.10, Equifax agreed that on the Closing Date, it will deliver funds to be deposited with an escrow agent for the purpose of securing the indemnification obligations of the Shareholders.  See id. at p. 21, ¶ 4.10(a).  The escrow fund was to be held by the escrow agent pursuant to the terms of an escrow

4

agreement. Id. The Shareholders agreed that by their adoption and approval of the Merger Agreement, they would approve the escrow agreement. See id. at p. 21, ¶ 4.10(b).

In Article 6 of the Merger Agreement, Naviant made various representations and warranties concerning the disclosure of information to Equifax, the accuracy and completeness of Naviant's books and records, the validity of Naviant's accounts receivable, the propriety of Naviant's contractual obligations and various other matters affecting Naviant's financial statements and financial conditions as of August 15, 2002.

Article 11 covers indemnification. It provides that if a closing occurs, the Shareholders will indemnify Equifax as follows:

> [I]n accordance with and subject to the further provision of this **Article 11**, the Company Shareholders and former Option Holders in consideration of their receipt of any Merger Consideration (each, an "**Indemnitor**", and collectively, the "**Indemnitors**") will, jointly and severally, indemnify and hold harmless [Equifax] and its Affiliates . . . (collectively, "**Indemnitees**"), from and against and in respect of any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts paid in settlement (collectively, "**Indemnified Losses**"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:
>
> (a) any misrepresentation, breach of warranty or breach or nonfulfillment of any agreement of [Naviant] contained in this Agreement, the Disclosure Memorandum, or in any other certificate, schedule, instrument or document delivered to [Equifax] by or on behalf of [Naviant] pursuant to the provisions of this Agreement and any Excess Expenses to the extent not deducted from the Merger Consideration at Closing.

Id. at p. 54, ¶ 11.1(a). Paragraph 11.1 identifies fourteen other

specific events that could give rise to an Indemnified Loss.  _Id_.

The Merger Agreement specifies the process that Equifax must follow to seek indemnification.  Paragraph 11.2 entitled "Indemnification Claims; Payments" provides:

> In order to seek indemnification under this Article 11, an Indemnitee shall give written notification (a "Claim Notice") to the Shareholders' Representative on behalf of the Indemnitors which contains (i) a description and the amount (the "Claimed Amount") of any Indemnified Loss incurred or reasonably expected to be incurred by the Indemnitee, (ii) a statement that the Indemnitee is entitled to indemnification under this Article 11 for such Indemnified Loss and a reasonable explanation of the basis therefor, and (iii) a demand for payment (in the manner provided in paragraph (b) below) in the amount of such Indemnified Loss.  The Indemnitee shall also deliver copy of the Claim Notice to the Escrow Agent.

_Id_. at p. 10, ¶ 11.2(a).

The Shareholders' liability for Indemnified Losses is limited as follows:

> **Limitation on Liability**.  Other than in respect to claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct (in which case [Equifax] shall have all remedies available at law or in equity) any and all claims for Indemnified Losses made pursuant to **Article 11** of this Agreement or for breaches of the representations and warranties made by Company herein shall be satisfied solely out of the Escrow Fund (which includes interest and earnings thereon) and no Indemnitee shall have personal recourse against any Company Shareholder for any claims for Indemnified Losses made pursuant to this **Article 11** or for breaches of the representations and warranties made by [Naviant] herein. For the avoidance of doubt, the limitations set forth in this **Paragraph 11.4** shall be inapplicable to any Person party to the Selling Shareholders Agreement for purposes of such Person's Liability, if any for breach of any representations and warranties made by such Person thereunder.

_Id_. at p. 58, ¶ 11.4.

6

The Merger Agreement contains an arbitration clause.   Paragraph 14.4, entitled "Dispute Resolution," provides that:

> Any and all disputes other than with respect to the Closing Balance Sheet or the calculation of the Closing Net Working Capital arising out of or in connection with the execution, interpretation, performance or nonperformance of this Agreement (each, a **"Disputed Matter"**) will be arbitrated and settled by the procedures established in this **Paragraph 14.4.**
>
> Disputed Matters will be solely and finally settled by arbitration, which will be conducted in Miami by a panel of three arbitrators. . . The arbitration procedure may be initiated by any of the parties to this Agreement by written notice to the other party to the Disputed Matter. . . The parties renounce all recourse to litigation and agree that the award of the arbitrators will be final and subject to no judicial review.
>
> The arbitrators will conduct the [sic] in accordance with the Commercial Arbitration Rules (the **"Rules"**) of the American Arbitration Association (**"Arbitral Body"**) provided that the provisions of this Agreement will prevail in the event of any conflict between the Rules and the provisions of this Agreement.  The arbitrators will decide the issues submitted in accordance with the provisions and commercial purposes of this Agreement, provided that all substantive questions of law will be determined under the laws of the State of Florida, United States of America (without regard to its principles of conflicts of laws or, to the extent permissible, to any provisions of any relevant Law that would nullify or refuse to give effect to any provision of this Agreement). . . .

Id. p. 62, ¶ 14.4(a)-(c).

## C.   The Selling Shareholders Agreement

Contemporaneously with the execution and delivery of the Merger Agreement, Equifax, the Merger Sub, Naviant and the Shareholders entered into a Selling Shareholders Agreement.

The Selling Shareholders Agreement begins by stating that as a

condition to entering into the Merger Agreement, Equifax was requiring the Shareholders, "as beneficiaries of the transactions contemplated by the Merger Agreement," to enter into the Selling Shareholders Agreement and "make the representations and warranties set forth in this Agreement. . ." See Selling Shareholders Agreement at p. 2. The Agreement contains a number of representations and warranties on the part of the Shareholders and the appointment of Softbank Capital Partners as the Shareholders' Representative. In paragraph 1.7, each Shareholder represented and warranted to Equifax that "[t]o the Actual Knowledge of such Shareholder, the representations and warranties of [Naviant] set forth in the Merger Agreement are correct and complete." It was also agreed that any claim against the Shareholders for a breach of this representation must be pled with specificity in the following manner:

> [Equifax] shall be required to (a) plead with particularity in any complaint related to an alleged breach of this representation by such Shareholder the precise and specific facts that evidence that such Shareholder had Actual Knowledge that the representations or warranties of [Naviant] in the Merger Agreement were not correct, and (b) prove by clear and convincing evidence that such Shareholder in fact had Actual Knowledge of the specific and precise facts as of the date of the execution and delivery of this Agreement that the representations and warranties of [Naviant] set forth in the Merger Agreement were not correct; *provided, further,* that each of [Equifax] and [Naviant] agrees to stipulate to the foregoing pleading and proof standards in any claim, action, proceeding or trial related to or arising out of this representation and not to raise any defenses or objections to the enforceability or applicability of such standards.

Id. at p. 4, ¶ 1.7.

The Selling Shareholders Agreement further provides, with respect to the Merger Agreement, that:

> The provisions of this Agreement are not intended to alter, modify, negate or replace any provisions of the Merger Agreement that may be in conflict with the provisions hereof, with each of the provisions of the Merger Agreement being acknowledged by each Shareholder to be controlling for all purposes insofar as relates to interpretation, application and enforcement of the Merger Agreement. Other than in respect of claims arising out of fraud under the Merger Agreement (in which case [Equifax] shall have all remedies available at law or in equity directly against the Shareholders and without application of either of Section 11.4 or 11.5 of the Merger Agreement), any and all claims for Indemnified Losses or any losses arising from a breach of the representation set forth in Section 1.7 of this Agreement shall be satisfied solely out of the Escrow Fund (which includes interest and earnings thereon) and no Indemnitee shall have personal recourse against any Shareholder for any claims for Indemnified Losses under all subparts of Section 11.1, other than for paragraph (b) thereof, of the Merger Agreement made pursuant to **Article 11** of the Merger Agreement; ***provided, however,*** that to the extent that (i) the Escrow Fund is insufficient to satisfy any claim by an Indemnitee for Indemnified Losses as a result of a breach of a representation or warranty by [Naviant] under the Merger Agreement and (ii) a Shareholder has breached his or its representation and warranty set forth in Section 1.7 of this Agreement with respect to the same breach referred to in the immediately preceding clause (i) above and such Indemnified Losses resulting from such breach by such Shareholder do not arise from fraud by such Shareholder, then, subject to the proof and pleading standards in Section 1.7 of this Agreement to which [Equifax] and [Naviant] have hereby stipulated, such Shareholder shall be liable to such Indemnitee for the excess of such Indemnified Losses over the then available (and unreserved) amount in the Escrow Fund up to the aggregate amount of Merger Consideration received by such Shareholder pursuant to Section 4.1 of the Merger Agreement.

Id. at pp. 8-9, ¶ 2.9.

The Selling Shareholders Agreement does not contain an arbitration clause. Regarding personal jurisdiction and venue, it

9

provides:

> **Consent to Jurisdiction and Venue.** Each Shareholder hereby irrevocably and unconditionally consents and submits to the personal jurisdiction of any state or federal court sitting in Dade County,  Florida, and each Shareholder also expressly consents and submits to and agrees that venue in any such Action is proper in said courts and county, and each Shareholder hereby expressly waives any and all personal rights under applicable law or in equity to object to jurisdiction and venue of said court and county. . .

Id. at p. 12, ¶ 5.1.

### D.   Equifax's Demand for Arbitration

Following the closing of the merger, Equifax submitted several demands for indemnification to the Shareholders' Representative arising out of a variety of Indemnified Losses.  The Shareholders' Representative administered these claims and authorized the payment of most of them without contest.  See Compl. at ¶44.  Sometime after the merger, Equifax discovered that former Naviant representatives had allegedly engaged in a fraudulent scheme to overstate Naviant's revenues and assets, and that fraudulent misrepresentations were allegedly made to Equifax in the Merger Agreement.

After providing the requisite written notice to the Shareholders' Representative of its intention to seek indemnification from the Shareholders, Equifax filed a Demand for Arbitration before the American Arbitration Association ("AAA") pursuant to the Merger Agreement.  In its Demand for Arbitration, Equifax asserts eight claims, but only Counts One and Two are directed to the Shareholders. See Cinnamon Declaration at Exh. B, p. 2.  Count One seeks recision of Equifax's acquisition of Naviant, alleging that Equifax relied on

10

false and misleading material factual misrepresentations in their acquisition of Naviant.  Count Two seeks damages, if recision is not granted in accordance with the relief sought in Count One, as indemnification for breach of the representations and warranties in Article 6 of the Merger Agreement.  Both claims arise out of the alleged fraud in connection with the representations made by Naviant in Article 6 of the Merger Agreement.  See Demand for Arbitration at pp. 26-33.

### E.   The Shareholders' Complaint

In an attempt to avoid defending against Equifax's claims at arbitration, the Shareholders filed a four-count complaint for declaratory relief with this Court.  The Shareholders ask the Court to declare: (1) the authority and obligations of Softbank Capital Partners as Shareholders' Representative with respect to Equifax's claims against the Shareholders; (2) the scope of the arbitration clause of the Merger Agreement; (3) the Shareholders' rights and liabilities with respect to paragraph 1.7 of the Selling Shareholders' Agreement; and (4) that the Shareholders' lack Actual Knowledge that Naviant's representations and warranties were untrue.

Shortly after the filing of the complaint, the parties stipulated to a stay of the arbitration pending this Court's decision on the matters raised in the Shareholders' complaint.  Equifax then moved to dismiss the Shareholders' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).  For the reasons explained below, the Motion to Dismiss must be granted.

11

### III. **LEGAL STANDARD**

Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Steelworkers v. Warrior & Guld Nav. Co., 363 U.S. 574, 582 (1960). The question of arbitrability -- whether parties have submitted a particular dispute to arbitration -- is an issue for judicial determination, unless the parties clearly and unmistakably provide otherwise. See Howsam v. Deean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995).

Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements. See Employers Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir. 2001). Under federal law, questions of arbitrability, when in doubt, should be resolved in favor of arbitration. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Under Florida's general contract law, the court must discern the intent of the parties from the language used in their agreement. See Lyng v. Bugbee Distrib. Co., 182 So. 801, 802 (1938) ("The intention of the parties to a contract is to be deduced from the language employed by them. The unambiguous terms of the contract . . . are conclusive, ... the question being, not what intention existed in the minds of the parties, but what intention is expressed by the language used.")

## IV. **DISCUSSION**

The threshold issue before the Court is whether an enforceable arbitration agreement exists between Equifax and the Shareholders. It is undisputed that the Merger Agreement contains an arbitration provision requiring resolution of all disputes arising out of or in connection with the Merger Agreement in arbitration.   What is disputed, however, is whether the Shareholders are bound by the arbitration clause in the Merger Agreement even if they did not sign it.

"Ordinary principles of contract law are used to determine if a non-signatory is to be bound by a contract and a party may be bound by an agreement to arbitrate even in the absence of a signature." Interpool Ltd. v. Through Transp. Mut. Ins. Ass'n. Ltd., 635 F.Supp. 1503, 1505 (S.D.Fla. 1985) (internal quotation marks omitted); see also Employers Ins. of Wasau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir. 2002)("Courts, however, have recognized a number of theories under which non-signatories may be bound to the arbitration agreements of others"); Martha Gottfried, Inc. v. Paulette Koch Real Estate, Inc., 778 So. 2d 1089, 1090 (Fla. 4th DCA 2001)("Non-signatories may be bound by an arbitration agreement if dictated by ordinary principles of contract law and agency"); Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero, 827 So. 2d 338, 339 (Fla. 3d DCA 2002)("A contract may be binding on a party despite the absence of a party's signature.  The object of a signature is to show mutuality of assent, but these facts may be shown

13

in other ways, for example, by the acts or conduct of the parties.")
With these principles in mind, the Court will determine whether the
Shareholders have a duty to arbitrate.

### A.    The Shareholders' Duty to Arbitrate

In this case, the Shareholders are bound by the arbitration
clause in the Merger Agreement for a number of reasons.    The
Shareholders are bound because they expressly agreed that the
Shareholders' Representative's actions and decisions will be binding
upon them and the Shareholders' Representative specifically agreed
that disputes arising out the Merger Agreement will be arbitrated.
It is undisputed that on August 13, 2002, the Shareholders executed
the Unanimous Consent Agreement.  In that agreement, the Shareholders
consented to the appointment of Softbank Capital Partners LP as the
Shareholders' Representative. The Shareholders gave the Shareholders'
Representative full power and authority to execute and deliver the
Merger Agreement and, among other things, to take all action as is
contemplated to be taken by the Shareholders by the terms of the
Merger Agreement.

Acting upon the authority given to it by the Shareholders, the
Shareholders' Representative executed the Merger Agreement.  Article
11 of the Merger Agreement, in turn, specifically requires the
Shareholders to indemnify Equifax for "any misrepresentation" made by
Naviant in that Agreement.    Furthermore, the Merger Agreement
specifically provides that all disputes arising thereunder will be
resolved at arbitration.    The Shareholders, while admitting that

14

Article 11 of the Merger Agreement binds them to indemnify Equifax, nevertheless maintain that they are not bound by Article 14 of the same agreement, which requires arbitration of any disputes arising out it.

In both the Merger Agreement and the Selling Shareholders Agreement, however, the Shareholders specifically agreed that "all decisions and actions by the Shareholders' Representative, including without limitation any agreement between the Shareholders' Representative and [Equifax] relating to . . . the defense or settlement of any claim for which the Company Shareholders may be required to indemnify [Equifax] pursuant to Article 11 of the Merger Agreement, shall be binding upon all of the Company Shareholders, and no Company Shareholder shall have the right to object, dissent, protest, or otherwise contest same." Such unambiguous language in the Selling Shareholders Agreement, which the Shareholders signed, evidences an intent on the part of the Shareholders to be bound by all of the Shareholders' Representative's decisions and agreements with Equifax relating to their duty to defend claims brought by Equifax, including the forum of such disputes. Moreover, the first page of the Merger Agreement specifically states that Softbank Capital Partners LP was acting as a Shareholders' Representative "for the purpose set forth in paragraphs 4.7, 4.8, 4.9, 14.1, 14.4, 14.5, 14.6, 14.7, 14.8 and Article 11 of the Merger Agreement." Because the arbitration clause, included in paragraph 14.4, is expressly included among the provisions for which the Shareholders' Representative was acting on behalf of the

15

Shareholders, the Shareholders are bound by the agreement contemplated in paragraph 14.4. If the Shareholders intended not to be bound by the Shareholders' Representative's agreement with Equifax concerning the arbitration of disputes, then they should not have agreed to authorize the Shareholders' Representative to act on their behalf for "the purpose set forth in paragraph[] . . . 14.4."

Furthermore, the Shareholders' express approval, adoption and ratification of the Merger Agreement constitutes further evidence of the Shareholders' assent to the terms of the Merger Agreement. The Unanimous Consent Agreement, signed by the Shareholders, provides that the Shareholders had been presented with the Merger Agreement and that they approved, ratified, and adopted the Agreement in all respects. Such adoption and approval of the Merger Agreement triggered a number of undertakings by the Shareholders under that Agreement. For example, the Merger Agreement specifically provides that the Shareholders' adoption and approval of the Merger Agreement constituted their consent to authorize the Shareholders' Representative to act on their behalf in administering the transactions contemplated by the Merger Agreement. By adoption and approval of the Merger Agreement, the Shareholders further agreed that all decisions and actions by the Shareholders' Representative will be binding upon them. See id at ¶ 4.9(d). By the approval and adoption of the Merger Agreement, the Shareholders also agreed to approve the escrow agreement and pay Equifax any deficiency in the net working capital. Additionally, by the approval and adoption of the Merger

16

Agreement, the Shareholders agreed that Equifax could "rely
conclusively" upon the Shareholders' Representative's "instructions
and decisions . . . as to . . . actions required or permitted to be
taken by the Shareholders' Representative hereunder. . . _See id._ at
¶ 4.9(f)(I).

Thus, by approving and adopting the Merger Agreement, the
Shareholders did more than merely provide their consent to the merger.
Instead, their approval and adoption of the Merger Agreement
constituted their asset to the agreements and assurances that were
only referenced in the Merger Agreement. Equifax was entitled to rely
on the Shareholders' approval of the Merger Agreement as a
confirmation of the Shareholders' assent to arbitrate disputes
concerning the Shareholders' obligations under the terms of the Merger
Agreement. Equifax did rely upon the Shareholders' approval and
adoption of the Merger Agreement and performed to the benefit of the
Shareholders, as is evident by Equifax's payment of the Merger
Consideration to the Shareholders, delivery of the escrow fund,
presentment of various claims for Indemnified Losses, which were
honored by the Shareholders' Representative, and filing of the Demand
for Arbitration against each individual Shareholder. As such, the
Court concludes that the Shareholders' approval and adoption of the
Merger Agreement binds them as to the duties imposed on the
Shareholders in the Merger Agreement, including the duty to arbitrate.

In addition to being bound because they approved and adopted the
Merger Agreement, the Shareholders are bound by the arbitration clause

17

because they derived benefits and performed obligations under the
Merger Agreement.   It is well-settled that the acceptance of rights
and obligations under a written agreement is sufficient to bind a non-
signatory to the agreement.   See Ocwen Financial Corp. v. Holman, 769
So. 2d 481, 483 (Fla. 4th DCA 2000)(holding that non-signatory to
agreement containing arbitration clause was bound to arbitrate despite
absence of signature because it "received rights and accepted
obligations" under the agreement); Martha Gottfried, Inc., 778 So. 2d
at 1090 (holding that non-signatory to arbitration agreement was bound
to arbitrate "as having accepted the economic and professional
benefits" under the agreement); Integrated Health Servs., 827 So. 2d
at 339 (non-signatory held to be bound by arbitration agreement
because both parties "performed under the contract").   In this case,
it is undisputed that the Shareholders received $86 million in merger
consideration from Equifax, to which they were entitled only under the
Merger Agreement.   "It would be hard to imagine a more direct benefit
under a contract than the receipt of large sums of money."   Vencor
Hospitals v. Blue Cross Blue Shield of Rhode Island, 169 F.3d 677, 680
(11th Cir. 1999).   In addition to receiving monetary benefits, the
Shareholders performed obligations under Merger Agreement.
Accordingly, through performance, the Shareholders bound themselves
to the Merger Agreement, including its arbitration clause.

The Court is unpersuaded by the Shareholders' argument that
paragraph 1.7 of the Selling Shareholders' Agreement requires Equifax
to bring all claims against the Shareholders in a court of law.   The

18

unambiguous language of paragraph 1.7 deals solely with the Shareholders' representation to Equifax that, to their actual knowledge, all of the representations made by Naviant in the Merger Agreement are true and complete. As such, paragraph 1.7 authorizes Equifax to bring claims against the Shareholders for any breach of the "Actual Knowledge" representation by pleading and proving facts in the manner described therein. The Selling Shareholders Agreement, however, says nothing about how claims under the Merger Agreement are to be brought or made and does not otherwise limit or specify the forum in which Equifax can pursue claims against the Shareholders for fraudulent breaches of *the Merger Agreement*. To the contrary, paragraph 2.9 of the Selling Shareholders Agreement specifically states that the Merger Agreement had been "acknowledged by each Shareholder to be controlling for all purposes insofar as relates to interpretation, application and enforcement of the Merger Agreement." This language shows that the Shareholders, in signing the Selling Shareholders Agreement, specifically acknowledged each of the provisions of the Merger Agreement, including the arbitration clause, and agreed that the Selling Shareholders Agreement cannot alter those provisions.

Moreover, the Selling Shareholders Agreement, in paragraph 2.9, reiterates that Equifax: "*Other than in respect of claims arising out of fraud under the Merger Agreement*. . . shall have no personal recourse against any Shareholder for any claims for Indemnified Losses under all subparts of Sections 11.1. . . of the Merger Agreement."

19

(emphasis added).  This language supports the conclusion that Equifax can have personal recourse against the Shareholders pursuant to the Merger Agreement "in respect of claims arising out of fraud under the Merger Agreement."  Accordingly, rather than support the Shareholders' arguments, the Selling Shareholders Agreement instead supports the conclusion that the Shareholders agreed to be bound by the Merger Agreement.[1]  The Shareholders could have included language in the Selling Shareholders Agreement specifically requiring that all claims by Equifax against them for Indemnified Losses *under the Merger Agreement* be brought in a court of law.  But there is simply no language anywhere in the Selling Shareholders Agreement limiting the precise provision in the Merger Agreement giving Equifax a right to arbitrate "[a]ny and all disputes. . . arising out of or in connection with the execution, interpretation, performance or nonperformance" of the Merger Agreement.

**B.**   **Scope of Duty to Arbitrate**

Having determined that the Shareholders are bound by the arbitration clause in the Merger Agreement, the question remains whether Equifax's specific claims for recision and indemnification in its Demand for Arbitration are covered by the arbitration clause.  The question of who has the primary power to decide arbitrability turns

---

[1] The conclusions reached by the Court in this section relate solely to the issue of whether a written arbitration exists between Equifax and the Shareholders.  As such, the Court's analysis shall have no bearing on the merits of Equifax's claims or the extent of the Shareholders' liability, if any, under the Merger Agreement.

20

upon what the parties' agreement is on that particular issue.  See
Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002).  The
arbitration clause at issue in this case incorporates the Commercial
Arbitration Rules of the AAA.  Under Rule R-7, the arbitrator has the
power  to  rule  on  the  scope  of  the  arbitration  agreement.    The
arbitration  clause,  however,  also  provides  that  "all  substantive
questions of law will be determined under the laws of the State of
Florida" and, under Florida law, courts, not arbitrators, must resolve
whether a particular dispute is subject to arbitration.  See Curtis
v. Olson, 837 So. 2d 1155, 1157 (Fla. 1st DCA 2003).  It is therefore
plain that the arbitration clause is ambiguous on the question of who
should decide whether the claims fall within the arbitration clause,
or at least does not answer the question "clearly and unmistakably."
Howsam, 537 U.S. at 83.  Because silence or ambiguity about that
question should be resolved in favor of a judicial determination on
the issue, see First Options of Chicago v. Kaplan, 514 U.S. 938, 944
(1995), the Court will decide for itself whether Equifax's claims for
indemnification and recision are subject to arbitration.

As  discussed  at  length  above,  one  of  the  reasons  why  the
Shareholders  are  bound  by  the  arbitration  clause  in  the  Merger
Agreement,  even  though  they  did  not  sign  it,  is  because  they
admittedly agreed to indemnify Equifax for the representations made
by Naviant in the Merger Agreement.  Based on this agreement, Count
Two of Equifax's Demand for Arbitration seeks indemnification from the
Shareholders  for  alleged  fraudulent  misrepresentations  made  by

Naviant's former officers in the Merger Agreement. Since the arbitration clause covers "[a]ny and all dispute arising out of . . . the Merger Agreement," the Court concludes that Count Two of Equifax's Demand for Arbitration is covered by the arbitration clause. To the extent that the Shareholders dispute the scope of the limitation on the Shareholders' liability for Indemnified Losses, that issue touches upon the merits of the claim and the interpretation of Article 11 of the Merger Agreement. The arbitration clause makes clear that issues bearing on the Merger Agreement's interpretation must be decided by the arbitrators. With respect to Equifax's claim for recision, the Court concludes that the claim is also covered by the arbitration clause because recision issues deal with the "execution, interpretation, performance or nonperformance" of the Merger Agreement.

### V. **CONCLUSION**

Having decided that the Shareholders are bound by the arbitration clause in Merger Agreement and that Equifax's claims for indemnification and recision are covered by the arbitration clause, the Court concludes that the Shareholders' remaining claims for declaratory relief must be dismissed for lack of jurisdiction. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss (D.E. 25) is hereby **GRANTED**. It is further

**ORDERED AND ADJUDGED** that and Plaintiffs' Motion for Partial Summary Judgment (D.E. 11) is **DENIED**. It is further

22

**ORDERED AND ADJUDGED** that this case is **CLOSED** for administrative purposes and any pending motions not otherwise ruled upon are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of March, 2005.

DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc:   Counsel of Record

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



Case No. 04-80754-CIV-PAINE

EQUIFAX, INC.

     Plaintiff,

vs.

AUSTIN VENTURES VII, L.P. et al.,

     Defendants.

_____/

## ORDER COMPELLING ARBITRATION AND STAYING ACTION

This matter is before the court upon the Plaintiff's Motion to Stay Action
Pending Arbitration (DE 117) and upon Defendant Scott Hirsch's Motion to Stay
Arbitration Proceedings (DE 166)..

### Background

In the Complaint, the Plaintiff, Equifax, explained that the action was filed in
order to protect against the running of the statute of limitations with respect to claims
Equifax sought to arbitrate and claims derivative of and dependant upon the claims
sought to be arbitrated.  The 41 Defendants in this case are former shareholders or
option holders of Naviant, Inc., a company which was party to a Merger Agreement

1

Exhibit _B_

with the Plaintiff. In an obvious attempt to prevent the unnecessary expenditure of resources on the part of the Plaintiff and all 41 Defendants, the Plaintiff promptly upon filing the present action moved for a stay of this action pending arbitration. All Deferndants, except for two, have agreed to entry of the stay pending arbitration of the Plaintiff's claims.

The two Defendants, Seisint, Inc., a former shareholder, and Scott Hirsch, a former option-holder, oppose the entry of a stay and the arbitration proceedings on the grounds that they are not signatories to the Merger Agreement which includes an express arbitration clause. Although Defendant Hirsch did not timely raise his objections to the Motion to Stay, thereby subjecting the Motion to be granted by default, the court will address the motion on the merits.

After the present motion was fully briefed, Judge Graham of this court entered an order in related litigation, Softbank v. Equifax, Case. No. 04-20994-Civ-Graham (S.D. Fla. 2005) in which he held that a number of Naviant shareholders who, like Defendants Seisint and Hirsch in the present case, were not signatories to the Merger Agreement nevertheless were bound by the arbitration clause. Judge Graham dismissed the action and closed the related case. Having reviewed this case and Judge Graham's case, the undersigned had concluded that the cases were related for transfer purposes. However, the attempted transfer of this case to Judge Graham was

not effected because Judge Graham's dismissal order was imminent at the time this case was forwarded to him for transfer. Therefore, having determined that this case and Judge Graham's case are sufficiently related for transfer purposes, the undersigned finds Judge Graham's order enforcing the arbitration clause and dismissing the case to be highly persuasive on the issues raised in the present case. Regardless of what this court rules, because of Judge Graham's earlier ruling, the Defendants who oppose arbitration in this case will be subject to arbitration with the Plaintiff Equifax on similar claims. That arbitration proceeding in the <u>Softbank</u> litigation is moving forward and, based upon the Plaintiff's representations to this court, the three claims in this lawsuit are completely duplicative of the claims asserted in the <u>Softbank</u> arbitration and, therefore, they should be stayed pending the arbitration proceeding. Further, the Plaintiff represents to this court that the resolution of the remaining claims may also be resolved by the arbitration claims because they will be affected by the arbitrator's ruling.

Equifax's demand for arbitration asserts a number of claims arising out of an alleged fraud in connection with Equifax's acquisition of Naviant, including (1) a claim for rescission of the Naviant acquisition; (2) an alternative claim for damages pursuant to the indemnification provisions of the Merger Agreement; and (3) a claim for damages for fraud. The first two claims seek relief from <u>all</u> former shareholders

3

and option-holders, but the claim for fraud is asserted only against those former shareholders and option holders who have been alleged to have participated in or aided in the alleged Naviant acquisition fraud. Defendants Seisint and Hirsch are Defendants in the fraud claim.

The Plaintiff contends that the claims asserted in the present case, including the claims alleged against the Defendants Seisint and Hirsch, cannot be fully resolved until the arbitrator resolves the issues pending before it and proceeding in accordance with Judge Graham's order. Furthermore, the Plaintiff contends that, if it prevails in the arbitration proceedings, it may be made whole by the award, thereby rendering its claims in the current litigation to be unnecessary. If the arbitrator rescind's the Naviant acquisition, then Equifax would be fully restored to its pre-acquisition status and all of the merger consideration would be returned to Equifax, thereby rendering this action moot. Having considered all of these facts and Judge Graham's order, and the following authority, this court finds that this case should be stayed pending arbitration

## Legal Analysis

The Federal Arbitration Act ("FAA") provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court

4

in which said suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

The FAA makes enforceable a written arbitration provision in a "contract evidencing a transaction involving commerce." 9 U.S.C.A. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983). The legislative history makes clear that the FAA's purpose was to overcome long-standing judicial hostility to arbitration agreements and to enforce such agreements. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 n. 14 (1985); Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-20 (1985).

The FAA extends to the furthest reaches of Congress's Commerce Power and is applicable as long as the contract at issue affects interstate commerce. 9 U.S.C. § 2 ("contract evidencing a transaction involving commerce"); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74 (1995); Toledo v. Kaiser Permanente Med. Group, 987 F.Supp. 1174, 1180 (N.D.Cal.1997) (applying applicable standard in

managed care context). There is no dispute that the contracts at issue in the present

case affect interstate commerce and, therefore, fall under the purview of the FAA..

"A party aggrieved by the alleged failure, neglect or refusal of another to

arbitrate under a written agreement for arbitration may petition any United States

district court ... for an order directing that such arbitration proceed in the manner

provided for in such agreement.... [T]he court shall make an order directing the parties

to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. §

4. The FAA establishes a strong federal policy, even a presumption, in favor of

arbitration. Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp., 460 U.S. 1, 24-25.

Whether a matter is within the scope of an arbitration provision is a matter of

the parties' intent, and "those intentions are generously construed as to issues of

arbitrability." Motors Corp. v. Soler Chrysler-Plymouth, Inc., at 626. Courts decide

this threshold issue of substantive arbitrability unless there is "clear and unmistakable

evidence" that the parties intended to submit such questions to an arbitrator. Dean

Witter Reynolds, Inc. v. Fleury, 138 F.3d 1339, 1342-43 (11th Cir.1998) (citing First

Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995)). However, even though

there is a strong federal policy favoring it, arbitration is a matter of contract, and

parties can only be required to submit disputes to arbitration if they agreed to do so.

First Options, 514 U.S. at 942-43; AT & T Techs., Inc. v. Communications Workers

of Am., 475 U.S. 643, 648-49 (1986); United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582  (1960). An arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A]lthough federal law establishes the enforceability of arbitration agreements, a court must construe that agreement according to generally applicable principles of state law." In re S.E. Banking Corp., 156 F.3d 1114 (11th Cir.1998) (citing Perry v. Thomas, 482 U.S. 483, 492 n. 9, (1987)); Eassa Props. v. Shearson Lehman Bros., Inc., 851 F.2d 1301, 1304 n. 7 (11th Cir.1988) ("While federal law may govern the interpretation and enforcement of a valid arbitration agreement, state law governs the question of whether such an agreement exists in the first instance."). Accordingly, "courts are not to twist the language of the contract to achieve a result which is favored by the federal policy but contrary to the intent of the parties." Goldberg v. Bear Sterns & Co., 912 F.2d 1418, 1419-20 (11th Cir.1990).

Therefore, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Memorial Hosp.v. Mercury Constr. Corp., 460 U.S. at 24.  And that body of law

counsels "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration ... The Arbitration Act establishes that, as a matter of law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25; Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P .A. v. MedPartners, Inc., 312 F.3d 1349, 1357-58 (11th Cir.2002); Employers Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316, 1322 (11th Cir.2001). The FAA also provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another party to arbitrate under a written agreement for arbitration may petition [the court] ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C.A. § 4. Section 4 goes on to provide that, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." Id.

In view of the foregoing authority, as a general matter of federal policy, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate a particular grievance should not be denied unless it

may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 651(1986) (reviewing dispute arising under the Labor Management Relations Act) (internal quotation omitted); see also Ruby-Collins, Inc. v. City of Huntsville, Alabama, 748 F.2d 573, 576 (11th Cir.1984) ("[F]ederal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration.").

In light of the general federal policy favoring arbitration, courts must "construe arbitration clauses generously, resolving all doubts in favor of arbitration." Seaboard Coast Line Railroad Co. v. Trailer Train Co., 690 F.2d 1343, 1348 (11th Cir.1982. See also Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054, 1056 (11th Cir.1998) ("The FAA creates a presumption in favor of arbitrability."). However, despite this strong federal policy, arbitration is a matter of contract, and a party generally cannot be required to submit to arbitration when it did not agree to do so. See AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986); Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, (1960). Accordingly, "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' "

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). Issues to be decided by the court "include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 451-53(2003).

As a general rule, when considering these "gateway issues," the court "may consider only issues relating to the making and performance of the agreement to arbitrate," and not issues relating to the making of the contract generally. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967); John B. Goodman Limited Partnership v. THF Construction, Inc., 321 F.3d 1094, 1095-96 (11th Cir.2003) (per curiam). "Prima Paint's mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator." Rollins, Inc. v. Foster, 991 F.Supp. 1426, 1431 (M.D.Ala.1998).

There is an exception to the Prima Paint rule, however, for "cases where not merely the enforceability, but the initial formation or existence of a contract, including a disputed arbitration clause, is legitimately called into question, and must be decided by the court." Rainbow Investments, Inc. v. Super 8 Motels, Inc., 973 F.Supp. 1387, 1390 (M.D.Ala.1997). Cases in which there is no signed contract and in which one party denies the existence of an agreement fall into this category. The Eleventh Circuit

10

has explained:

> "Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. Because the making of the arbitration agreement itself is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests.
>
> "The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. In such a case, that party is challenging the very existence of any agreement, including the existence of an agreement to arbitrate. Under these circumstances, there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act. If a party has not signed an agreement containing arbitration language, such a party may not have agreed to submit grievances to arbitration at all. Therefore, before sending any such grievances to arbitration, the district court itself must first decide whether or not the non-signing party can nonetheless be bound by the contractual language."

Chastain v. The Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir.1992) (citations and footnotes omitted).

In the present case, although the Merger Agreement contains a valid and enforceable arbitration clause, the Defendants Seisint and Hirsch did not sign the agreement. Accordingly, this court must determine if these two Defendants otherwise

assented to the arbitration clause. The Defendant Seisint, like all other former shareholders, executed a "Unanimous Written Consent of the Shareholders of Naviant." In said Consent, the shareholders designated Softbank Capital Partners LP to act as a representative for all of the shareholders in administering the transactions necessary to consummate the acquisition. Likewise, although Defendant Hirsch was not a Naviant shareholder at the time of the acquisition, he was an option-holder and he executed similar documents which provided that the Shareholders Representative (i.e. Softbank Capital) would act as his representative for purposes of effecting the acquisition and for the additional purpose of administering the merger on his behalf and on behalf of the former shareholders. Therefore, the court finds that both Defendants Hirsch and Seisint authorized the Shareholders' Representative to act on their behalf in effecting the merger. In this representative capacity, the Shareholders' Representative, acting on behalf of all the shareholders, including Defendants Hirsch and Seisint, actually signed the Merger Agreement which contained the arbitration clause. Judge Graham found that this was sufficient to manifest the assent of the non-signatory shareholders to the arbitration clause and this court agrees. Plainly, this case is a dispute arising under or relating to the Merger Agreement which contains an enforceable arbitration clause. Therefore, the Court is satisfied that the issues involved in this matter are referable to arbitration under section 3 of the FAA, as ordered by

12

Judge Graham in the related case, and that a stay of the present action is necessary to allow the arbitrator the opportunity to resolve the matters presented in this case. Accordingly, it is

ORDERED AND ADJUDGED that Equifax' Motion to Stay Pending Arbitration (DE 117) is GRANTED and Defendant Hirsch's Motion to Stay Arbitration Proceedings (DE 166) is DENIED. This case shall remain pending but shall be STAYED until an arbitration award is issued. The parties are to proceed with the arbitration as ordered by Judge Graham and all further activity in this case is stayed pending an opinion by the arbitrator. It is further

ORDERED and ADJUDGED all motions not otherwise addressed in this order are hereby DENIED as moot and shall be deleted from the undersigned's pending motion list. Finally, it is

ORDERED and ADJUDGED that within 10 days of a decision by the arbitrator, the Plaintiff shall provide this court with a detailed explanation of the arbitrator's ruling and it affect on each and every claims asserted in this case, clearly identifying what issues , if any, remain for resolution of the matter.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this _17th_

day of June, 2005.

_____
JAMES C. PAINE
UNITED STATES DISTRICT JUDGE

cc:
Counsel of Record

14

## SERVICE LIST

**Counsel for Austin Ventures VII, L.P., Austin Ventures VIII, L.P., BERJ, LLC (f/k/a BERJ, Inc.), Softbank Capital Partners LP, Softbank Capital Advisors Fund LP, Softbank Capital LP, TL Ventures III L.P., TL Ventures III Offshore, L.P., TL Ventures III Interfund LP, TL Ventures IV L.P., and TL Ventures IV Interfund, L.P.**
**(a/k/a Venture Capital Defendants)**
Hilarie Bass, Esquire
Christine M. Nanfeldt, Esquire
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
305-579-0500
Fax 305-579-0717

**of counsel:**
Michael H. Steinberg, Esquire
Matthew S. Warren, Esquire
Sullivan & Cromwell, LLP
1888 Century Park East
Los Angeles, CA 90067
310-712-6600
Fax 310-712-8800

James V. Masella, III, Esquire
Sullivan & Cromwell, LLP
125 Broad Street
New York, New York 10004
212-558-4000
Fax 212-558-3588

**Counsel for Seisint, Inc.**
Robert D. Critton, Esquire
Burman, Critton, Luttier & Coleman
515 North Flagler Drive, Suite 400
West Palm Beach, Florida 33401
561-842-2820
Fax 561-844-6929

Appearing *pro hac vice*
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Robert D. Zebro, Esquire
J. Allen Maines, Esquire
William K. Whitner, Esquire
600 Peachtree Street, NE, Suite 2400
Atlanta, GA 30308-2222
404-815-2400
fax 404-815-2424

<u>Counsel for SweepsClub.com, Inc., Marc Rona, Richard Kaufman, and Steve Siccone</u>
Kenneth R. Hartman, Esquire
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
305-372-1800
Fax 305-372-3508
<u>Co-counsel</u>
Budd Larner, Esquire
Michael Covino, Esquire
Budd Larner, P.C.
150 John F. Kennedy Parkway, CN 1000
Short Hills, NJ 07078-0999
Tel. 973-379-4800

<u>Counsel for Michael Brauser</u>
Jonathan Goodman, Esquire
Lawrence D. Silverman, Esquire
Akerman Senterfitt
One Southeast Third Avenue, 28th Floor
Miami, Florida 33131-1714
305-374-5600
Fax 305-374-5095

<u>Counsel for Dubner</u>
Kenneth W. Lipman, Esquire
Linda B. Lyman, Esquire
Siegel, Lipman, Dunay & Shepard, LLP
The Plaza, Suite 801
5355 Town Center Road
Boca Raton, Florida 33486
561-368-7700
Fax 561-368-9274

<u>Counsel for Venture Development Center, Inc. a/k/a Venture Development Company</u>
Gerald H. Litwin, Esquire
Litwin & Tierman, P.A.
2 University Plaza, Suite 210
Hackensack, NJ 07601
201-487-9044
Fax 201-487-9054

<u>Counsel for Scott Hirsch</u>
Gregg W. McClosky, Esquire
McClosky, D'Anna & Dieterle, LLP
2300 Glades Road
Suite 400, East Tower
Boca Raton, Florida 33431
561-368-9200
fax 561-395-7050



**Pro Se Defendants**
Ty Baines
6337 Northdale Court
San Jose, CA 95123

Robert Conley
10730 Paso Fino Drive
Wellington, Florida 33467

Phil Davis
2210 Center Avenue
Northbrook, IL 60062

Mark Eddy
2553 Cranbrook Drive
Boynton Beach, Florida 33436

Dan Babb
2554 Jardin Manor
Weston, Florida 33327

Charles Eissa
921 SE 5th Avenue
Pompano Beach, Florida 33060

Kevan Fleming
4725 SW 109th Trail
Ft. Lauderdale, Florida 33328

Tom Hickey
73 Parkway West
Mount Vernon, NY 10552

Richard Hill
2141 North University Drive, #375
Coral Springs, Florida 33071

Jeff Killeen
21 Woodside Lane
Westport, CT 06880

John Logan
6071 Newport Village Way
Lake Worth, Florida 33463

David Marcil
822 SW Blue Stern Way
Stuart, Florida 34997

3

Adam Mittelburg
1172 Birchwood Rd.
Weston, Florida 33327

Louis Nobile
6548 Serena Lane
Boca Raton, Florida 33433

Elder Ripper
393 Gilston Court
Heathrow, Florida 32746

Richard A. Schell
3751 NE 27th Terrace
Lighthouse Point, Florida 33064

Steve Stowell
1665 SW 2nd Avenue
Boca Raton, Florida 33432

Scott Thaler
6911 NW 104th Lane
Parkland, Florida 33076

David Wood
7880 Ambleside Way
Lake Worth, Florida 33467

Scott Frohman
347 N. New River Drive East #3001
Ft. Lauderdale, Florida 33301

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 06-60839-CIV-DIMITROULEAS

| | | |
|---|---|---|
| MICHAEL BRAUSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EQUIFAX INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF GREGORY K. CINNAMON**

1.

I am a partner with Kilpatrick Stockton LLP, resident in its Atlanta, Georgia office. I make this declaration under penalty of perjury for use in the above-captioned matter in support of Defendant's Motion to Dismiss. I have personal knowledge of the facts stated herein.

2.

I was the lawyer principally responsible on behalf of Equifax Inc. ("Equifax") for drafting, negotiating and closing the merger and the documents that attended it, including the Agreement and Plan of Merger made and entered into as of August 15, 2002, by and among Equifax, Armagh Acquisition Corporation, Naviant, Inc. and Softbank Capital Partners LP, as Shareholders' Representative (the "Merger Agreement"), that are the subject of the above-styled action. I have personal knowledge of the facts stated herein. Words and terms are used herein with the same definitions used in the Memorandum of Law in Support of Defendant's Motion to Dismiss.

Exhibit $\underline{C}$

9383727.1

3.

I have reviewed the exhibits that were served by plaintiff along with his Complaint for Declaratory Relief and a Stay (the "Complaint"). Exhibit A to the Complaint appears to be a true copy of the Merger Agreement, except that it does not include the attachments. Most of the attachments to the Merger Agreement do not appear material to the Court's present consideration, but Annex A to the Merger Agreement may be of import. As stated in Paragraph 5 below, I have therefore included that document here.

4.

Exhibit 1 hereto is a true copy of the Amended Demand for Arbitration that has been filed in the pending arbitration, which Equifax first commenced before the American Arbitration Association in March 2004. As a result of an Escrow Resolution Agreement entered into June 13, 2006, among Softbank Bank Capital Partners, L.P., acting solely in its capacity as the Shareholders' Representative, Equifax and Equifax eMarketing Solutions, Inc. f/k/a Naviant, Inc. ("Naviant"), Equifax and Naviant have dismissed their claims for indemnification under Article 11 of the Merger Agreement. Exhibit 2 hereto are true copies of the dismissals that Equifax and Naviant recently filed in the arbitration.

5.

Exhibit 3 hereto is a true copy (without its attachments) of the Unanimous Written Consent of the Shareholders of Naviant, Inc., which is a document executed in connection with the merger that is the subject of the Merger Agreement.

6.

Exhibit 4 hereto is a true copy of the Employee Agreement executed by Michael Brauser in connection with the merger that is the subject of the Merger Agreement.

7.

During the negotiation and drafting of the Merger Agreement, it was consistently stated by the lawyers with whom I dealt and well understood that the attorneys who represented Michael Brauser were intimately involved with the drafting of the Merger Agreement, as well as the other documents that accompanied it, from early in the process until the Merger Agreement's finalization, and that many changes were being made to the Merger Agreement in response to their comments.

8.

Exhibit 5 hereto is a true copy of the Exchange Agreement, which is a document executed as part of the merger, to detail the payments that were made.  Exhibit 6 hereto is a true copy of a Merger Consideration Schedule that was Annex A to the Merger Agreement and Attachment A to the Exchange Agreement; it was attached to and incorporated into the Merger Agreement.   Part III of the Schedule shows the sums received by the former Company Shareholders, as that term is used here, and by the other Naviant equity holders.

9.

Exhibit 7 hereto is a true copy of the American Arbitration Association's Commercial Arbitration Rule R-7.

10.

Michael Brauser has received his $14,316,365 in gross Merger Consideration, which he retains.  The Merger Agreement is the only document pursuant to which Naviant's former equity holders, including Mr. Brauser, were entitled to or did receive the Merger Consideration.

11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of June, 2006.

_____
Gregory K. Cinnamon

# EXHIBIT 1

(TO DECLARATION OF GREGORY K. CINNAMON)

AMERICAN ARBITRATION ASSOCIATION
(MIAMI, FLORIDA)
AAA CASE NO. 32 Y 168 00240 04

EQUIFAX INC., et al.

     Claimants,

v.

AUSTIN VENTURES VII, L.P., et al.,

     Respondents.

_____/

## AMENDED DEMAND FOR ARBITRATION

As permitted by Paragraph 4 of the Scheduling Order Following Preliminary Hearing entered in the above-styled arbitration, Claimants hereby amend their pleadings by replacing the originally-filed Demand for Arbitration with the following:

### Introductions

1.

Claimant Equifax Inc. ("Equifax") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 1550 Peachtree Street, Atlanta, Georgia 30309. Equifax is an information services company best known for its consumer credit reporting and marketing services.

2.

Claimant Equifax eMarketing Solutions, Inc. was formerly known as Naviant, Inc. and is referred to herein as "Naviant." Naviant is a corporation organized and existing under the laws of the State of Florida with its principal place of business at 999 Yamato Road, Boca Raton, Florida 33431. Naviant's web-based services include developing and delivering e-mail marketing campaigns that allow its customers to identify, target and reach online

consumers, who have consented to receive marketing information (opt-in e-mail) and whose

e-mail addresses and other demographic data are housed in Naviant's databases.

3.

Prior to the merger that is the subject of this Demand (the "Merger"), which took

place effective August 15, 2002, the stock of Naviant was held by the following respondents,

who are referred to herein (and who were referred to in the Merger) as the "Company

Shareholders":

Company Shareholders

| | |
|---|---|
| Austin Ventures VII, L.P. | Softbank Capital LP |
| Austin Ventures VIII, L.P. | SweepsClub.com, Inc. |
| BERJ, LLC (f/k/a BERJ, Inc.) | TL Ventures III L.P. |
| Michael Brauser | TL Ventures III Interfund, L.P. |
| Softbank Capital Partners LP | TL Ventures III Offshore, L.P. |
| Softbank Capital Advisors Fund LP | TL Ventures IV L.P. |
| | TL Ventures IV Interfund, L.P. |

The following respondents held options for shares of Naviant, and they are referred to herein

(and were similarly referred to in the Merger) as the "Former Option Holders":

Former Option Holders

| | |
|---|---|
| Dan Babb | Richard Kaufman |
| Ty Baines | Jeff Killeen |
| Rodger Berman | John Logan |
| Michael Brauser | David Marcil |
| Robert Conley | Adam Mittelburg |
| Phil Davis | Lou Nobile |
| Derek Dubner | Elder Ripper |
| Mark Eddy | Marc Rona |
| Charles Eissa | Rick Schell |
| Kevan Fleming | Steve Siccone |
| Scott Frohman | Steve Stowell |
| Tom Hickey | Scott Thaler |
| Richard Hill | Venture Development Center, Inc. |
| Scott Hirsch | David Wood |

2

The address of each Company Shareholder and Former Option Holder is shown in Exhibit 1 to the original Demand for Arbitration, which is here incorporated by reference.

4.

The Merger transaction was documented in an agreement entitled "Agreement and Plan of Merger by and among Equifax Inc., Armagh Acquisition Corporation, Naviant, Inc. and Softbank Capital Partners, LP, as Shareholders' Representative August 15, 2002" (referred to herein as the "Merger Agreement"). A true and correct copy of the Merger Agreement is at Tab 1 of the previously-filed Appendix in Support of Demand for Arbitration ("Claimants' Appendix"), which is here incorporated by reference. Armagh Acquisition Corporation was a merger subsidiary of Equifax that ceased to exist after the Merger. In the Merger Agreement, Equifax is identified as "EFX," Armagh is identified as "Merger Sub," Naviant is identified as "Company."

5.

Respondent Softbank Capital Partners LP ("Softbank") is a private equity fund that invests in technology-based companies and is one of the Company Shareholders. Softbank executed the Merger Agreement as Shareholders' Representative for the Company Shareholders and Former Option Holders, who designated Softbank as their representative, among other things, to receive notice on their behalf under the Merger Agreement. In the Merger Agreement, Softbank is identified as "Shareholders' Representative."

6.

In the Merger and pursuant to the Merger Agreement, the Company Shareholders and Former Option Holders disposed of their respective interests in Naviant – the shares of stock and the option rights—and Equifax became the sole owner of Naviant, in exchange for cash

3

paid by Equifax to the Company Shareholders and Former Option Holders, referred to in the Merger Agreement as the "Merger Consideration," which amounted in total to about $135,000,000. The Merger Consideration payments are detailed in Exhibit A to this Amended Demand. (The Exhibits to this Amended Demand are being filed separately and concurrently, entitled "Exhibits to Amended Demand for Arbitration," and references herein to "Exhibit" are to these exhibits.)

7.

As detailed below, in connection with Equifax entering the Merger Agreement and engaging in the Merger transaction and paying the Merger Consideration (hereinafter collectively referred to as the "Merger Transaction"), devices, schemes and artifices to defraud were employed against Equifax; Equifax's money in the form of the Merger Consideration was obtained by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; transactions, practices and courses of business were employed that operated and were intended and expected to operate as a fraud and deceit upon Equifax; misrepresentations, breaches of warranty, breaches and nonfulfillment of agreements in the Merger Agreement occurred and arose out of fraud, intentional misrepresentation, willful misconduct and criminal conduct and caused losses to Equifax; misrepresentations of material facts were made to Equifax with the intent to deceive Equifax and induce it to enter the Merger Transaction; and Equifax was defrauded into entering the Merger Transaction.

4

8.

The following are the respondents (based on Equifax's present knowledge) who knowingly and intentionally defrauded and deceived Equifax and knowingly, intentionally and with intent to deceive made untrue statements of material fact and omitted to state material facts with the intent to deceive Equifax and to induce Equifax to enter the Merger Transaction and who knowingly and intentionally participated in devices, schemes and artifices to defraud Equifax:

Michael Brauser (Naviant's President and Chief Executive Officer and a member of its Board of Directors before the acquisition, who became General Manager and Senior Vice President of Naviant thereafter until his departure in April 2003, during which time he was primarily responsible for Naviant's day-to-day operations)

Robert Conley (Naviant's Controller before the acquisition and from August 2002 until his departure from Naviant in March 2003).

Charles Eissa (Naviant's Fulfillment Manager before the acquisition and from August 2002 until his departure in July 2003).

Scott Hirsch (Naviant's Chief Operating Officer before the acquisition and a consultant of Naviant for several months following the acquisition).

Richard Kaufman (Executive Vice President of Naviant and President of Naviant's Performance Division before the acquisition, and Vice President of Naviant from August 2002 until his departure in July 2003, who also was President and Chief Executive Officer of SweepsClub.com, Inc., which is one of the Company Shareholders).

5

Marc Rona (Naviant's Director of Sales before the acquisition and a Vice President of Naviant from August 2002 until his departure in July 2003).

Rick Schell (Naviant's Chief Financial Officer before the acquisition).

Steve Stowell (Naviant's Vice President of Finance before the acquisition and Vice President and Chief Financial Officer of Naviant from August 2002 until his departure in June 2003)

The foregoing respondents, together with others known and unknown to Equifax who worked with them with knowledge of the fraudulent conduct, are referred to herein as the "Defrauders." The specifics showing the knowledge, participation and intent of the respondent Defrauders are alleged below.

9.

All respondents are bound by the Merger Agreement. The reasons for this are set forth in "Claimants' Opposition to Following Motions by Former Option Holders Challenging Arbitrability of Claims: (1) Derek Dubner's Motion to Dismiss; (2) Ty Baines' Motion to Dismiss; and (3) Respondent's Motion Contesting the Arbitrability of Claims (By Elder Ripper)," which was previously filed in this arbitration and is here incorporated by reference. The reasons are also set forth in orders of a United States District Court. The orders, which have been filed in this arbitration, are: <u>Softbank Capital Partners L.P., et al. v. Equifax Inc., et al.</u>, Case No. 04-20994-CIV-GRAHAM (S.D. Fla. Mar. 31, 2005), and <u>Equifax Inc. v. Austin Ventures VII, L.P., et al.</u>, Order Compelling Arbitration and Staying Action, Case No. 04-80754-CIV-PAINE (S.D. Fla. June 20, 2005). The first of these orders has now been reduced to a judgment, which has also been filed in this arbitration. The reasoning of the orders is applicable to all respondents. The orders are binding on the

6

respondents who were parties to the litigation in which the orders were entered, who are shown on the orders.  These respondents are precluded from contesting that the Merger Agreement is binding on them, because these issues were actually litigated and necessarily resolved in the court actions, with a full opportunity to be heard, and the issues resolved in the court action are identical to these issues in this arbitration.

10.

The matters alleged in Paragraph 7 above and in the entirety of this Demand and Equifax's claims based thereon are disputes arising out of and in connection with the execution, interpretation, performance and nonperformance of the Merger Agreement (and are unrelated to the Closing Balance Sheet[1] or the calculation of the Net Working Capital) and are therefore "Disputed Matters" as that term is defined in Paragraph 14.4(a) of the Merger Agreement.   Paragraph 14.4(b) of the Merger Agreement provides for binding arbitration of Disputed Matters, and Section 14.4 of the Merger Agreement provides for specific terms and conditions of the arbitration, which are being employed in this arbitration. The orders described in the preceding paragraph also preclude the parties to those lawsuits from contesting the arbitrability of the claims made in this Demand.

<u>Overview of Equifax's Claims</u>

11.

Equifax has identified the following four particular frauds and criminal conduct, which establish Equifax's allegations of breaches and fraud as alleged in Paragraph 7 above and which are detailed in separate sections below:

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings given them in the Merger Agreement.

7

(i)  Naviant's databases were represented in Paragraph 6.12(c) of the Merger Agreement to contain, free of consideration to any third party, at a minimum, 65,000,000 Valid and Unique Records of non-duplicative "opt-in" or "permission-based" e-mail addresses with the first and last name of the e-mail user; and the Defrauders provided to Equifax prior to the Merger Transaction various documents and information – falsified as it turned out – confirming and verifying the size of the databases.  In truth, the number of conforming e-mail addresses in the databases was far smaller, and the Defrauders knew this and intentionally concealed it and provided Equifax with false information about the databases.  The size of the databases was a key and integral part of Equifax's assessment of whether to enter the Merger Transaction and of how much to pay.

(ii)  The Defrauders misrepresented the volume and price of e-mail transactions that accounted for a major percentage of Naviant's pre-acquisition revenue and were a key and integral part of Equifax's valuation of Naviant.  Records the Defrauders provided to Equifax and its accountants who were doing the financial due diligence omitted more than a billion e-mails for which Naviant had received a very low price, resulting in the represented amount received by Naviant per e-mail (a significant factor in determining whether to acquire Naviant and how much to pay) being much higher than it really was.  The Defrauders hid the true volume and rate by maintaining two sets of books, with one being the truth and the other being what the Defrauders supplied to Equifax and its accountants.

(iii) The Defrauders booked e-mail services as if they were actual receivables when, instead, they would only constitute receivables if and when a recipient actually

8

responded to the advertisement, which only a fraction of the total did.  This resulted in the recognition of unearned, pre-acquisition revenue on Naviant's books and records and the write-off of substantial uncollectible accounts following the acquisition.

(iv) The Defrauders caused Naviant to participate in illusory, reciprocal transactions with other e-mail marketing companies, pursuant to which Naviant invoiced fictitious sales of marketing services and was concurrently invoiced comparable dollar amounts for fictitious sales of consumer data and marketing services by the other companies.  These transactions, known among the Defrauders as "Management Deals," grossly overstated Naviant's financial statements and created the false impression that the revenue figures developed in Equifax's valuation model were realistic projections.

12.

The foregoing frauds establish that the Merger Transaction was made in violation of Section 517.301 of the Florida Securities and Investor Protection Act ("FSIPA"), which makes it unlawful for a person, in connection with the offer, sale, or purchase of any investment or security, directly or indirectly,

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

9

13.

FSIPA provides that any person selling a security in violation of Section 517.301 is liable in an action for rescission. (Fla. Stat. Ann. § 517.211(2)).   Count One of this Demand seeks rescission from each of the respondents and for a return by each respondent to Equifax of the Merger Consideration received by that respondent.   To prevail on Count One, Equifax need not show that a given respondent participated in the fraud or had fraudulent knowledge or intent; Equifax need only show that the Merger Transaction was made in violation of Section 517.301 because it was infected by the fraud of someone. *See Merrill Lynch, Pierce, Fenner & Smith v. Byrne*, 320 So. 2d 436, 440-441 (Fla. 3d DCA 1975) (rejecting argument that scienter was required under § 517.301). Under Count One, neither Equifax's reliance nor loss causation are pertinent.   *E.F. Hutton & Co. v. Rousseff*, 537 So. 2d 978, 981 (Fla. 1989).

14.

The foregoing frauds also establish misrepresentations, breaches of warranty, breaches and nonfulfillment of agreements in the Merger Agreement, which are detailed below, which occurred and arose out of fraud, intentional misrepresentation, willful misconduct and criminal conduct and caused losses to Equifax.

15.

Paragraph 11.1 of the Merger Agreement, entitled "Indemnification," provides that in consideration of their receipt of any Merger Consideration, the Company Shareholders and Former Option Holders, as Indemnitors, will, jointly and severally, indemnify and hold harmless Equifax and Naviant, as Indemnitees,

> from and against and in respect of any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts

10

paid in settlement (collectively, the "Indemnified Losses"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:

(a)     any misrepresentation, breach of warranty or breach or nonfulfillment of any agreement of Company (without regard to any materiality or Company Material Adverse Change qualifications contained therein) contained in this Agreement, the Disclosure Memorandum, or in any other certificate, schedule, instrument or document delivered to EFX by or on behalf of Company pursuant to the provisions of this Agreement. . . .;

Count Two of this Demand is an alternative claim for indemnification under this provision of

the Merger Agreement.

16.

The foregoing frauds and criminal conduct and the facts attending them also establish

that Section 11.4 of the Merger Agreement, which imposes a limitation on this general

indemnification obligation, is not applicable, because Section 11.4 does not apply "to claims

arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct."

While Equifax alleges and will prove fraud, criminal conduct and the other aspects of this

exception to show that the exception to Section 11.4 applies and that the limitation in Section

11.4 thus does not, Count Two is not a fraud claim; it is a contractual indemnity claim. For

the exception to be inapplicable, Equifax need not have or assert a civil action for damages

for fraud. Reliance is immaterial to this claim. While reliance is an element of a cause of

action for damages for fraud, reliance is not a part of the definition of fraud itself or of the

statutes making the conduct criminal. The limitation in Section 11.4 is inapplicable to any

claims arising out of fraud or criminal conduct, which can be established without regard to

reliance.

17.

Count Three is an alternative common law fraud cause of action for damages, against the respondent Defrauders only, based on the foregoing frauds.

<u>The Fraud as to the Size of Naviant's Databases</u>

18.

A key number that was highly significant to Equifax's determinations as to whether to enter the Merger Transaction and how much to pay was the number of e-mail addresses in Naviant's databases that met all of the following criteria: (i) Naviant had the exclusive right to use the information, without the need to pay a royalty or other consideration to anyone else; (ii) the address accepts delivery of email transmissions (i.e., emails are not rejected as "undeliverable"); (iii) the address was not duplicative of another address in the databases; (iv) the address was "opt-in" or "permission-based"; and (v) the databases contained for the e-mail address the first and last name of the e-mail user.

19.

After several prior discussions and analyses, in July 2002, Respondent Scott Hirsch, with the full knowledge and participation of the other Defrauders, told Equifax's Jim Wesley that Naviant at that time had 76,422,220 e-mail addresses in its databases that met the foregoing criteria.

20.

Additionally, Equifax obtained in the Merger Agreement an express representation in Paragraph 6.12(c) as follows:

> All information (the "Database Information") contained in the databases maintained by Company and any Subsidiary thereof (the "Databases") has been at all times (i) collected in substantial compliance with fair information collection practices (including but

12

not limited to (a) the guidelines promulgated by the Online Privacy Alliance; (b) the standards promulgated by the Direct Marketing Association, and (c) all applicable Federal, state and other laws, rules and regulations including but not limited to those relating to the use or collection of information collected from or about consumers) so that, at a minimum and prior to submitting any information to Company or its agents, Internet users received notice of how the information will be used and a choice whether to submit such information; and (ii) stored, maintained and used in accordance with such notices and all Federal, state and local laws, rules and regulations. Company has the sole and exclusive right to use and commercially exploit the Database Information, free of consideration to any third party. The Databases contain, at a minimum, 65,000,000 Valid and Unique Records. For purposes of this Agreement, a "Valid and Unique Record" is (i) a Record with an e-mail address that accepts delivery of email transmissions (i.e., emails are not rejected as "undeliverable"); and (ii) a subject Record is not duplicative of other Records contained in any of the Databases. For purposes of this Agreement, a "Record" is a set of information consisting of: (i) one "opt-in" or "permission-based" e-mail address, and (ii) the first and last name of the e-mail user that uses such e-mail address. In determining whether there are 65,000,000 Valid and Unique Records, a duplicative Record will be counted only once.

### 21.

Equifax used a "model" to assist it in determining whether to purchase Naviant and how much to pay for Naviant. In the model, Equifax used the 76.4 million number represented by Scott Hirsch.

### 22.

Following the closing of the Merger, when Equifax for the first time was given actual access to Naviant's databases, Jim Wesley performed an analysis and count of Naviant's e-mail addresses in databases other than the "24/7" database. The total number of records in these databases, as determined by Wesley, was 324,581,724 (Exhibit B). However, when he removed those that failed to conform to one or more of the criteria described in Paragraphs 18 and 20 above, only 27,465,916 e-mail addresses remained that met the criteria.

13

23.

It turned out that Naviant was required to pay a royalty to use the e-mail addresses in the 24/7 database, so none of those addresses met the criteria (Exhibit C).

24.

In truth, there were only 27,465,916 e-mail addresses in the Naviant databases that met the criteria described in Paragraphs 18 and 20 above.

25.

The Defrauders knew that the number of e-mail addresses meeting the criteria described in Paragraphs 18 and 20 above contained in Naviant's databases was far less than 76.4 million or 65 million and that the true number was only 27.5 million. The Defrauders also knew that Equifax did, and that any reasonable prospective purchaser would, place great importance on the numbers as represented in deciding whether to buy Naviant and how much to pay for Naviant, and they intended that Equifax do so and be deceived and induced thereby into entering the Merger Transaction.

Hiding low-priced CPM transactions to inflate CPM rate

26.

"CPM" (Cost Per Thousand) e-mail marketing campaigns earned revenue as soon as Naviant sent the e-mails to targeted consumers. "CPA" (Cost Per Action, Cost Per Acquisition or Cost Per Account) e-mail marketing campaigns earned revenue only when and to the extent e-mail recipients responded to a solicitation (e.g., placing an order) in some manner agreed between Naviant and the customer.

14

27.

The rate Naviant received for CPM transactions directly affected the calculation of revenues, and thus the price Equifax would pay for Naviant, in the valuation model Equifax used to assist it in determining whether to buy Naviant and the price to pay.

28.

Revenues from CPM e-mail marketing campaigns accounted for the majority of Naviant's revenues in 2001 and the first five months of 2002. There existed an increasing preference among customers in the e-mail marketing industry for the CPA e-mail marketing campaigns, which earned revenue only when and to the extent e-mail recipients responded. Other pricing pressures also affected CPM transactions. All this was considered by Equifax in deciding whether to enter the Merger Transaction.

29.

Analyzing Naviant's CPM transactions and determining Naviant's CPM rate was an important part of Equifax's pre-acquisition analysis of Naviant.

30.

Ernst & Young LLP (E&Y), Equifax's pre-acquisition accountant engaged to conduct financial due diligence in connection with the Merger Transaction, analyzed the volume and pricing of Naviant's CPM e-mail marketing campaigns.

31.

E&Y asked Respondent Steve Stowell to provide the quantity and dollar amount of *all* CPM transactions for 2001 and the first five months of 2002. E&Y explained that it needed *complete* historical information to bridge the gap between Naviant's historical data and its management's forecasts.

32.

In response, Steve Stowell and Robert Conley, acting with the other Defrauders, provided E&Y data misrepresented to contain all of Naviant's CPM transactions during the 17-month period ending May 31, 2002, in the form of a file purporting and represented to contain all of Naviant's CPM transactions for the seventeen months ending May 31, 2002.

33.

The Defrauders also provided other similar data for the 18-month period ending June 30, 2002, in a file entitled "June CPM 2001-2002.xls," which included the two charts that are contained in Exhibit D.

34.

Based on its analysis of this data furnished by the Defrauders, E&Y concluded that Naviant's effective CPM rate was approximately $60 in January 2002, and had remained relatively constant throughout 2002.

35.

The results of the E&Y analysis were used by Equifax in its model and in determining whether to buy Naviant and how much to pay for it.

36.

Unknown to Equifax and E&Y at the time, the files represented to contain all CPM transactions for January through May 2002 (the five-month period on which E&Y concentrated its financial due diligence) were materially incomplete, omitting more than 1 billion CPM e-mails and approximately $3 million in revenue attributable to high-volume, low-priced CPM transactions during the five-month period ending May 31, 2002.

16

37.

The Defrauders maintained two sets of CPM data, one set that they knew was accurate and another set that they knew omitted many significant transactions and that was provided to E&Y.

38.

Equifax first discovered this fraud by extracting QuickBooks data from Naviant's server to create a file of Naviant's CPM transactions for the same 17-month period (the "QuickBooks CPM File"). The QuickBooks CPM File is nearly identical to a file Equifax later discovered on Naviant's server entitled "Naviant CPM 2001-2002.xls" (the "2001-2002 CPM File"). These files include the high-volume, low-priced CPM transactions that the Defrauders hid from E&Y.

39.

Equifax discovered another file on Naviant's server entitled "CPM 2001-2002 without larger orders.xls" (the "Omitted Larger Orders File"), which is identical to the materially incomplete CPM transaction listing that the Defrauders provided to E&Y. Indeed, the only significant difference in the files is that the one Equifax later found contained a title showing that its makers and users knew that it omitted the larger order files, while the files provided before the acquisition had had their names changed to hide their true nature.

40.

The Naviant records Equifax obtained after the Merger Transaction further show that, on May 28, 2002, the Defrauders circulated among themselves a chart (Exhibit E) reflecting "updated CPM trends," which tracked Exhibit B but reflected more complete data than was given to E&Y. The e-mail accompanying the chart (also at Exhibit E) indicates that certain

e-mail transmissions were excluded even from that chart, but the chart still reflects many more CPM transactions and thus materially lower CPM rates than do the charts the Defrauders provided to E&Y (Exhibit D).

41.

The following table contrasts the CPM rates for January through April 2002 that the Defrauders circulated among themselves in May 2002 (based on more complete data) versus the CPM rates they disclosed to E&Y in mid-July 2002 (based on materially incomplete data):

| Month | Internal Monthly CPM Rate (Exhibit E) | Monthly CPM Rate Disclosed to E&Y (Exhibit D) |
|---|---|---|
| January 2002 | $29 | $65 |
| February 2002 | $53 | $55 |
| March 2002 | $16 | $63 |
| April 2002 | $27 | $58 |

42.

The Defrauders deliberately and intentionally furnished materially incomplete information to E&Y, failing to disclose high-volume, low-priced CPM transactions, in order to distort its price-volume analysis and to deceive Equifax and induce it to enter the Merger Transaction.

Accounting for CPA as CPM

43.

The Defrauders falsely accounted for CPA e-mail marketing campaigns as if they were CPM e-mail marketing campaigns.

18

44.

Naviant could only recognize revenue for CPA e-mails if and to the extent e-mail recipients responded to the e-mail advertisement in some particular way agreed upon in advance by Naviant and its customer (e.g., placing an order).  By contrast, revenue for CPM transactions was earned upon Naviant's sending e-mails to consumers.

45.

Although many of Naviant's customers hired it to provide CPA campaigns, the Defrauders encouraged Naviant's sales force to ignore Naviant's contractual arrangements with its customers and to account for the CPA transactions as if they were CPM and thereby to recognize more revenue than was justified or proper based on actual campaign results or the arrangement with the customer.

46.

The Defrauders were able to inflate Naviant's financial statements by recording revenue prematurely and at inflated prices, although Naviant generally could not collect the amounts booked from the affected customers but could only later collect some lesser amount justified by the campaign results.

47.

Moreover, in an effort to wring results from a campaign so as to make up a part of the amounts improperly booked, Naviant re-sent the same e-mails to the same addressees repeatedly.  This usually did not materially enhance the campaign's performance, but it led to data fatigue.

19

48.

This practice of prematurely and erroneously recording revenue on CPA campaigns was widespread and affected a large number of small dollar-amount transactions. In some cases, the Defrauders recorded revenue Naviant had not earned on large dollar-amount CPA transactions. For example, in June 2001, Naviant recorded as if it were a CPM transaction $200,000 in revenue in connection with a CPA campaign for BMG Music, a customer of eDemographic. Two years later, after Naviant had repeatedly re-sent the same e-mails to the targeted consumers, the campaign results only justified recognizing revenue of about half of the invoiced amount (Exhibit F). The remaining, uncollected balance of $100,000 had to be written off.

49.

Respondent Marc Rona, who was Vice President of Sales for Naviant's Performance Division, instructed Alex Ellis, a Senior Accountant within the Performance Division of Naviant, to recognize revenue that had not been earned in connection with CPA transactions and other spurious transactions. Respondent Rona's instructions typically came at month's end as part of the Defrauders' efforts to pad Naviant's sales.

50.

This recording of revenues for CPA campaigns that Naviant could not justify or collect from its customers resulted in the write-off of significant accounts receivable following the Merger Transaction.

51.

The recording of CPA as CPM was effectuated by the Defrauders intentionally to deceive Equifax and to induce it to enter into the Merger Transaction.

20

<u>Fraudulent, fictitious, Roundtrip transactions: so-called "Management Deals"</u>

52.

A key aspect of the fraud involved transactions that were known as "Management Deals" at Naviant (they are now often referred to as "Roundtrips"). In these transactions, Naviant pretended to sell e-mail marketing services to certain other companies (the "Other Companies"), which, in turn, concurrently pretended to sell Naviant a comparable dollar amount of e-mail marketing services or consumer data (i.e., e-mail addresses). In many instances, no marketing services or data were provided and, thus, there was no economic substance to the transactions. In other instances, there was some substance to the transactions but they were recorded on Naviant's books and records at amounts far greater than the value of the services or data actually provided.

53.

Naviant recorded the fictitious sales of marketing services as revenue and capitalized the phony data purchases. Thus, revenues, income and asset value were reflected on Naviant's books as higher than they truly were. This materially distorted Naviant's pre-acquisition financial position and performance as reflected in its financial statements, pro forma financial data and related records Naviant furnished to Equifax and E&Y in connection with their evaluation of the prospective Merger Transaction.

54.

The Defrauders created and booked these spurious transactions in a deliberate effort to inflate Naviant's pre-acquisition revenues and profits and to deceive and induce Equifax into over-valuing Naviant and proceeding with the Merger Transaction.

21

55.

The Other Companies that participated in these Roundtrips were, like Naviant, e-mail

marketing companies. They included eDemographic, Inc. (also doing business as Elite Data

Direct), One Route Inc. (also doing business as One Stop Data, LLC and Opt-In Services,

LLC), ROI Network, LLC (also doing business as My Leads) and Tel3.com (also doing

business as InMar, LLC).

56.

In pretense, the Other Companies retained Naviant to send e-mail marketing

campaigns on behalf of their respective customers, who could benefit from Naviant's ability

to target e-mail addresses the Other Companies did not have in their databases.  Thus, for

each Roundtrip transaction, on the side involving Naviant's sale of marketing services, there

needed to be two separate and distinct paper trails – one involving the contractual

arrangement between Naviant and the Other Company that hired it to send the e-mails and

another, at the Other Company, involving the contractual arrangement between that Other

Company and its customer for whose benefit the e-mails were sent.  Additionally, to create

the false impression that Naviant actually provided marketing services in connection with

these Roundtrips, Naviant's order fulfillment system could be and was manipulated to create

tracking reports for e-mail transmissions that never occurred.   The aspect of a Roundtrip

described in this paragraph is referred to here as the "Naviant Sells" side of a Roundtrip.

57.

On the other side of a Roundtrip, Naviant supposedly purchased from the same Other

Company either e-mail addresses or marketing services for the benefit of Naviant's

customers on whose behalf the e-mails were supposedly sent.  Again, there needed to be two

22

separate and distinct paper trails -- one involving the contractual arrangement between Naviant and the Other Company from whom Naviant purchased the e-mail addresses or whom Naviant hired to send e-mails to Naviant's customers and another documenting either receipt of the e-mails or whatever contractual arrangements Naviant made with its customers. This is referred to here as the "Naviant Buys" side of a Roundtrip.

58.

The Defrauders made partial attempts to create the paperwork. However, after the Merger Transaction was consummated, when Equifax obtained the documents, Equifax determined that the paperwork was irregular and incomplete.

59.

One of the Other Companies was eDemographic, which did business as Elite Data Direct and which is owned by Michael Tiezzi. On January 31, 2002, Naviant Invoice No. 39703 invoiced Elite Data Direct for fulfillment services in the amount of $300,000 (for 3,000,000 e-mails at $0.10). See Exhibit G. A tracking report for Naviant Invoice No. 39703 suggests the charges were for an e-mail marketing campaign for eDemographic's customer, AT&T (Exhibit H). The foregoing constituted the Naviant Sells side of this Roundtrip. For the Naviant Buys side, on that same date, eDemographic invoiced Edirect, Inc. (a name by which Naviant had been known before it changed its name to Naviant, Inc.) for co-registration data (i.e., e-mail addresses) in the amount of $300,000 (6,000,000 e-mail addresses at $0.05). See Exhibit I (eDemographic Invoice No. 65743777).

23

60.

Although both invoices were dated January 31, 2002, Naviant did not pay eDemographic by check until June 18, 2002 (Exhibit J).  eDemographic paid Naviant by check on June 19, 2002 (Exhibit K).

61.

The spurious tracking report that the Defrauders had created by Naviant for the Naviant Sells side of this transaction (Exhibit H) references Campaign Numbers and "Campaign Results" with campaign dates that do not coincide with a January 31, 2002 invoice.

62.

The Naviant invoice for this transaction, Invoice No. 39703 (Exhibit G) says it is for AT&T.  But the subject line for the artwork or advertisement associated with this invoice says "Subject:  Worldcom or Suncom??  Free Cell Phone & Shipping," without any reference to AT&T (Exhibit L).

63.

This was the first of many Roundtrip transactions between eDemographic and Naviant in 2002, before Equifax acquired Naviant on August 15.  In all, on the Naviant Sells side of the Roundtrips, Naviant invoiced eDemographic for phony marketing services totaling $1 million (including marketing services totaling $700,000 in June and July 2002) from January 1, 2002 through July 31, 2002, as follows:

| Invoice No. | Date | Amount | Purported Substance |
|---|---|---|---|
| 39703 | 1/31/02 | $300,000 | E-mail marketing |
| 43326 | 6/27/02 | $186,220 | E-mail marketing |
| 43329 | 6/27/02 | $213,780 | E-mail marketing |
| 44002 | 7/30/02 | $105,000 | E-mail marketing |
| 44003 | 7/30/02 | $100,000 | E-mail marketing |
| 43929 | 7/26/02 | $ 95,000 | E-mail marketing |
| | | $1,000,000 | |

On the Naviant Buys side, eDemographic invoiced Naviant for phony data sales totaling $867,321 (including data sales totaling $567,321 in June and July 2002), and for e-mail marketing services totaling $206,000 in July 2002, as follows:

| Invoice No. | Date | Amount | Purported Substance |
|---|---|---|---|
| 85743777 | 1/31/02 | $300,000 | Data delivery |
| 36458 | 6/26/02 | $471,221 | Data delivery |
| 36560 | 7/26/02 | $ 96,100 | Data delivery |
| 36567 | 7/31/02 | $106,500 | E-mail marketing |
| 36568 | 7/31/02 | $ 99,500 | E-mail marketing |
| | | $1,073,321 | |

64.

In each instance Naviant did not provide any marketing services to eDemographic or receive any data or marketing services from eDemographic. There was thus no substance to these Roundtrips, which, in the case of eDemographic, also were known among the Defrauders as "Tiezzi Deals."

65.

Throughout the time eDemographic and Naviant fabricated Roundtrips, they were doing other business together for which there was some substance. Among other transactions, eDemographic sold Naviant co-registration data (i.e., e-mail addresses) on a regular basis, but in much smaller quantities than any reflected in the Roundtrip invoices.

25

66.

Ganesa Saravanan, who worked in Naviant's Technology group, was responsible for analyzing co-registration data that eDemographic furnished to Naviant.   Mr. Saravanan would   analyze the information to determine how many unique, valid e-mail addresses eDemographic actually provided in any given delivery of data.

67.

Mr. Saravanan maintained detailed and apparently honest records documenting his analysis of the data eDemographic provided.  At month's end, after Mr. Saravanan reported to eDemographic how many records Naviant was able to use, eDemographic would issue an invoice for all such data it really furnished to Naviant that month.

68.

The invoices for data really furnished were detailed.  On July 15, 2002, for example, eDemographic Invoice No. 36532 invoiced Naviant for genuine co-registration data sales totaling $38,357.28 for June 2002 (Exhibit M), itemizing the charges in detail as follows:

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 2,857 | Co registration | One Co registration campaign for the month of June.  Opinion Surveys per Ganesa Saravanan | 0.18 | 514.26 |
| 285 | Co registration | One Co registration campaign for the month of June.  Bay9 per Ganesa Saravanan | 0.18 | 51.30 |
| 39,235 | Co registration | One Co registration campaign for the month of June.  Planet of Music per Ganesa Saravanan | 0.18 | 7,062.30 |
| 13,407 | Co registration | One Co registration campaign for the month of June.  Funny money per Ganesa Saravanan | 0.18 | 2.413.26 |
| 128,817 | Co registration | One Co registration campaign for the month of June.  EZsweeps per Ganesa Saravanan | 0.18 | 23,187.06 |
| 867 | Co registration | One Co registration campaign for the month of June.  AreaMax per Ganesa Saravanan | 0.18 | 156.06 |
| 2,907 | Co registration | One Co registration campaign for the month of June.  Search Cactus per Ganesa Saravanan | 0.18 | 523.26 |
| 20,279 | Co registration | One Co registration campaign for the month of June.  PCH per Ganesa Saravanan | 0.18 | 3,650.22 |
| 4,442 | Co registration | One Co registration campaign for the month of June.  Peel per Ganesa Saravanan | 0.18 | 799.56 |
| | | Total | | $38,357.28 |

26

69.

The above-quoted data quantities and unit prices correspond to records maintained by Mr. Saravanan regarding his analysis of eDemographic's data deliveries for June 2002.

70.

In contrast, the invoices for the Roundtrip Naviant Buys phony transactions are cursory and not itemized. eDemographic's Invoice No. 36458 (Exhibit N), was for the Naviant Buys side of a Roundtrip and was also for the same month of June 2002 covered by Invoice 36532 described above. It contains no detail but reads only as follows:

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | Co registration | One Co registration campaign for the month of June. Data to be supplied to Edirect. Counts per Arven, Derek Dubner, and Scott Hirsch | 471,221.00 | 471,221.00 |
| | | Total | | $471,221.00 |

71.

Unlike the data sales enumerated in the legitimate eDemographic Invoice No. 36532 described above, Mr. Saravanan has no record of any data delivery that corresponds to eDemographic's Roundtrip Invoice No. 36458.

72.

Invoices detailing eDemographic's actual data sales to Naviant each month January through July 2002 are similar to eDemographic Invoice No. 36532 in their detailed specification of quantity, unit price, amount and description and match records maintained by Mr. Saravanan. By comparison, data sales depicted in eDemographic's Roundtrip invoices are less detailed (in some cases providing no specifics as to quantity or unit price and in other cases specifying much greater quantities and much lower unit prices), reflect far higher total dollar-amount charges and do not correspond to records maintained by Mr. Saravanan, who

27

was responsible for analyzing all co-registration data supplied by eDemographic to Naviant in 2002.

73.

Each company also hired the other to provide e-mail marketing services for one another's customers. The real transactions appear to have been recorded at inflated amounts (especially in the case of eDemographic's sales to Naviant), but there was substance to a number of these significantly smaller dollar-amount transactions, for which Naviant's charges to eDemographic typically ran anywhere from as low as $100 to generally no more than a few thousand dollars per invoice.

74.

But the Roundtrip charges ranged from $95,000 to $300,000 per invoice (in the case of invoices for the Naviant Sells side of Roundtrips – for marketing services Naviant purportedly provided to eDemographic),   Similarly, on the Naviant Buys side, eDemographic's Roundtrip charges were for $99,500 and $106,500 for marketing services in July 2002, markedly higher than other sales of marketing services to Naviant.

75.

With respect to Roundtrips involving eDemographic's "sale" of e-mail marketing services to Naviant (Naviant Buys), there are no records between Naviant and any end customer for whose benefit the e-mails supposedly were sent. After further investigation and discovery, Claimants expect to demonstrate that eDemographic also has no such records to corroborate Roundtrip invoices for e-mail marketing services supposedly provided by Naviant for eDemographic's customers (Naviant Sells).

28

76.

To perpetrate Roundtrips with eDemographic, the Defrauders concealed information, lied, falsified invoices, diverted money and other assets or resources of Naviant and made false entries or allowed or caused false entries to be made on Naviant's books and records.

77.

Respondents Michael Brauser, Scott Hirsch and Richard Kaufman were directly involved in initiating, arranging and approving Roundtrips between Naviant and eDemographic. Respondents Robert Conley, Rick Schell and Steve Stowell aided or abetted the fraud by approving the invoices, issuing checks in payment of the invoices, facilitating the Accounting Department's processing and recording of erroneous transactions and providing false financial statements and reports to Equifax in connection with the Merger Transaction.

78.

Roundtrips between Naviant and eDemographic alone accounted for nearly 5% of Naviant's revenue for the first six months of 2002, and nearly 26% of Naviant's EBITDA for the same period.

79.

The Defrauders caused Naviant to engage in numerous transactions of the kind described above with other entities, including One Route Inc. and One Stop Data, LLC, both of which are owned by Eddie Marin, a close associate of Scott Hirsch, ROI Network, LLC, My Leads, Tel3.com and InMar, LLC. In some instances, as in the case of Roundtrips with eDemographic, there was no substance to the transactions. In other instances, there was substance to the transactions but they were recorded at greatly inflated prices. By way of

29

example, pre-acquisition Roundtrip transactions between Naviant and ROI Network, LLC

(and My Leads, another name under which the principals of ROI Network, LLC did

business) and between Naviant and Tel3.com (and InMar, LLC, another name under which it

did business) are shown below:

### Roundtrips Between Naviant and Tel3.com

| Invoice No. | Date | From | To | Amount | Purported Substance |
|---|---|---|---|---|---|
| 40849 | 3/20/02 | Naviant | Tel3.com | $150,000 | E-mail marketing |
| 40913 | 3/20/02 | Naviant | Tel3.com | $350,000 | E-mail marketing |
| 5108 | 4/30/02 | InMar, LLC | Naviant | $382,375 | Data Sales |

### Roundtrips Between Naviant and ROI Network, LLC

| Invoice No. | Date | From | To | Amount | Purported Substance |
|---|---|---|---|---|---|
| 43833 | 7/26/02 | Naviant | ROI Network, LLC | $125,000 | E-mail marketing |
| 02-1075 | 7/26/02 | My Leads | Naviant | $125,000 | E-mail campaign |
| 43834 | 7/26/02 | Naviant | ROI Network, LLC | $125,000 | E-mail marketing |
| 02-1076 | 7/26/02 | My Leads | Naviant | $125,000 | E-mail campaign |

80.

The Defrauders also caused Naviant to engage in similar large dollar-amount

transactions partially or wholly lacking substance with numerous other entities, including, by

way of example, ContactLens2u.com, Impulse Marketing Group, Info USA Technology

Center, 186K.net, Loansavings.com, Mail Creations, Inc., Mal Dunn Associates, Silver

Carrot, TSN e-business and Vivendi Universal Net USA. Many of these transactions did not

have corresponding, offsetting "sales" to Naviant.

81.

The Defrauders caused Naviant to record more than $2 million in fictitious sales

during May through July 2002. They did this to create the false impression that Naviant's

revenues and earnings were trending in accordance with its first quarter's results of

30

operations and management's projections, in order to deceive Equifax and to induce Equifax into consummating the Merger Transaction.

82.

These transactions also resulted in the payment of bonuses or commissions on the basis of spurious transactions for which there was little or no economic benefit to Naviant.

The Import of the Frauds

83.

If each of the following factors are considered alone or if they are considered together, the Merger Transaction is a transaction that Equifax would not have entered at all had it known the true facts as to any one or more of the following factors:

    a.  The true number of e-mail addresses meeting the criteria described in Paragraphs 18 and 20 above.

    b.  The true CPM volume and rate, as described in Paragraphs 26 - 42 above.

    c.  The truth about the CPA transactions that were recorded as CPM transactions and therefore improperly booked as valid receivables, as described in Paragraphs 43 - 51.

    d. The truth about the fictitious transactions, including the Roundtrips, described in Paragraphs 52 - 82 above, which were shown on Naviants' books and reflected in its financial reporting.

84.

When the true numbers for the items listed in Subparagraphs a and b of the preceding paragraph are inserted into the model used by Equifax as an aid to determining whether to buy Naviant and how much to pay for it, the price reflected by the model becomes less than

31

half the price Equifax paid and the numbers become such that Equifax would not have entered the Merger Transaction had it known the true facts.

85.

Hiding the true CPM volume and rate also created a false sense of CPM price stability, misstated e-mail volume and disguised database fatigue – all of which would have resulted, if the truth were known, in Equifax not entering the Merger Transaction.

86.

The fraud listed in Subparagraph c of Paragraph 83 above (CPA transactions that were recorded as CPM transactions) did not affect the model directly.  Its importance and effect was to make it appear, falsely, that Naviant's receivables and revenues were better and higher than they were.  Had the truth been known, Equifax would not have completed the Merger Transaction and would not have valued Naviant at anything close to the amount of the Merger Consideration.

87.

The fraud listed in Subparagraph d of Paragraph 83 above (fictitious transactions, including the Roundtrips), gave credence to the revenue and profit projections in the model. Its particular importance and effect was to make it appear, falsely, that Naviant's revenues during May through July 2002, the time when Equifax was deciding whether to complete the Merger Transaction, were sound and as projected.  Had the truth been known, Equifax would not have completed the Merger Transaction and would not have valued Naviant at anything close to the amount of the Merger Consideration.

32

<u>Post-acquisition Continuation of Misconduct by the Defrauders Who Remained</u>

88.

All of the Defrauders, except for Scott Hirsch and Rick Schell, remained employed at Naviant after the Merger in August 2002. The Defrauders who remained engaged in more spurious activities and transactions of the kind described above. They did so (a) to obscure their pre-acquisition misconduct, (b) to inflate post-acquisition revenues in order to meet post-acquisition revenue targets that were based largely on Naviant's inflated pre-acquisition revenues and (c) to continue to divert assets and resources of Naviant to themselves or to other individuals or entities affiliated, associated or acting in concert with them, including, without limitation, the payment of excessive and unauthorized bonuses and commissions.

89.

By continuing to engage in spurious activities and transactions after the acquisition, and by continuing to conceal information, lie, falsify invoices and make false entries on Naviant's books and records, among other things, the Defrauders who remained employed delayed Equifax's discovery of suspect transactions and its development of proof concerning what occurred before and after the acquisition in August 2002.

90.

Claimants do not here seek recovery for any claim arising out of or in connection with post-acquisition misconduct. However, such misconduct is probative of Equifax and Naviant's pre-acquisition claims.

<u>Count One: Rescission under the FSIPA</u>

91.

Claimants here incorporate by reference Paragraphs 1 through 90 above.

33

92.

Under FSIPA, "'Security' includes . . . stock [and a]ny option contract which entitles the holder to purchase or sell a given amount of the underlying security at a fixed price within a specified period of time." (Fla. Stat. Ann. § 517.021(20)(b)&(t))

93.

As a result of the frauds described above, the Merger Transaction was made in violation of Section 517.301 of the FSIPA, because, in connection with the offer, sale, or purchase of the Naviant stock and option rights for it, persons directly and indirectly, did undertake

> 1. To employ any device, scheme, or artifice to defraud;
>
> 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

94.

Respondents, in engaging in the Merger Transaction, were persons selling a security in violation of Section 517.301.

95.

Respondents are liable to Equifax in this action for rescission, under Fla. Stat. Ann. § 517.211(2), for the Merger Consideration received by them as the consideration paid them in connection with the transaction, in the amounts set forth in Exhibit A, plus interest thereon at the legal rate. (Fla. Stat. Ann. § 517.211(2)-(3))

34

96.

In addition, Equifax is entitled to recover its reasonable attorney's fees. (Fla. Stat. Ann. § 517.211(6)). However, Equifax will seek these fees in connection with proceedings to confirm the arbitration award. Equifax hereby again gives notice of its intention to seek these fees.

<u>Count Two:  Indemnification under the Merger Agreement</u>

97.

Paragraphs 1 through 90 above are here incorporated by reference.

98.

The claim made in this Count Two is made alternatively and without waiving Equifax's claim for rescission as set forth in Count One.

99.

Article 6 of the Merger Agreement contains representations and warranties by Naviant concerning its databases, the disclosure of information to Equifax, the accuracy and completeness of Naviant's books and records, the validity of Naviant's accounts receivable, the propriety of Naviant's contractual obligations and various other matters affecting Naviant's financial statements and financial condition as of August 15, 2002. Article 6 provides that "[t]o induce EFX and Merger Sub to enter into and perform this Agreement, Company represents and warrants to EFX and Merger Sub that except as set forth in the Disclosure Memorandum, each of the representations, warranties and statements in the following paragraphs of this Article 6 is true and correct as of the date of this Agreement [i.e., August 15, 2002]." A true and correct copy of the Disclosure Memorandum is at Tab 2 in Claimants' Appendix.

35

100.

Specifically, Article 6 includes the following representations and warranties by Naviant to Equifax and Armagh, which were false or breached as a result of the fraudulent conduct and its results alleged above:

    a.    Paragraph 6.32, entitled "Disclosure," provides that

> Neither this Agreement, the Disclosure Memorandum (including the Financial Statements) nor any certificate delivered by or on behalf of Company or any Subsidiary thereof in connection with the Closing of the transactions contemplated hereby or thereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, viewed as a whole, in light of the circumstances under which they are made, not misleading.  To the Knowledge of Company,[2] there is no fact which materially and adversely affects the business, assets, properties, operations, prospects, condition (financial or otherwise), results of operations or liabilities of Company or any Subsidiary thereof that has not been set forth or disclosed in this Agreement or in such other or certificates.  Company has delivered and made available true and complete copies of each material document (to the extent such documents exist), or true and complete summaries thereof, requested by EFX in writing prior to the date of this Agreement.

---

[2] "Knowledge of Company" or "Company's Knowledge" is defined in Article 1 of the Merger Agreement to mean

> any fact, circumstance, event or other matter that (a) any of Michael Brauser, Rick Schell, Scott Hirsch, Derek Dubner, Rodger Berman, Richard Kaufman, Steven Stowell, or any director of Company actually knows, or (b) any of the individuals referred to in the preceding clause (a) should know or would reasonably be expected to know in the normal discharge of his assigned duties and responsibilities.

(Merger Agreement at 4)

36

b.      Subparagraph (b) of Paragraph 6.28, entitled "Books and Records," provides

that

> The books, records and accounts of Company and its
> Subsidiaries (i) are accurate and complete in all material respects and
> have been maintained in accordance with good business practices on a
> basis consistent with prior years, (ii) are stated in reasonable detail and
> accurately and fairly reflect the transactions and dispositions of the
> respective assets of the Company and each Subsidiary thereof and (iii)
> accurately and fairly reflect the basis for the Financial Statements.

c.      Paragraph 6.16, entitled "Receivables," provides that

> All notes and accounts receivable shown on the Most Recent
> Balance Sheet [i.e., the unaudited balance sheet as of July 31, 2002]
> and all such receivables now held by Company or any Subsidiary are
> valid and collectible obligations and were not and are not subject to
> any offset or counterclaim, except for amounts reserved against such
> receivables which are reflected on the Most Recent Balance Sheet and
> with respect to notes and accounts receivable arising after the date of
> the Most Recent Balance Sheet and now outstanding, except for a
> percentage thereof equal to the percentage which said reserved
> amounts on the Most Recent Balance Sheet constituted of the
> aggregate of notes and accounts receivable on the Most Recent
> Balance Sheet. Except for the accounts receivable acquired pursuant
> to the Reorganization Agreement, all of such notes and accounts
> receivable arose in the ordinary course of business from the sale of
> goods or the rendition of services and represent bona fide obligations
> of the account debtor thereof.

d.      Subparagraph (c) of Paragraph 6.12, entitled "Compliance; Licenses and

Permits," is quoted in Paragraph 20 above.

e.      Paragraph 6.10, entitled "Contracts and Commitments," provides that

"[n]either Company nor any Subsidiary thereof is a party to any written or oral contract not

made in the ordinary course of business. . . . The Disclosure Memorandum sets forth a true,

correct and accurate list of the Contracts. Each Contract constitutes the valid and binding

obligation of Company or Subsidiary. . . ."

37

    f.        Paragraph 6.8, entitled "Absence of Changes," provides that

                Since the Balance Sheet Date [i.e., December 31, 2001]:

                (a) there has been no Material Adverse Change[3];

                (b) neither Company nor any Subsidiary thereof has entered into any material transaction which was not in the ordinary course of business;

    g.        Paragraph 6.7, entitled "Financial Statements; No SEC Filings," provides that

                The Disclosure Memorandum contains the consolidated unaudited financial statements of the Company and its Subsidiaries as at and ending at the conclusion of (a) each fiscal quarter following December 31, 2001, and at March 312, 2002 and June 30, 2002 and (b) an unaudited balance sheet as of July 31, 2002 (the "Most Recent Balance Sheet") as at such date (the "Unaudited Financial Statements"; together with the Audited Financial Statement, the "Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied (except for the absence of required footnotes and subject to normal and recurring year-end audit adjustments not material in amount), present fairly the financial position and the results of operations of the Business as conducted by Company and its Subsidiaries for the periods as at and then ended, and are complete and consistent with the books and records of Company and each Subsidiary thereof. . . .

101.

       As described in the foregoing descriptions of the frauds, Claimants have suffered and incurred losses, damages, liabilities, costs and expenses, including attorneys fees, by reason of and arising out of the foregoing misrepresentations, breaches of warranty and breaches and nonfulfillments of agreements of Naviant, as "Company" under the Merger Agreement, contained in the Merger Agreement, the Disclosure Memorandum and other certificates, schedules, instruments and documents delivered to Equifax by or on behalf of Naviant pursuant to the provisions of the Merger Agreement.

---

[3] This is defined in Article 1 on page 5 of the Merger Agreement.

38

102.

Respondents are liable to Equifax, jointly and severally, pursuant to Paragraph 11.1 of the Merger Agreement for all such losses, damages, liabilities, costs and expenses, including attorneys fees.

103.

As described in the foregoing description of the frauds, these claims for indemnification are claims arising out of fraud, intentional misrepresentation and willful misconduct, such that the limitation contained in Paragraph 11.4 of the Merger Agreement is not applicable.

104.

These claims for indemnification are also claims arising out of criminal conduct such that the limitation contained in Paragraph 11.4 of the Merger Agreement is not applicable, including conduct constituting the following crimes:

    a.  Making and causing to be made false written statements relating to the financial condition, assets or liabilities of a corporation in which the actor has a financial interest or for which he is acting, with a fraudulent intent of obtaining money; under F.S.A. § 817.03.

    b.  Making false entry in books of a corporation by officer or agent thereof with intent to defraud; under F.S.A. § 817.15.

    c.  Wire fraud; under 18 U.S.C. § 1343.

    d.  Securities fraud, under F.S.A. § 517.302 (making it a crime to violate Section 517.301, which is quoted in Paragraph 12 above.

e.  Securities fraud, under 15 U.S.C. § 78ff (making it a crime to willfully violate 15 U.S.C. § 78j, which makes it unlawful to use or employ, in connection with the sale of any security, any manipulative or deceptive device or contrivance in contravention of SEC rules – SEC Rule 10b-5 makes it unlawful, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, for any person to employ any device, scheme, or artifice to defraud; or to make any statement of an untrue fact or to omit to state a material fact necessary in order to make the statements made, in the circumstances in which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person).

105.

In accordance with Paragraph 11.2 of the Merger Agreement, Claimants have provided the Company Shareholders and Former Option Holders, through their appointed agent, Softbank, timely written demand for indemnification pursuant to Article 11 of the Merger Agreement.  A true and correct copy of Equifax's written demand for indemnification is at Tab 3 of Claimant's Appendix.

### Count Three:  Against the Defrauders For Damages for Fraud

106.

Paragraphs 1 through 90 above are here incorporated by reference.

107.

The claim made in this Count Three is made alternatively and without waiving Equifax's claim for rescission as set forth in Count One.

108.

As detailed above, the Defrauders made material misrepresentations to Equifax and concealed material information they were under a duty to disclose concerning Naviant's business, financial condition and performance and operations, and they did so with the specific intent to deceive and defraud Equifax. The Defrauders acted deliberately, fraudulently, intentionally, willfully, wantonly, maliciously or recklessly in connection with the above-described misrepresentations or omissions.

109.

These factual misrepresentations and omissions were false and misleading to Equifax, and the Defrauders knew and should have known them to be false and misleading.

110.

Equifax justifiably relied on the above-described misrepresentations and omissions in connection with its entry into the Merger Transaction.

111.

As a direct and proximate result of the above-described acts or omissions, Equifax has suffered damages in amounts to be proven at the arbitration hearing.

112.

The Defrauders are jointly and severally liable to Equifax for all such damages, plus punitive damages in an amount to punish, penalize or deter the Defrauders from engaging in similar misconduct.

<u>Prayers</u>

WHEREFORE, Claimants request that the Arbitrators enter an award:

(1) Rescinding the Merger Transaction and finding each Respondent liable to Equifax for the Merger Consideration received by that Respondent, as shown in Exhibit A, plus interest thereon at the legal rate.

(2) If and to any extent the relief requested in (1) above is not granted, alternatively, finding each Respondent, jointly and severally, liable for Equifax's losses, damages, liabilities, costs and expenses, including attorneys fees, suffered or incurred by reason of or arising out of the misrepresentations, breaches of warranty and breaches and nonfulfillments of agreements of Naviant contained in the Merger Agreement, the Disclosure Memorandum and other certificates, schedules, instruments and documents delivered to Equifax by or on behalf of Naviant pursuant to the provisions of the Merger Agreement.

(3) If and to any extent the relief requested in (1) above is not granted, alternatively, finding each Defrauder, jointly and severally, liable for Equifax's damages suffered or incurred as a result of the fraud.

(4) Awarding Claimants their costs of arbitration, including arbitrators' fees.


KILPATRICK STOCKTON LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309
Tel: (404) 815-6500
Fax: (404) 815-6555

Matthew H. Patton
Georgia Bar No. 567300
Thomas C. Harney
Georgia Bar No. 327700
Craig E. Bertschi
Georgia Bar No. 055739
Michael E. Brooks
Georgia Bar No. 084710

Attorneys for Claimants

42

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing upon Respondents as follows:

*By Electronic Transmission:*

Michael H. Steinberg          SteinbergM@sullcrom.com

*Via United States mail*, first-class postage prepaid, addressed to:

Michael H. Steinberg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067-1725

Brendan P. Cullen, Esq.
Cory T. Putman Esq.
Sullivan & Cromwell LLP
1870 Embarcadero Rd
Palo Alto CA 94303

Hilarie Bass, Esq.
Greenberg Traurig LLP
1221 Brickell Avenue
Miami, Florida 33131

James F. Fitzsimmons, Esq.
A. Michael Covin
Lani D'Agostino, Esq.
Budd Larner, P.C.
150 John F. Kennedy Pkwy
Short Hills, NJ 07078

Kenneth R. Hartmann, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Jonathan Goodman, Esq.
Lawrence D. Silverman, Esq.
Akerman Senterfitt
One Southeast Third Avenue
28th Floor
Miami, Florida 33131-1714

Gerald H. Litwin, Esq.
Litwin & Tierman, P.A.
Two University Plaza, Suite 210
Hackensack, NJ 07601

E. Cole Fitzgerald, III, Esq.
Gregory D. Cook, Esq.
Fitzgerald, Hawkins, Mayans & Cook, P.A.
Northbridge Center, Suite 900
515 North Flagler Drive
West Palm Beach, FL 33401

Gregg W. McClosky, Esq.
McClosky, D'Anna & Dieterle, LLP
2300 Glades Road
Suite 400 – East Tower
Boca Raton, Florida 33431

Robert W. Anthony, Esq.
Fassett, Anthony & Taylor, P.A.
1325 W. Colonial Drive
Orlando, FL 32804

John Logan
6071 Newport Village Way
Lake Worth, Florida 33463

Tom Hickey
73 Parkway West
Mount Vernon, New York 10552

Richard Hill
8855 NW 18th Street
Coral Springs, Florida 33071

James F. Carroll, Esq.
Conrad & Scherer LLP
633 South Federal Highway Eighth Floor
Fort Lauderdale, FL 33301-3166

Dan Babb
2554 Jardin Manor
Weston, Florida 33327

Ty Baines
848 Bucks Lake Court
San Jose, California 95123

Robert Conley
10730 Paso Fino Drive
Wellington, Florida 33467

Phil Davis
2210 Center Avenue
Northbrook, IL 60062-4519

Mark Eddy
2553 Cranbrook Drive
Boynton Beach, Florida 33436

Charles Eissa
921 SE 5th Avenue
Pompano Beach, Florida 33060

Kevan Fleming
119 NE 2nd Avenue
Deerfield Beach, Florida 33441

Scott Frohman
620 Golden Harbour Drive
Boca Raton, Florida 33432

David Marcil
822 SW Blue Stem Way
Stuart, Florida 34997

Adam Mittelberg
1172 Birchwood Road
Weston, Florida 33327

Lou Nobile
6548 Serena Lane
Boca Raton, Florida 33433

Steve Stowell
1665 SW 2nd Avenue
Boca Raton, Florida 33432

Scott Thaler
6911 NW 104th Lane
Parkland, Florida 33076

David Wood
7880 Ambleside Way
Lake Worth, Florida 33467

This 2nd day of September, 2005.

Michael E. Brooks
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

2

# EXHIBIT 2

## (TO DECLARATION OF GREGORY K. CINNAMON)

AMERICAN ARBITRATION ASSOCIATION
(MIAMI, FLORIDA)
AAA CASE NO. 32 Y 168 00240 04

EQUIFAX INC., et al.

    Claimants,

v.

AUSTIN VENTURES VII, L.P., et al.,

    Respondents.

_____/

## CLAIMANTS' DISMISSAL WITHOUT PREJUDICE OF COUNT TWO OF AMENDED DEMAND AS TO CERTAIN RESPONDENTS

Pursuant to Paragraph 5.A(ii) of the Escrow Resolution Agreement entered June 13, 2006, and without affecting in any way their other claims against the Respondents named below, Claimants, Equifax Inc. and Equifax eMarketing Solutions, Inc. f/k/a Naviant, Inc., hereby dismiss without prejudice as to the following Respondents Count Two (which seeks indemnification under Article 11 of the Merger Agreement) of the Amended Demand for Arbitration:

        Rodger Berman
        Michael Brauser
        Robert Conley
        Charles Eissa
        Scott Hirsch
        Richard Kaufman
        Lou Nobile
        Marc Rona
        Rick Schell
        Steven Stowell

This dismissal, combined with the concurrently-filed "Claimants' Dismissal of Certain Respondents Without Prejudice," means that Count Two of the Amended Demand for Arbitration is no longer asserted or pending in this arbitration proceeding.

9356936.1

Respectfully submitted this 14th day of June, 2006.

KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 541-3333

Matthew H. Patton
Thomas C. Harney
Craig E. Bertschi
Michael E. Brooks

Attorneys for Claimants

- 2 -

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

foregoing upon Respondents as follows:

*By Electronic Transmission*:

      Michael H. Steinberg        SteinbergM@sullcrom.com

*Via United States mail*, First-class postage prepaid, addressed to:

Michael H. Steinberg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067-1725

Brendan P. Cullen, Esq.
Cory T. Putman, Esq.
Sullivan & Cromwell LLP
1870 Embarcadero Rd.
Palo Alto, CA 94303

Hilarie Bass, Esq.
Greenberg Traurig LLP
1221 Brickell Avenue
Miami, Florida 33131

James F. Fitzsimmons, Esq.
A. Michael Covino, Esq.
Lani D'Agostino, Esq.
Budd Larner, P.C.
150 John F. Kennedy Pkwy
Short Hills, NJ 07078

Kenneth R. Hartman, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gerald H. Litwin, Esq.
Litwin & Tierman, P.A.
Two University Plaza, Suite 210
Hackensack, NJ 07601

E. Cole Fitzgerald, III, Esq.
Gregory D. Cook, Esq.
Fitzgerald, Hawkins, Mayans & Cook, P.A.
Northbridge Center, Suite 900
515 North Flagler Drive
West Palm Beach, FL 33401

Gregg W. McClosky, Esq.
McClosky, D'Anna & Dieterle, LLP
2300 Glades Road
Suite 400 – East Tower
Boca Raton, FL 33431

Robert W. Anthony, Esq.
Fassett, Anthony & Taylor, P.A.
1325 W. Colonial Drive
Orlando, FL 32804

James F. Carroll, Esq.
Conrad & Scherer LLP
633 South Federal Highway, Eighth Floor
Fort Lauderdale, FL 33301-3166

9356936 1

Michael Weinstock, Esq.
Weinstock & Scavo, P.C.
Lincoln-Piedmont Building – Suite 300
3405 Piedmont Road
Atlanta, Georgia 30305

Dan Babb
2554 Jardin Manor
Weston, FL 33327

Jonathan Goodman, Esq.
Lawrence D. Silverman, Esq.
Akerman Senterfitt
One Southeast Third Avenue
28th Floor
Miami, Florida 33131-1714

Ty Baines
848 Bucks Lake Court
San Jose, CA 95123

Robert Conley
10730 Paso Fino Drive
Wellington, FL 33467

Richard Hill
8855 NW 185h Street
Coral Springs, FL 33071

Phil Davis
4770 Glenn Pine Lane
Boynton Beach, FL 33436

John Logan
6071 Newport Village Way
Lake Worth, FL 33463

Mark Eddy
2553 Cranbook
Boynton Beach, FL 33436

David Marcil
811 Sevilla Drive
Boca Raton, FL 33432-8119

Charles Eissa
921 SE 5th Avenue
Pompano Beach, FL 33060

Adam Mittelberg
1172 Birchwood Road
Weston, FL 33327

Kevan Fleming
119 NE 2nd Avenue
Deerfield Beach, FL 33441

Lou Nobile
6548 Serena Lane
Boca Raton, FL 33433

Scott Frohman
620 Golden Harbour Drive
Boca Raton, FL 33432

Steve Stowell
1665 SW 2nd Avenue
Boca Raton, FL 33432

Tom Hickey
73 Parkway West
Mount Vernon, NY 10552

Scott Thaler
6911 NW 104th Lane
Parkland, FL 33076

David Wood
7880 Ambleside Way
Lake Worth, FL 33467

- 2 -

This 14th day of June, 2006.

_____
Michael E. Brooks

AMERICAN ARBITRATION ASSOCIATION
(MIAMI, FLORIDA)
AAA CASE NO. 32 Y 168 00240 04

EQUIFAX INC., et al.

     Claimants,

v.

AUSTIN VENTURES VII, L.P., et al.,

     Respondents.

_____/

### CLAIMANTS' DISMISSAL OF CERTAIN RESPONDENTS WITHOUT PREJUDICE

Pursuant to Paragraph 5.A(i) of the Escrow Resolution Agreement entered June 13, 2006, and without affecting in any way their claims against the other Respondents, Claimants, Equifax Inc. and Equifax eMarketing Solutions, Inc. f/k/a Naviant, Inc., hereby dismiss without prejudice from this Arbitration each of the following Respondents:

     Austin Ventures VII, L.P.
     Austin Ventures VIII, L.P.
     BERJ, LLC
     Softbank Capital Partners LP
     Softbank Capital Advisors Fund, LP
     Softbank Capital LP
     Sweepsclub.com
     TL Ventures III L.P.
     TL Ventures III Interfund, L.P.
     TL Ventures III Offshore, L.P.
     TL Ventures IV L.P.
     TL Ventures IV Interfund, L.P.
     Venture Development Center
     Dan Babb
     Ty Baines
     Phil Davis
     Derek Dubner
     Mark Eddy
     Kevan Fleming
     Scott Frohman
     Tom Hickey

Richard Hill
Jeff Killeen
John Logan
David Marcil
Adam Mittelburg
Elder Ripper
Steve Siccone
Scott Thaler
David Wood

This dismissal, combined with the concurrently filed "Claimants' Dismissal Without Prejudice of Count Two of Amended Demand as to Certain Respondents," means that Count Two of the Amended Demand for Arbitration is no longer asserted or pending in this arbitration proceeding.

Respectfully submitted this 14th day of June, 2006.

KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 541-3333

Matthew H. Patton
Thomas C. Harney
Craig E. Bertschi
Michael E. Brooks

Attorneys for Claimants

- 2 -

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

foregoing upon Respondents as follows:

*By Electronic Transmission:*

    Michael H. Steinberg        SteinbergM@sullcrom.com

*Via United States mail*, First-class postage prepaid, addressed to:

Michael H. Steinberg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067-1725

Gerald H. Litwin, Esq.
Litwin & Tierman, P.A.
Two University Plaza, Suite 210
Hackensack, NJ 07601

Brendan P. Cullen, Esq.
Cory T. Putman, Esq.
Sullivan & Cromwell LLP
1870 Embarcadero Rd.
Palo Alto, CA 94303

E. Cole Fitzgerald, III, Esq.
Gregory D. Cook, Esq.
Fitzgerald, Hawkins, Mayans & Cook, P.A.
Northbridge Center, Suite 900
515 North Flagler Drive
West Palm Beach, FL 33401

Hilarie Bass, Esq.
Greenberg Traurig LLP
1221 Brickell Avenue
Miami, Florida 33131

Gregg W. McClosky, Esq.
McClosky, D'Anna & Dieterle, LLP
2300 Glades Road
Suite 400 – East Tower
Boca Raton, FL 33431

James F. Fitzsimmons, Esq.
A. Michael Covino, Esq.
Lani D'Agostino, Esq.
Budd Larner, P.C.
150 John F. Kennedy Pkwy
Short Hills, NJ 07078

Robert W. Anthony, Esq.
Fassett, Anthony & Taylor, P.A.
1325 W. Colonial Drive
Orlando, FL 32804

Kenneth R. Hartman, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

James F. Carroll, Esq.
Conrad & Scherer LLP
633 South Federal Highway, Eighth Floor
Fort Lauderdale, FL 33301-3166

Michael Weinstock, Esq.
Weinstock & Scavo, P.C.
Lincoln-Piedmont Building – Suite 300
3405 Piedmont Road
Atlanta, Georgia  30305

Jonathan Goodman, Esq.
Lawrence D. Silverman, Esq.
Akerman Senterfitt
One Southeast Third Avenue
28th Floor
Miami, Florida 33131-1714

Robert Conley
10730 Paso Fino Drive
Wellington, FL 33467

Phil Davis
4770 Glenn Pine Lane
Boynton Beach, FL 33436

Mark Eddy
2553 Cranbook
Boynton Beach, FL 33436

Charles Eissa
921 SE 5th Avenue
Pompano Beach, FL 33060

Kevan Fleming
119 NE 2nd Avenue
Deerfield Beach, FL 33441

Scott Frohman
620 Golden Harbour Drive
Boca Raton, FL 33432

Tom Hickey
73 Parkway West
Mount Vernon, NY 10552

Dan Babb
2554 Jardin Manor
Weston, FL 33327

Ty Baines
848 Bucks Lake Court
San Jose, CA 95123

Richard Hill
8855 NW 185h Street
Coral Springs, FL 33071

John Logan
6071 Newport Village Way
Lake Worth, FL 33463

David Marcil
811 Sevilla Drive
Boca Raton, FL 33432-8119

Adam Mittelberg
1172 Birchwood Road
Weston, FL 33327

Lou Nobile
6548 Serena Lane
Boca Raton, FL 33433

Steve Stowell
1665 SW 2nd Avenue
Boca Raton, FL 33432

Scott Thaler
6911 NW 104th Lane
Parkland, FL 33076

David Wood
7880 Ambleside Way
Lake Worth, FL 33467

- 2 -

This 14th day of June, 2006.

_____
Michael E. Brooks

9356933 1

# EXHIBIT 3

## (TO DECLARATION OF GREGORY K. CINNAMON)

UNANIMOUS WRITTEN CONSENT OF
THE SHAREHOLDERS OF
NAVIANT, INC.

August 13, 2002

The undersigned, being all of the shareholders of NAVIANT, INC., a Florida corporation (the "Company"), pursuant to the authority contained in Section 607.0704 of the Florida Business Corporation Act (the "FBCA"), without the formality of convening a meeting, do hereby consent to and adopt the following:

WHEREAS, Equifax Inc., a Georgia corporation ("EFX"), is contemplating acquiring the Company, through the merger of Armagh Acquisition Corporation, a Florida corporation and wholly-owned subsidiary of EFX ("Merger Sub"), with and into the Company, as a result of which the separate corporate existence of the Merger Sub shall cease, and the Company shall continue as the surviving corporation, pursuant to Section 607.1101 of the FBCA (the "Merger"); and

WHEREAS, the Board of Directors of the Company has adopted and approved that certain Agreement and Plan of Merger by and among EFX, Merger Sub, Company and Softbank Capital Partners LP, a limited partnership organized under the laws of the State of Delaware, solely in its capacity as Shareholders' Representative, in substantially the form attached hereto as Exhibit A (the "Merger Agreement"), and has submitted such Merger Agreement to the undersigned shareholders for their approval; and

WHEREAS, in connection with the Merger Agreement, the Board of Directors of the Company has adopted and approved the Plan of Merger (the "Plan of Merger") between the Company and the Merger Sub, in substantially the form attached hereto as Exhibit B, and has submitted such Plan of Merger to the undersigned shareholders for their approval.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned shareholders believe that is in the best interests of the Company and deem it advisable for the Merger Sub to be merged with and into the Company in accordance with the Plan of Merger, with the Company remaining as the surviving corporation, pursuant to Section 607.1101 of the FBCA; and be it further

RESOLVED, that the shareholders of the Company hereby adopt and approve the Merger Agreement and Plan of Merger; and be it further

RESOLVED, that the Merger Sub be merged with and into the Company pursuant to the Plan of Merger and in accordance with Section 607.1101 of the FBCA, with the Company remaining as the surviving corporation; and be it further

RESOLVED, that the form, terms and provisions of the Plan of Merger, in substantially the form presented to the undersigned shareholders for approval, be and hereby are, approved, adopted and ratified in all respects; and be it further

**RESOLVED**, that in accordance with the terms and conditions of the Merger Agreement, the shareholders hereby consent to the appointment of Softbank Capital Partners LP as the Shareholders' Representative, as such term is defined in the Merger Agreement, and grant such Shareholders' Representative full power and authority to execute and deliver the Merger Agreement and to, among other things: (i) make all decisions relating to the determination of the Closing Working Capital Adjustment and the Adjusted Net Merger Consideration, as such terms are defined in the Merger Agreement; (ii) take all action necessary in connection with the waiver of any condition to the obligations of the shareholders to consummate the transactions contemplated in the Merger Agreement, or the defense or settlement of any claims for which the shareholders may be required to indemnify EFX or the surviving corporation pursuant to the terms therein; (iii) to give and receive all notices required to be given under the Merger Agreement; (iv) to take any and all additional action as is contemplated to be taken by or on behalf of the shareholders by the terms of the Merger Agreement; and be it further

**RESOLVED**, that to the extent applicable, each of the undersigned who is not a party to that certain Shareholders' Representative Agreement, among the shareholders of the Company, hereby authorizes Michael Brauser to execute and deliver, and perform the duties set forth in, such Shareholders' Representative Agreement on his or her or its behalf; and be it further

**RESOLVED**, that in accordance with Section 607.1103(4) of the FBCA, each of the undersigned shareholders has received a Notice of Merger in substantially the form attached hereto as <u>Exhibit C</u>, which constitutes notice that the undersigned shareholders may dissent from approval of the Merger, and provides that any such dissenting shareholders, if they comply with the provisions of Sections 607.1301, 607.1302 and 607.1320 of the FBCA attached to such Notice of Merger, may be entitled to obtain an appraisal of and/or be paid the fair value of their shares of capital stock of the Company in the event of the consummation of the Merger; and be it further

**RESOLVED**, that the undersigned believe it to be in the best interests of the Company and hereby approve an increase in the number of shares of common stock reserved for the Naviant, Inc. 2002 Stock Option/Stock Issuance Plan from 1,700,000 shares to 2,000,000, which such increase was previously approved by the Board of Directors of the Company subject to shareholder approval; and it is further

**RESOLVED**, the undersigned, by their consent hereto, hereby waive any and all rights, preferences and/or privileges as set forth in: (i) Articles IV.B.2.(e), IV.B.4.(h)(iv), IV.C.2, IV.C.4.(h)(iv) and V.(b)(x) of the Second Amended and Restated Articles of Incorporation of the Company, relating to the shares of each class of the Company's outstanding capital stock held of record by them; and (ii) Section 6 of that certain Shareholders' Agreement, dated March 29, 2002, by and among certain of the undersigned shareholders of the Company; and be it further

**RESOLVED**, that this Unanimous Written Consent may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original.

*SIGNATURE PAGE FOLLOWS*

**IN WITNESS WHEREOF**, the undersigned, being all of the shareholders of the Company, hereby voting the full number of shares of each class of the Company's outstanding voting stock held of record by them, have executed this Unanimous Written Consent, as of the date first written above.

_____
Michael Brause

**AUSTIN VENTURES VII, L.P.**

**By:**   **AV PARTNERS VII, L.P.,**
         **its general partner**

**By:**   _____
         Joe Aragona
         General Partner

**AUSTIN VENTURES VIII, L.P.**

**By:**   **AV PARTNERS VIII, L.P.**
         **its general partner**

**By:**   _____
         Joe Aragona
         General Partner

**IN WITNESS WHEREOF**, the undersigned, being all of the shareholders of the Company, hereby voting the full number of shares of each class of the Company's outstanding voting stock held of record by them, have executed this Unanimous Written Consent, as of the date first written above.

_____
Michael Brauser

**AUSTIN VENTURES VII, L.P.**

**By:      AV PARTNERS VII, L.P.,**
**_its general partner_**

By: _____
Joe Aragona
General Partner

**AUSTIN VENTURES VIII, L.P.**

**By:      AV PARTNERS VIII, L.P.**
**_its general partner_**

By: _____
Joe Aragona
General Partner

**SIGNATURE PAGE FOR SHAREHOLDER RESOLUTIONS APPROVING THE MERGER**

**SOFTBANK CAPITAL PARTNERS LP**

By:    **SOFTBANK CAPITAL PARTNERS LLC, its general partner**

By:    _____

Steven J. Murray
Administrative Member

**SOFTBANK CAPITAL ADVISORS FUND LP**

By:    **SOFTBANK CAPITAL PARTNERS LLC, its general partner**

By:    _____

Steven J. Murray
Administrative Member

**SOFTBANK CAPITAL LP**

By:    **SOFTBANK CAPITAL PARTNERS LLC, its general partner**

By:    _____

Steven J. Murray
Administrative Member

**SIGNATURE PAGE FOR SHAREHOLDER RESOLUTIONS APPROVING THE MERGER**

**TL VENTURES III L.P.**

> **By:**   **TL VENTURES III MANAGEMENT L.P., its general partner**
>
> **By:**   **TL VENTURES III GENERAL PARTNER L.P., its general partner**
>
> **By:**   **TL VENTURES III MANAGER L.L.C., its general partner**

**By:** _____
Robert E. Keith, Jr.
Managing Director

**TL VENTURES III OFFSHORE L.P.**

> **By:**   **TL VENTURES III OFFSHORE PARTNERS L.P., its general partner**
>
> **By:**   **TL VENTURES III OFFSHORE LTD., its general partner**

**By:** _____
Robert E. Keith, Jr.
Managing Director

**TL VENTURES III INTERFUND L.P.**

> **By:**   **TL VENTURES III GENERAL PARTNER L.P., its general partner**
>
> **By:**   **TL VENTURES III MANAGER L.L.C., its general partner**

**By:** _____
Robert E. Keith, Jr.
Managing Director

**SIGNATURE PAGE FOR SHAREHOLDER RESOLUTIONS APPROVING THE MERGER**

**TL VENTURES IV L.P.**

**By:**   **TL VENTURES IV MANAGEMENT L.P., its general partner**

**By:**   **TL VENTURES IV L.L.C., its general partner**

By:   _____
Robert E. Keith, Jr.
Managing Director

**TL VENTURES IV INTERFUND L.P.**

**By:**   **TL VENTURES IV L.L.C, its general partner**

By:   _____
Robert E. Keith, Jr.
Managing Director

**BERJ, LLC**

By:_____
David Finley
President

**SWEEPSCLUB.COM, INC.**

By:_____
Richard Kaufman
President and Chief Executive Officer

**SEISINT, INC.**

By:_____
Name:_____
Title:_____

*SIGNATURE PAGE FOR SHAREHOLDER RESOLUTIONS APPROVING THE MERGER*

**TL VENTURES IV L.P.**

> **By:** **TL VENTURES IV MANAGEMENT L.P., its general partner**
>
> **By:** **TL VENTURES IV L.L.C., its general partner**
>
> By: _____
> Robert E. Keith, Jr.
> Managing Director

**TL VENTURES IV INTERFUND L.P.**

> **By:** **TL VENTURES IV L.L.C, its general partner**
>
> By: _____
> Robert E. Keith, Jr.
> Managing Director

**BERJ, LLC**

> By: _____
> David Finley
> President

**SWEEPSCLUB.COM, INC.**

> By:_____
> Richard Kaufman
> President and Chief Executive Officer

**SEISINT, INC.**

> By:_____
> Name:_____
> Title:_____

SIGNATURE PAGE FOR SHAREHOLDER RESOLUTIONS APPROVING THE MERGER

**TL VENTURES IV L.P.**

By:   **TL VENTURES IV MANAGEMENT L.P., its general partner**

By:   **TL VENTURES IV L.L.C., its general partner**

By:   _____

Robert E. Keith, Jr.
Managing Director

**TL VENTURES IV INTERFUND L.P.**

By:   **TL VENTURES IV L.L.C, its general partner**

By:   _____

Robert E. Keith, Jr.
Managing Director

**BERJ, LLC**

By:_____

David Finley
President

**SWEEPSCLUB.COM, INC.**

By:_____

Richard Kauffman
President and Chief Executive Officer

**SEISINT, INC.**

By:_____

Name:_____

Title:_____

**TL VENTURES IV L.P.**

> **By:**   **TL VENTURES IV MANAGEMENT L.P., its general partner**
>
> **By:**   **TL VENTURES IV L.L.C., its general partner**
>
> By:   _____
> Robert E. Keith, Jr.
> Managing Director

**TL VENTURES IV INTERFUND L.P.**

> **By:**   **TL VENTURES IV L.L.C, its general partner**
>
> By:   _____
> Robert E. Keith, Jr.
> Managing Director

**BERJ, INC.**

> By:_____
> David Finley
> President

**SWEEPSCLUB.COM, INC.**

> By:_____
> Richard Kaufman
> President and Chief Executive Officer

**SEISINT, INC.**

> By: *[signature]*
> Name: *Kenneth J. Schwartz*
> Title: *Secretary & General Counsel*

<u>EXHIBIT A</u>

FORM OF AGREEMENT AND PLAN OF MERGER

## EXHIBIT B

PLAN OF MERGER

# PLAN OF MERGER
## OF
## ARMAGH ACQUISITION CORPORATION
### (a Florida corporation),
## AND
## NAVIANT, INC.
### (a Florida corporation)

The following plan of merger is submitted in compliance with section 607.1101, F.S. and in accordance with the laws of any other applicable jurisdiction of incorporation.

**FIRST**: The name and jurisdiction of the surviving corporation shall be Naviant, Inc., a Florida corporation ("**Company**").

**SECOND**: The name and jurisdiction of the merging corporation is Armagh Acquisition Corporation, a Florida corporation ("**Armagh**").

**THIRD**: The Merger shall become effective (the "**Effective Time**") when Company and Armagh file the Articles of Merger, including this Plan of Merger in accordance with Section 607.1105 of the FBCA with the Department of State of the State of Florida.

**FOURTH**: At the Effective Time, upon and subject to the terms and conditions of the Agreement and Plan of Merger, dated as of August 15, 2002 by and among Company, Armagh, Equifax Inc. and Softbank Capital Partners LP, as Shareholders' Representative (the "**Agreement and Plan of Merger**") and in accordance with Section 607.1101 of the FBCA, Armagh shall be merged with and into Company, the separate corporate existence of Armagh shall cease, and Company shall continue as the surviving corporation. Company as the surviving corporation after the Merger is sometimes referred to in this Plan of Merger as the "**Surviving Corporation**". At the Effective Time, the effect of the Merger shall be as provided in Section 607.1106 of the FBCA. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all rights, privileges, immunities, franchises and powers of the Company and Armagh shall vest in Surviving Corporation, and all duties, liabilities, debts and obligations of Company and Armagh shall become the duties, liabilities, debts and obligations of the Surviving Corporation.

**FIFTH**: The manner and basis of converting the shares of Company and Armagh are as follows:

(a)     Common Shares of Company.    As of the Effective Time, each share of Company's Common Stock, $0.01 par value per share (a "**Common Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares (as defined below) will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount; and (iii) a conditional amount of cash per share equal to the Per Share Contingent Payment.

(b)     Series A Shares of Company.  As of the Effective Time, each share of Company's Series A Preferred Stock, $0.01 par value per share (a "**Series A Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount; and (iii) a conditional amount of cash per share equal to the Per Share Contingent Payment.

(c)     Series B Shares of Company.  As of the Effective Time, each share of Company's Series B Preferred Stock, $0.01 par value per share (a "**Series B Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Series B Preference, without interest; (ii) an amount in cash equal to the Per Share Net Participation Amount, without interest; (iii) a conditional amount in cash equal to the Per Share Escrow Amount; and (iv) a conditional amount of cash per share equal to the Per Share Contingent Payment.

(d)     Treasury Shares of Company.  Each Company Share held in Company's treasury immediately prior to the Effective Time and each Company Share owned beneficially by Equifax Inc. or Armagh, will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and retired without payment therefore, and all rights in respect thereto shall cease to exist.

(e)     Conversion of Armagh Shares.  Each share of common stock, $0.01 par value per share, of Armagh issued and outstanding immediately prior to the Effective Time will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of Surviving Corporation.

(f)     Dissenting Shares.  Company Shares held by holders thereof who are entitled to vote on the Merger and who have not voted such Company Shares in favor of the adoption of the Agreement and Plan of Merger and the Merger and with respect to which dissenters' rights shall have been properly exercised and perfected in accordance with Section 607.1320 of the FBCA (the "**Dissenting Shares**"), shall not be converted into or represent the right to receive the Merger Consideration which the holders of Outstanding Company Shares are entitled to receive pursuant to the Agreement and Plan of Merger, and holders of such Dissenting Shares shall be entitled to receive only the payment provided for by Section 607.1320 of the FBCA, unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to demand payment under the FBCA.  If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares shall thereupon be deemed to have been converted into and have become exchangeable for, as of the Effective Time, as described in the Agreement and Plan of Merger, the right to receive the Merger Consideration set forth in such provisions, without any interest thereon.

(g)     Defined Terms.   For purposes of this Plan of Merger capitalized terms not otherwise defined shall have the meanings ascribed to such terms in the Agreement and Plan of Merger.

**SIXTH**:  The Articles of Incorporation of Armagh as in effect immediately prior to the Effective Time shall be the articles of incorporation of the Surviving Corporation immediately following the Effective Time, until thereafter amended in accordance with applicable law and the articles of incorporation of Surviving Corporation, except that the name of the corporation set forth in Article I thereof shall be changed to "Naviant, Inc." and the identity of the incorporator shall be deleted.

**SEVENTH:**  The bylaws of Armagh as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law, the articles of incorporation of the Surviving Corporation, and such bylaws.

**EIGHTH:**  The directors of Armagh immediately prior to the Effective Time shall be the initial board of directors of the Surviving Corporation, each of such directors to serve until his or her successor is duly elected and qualified.

**NINTH:**  The officers of Armagh immediately prior to the Effective Time shall be the officers of the Surviving Corporation, in their respective positions as with Armagh, each of such officers to serve until the earlier of their resignation, removal or until their respective successors are duly elected or appointed and qualified in accordance with applicable law.

**TENTH**:

(a)     Termination; Amendment.   Notwithstanding the approval of this Plan of Merger by the shareholders of Company and Armagh, this Plan of Merger shall immediately terminate if the Agreement and Plan of Merger is terminated.  If this Plan of Merger is terminated, this Plan of Merger shall immediately become void and there shall be no liability on the part of Company or Armagh or their respective officers or directors, except as otherwise provided in the Agreement and Plan of Merger.  Furthermore, the Boards of Directors of Armagh and Company are hereby authorized to amend this Plan of Merger in accordance with Section 607.1103(8) of the FCBA prior to the filing of Articles of Merger with the Department of State of the State of Florida.

(b)     Execution in Counterparts.   This Plan of Merger may be executed in any number of counterparts, each of which will be deemed an original, and all of which will constitute one and the same instrument.

(c)     Amendment.   This Plan of Merger may be amended by the parties hereto any time before or after approval by the shareholders of Company and Armagh, but, after such approval, no amendments shall be made which by law require the further approval of such shareholders without obtaining such approval. This Plan of Merger may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

*[Signatures Commence On The Following Page]*

*IN WITNESS WHEREOF*, the undersigned have caused this Plan of Merger to be executed by their respective duly authorized officers as of August 15, 2002.

**ARMAGH:**

**ARMAGH ACQUISITION CORPORATION**

By:_____
Name:_____
Title:_____

**COMPANY:**

**NAVIANT, INC.**

By:_____
Name:_____
Title:_____

## EXHIBIT C

NOTICE OF MERGER



August 8, 2002

Dear Naviant, Inc. Shareholder:

This letter is being furnished to you along with the attached Notice of Merger, in connection with the proposed acquisition of Naviant, Inc. (the "Company") by Equifax, Inc., a Georgia corporation ("EFX"), through the merger of Armagh Acquisition Corporation, a Florida corporation and wholly owned subsidiary of EFX ("Armagh"), with and into the Company, as a result of which, the separate corporate existence of Armagh shall cease, and Company shall continue as the surviving corporation. As a result of the merger, subject to statutory dissenters' rights, the Company's securities will be converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount.

Details of the merger and other important information are described in the accompanying Notice of Merger and the Plan of Merger, which is attached as Annex A to the Notice of Merger, and which we urge you to read.

If you comply with the provisions and strictly adhere to the procedures under Florida law regarding the rights of dissenting shareholders, you will be entitled to assert your statutory dissenters' rights with respect to the securities you own, as more fully described in the attached Notice of Merger. The applicable statutory provisions relating to the procedures for asserting dissenters' rights under Florida law are attached as Annex B to the Notice of Merger.

Sincerely,

Michael Brauser
Chief Executive Officer and President
Naviant, Inc.

## NOTICE OF MERGER

This Notice of Merger is being sent to you by Naviant, Inc. (the "Company"), in connection with the proposed acquisition of the Company by Equifax, Inc., a Georgia corporation ("EFX"), through a merger (the "Merger"), pursuant to Section 607.1101 of the Florida Business Corporation Act ("FBCA"), of Armagh Acquisition Corporation, a Florida corporation and wholly owned subsidiary of EFX ("Armagh"), with and into the Company, as a result of which, the separate corporate existence of Armagh shall cease, and Company shall continue as the surviving corporation. The effective date of the Merger is expected to be on or about August 9, 2002.

**Principal Terms of the Merger**

The Merger. The Merger shall become effective (the "Effective Time") when Company and Armagh file Articles of Merger, including the Plan of Merger in substantially the form attached hereto as Annex A (the "Plan of Merger"), with the Department of State of the State of Florida, in accordance with Section 607.1105 of the FBCA. At the Effective Time, upon and subject to the terms and conditions of the Agreement and Plan of Merger, dated as of August [__], 2002 by and among EFX, Armagh and Company (the "Merger Agreement") and in accordance with Section 607.1101 of the FBCA, Armagh shall be merged with and into Company, the separate corporate existence of Armagh shall cease, and Company shall continue as the surviving corporation. Company as the surviving corporation after the Merger is sometimes referred to herein as the "Surviving Corporation".

At the Effective Time, the effect of the Merger shall be as provided in Section 607.1106 of the FBCA. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all rights, privileges, immunities, franchises and powers of the Company and Merger Sub shall vest in Surviving Corporation, and all duties, liabilities, debts and obligations of Company and Armagh shall become the duties, liabilities, debts and obligations of the Surviving Corporation.

Conversion of Shares. The manner and basis of converting the shares of Company and Armagh are as follows:

(a)     Common Shares of Company. As of the Effective Time, each share of Company's Common Stock, $0.01 par value per share (a "Common Share") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares (as defined below) will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount.

(b)     Series A Shares of Company. As of the Effective Time, each share of Company's Series A Preferred Stock, $0.01 par value per share (a "Series A Share") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the

Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount.

        (c)    <u>Series B Shares of Company</u>. As of the Effective Time, each share of Company's Series B Preferred Stock, $0.01 par value per share (a "<u>Series B Share</u>") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Series B Preference, without interest; (ii) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (iii) a conditional amount in cash equal to the Per Share Escrow Amount.

        (d)    <u>Treasury Shares of Company</u>. Each Company Share held in Company's treasury immediately prior to the Effective Time and each Company Share owned beneficially by EFX or Armagh, will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and retired without payment therefore, and all rights in respect thereto shall cease to exist.

        (e)    <u>Conversion of Armagh Shares</u>. Each share of common stock, $0.01 par value per share, of Armagh issued and outstanding immediately prior to the Effective Time will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of Company.

    <u>Company Options</u>. Immediately prior to the Effective Time, and subject to the consummation of the Merger, each Company option shall be fully vested and exercisable in full, and all Company options which are not exercised prior to the consummation of the Merger shall be canceled. Simultaneously with, and conditioned upon the consummation of the Merger, the Company shall waive the exercise price of any Company option to the extent the exercise price of such Company option exceeds $.01 per share.

    <u>Dissenting Shares</u>. Company shares held by holders thereof who are entitled to vote on the Merger and who have not voted such Company shares in favor of the adoption of the Merger Agreement and the Merger and with respect to which dissenters' rights shall have been properly exercised and perfected in accordance with Section 607.1320 of the FBCA (the "<u>Dissenting Shares</u>"), shall not be converted into or represent the right to receive the Merger Consideration which the holders of outstanding Company shares are entitled to receive pursuant to the Merger Agreement, and holders of such Dissenting Shares shall be entitled to receive only the payment provided for by Section 607.1320 of the FBCA, unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to demand payment under the FBCA. If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares shall thereupon be deemed to have been converted into and have become exchangeable for, as of the Effective Time, as described in the Merger Agreement, the right to receive the Merger Consideration set forth in such provisions, without any interest thereon.

{MI828424;1}                                                         2

Shareholders' Representative. In accordance with the terms and conditions of the Merger Agreement, the Company shareholders will be required to use best efforts to designate or cause to designate a Shareholders' Representative to, among other things: (i) make all decisions relating to the determination of the Closing Working Capital Adjustment and the Adjusted Net Merger Consideration, as such terms are defined in the Merger Agreement; (ii) take all action necessary in connection with the waiver of any condition to the obligations of the shareholders to consummate the transactions contemplated in the Merger Agreement, or the defense or settlement of any claims for which the shareholders may be required to indemnify EFX or the surviving corporation pursuant to the terms therein; (iii) to give and receive all notices required to be given under the Merger Agreement; (iv) to take any and all additional action as is contemplated to be taken by or on behalf of the shareholders by the terms of the Merger Agreement;

Escrow Arrangements. On the Closing Date, EFX will deliver to SunTrust (the "Escrow Agent") by wire transfer of immediately available funds, an amount equal to the Escrowed Amount, which amount shall be withheld from the Net Merger Consideration and shall be deposited with the Escrow Agent for the purpose of securing the indemnification and Net Merger Consideration adjustment obligations of the Company shareholders set forth in the Merger Agreement (together with all accrued interest thereon, except as provided in the Escrow Agreement, the "Escrow Fund"). The Escrow Fund shall be held by the Escrow Agent pursuant to the terms of the agreement among the Escrow Agent, Company and the Shareholders' Representative (the "Escrow Agreement"). The portion of the Escrow Fund contributed on behalf of each Company Shareholder shall be proportionate to his, her or its Pro Rata Share.

Indemnification by Company. Subject to Closing, and the Company shareholders and holders of Company options receiving the Merger Consideration (each, an "Indemnitor", and collectively, the "Indemnitors"), the Indemnitors will, severally and to the extent of such Indemnitor's proportionate interest in the Escrow Fund, indemnify and hold harmless EFX and its affiliates and their respective officers, directors, agents, employees and stockholders, other than any officer, director, agent or employee who immediately prior to the Closing was a Company Shareholder or an officer, director, agent or employee of a Company Shareholder, from and against certain Indemnified Losses, as set forth in the Merger Agreement.

Articles of Incorporation and Bylaws. The Articles of Incorporation of Armagh as in effect immediately prior to the Effective Time shall be the articles of incorporation of the Surviving Corporation immediately following the Effective Time, until thereafter amended in accordance with applicable law and the articles of incorporation of Surviving Corporation, except that the name of the corporation set forth in Article I thereof shall be changed to "Naviant, Inc." and the identity of the incorporator shall be deleted. The bylaws of Armagh as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law, the articles of incorporation of the Surviving Corporation, and such bylaws.

Directors and Officers. The directors of Armagh immediately prior to the Effective Time shall be the initial board of directors of the Surviving Corporation, each of such directors to serve until his or her successor is duly elected and qualified. The officers of Armagh immediately prior to the Effective Time shall be the officers of the Surviving Corporation, in their respective

{MI828424;1}                                              3

positions as with Armagh, each of such officers to serve until the earlier of their resignation, removal or until their respective successors are duly elected or appointed and qualified in accordance with applicable law.

Termination; Amendments. Notwithstanding the approval of the Plan of Merger by the shareholders of Company and Armagh, the Plan of Merger shall immediately terminate if the Merger Agreement is terminated in accordance with the terms therein. If the Plan of Merger is terminated, the Plan of Merger shall immediately become void and there shall be no liability on the part of Company or Armagh or their respective officers or directors, except as otherwise provided in the Merger Agreement. Furthermore, each of the respective Board of Directors of Armagh and Company may amend the Plan of Merger in accordance with Section 607.1103(8) of the FBCA prior to the filing of Articles of Merger with the Department of State of the State of Florida.

**Approval of the Company's Shareholders**

Company hereby seeks Requisite Shareholder Approval, pursuant to the Merger Agreement, by effectuating a written shareholder consent, in accordance with the applicable requirements of the FBCA and Company bylaws. The adoption of the Merger Agreement by the shareholders of the Company shall constitute approval of all the terms set forth therein. By providing this Notice of Merger Company is hereby complying with Section 607.1320(b) of the FBCA, with regard to the mechanisms which the Company must follow in order to perfect Company shareholders' dissenters' rights, and Section 607.0704 of the FBCA, with regard to obtaining the Requisite Shareholder Approval by means of a written consent, and shall promptly inform EFX of the date on which this Notice of Merger is sent. In order for the Plan of Merger to be approved pursuant to Section 607.1103 of the FBCA, the Plan of Merger must be approved by each class entitled to vote on the Plan of Merger by a majority of all the votes entitled to be cast on the plan by that class.

**Approval of the Board of Directors of the Company**

The Board of Directors of the Company has unanimously recommended that the shareholders of the Company vote in favor of the adoption of the Merger Agreement.

**Dissenters' Rights**

Shareholders are entitled to dissenters' rights under Sections 607.1301, 607.1302 and 607.1320 of the FBCA, in connection with the Merger. This Notice of Merger constitutes notice to the shareholders of the ability of the shareholders to dissent from approval of effectuating the Merger. The applicable statutory provisions of the FBCA are attached to this Notice of Merger as Annex B.

**EACH BENEFICIAL OWNER OF COMPANY SECURITIES IS URGED TO CONSULT SUCH BENEFICIAL OWNER'S TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES TO SUCH BENEFICIAL OWNER OF THE MERGER, INCLUDING THE APPLICATION OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.**

# ANNEX A

## PLAN OF MERGER
## OF
## ARMAGH ACQUISITION CORPORATION
### (a Florida corporation),
## AND
## NAVIANT, INC.
### (a Florida corporation)

The following plan of merger is submitted in compliance with section 607.1101, F.S. and in accordance with the laws of any other applicable jurisdiction of incorporation.

**FIRST**: The name and jurisdiction of the surviving corporation shall be Naviant, Inc., a Florida corporation ("**Company**").

**SECOND**: The name and jurisdiction of the merging corporation is Armagh Acquisition Corporation, a Florida corporation ("**Armagh**").

**THIRD**: The Merger shall become effective (the "**Effective Time**") when Company and Armagh file the Articles of Merger, including this Plan of Merger in accordance with Section 607.1105 of the FBCA with the Department of State of the State of Florida.

**FOURTH**:  At the Effective Time, upon and subject to the terms and conditions of the Agreement and Plan of Merger, dated as of August [__], 2002 by and among Company, Armagh and EFX (the "**Agreement and Plan of Merger**") and in accordance with Section 607.1101 of the FBCA, Armagh shall be merged with and into Company, the separate corporate existence of Armagh shall cease, and Company shall continue as the surviving corporation.  Company as the surviving corporation after the Merger is sometimes referred to in this Plan of Merger as the "**Surviving Corporation**".  At the Effective Time, the effect of the Merger shall be as provided in Section 607.1106 of the FBCA.  Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all rights, privileges, immunities, franchises and powers of the Company and Merger Sub shall vest in Surviving Corporation, and all duties, liabilities, debts and obligations of Company and Armagh shall become the duties, liabilities, debts and obligations of the Surviving Corporation.

**FIFTH**: The manner and basis of converting the shares of Company and Armagh are as follows:

(a)    Common Shares of Company.   As of the Effective Time, each share of Company's Common Stock, $0.01 par value per share (a "**Common Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares (as defined below) will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount.

(b)    <u>Series A Shares of Company</u>.  As of the Effective Time, each share of Company's Series A Preferred Stock, $0.01 par value per share (a "**Series A Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (ii) a conditional amount of cash per share equal to the Per Share Escrow Amount.

(c)    <u>Series B Shares of Company</u>.  As of the Effective Time, each share of Company's Series B Preferred Stock, $0.01 par value per share (a "**Series B Share**") that is issued and outstanding at the Effective Time (but before cancellation thereof by operation of the Merger) except for Dissenting Shares will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and extinguished and converted into the right to receive: (i) an amount in cash equal to the Series B Preference, without interest; (ii) an amount in cash equal to the Per Share Net Participation Amount, without interest; and (iii) a conditional amount in cash equal to the Per Share Escrow Amount.

(d)    <u>Treasury Shares of Company</u>.  Each Company Share held in Company's treasury immediately prior to the Effective Time and each Company Share owned beneficially by EFX or Armagh, will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be canceled and retired without payment therefore, and all rights in respect thereto shall cease to exist.

(e)    <u>Conversion of Armagh Shares</u>.  Each share of common stock, $0.01 par value per share, of Armagh issued and outstanding immediately prior to the Effective Time will, by virtue of the Merger and without any action on the part of any holder thereof, automatically be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of Company.

(f)    <u>Dissenting Shares</u>.  Company shares held by holders thereof who are entitled to vote on the Merger and who have not voted such Company shares in favor of the adoption of the Agreement and Plan of Merger and the Merger and with respect to which dissenters' rights shall have been properly exercised and perfected in accordance with Section 607.1320 of the FBCA (the "**Dissenting Shares**"), shall not be converted into or represent the right to receive the Merger Consideration which the holders of outstanding Company shares are entitled to receive pursuant to the Agreement and Plan of Merger, and holders of such Dissenting Shares shall be entitled to receive only the payment provided for by Section 607.1320 of the FBCA, unless and until such holders fail to perfect or effectively withdraw or otherwise lose their rights to demand payment under the FBCA.  If, after the Effective Time, any such holder fails to perfect or effectively withdraws or loses such right, such Dissenting Shares shall thereupon be deemed to have been converted into and have become exchangeable for, as of the Effective Time, as described in the Agreement and Plan of Merger, the right to receive the Merger Consideration set forth in such provisions, without any interest thereon.

(g)    <u>Defined Terms</u>.  For purposes of this Plan of Merger capitalized terms not otherwise defined shall have the meanings ascribed to such terms in the Agreement and Plan of Merger.

**SIXTH**:  The Articles of Incorporation of Armagh as in effect immediately prior to the Effective Time shall be the articles of incorporation of the Surviving Corporation immediately following the Effective Time, until thereafter amended in accordance with applicable law and the articles of incorporation of Surviving Corporation, except that the name of the corporation set forth in Article I thereof shall be changed to "Naviant, Inc." and the identity of the incorporator shall be deleted.

**SEVENTH:**  The bylaws of Armagh as in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law, the articles of incorporation of the Surviving Corporation, and such bylaws.

**EIGHTH:**  The directors of Armagh immediately prior to the Effective Time shall be the initial board of directors of the Surviving Corporation, each of such directors to serve until his or her successor is duly elected and qualified.

**NINTH:**  The officers of Armagh immediately prior to the Effective Time shall be the officers of the Surviving Corporation, in their respective positions as with Armagh, each of such officers to serve until the earlier of their resignation, removal or until their respective successors are duly elected or appointed and qualified in accordance with applicable law.

**TENTH**:

(a)    Termination; Amendment.   Notwithstanding the approval of this Plan of Merger by the shareholders of Company and Armagh, this Plan of Merger shall immediately terminate if the Agreement and Plan of Merger is terminated.  If this Plan of Merger is terminated, this Plan of Merger shall immediately become void and there shall be no liability on the part of Company or Armagh or their respective officers or directors, except as otherwise provided in the Agreement and Plan of Merger.  Furthermore, the Boards of Directors or Armagh and Company are hereby authorized to amend this Plan of Merger in accordance with Section 607.1103(8) of the FBCA prior to the filing of Articles of Merger with the Department of State of the State of Florida.

(b)    Execution in Counterparts.  This Plan of Merger may be executed in any number of counterparts, each of which will be deemed an original, and all of which will constitute one and the same instrument.

(c)    Amendment.  This Plan of Merger may be amended by the parties hereto any time before or after approval by the shareholders of Company and Armagh, but, after such approval, no amendments shall be made which by law require the further approval of such shareholders without obtaining such approval. This Plan of Merger may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

*[Signatures Commence On The Following Page]*

*IN WITNESS WHEREOF*, the undersigned have caused this Plan of Merger to be executed by their respective duly authorized officers as of August [__]. 2002.

**ARMAGH:**

**ARMAGH ACQUISITION CORPORATION**

By:_____

Name:_____

Title:_____

**COMPANY:**

**NAVIANT, INC.**

By:_____

Name:_____

Title:_____

## ANNEX B

## FLORIDA STATUTES GOVERNING DISSENTERS' RIGHTS

**607.1301.   Dissenters' rights; definitions**

The following definitions apply to ss. 607.1302 and 607.1320:

(1) "Corporation" means the issuer of the shares held by a dissenting shareholder before the corporate action or the surviving or acquiring corporation by merger or share exchange of that issuer.

(2) "Fair value," with respect to a dissenter's shares, means the value of the shares as of the close of business on the day prior to the shareholders' authorization date, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.

(3) "Shareholders' authorization date" means the date on which the shareholders' vote authorizing the proposed action was taken, the date on which the corporation received written consents without a meeting from the requisite number of shareholders in order to authorize the action, or, in the case of a merger pursuant to s. 607.1104, the day prior to the date on which a copy of the plan of merger was mailed to each shareholder of record of the subsidiary corporation.

**607.1302.    Right of shareholders to dissent**

(1) Any shareholder of a corporation has the right to dissent from, and obtain payment of the fair value of his or her shares in the event of, any of the following corporate actions:

(a) Consummation of a plan of merger to which the corporation is a party:

1. If the shareholder is entitled to vote on the merger, or

2. If the corporation is a subsidiary that is merged with its parent under s. 607.1104, and the shareholders would have been entitled to vote on action taken, except for the applicability of s. 607.1104;

(b) Consummation of a sale or exchange of all, or substantially all, of the property of the corporation, other than in the usual and regular course of business, if the shareholder is entitled to vote on the sale or exchange pursuant to s. 607.1202, including a sale in dissolution but not including a sale pursuant to court order or a sale for cash pursuant to a plan by which all or substantially all of the net proceeds of the sale will be distributed to the shareholders within 1 year after the date of sale;

(c) As provided in s. 607.0902(11), the approval of a control-share acquisition;

(d) Consummation of a plan of share exchange to which the corporation is a party as the corporation the shares of which will be acquired, if the shareholder is entitled to vote on the plan;

(e) Any amendment of the articles of incorporation if the shareholder is entitled to vote on the amendment and if such amendment would adversely affect such shareholder by:

1. Altering or abolishing any preemptive rights attached to any of his or her shares;

2. Altering or abolishing the voting rights pertaining to any of his or her shares, except as such rights may be affected by the voting rights of new shares then being authorized of any existing or new class or series of shares;

3. Effecting an exchange, cancellation, or reclassification of any of his or her shares, when such exchange, cancellation, or reclassification would alter or abolish the shareholder's voting rights or alter his or her percentage of equity in the corporation, or effecting a reduction or cancellation of accrued dividends or other arrearages in respect to such shares;

4. Reducing the stated redemption price of any of the shareholder's redeemable shares, altering or abolishing any provision relating to any sinking fund for the redemption or purchase of any of his or her shares, or making any of his or her shares subject to redemption when they are not otherwise redeemable;

5. Making noncumulative, in whole or in part, dividends of any of the shareholder's preferred shares which had theretofore been cumulative;

6. Reducing the stated dividend preference of any of the shareholder's preferred shares; or

7. Reducing any stated preferential amount payable on any of the shareholder's preferred shares upon voluntary or involuntary liquidation;  or

(f) Any corporate action taken, to the extent the articles of incorporation provide that a voting or nonvoting shareholder is entitled to dissent and obtain payment for his or her shares.

(2) A shareholder dissenting from any amendment specified in paragraph (1)(e) has the right to dissent only as to those of his or her shares which are adversely affected by the amendment.

(3) A shareholder may dissent as to less than all the shares registered in his or her name. In that event, the shareholder's rights shall be determined as if the shares as to which he or she has dissented and his or her other shares were registered in the names of different shareholders.

(4) Unless the articles of incorporation otherwise provide, this section does not apply with respect to a plan of merger or share exchange or a proposed sale or exchange of property, to the holders of shares of any class or series which, on the record date fixed to determine the shareholders entitled to vote at the meeting of shareholders at which such action is to be acted

{MI828424;1}

upon or to consent to any such action without a meeting, were either registered on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc., or held of record by not fewer than 2,000 shareholders.

(5) A shareholder entitled to dissent and obtain payment for his or her shares under this section may not challenge the corporate action creating his or her entitlement unless the action is unlawful or fraudulent with respect to the shareholder or the corporation.

**607.1320.    Procedure for exercise of dissenters' rights**

(1)(a) If a proposed corporate action creating dissenters' rights under s. 607.1302 is submitted to a vote at a shareholders' meeting, the meeting notice shall state that shareholders are or may be entitled to assert dissenters' rights and be accompanied by a copy of ss. 607.1301, 607.1302, and 607.1320. A shareholder who wishes to assert dissenters' rights shall:

1. Deliver to the corporation before the vote is taken written notice of the shareholder's intent to demand payment for his or her shares if the proposed action is effectuated, and

2. Not vote his or her shares in favor of the proposed action. A proxy or vote against the proposed action does not constitute such a notice of intent to demand payment.

(b) If proposed corporate action creating dissenters' rights under s. 607.1302 is effectuated by written consent without a meeting, the corporation shall deliver a copy of ss. 607.1301, 607.1302, and 607.1320 to each shareholder simultaneously with any request for the shareholder's written consent or, if such a request is not made, within 10 days after the date the corporation received written consents without a meeting from the requisite number of shareholders necessary to authorize the action.

(2) Within 10 days after the shareholders' authorization date, the corporation shall give written notice of such authorization or consent or adoption of the plan of merger, as the case may be, to each shareholder who filed a notice of intent to demand payment for his or her shares pursuant to paragraph (1)(a) or, in the case of action authorized by written consent, to each shareholder, excepting any who voted for, or consented in writing to, the proposed action.

(3) Within 20 days after the giving of notice to him or her, any shareholder who elects to dissent shall file with the corporation a notice of such election, stating the shareholder's name and address, the number, classes, and series of shares as to which he or she dissents, and a demand for payment of the fair value of his or her shares. Any shareholder failing to file such election to dissent within the period set forth shall be bound by the terms of the proposed corporate action. Any shareholder filing an election to dissent shall deposit his or her certificates for certificated shares with the corporation simultaneously with the filing of the election to dissent. The corporation may restrict the transfer of uncertificated shares from the date the shareholder's election to dissent is filed with the corporation.

(4) Upon filing a notice of election to dissent, the shareholder shall thereafter be entitled only to payment as provided in this section and shall not be entitled to vote or to exercise any other rights of a shareholder. A notice of election may be withdrawn in writing by the shareholder at any time before an offer is made by the corporation, as provided in subsection (5), to pay for his or her shares. After such offer, no such notice of election may be withdrawn unless the corporation consents thereto. However, the right of such shareholder to be paid the fair value of his or her shares shall cease, and the shareholder shall be reinstated to have all his or her rights as a shareholder as of the filing of his or her notice of election, including any intervening preemptive rights and the right to payment of any intervening dividend or other distribution or, if any such rights have expired or any such dividend or distribution other than in cash has been completed, in lieu thereof, at the election of the corporation, the fair value thereof in cash as determined by the board as of the time of such expiration or completion, but without prejudice otherwise to any corporate proceedings that may have been taken in the interim, if:

(a) Such demand is withdrawn as provided in this section;

(b) The proposed corporate action is abandoned or rescinded or the shareholders revoke the authority to effect such action;

(c) No demand or petition for the determination of fair value by a court has been made or filed within the time provided in this section;  or

(d) A court of competent jurisdiction determines that such shareholder is not entitled to the relief provided by this section.

(5) Within 10 days after the expiration of the period in which shareholders may file their notices of election to dissent, or within 10 days after such corporate action is effected, whichever is later (but in no case later than 90 days from the shareholders' authorization date), the corporation shall make a written offer to each dissenting shareholder who has made demand as provided in this section to pay an amount the corporation estimates to be the fair value for such shares. If the corporate action has not been consummated before the expiration of the 90-day period after the shareholders' authorization date, the offer may be made conditional upon the consummation of such action. Such notice and offer shall be accompanied by:

(a) A balance sheet of the corporation, the shares of which the dissenting shareholder holds, as of the latest available date and not more than 12 months prior to the making of such offer; and

(b) A profit and loss statement of such corporation for the 12-month period ended on the date of such balance sheet or, if the corporation was not in existence throughout such 12-month period, for the portion thereof during which it was in existence.

(6) If within 30 days after the making of such offer any shareholder accepts the same, payment for his or her shares shall be made within 90 days after the making of such offer or the consummation of the proposed action, whichever is later. Upon payment of the agreed value, the dissenting shareholder shall cease to have any interest in such shares.

(7) If the corporation fails to make such offer within the period specified therefor in subsection (5) or if it makes the offer and any dissenting shareholder or shareholders fail to accept the same within the period of 30 days thereafter, then the corporation, within 30 days after receipt of written demand from any dissenting shareholder given within 60 days after the date on which such corporate action was effected, shall, or at its election at any time within such period of 60 days may, file an action in any court of competent jurisdiction in the county in this state where the registered office of the corporation is located requesting that the fair value of such shares be determined. The court shall also determine whether each dissenting shareholder, as to whom the corporation requests the court to make such determination, is entitled to receive payment for his or her shares. If the corporation fails to institute the proceeding as herein provided, any dissenting shareholder may do so in the name of the corporation. All dissenting shareholders (whether or not residents of this state), other than shareholders who have agreed with the corporation as to the value of their shares, shall be made parties to the proceeding as an action against their shares. The corporation shall serve a copy of the initial pleading in such proceeding upon each dissenting shareholder who is a resident of this state in the manner provided by law for the service of a summons and complaint and upon each nonresident dissenting shareholder either by registered or certified mail and publication or in such other manner as is permitted by law. The jurisdiction of the court is plenary and exclusive. All shareholders who are proper parties to the proceeding are entitled to judgment against the corporation for the amount of the fair value of their shares. The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have such power and authority as is specified in the order of their appointment or an amendment thereof. The corporation shall pay each dissenting shareholder the amount found to be due him or her within 10 days after final determination of the proceedings. Upon payment of the judgment, the dissenting shareholder shall cease to have any interest in such shares.

(8) The judgment may, at the discretion of the court, include a fair rate of interest, to be determined by the court.

(9) The costs and expenses of any such proceeding shall be determined by the court and shall be assessed against the corporation, but all or any part of such costs and expenses may be apportioned and assessed as the court deems equitable against any or all of the dissenting shareholders who are parties to the proceeding, to whom the corporation has made an offer to pay for the shares, if the court finds that the action of such shareholders in failing to accept such offer was arbitrary, vexatious, or not in good faith. Such expenses shall include reasonable compensation for, and reasonable expenses of, the appraisers, but shall exclude the fees and expenses of counsel for, and experts employed by, any party. If the fair value of the shares, as determined, materially exceeds the amount which the corporation offered to pay therefor or if no offer was made, the court in its discretion may award to any shareholder who is a party to the proceeding such sum as the court determines to be reasonable compensation to any attorney or expert employed by the shareholder in the proceeding.

(10) Shares acquired by a corporation pursuant to payment of the agreed value thereof or pursuant to payment of the judgment entered therefor, as provided in this section, may be held

and disposed of by such corporation as authorized but unissued shares of the corporation, except that, in the case of a merger, they may be held and disposed of as the plan of merger otherwise provides. The shares of the surviving corporation into which the shares of such dissenting shareholders would have been converted had they assented to the merger shall have the status of authorized but unissued shares of the surviving corporation.

# EXHIBIT 4

## (TO DECLARATION OF GREGORY K. CINNAMON)

## EMPLOYEE AGREEMENT

This **EMPLOYEE AGREEMENT** (this "Agreement") is entered into as of this 12th day of August, 2002, between Naviant, Inc., a Florida corporation (the "Company"), and Michael Brauser ("Employee" and, with the Company, collectively, the "Parties" and each, individually, a "Party").

WHEREAS, Employee has been employed with the Company pursuant to that certain employment agreement between Employee and the Company dated as November 26, 2001 (the "Employment Agreement");

WHEREAS, the Company is currently contemplating a transaction whereby Armagh Acquisition Corporation ("Merger Sub"), a wholly owned subsidiary of Equifax Inc. ("Equifax") will be merged with and into the Company (the "Merger"), pursuant to an Agreement and Plan of Merger among the Company, Merger Sub and Equifax (the "Merger Agreement"); and

WHEREAS, in consideration of the consummation of the Merger and the covenants set forth herein, Employee and the Company have mutually agreed to terminate the Employment Agreement and wish to memorialize the terms of that termination in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, and the mutual promises, covenants and agreements made herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Effectiveness**.  This Agreement, and all terms and provisions contained herein, are expressly conditioned upon the closing of the transactions contemplated by the Merger Agreement, including, without limitation, the effectiveness of the Merger.  In the event that the Merger Agreement does not close by August 31 , 2002, the parties agree that this Agreement shall be null and have no effect, and the Employment Agreement shall continue in full force and effect up to such date and thereafter in accordance with its terms.  Employee also acknowledges that he has twenty-one (21) days following his receipt of this Employee Agreement to review and consider it. Employee is advised to consult with an attorney before entering into this Employee Agreement.  If Employee decides to accept this Employee Agreement, he must deliver a signed copy of the Employee Agreement to Gregory K. Cinnamon, counsel to Equifax by the close of business on the twenty-first day after Employee receives this Employee Agreement, together with a signed acknowledgment in the form of Exhibit A hereto.  Furthermore, Employee may revoke this Agreement within seven (7) calendar days after signing it.  To be effective, such revocation must be delivered in writing to Gregory K. Cinnamon, counsel to Equifax, before the expiration of this seven-day period.  (Delivery shall be presumed as of the date sent if such notice is sent by facsimile to (404) 541-3157 and Employee can produce confirmation of such transmission.)  This Agreement

1

{MI829478;1}

shall become effective upon the expiration of the seven-day revocation period without timely delivery of a revocation notice (the "Effective Date"). Employee agrees that upon request he will, at any time following the expiration of such seven-day revocation period sign and return the Statement of Non-Revocation attached hereto as Exhibit B (which shall be incorporated fully herein by reference) confirming such non-revocation.

2.     **Termination of Employment Agreement**. At the effective time of the Merger or the Effective Date, whichever is later, the Employment Agreement shall terminate and, except as otherwise provided in this Paragraph 2, all rights and obligations of Employee to receive any compensation or benefit of any kind from the Company, Merger Sub, Equifax or any individual or entity that is an affiliate of the foregoing under the Employment Agreement shall terminate as of such date, provided, however, that the provisions set forth in Sections 7 and 9 relating to noncompetition, nonsolicitation and nondisclosure of confidential information (collectively, the "Restrictive Covenants"), as well as any covenants relating to non-disparagement of the Company or the assignment of inventions, discoveries, intellectual property rights and other materials produced by Employee to the Company during or in connection with his employment shall continue in full force and effect notwithstanding such termination. Notwithstanding the foregoing, Employee's employment shall continue with the Company following the Merger and Employee shall continue to be paid the same salary and be subject to the same commission schedule at the same annual rate as in effect immediately before the termination of the Employment Agreement but on an "at will" basis, and subject to the Company's right to modify such salary or commission schedule from time to time in its discretion.   Solely for purposes of determining the term of any Restrictive Covenant, Employee's term of employment (howsoever denominated in the Employment Agreement) will be deemed to continue until the termination for any reason of Employee's at-will employment relationship with the Company.   In addition, Employee's health, dental, life and disability insurance in effect at the time of the termination of the Employment Agreement will be continued without interruption in accordance with the terms of such plans and subject to the right of the Company to modify or terminate such plans at any time.  Employee acknowledges and agrees that as a condition of his or her continued employment by Company following the Merger, Employee must execute and deliver an Employee Confidentiality, Non-Solicitation and Assignment Agreement in favor of Equifax and its affiliates, in the form attached hereto as Exhibit D.  For the avoidance of doubt, it is expressly agreed that the term "Equifax" as used in such agreement shall include the Company and its subsidiaries both before and after the Merger, and that the terms "Trade Secrets" and "Confidential Information" as used therein include any knowledge, information, data, methods or plans of Company otherwise satisfying the definitions of such terms in such agreement received or developed by Employee during his employment by the Company (or any predecessor), including prior to the Merger.

3.     **Termination of Options; Consideration**.  Employee currently holds options to acquire shares of the common stock of the Company as more fully described on Exhibit C hereto (the "Options").  Employee represents and warrants to the Company that the number of Options to

2

purchase shares of the Company's stock, which number constitutes all of the Employee's unexercised Options, is correctly stated on Exhibit C and that except for such Options he has no option, claim or right to receive or subscribe for additional shares or other equity interests in the Company or any security or right convertible into additional shares or other equity interests in the Company. In consideration of Employee's agreement to terminate the Employment Agreement and to grant the releases in Paragraph 5 hereof, the Board of Directors of the Company shall waive the exercise price that would be payable to the Company if Employee exercised the Options, or that would be payable to the Company under the terms of the Merger Agreement as a reduction of the consideration payable to Employee for the cancellation of the Options, as described below. Employee agrees and acknowledges that each Option shall vest in full and be exercisable immediately prior to the Merger, and at the effective time of the Merger, to the extent not exercised, each Option shall be cancelled in exchange for the right to receive cash in an amount equal to $8.79 (the "Cash Option Consideration") and $1.32 (the "Conditional Option Consideration"), in each case minus withholding taxes. To the extent necessary, this Agreement shall constitute an amendment of the outstanding Options and the Employee hereby agrees and consents to such amendment. The Cash Option Consideration shall be paid to Employee as soon as possible following the closing date of the Merger or the Effective Date, whichever is later. Employee acknowledges and agrees that, notwithstanding any contrary provision of the Merger Agreement, Employee's right to receive the Cash Option Consideration and the Conditional Option Consideration is conditioned on and subject to this Agreement having become effective and that if this Agreement does not become effective, such consideration shall be refunded to Equifax free and clear of any claim of Employee. Employee understands and acknowledges that the Conditional Option Consideration is part of an escrow fund (the "Escrow Fund") set aside to satisfy potential claims against and liabilities of the Company, Equifax and Merger Sub for a minimum of two (2) years following the closing of the Merger. Following the satisfaction of any such claims, the Escrow Fund may be depleted in its entirety or impaired to such an extent that it contains insufficient funds to pay Employee any portion of or all of the Conditional Option Consideration. Employee hereby acknowledges that he shall have no right (a) to demand the Conditional Option Consideration, (b) to influence the payment of amounts from the Escrow Fund or (c) to influence whether or not any such consideration shall be paid, and if so, how much shall be paid. Upon payment of the Cash Option Consideration (less applicable withholding taxes), Employee shall cease to have any right or entitlement to acquire any capital stock or other securities of the Company, Merger Sub or Equifax.

4.     **Shareholders' Representative.**

a) In order to efficiently administer the transactions contemplated by the Merger Agreement, the shareholders of the Company will designate a representative (the "Shareholders' Representative"), and Employee acknowledges such appointment as his representative as well with respect to certain provisions of the Merger Agreement which affect him. The Shareholders' Representative will (i) make all decisions affecting and relating to the determination of the Conditional Option

3

{MI829478;1}

Consideration, (ii) take all action necessary in connection with the waiver of any condition to the obligations of Company to consummate the transactions contemplated by the Merger Agreement, or the defense or settlement of any claims for indemnification under the Merger Agreement, (iii) give and receive all notices required to be given under the Merger Agreement, and (iv) take any and all additional action as is contemplated to be taken by or on behalf of Employee by the terms of this Agreement and the Merger Agreement.

b) In the event that the Shareholders' Representative dies, becomes unable to perform his or her responsibilities or resigns from such position, Employee understands and agrees that the shareholders of the Company holding, prior to the closing of the Merger Agreement, a majority of the outstanding shares of the Company's capital stock (on an as-converted basis) are authorized to and shall select another representative to fill such vacancy, such substituted representative shall be deemed to be the Shareholders' Representative for all purposes of this Agreement and the Merger Agreement, and Employee shall have no say in the appointment of a substitute Shareholders' Representative.

c) All decisions and actions by the Shareholders' Representative shall be binding upon the Employee, and Employee shall not have the right to object, dissent, protest or otherwise contest the same.

d) The Shareholders' Representative shall not have any liability to Employee for any act done or omitted hereunder as Shareholders' Representative while acting in good faith and in the exercise of reasonable judgment, and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith.

e) Employee agrees, in addition to the foregoing, that:

   i. Equifax shall be entitled to rely conclusively on the instructions and decisions of the Shareholders' Representative and Employee shall not have any cause of action against Equifax for any action taken by Equifax in reliance upon the instructions or decisions of the Shareholders' Representative;

   ii. all actions, decisions and instructions of the Shareholders' Representative shall be conclusive and binding upon Employee, and Employee shall not have any cause of action against the Shareholders' Representative for any action taken, decision made or instruction given by the Shareholders' Representative under this Agreement, except for fraud or willful misconduct by the Shareholders' Representative;

4

    iii.  the provisions of this Paragraph 4 are independent and severable, are irrevocable and coupled with an interest and shall be enforceable notwithstanding any rights or remedies that Employee may have in connection with the transactions contemplated by this Agreement;

    iv.  remedies available at law for any breach of the provisions of this Paragraph 4 are inadequate; therefore, Equifax shall be entitled to temporary and permanent injunctive relief without the necessity of proving damages if Equifax brings an action to enforce the provisions of this Paragraph 4; and

    v.  the provisions of this Paragraph 4 shall be binding upon the executors, heirs, legal representatives, personal representatives, successor trustees and successors of Employee, and any references in this Agreement to Employee shall mean and include the successors to Employee's rights hereunder, whether pursuant to testamentary disposition, the laws of descent and distribution or otherwise.

    5.    **Release by Employee.**  Employee, on his own behalf and for his heirs, legal representatives, agents, attorneys, personal representatives, successors and assigns expressly releases and covenants not to sue the Company, Merger Sub, Equifax, and any of their current, future and former affiliates and the direct and indirect owners, members, directors, officers, shareholders, employees, agents, successors, assigns, attorneys and accountants of any of them and such affiliates (collectively, the "Releasees") and their respective heirs and legal representatives, with respect to any and all rights, claims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, executions, liens, demands, damages, obligations, liabilities, losses, expenses, complaints, charges, costs (including attorneys' fees and legal expenses), actions or causes of action of any nature whatsoever arising at law or in equity, which Employee may have had, may now have or may have or claim to have in the future, both known and unknown, against the Releasees, from the beginning of the world to the date of execution of this Agreement, arising out of, or relating to any matter, act, omission, cause or event that has occurred up to the present date, including, without limitation, any claim for compensation or severance pay under Employee's Employment Agreement, but excluding obligations hereunder, any rights in respect of unpaid compensation or benefits accrued through the date hereof and reflected in the Closing Balance Sheet (as defined in the Merger Agreement).

    (a)    This release specifically includes, but is not limited to all claims arising from or relating in any way to Employee's employment relationship with the Company through the date hereof or the termination of the Employment Agreement and change in Employee's status to an "at-will" employee, including any claims for loss or reduction of wages, medical or other benefits,

5

and those claims which could have been asserted against the Company under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 et seq.; the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq.; the Florida Civil Human Rights Act, Fla. Stat. Ann §§ 760.01 to 760.11; or under any other federal, state, or local laws relating to his employment;

(b)     In addition to the specific claims listed above, this release also includes any and all claims, whether known or unknown, which might have been asserted by Employee in any suit, claim, or charge of discrimination against the Releasees for or on account of any matter or thing whatsoever that has occurred up to and including the date of this Agreement; and

(c)     Employee expressly acknowledges that this release may be pled as a complete defense and will fully and finally bar any such known or unknown claim or claims based on any acts or omissions of the Releasees up to the present date.

The foregoing releases are given in exchange for compensation in excess of what Employee was entitled to at the time of the termination of the Employment Agreement.

6.     **Termination on Breach.**  Except as hereinafter provided, Employee agrees that the Company may at its option immediately terminate his eligibility for benefits under this Employee Agreement and immediately recover all benefits and monies previously .paid pursuant to this Employee Agreement in excess of $500.00, as well as recover actual damages, if Employee breaches the terms of this Employee Agreement.  Employee agrees to reimburse the Company or any other party released under this Employee Agreement for any costs, including attorneys' fees, incurred by them as a result of any breach of this Employee Agreement by Employee.  Employee understands and agrees that for the purposes of this paragraph only, the filing of an Age Discrimination in Employment Act (ADEA) charge or lawsuit shall not be considered a breach of this Employee Agreement.  Employee further understands and agrees, however, that the benefits paid to him under this Employee Agreement may serve as restitution, recoupment, or setoff in the event Employee prevails on the merits of an ADEA claim.

7.     **Confidentiality.**  Each of Employee and the Company agrees to hold and maintain in strictest confidence the terms and conditions of this Agreement, and agrees not to disclose the terms and conditions hereof to any individual, entity or group of any kind whatsoever, other than in confidence to their respective attorney or accountant, as needed by such individuals in connection with the services they are performing for such Party each of whom will be instructed to maintain the confidential nature of this Agreement.  Notwithstanding the above, the Company may disclose the

6

terms of this Agreement to the Company's shareholders if necessary or advisable with respect to obtaining shareholder approval of any of the payments provided for herein.

8. **Full and Knowing Waiver.**  By signing this Agreement, the Employee certifies that: (a) the Employee has carefully read and fully understands the provisions of this Agreement, and has had a reasonable opportunity to ask questions concerning this Agreement and to have received answers thereto; (b) the Employee was advised by the Company in writing, via this Agreement, to consult with an attorney before signing this Agreement; (c) the Company hereby allows the Employee a reasonable period of time (at least 21 days) from its initial presentation to him/her to consider this Agreement before signing it, should he/she so desire, or has waived such time period by executing the waiver attached hereto; and (d) the Employee agrees to its terms knowingly, voluntarily, and without intimidation, coercion or pressure.

9. **Entire Agreement; Waiver; Terms.**  This Agreement constitutes and contains the entire agreement of the parties with respect to the matters addressed herein and supersedes any and all prior negotiations, correspondence, understandings and agreements between the parties respecting the subject matter hereof, including, but not limited to, all other proposed or actual, if any, agreements and arrangements relating to the payment of any compensation to Employee with respect to any services performed, or to be performed on behalf of the Company. No waiver of any rights under this Agreement, nor any modification or amendment of this Agreement shall be effective or enforceable unless in writing and signed by the party to be charged therewith. When used in this Agreement, the terms "hereof," "herein" and "hereunder" refer to this Agreement in its entirety, including any exhibits or schedules attached to this Agreement, and not to any particular provisions of this Agreement, unless otherwise indicated. Equifax, its affiliates and the other Releasees are intended third party beneficiaries of the provisions of Paragraph 5 hereof.

10. **Counterparts.**  This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

11. **Governing Law, etc.**  This Agreement shall be governed by and construed in accordance with the laws of Florida without regard to choice of law provisions and the venue for all actions or proceedings brought by Employee arising out of or relating to this Agreement shall be in the state or federal courts, as the case may be, located in Palm Beach County, Florida (collectively, the "Courts"). Employee hereby irrevocably waives any objection which she now or hereafter may have to the laying of venue of any action or proceeding arising out of or relating to this Agreement brought in any of the Courts and any objection on the ground that any such action or proceeding in any of the Courts has been brought in an inconvenient forum.

12. **Severability.**  It is the intention of the parties hereto that any provision of this Agreement found to be invalid or unenforceable be reformed rather than eliminated. If any of the provisions of this Agreement, or any part thereof, is hereinafter construed to be invalid or

7

{MI829478;1}

unenforceable, the same shall not affect the remainder of such provision or the other provisions of this Agreement, which shall be given full effect, without regard to the invalid portions.  In the event that the courts of any one or more jurisdictions shall hold such provisions wholly or partially unenforceable by reason of the scope thereof or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's rights provided for herein in the courts of any other jurisdictions as to breaches or threatened breaches of such provisions in such other jurisdictions, the above provisions as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

13.    **Headings.**  The headings preceding the text of the paragraphs of this Agreement have been inserted solely for convenience of reference and neither constitute a part of this Agreement nor affect its meaning, interpretation, or effect.

*[Signatures on next page.]*

8

IN WITNESS WHEREOF, the parties have executed these presents as of the day and year first above written.   BY SIGNING BELOW, AND REGARDLESS OF WHETHER THIS AGREEMENT IS SUBSEQUENTLY REVOKED BY EMPLOYEE IN ACCORDANCE WITH ITS TERMS, EMPLOYEE ACKNOWLEDGES THAT HE HAS RECEIVED NOTICE OF THE PENDING CHANGE OF CONTROL OF THE COMPANY AS REQUIRED BY THE COMPANY'S 2002 STOCK OPTION/STOCK ISSUANCE PLAN AND THAT, IF EMPLOYEE REVOKES THIS AGREEMENT IN ACCORDANCE WITH ITS TERMS, UNLESS EMPLOYEE HAS OTHERWISE EXERCISED HIS OPTIONS PRIOR TO THE CONSUMMATION OF THE MERGER, ALL OF EMPLOYEE'S OPTIONS WILL BE CANCELLED WITHOUT FURTHER CONSIDERATION AS OF THE EFFECTIVE TIME OF THE MERGER PURSUANT TO THE TERMS OF SUCH STOCK OPTION PLAN.

**NAVIANT, INC.**

By: _____

Title: _____

_____
Michael Brauser

{M1829478;1}

**Exhibit A**

## WAIVER OF 21-DAY WAITING PERIOD

I, Michael Brauser, acknowledge that on ___8/12/02___, Naviant, Inc. ("Employer") gave me an Employee Agreement ("Agreement") and that I was advised to consult an attorney before I signed it and was further advised that I had at least twenty-one (21) days to consider the Agreement.

Although twenty-one (21) days have not passed, I have considered the Agreement, and [~~have consulted an attorney~~] [,although advised to, have decided not to have an attorney review the Agreement.] *Cross out and initial the phrase that does not apply.*

Therefore, I waive any remaining days of the twenty-one (21) day review period and request that the seven- (7) day revocation period, during which I may revoke my acceptance of the Agreement, begin. I UNDERSTAND THAT I MAY NOT WAIVE THE SEVEN (7) DAY REVOCATION PERIOD.

_____
Michael Brauser

_____
Date   8/12/02

10

**Exhibit B**

## STATEMENT OF NON-REVOCATION
## AS TO THE DATE SHOWN ON THIS FORM

By signing below, I, Michael Brauser, social security number 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, hereby verify that seven days have elapsed since I executed that certain Employee Agreement with Naviant, Inc., and that I did not revoke my agreement to execute the Employee Agreement. My signature confirms my renewed agreement to the terms of that Agreement, including the release and waiver of any and all claims relating to my former Employment Agreement.

_____

Michael Brauser

_____

8/19/02

Date

11

{MI829478;1}

**Exhibit C**

**Options**

578,573

12

**Exhibit D**

**Form of Employee Confidentiality, Non-Solicitation And Assignment Agreement**

13



**EQUIFAX**

**EMPLOYEE CONFIDENTIALITY,
NON-SOLICITATION AND
ASSIGNMENT AGREEMENT**

This Employee Confidentiality, Non-solicitation and Assignment Agreement (the "Agreement") is entered into on _____, by and between Equifax Inc. on behalf of itself, its subsidiary and/or affiliate companies (collectively "Equifax") and the undersigned Equifax employee (" Employee").

<span style="margin-left:5em">Date</span>

### Statement of Facts

The purpose of this Agreement is to obtain Employee's commitment to protect and preserve Equifax's business relationships, Trade Secrets and Confidential Information as defined below.

### Statement of Terms

1. **Employment Relationship** Employee acknowledges that (A) this Agreement is not an employment agreement, and (B) his or her employment with Equifax is not specified for any particular term. Employee will abide by Equifax's rules, regulations, policies and practices as revised from time to time by Equifax at its sole discretion.

2. **Agreement Not to Solicit Employees.** During the term of Employee's employment by Equifax and for a period of six (6) months following the termination of Employee's employment for any reason, Employee will not, either directly or indirectly, on his or her behalf or on behalf of others, solicit for employment or hire, or attempt to solicit for employment or hire, any Equifax employee with whom Employee had regular contact in the course of his or her employment or any Equifax employee at any facility where Employee performed services for Equifax.

3. **Trade Secrets and Confidential Information.**

    (a) All Trade Secrets (defined below) and Confidential Information (defined below), and all materials containing them, received or developed by Employee during the term of his or her employment are confidential to Equifax, and will remain Equifax's property exclusively. Except as necessary to perform Employee's duties for Equifax, Employee will hold all Trade Secrets and Confidential Information in strict confidence, and will not use, reproduce, disclose or otherwise distribute the Trade Secrets or Confidential Information, or any materials containing them, and will take those actions reasonably necessary to protect any Trade Secret or Confidential Information. Employee's obligation regarding Trade Secrets will continue indefinitely, while Employee's obligations regarding Confidential Information will cease two (2) years from the date of termination of Employee's employment with Equifax.

    (b) "Trade Secret" means information, including, but not limited to, technical or non-technical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential Equifax customers or suppliers which (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (B) is the subject of Equifax's efforts that are reasonable under the circumstances to maintain secrecy; or as otherwise defined by applicable state law.

    "Confidential Information" means any and all knowledge, information, data, methods or plans (other than Trade Secrets) which are now or at any time in the future developed, used or employed by Equifax which are treated as confidential by Equifax and not generally disclosed by Equifax to the public, and which relate to the business or financial affairs of Equifax, including, but not limited to, financial statements and information, marketing strategies, business development plans and product or process enhancement plans.

    (c) Employee acknowledges that Equifax is obligated under federal and state credit reporting and similar laws and regulations to hold in confidence and not disclose certain information regarding individuals, firms or corporations which is obtained or held by Equifax, and that Equifax is required to adopt reasonable procedures for protecting the confidentiality, accuracy, relevancy and proper utilization of consumer credit information. In that regard, except as necessary to perform Employee's duties for Equifax, Employee will hold in strict confidence, and will not use, reproduce, disclose or otherwise distribute any information which Equifax is required to hold confidential under applicable federal and state laws and regulations, including the federal Fair Credit reporting Act (15 U.S.C. § 1681 et. Seq.) and any state credit reporting statutes.

**EQUIFAX**

**EMPLOYEE CONFIDENTIALITY,
NON-SOLICITATION AND
ASSIGNMENT AGREEMENT**

(d)   Employee agrees that any unauthorized disclosure of confidential codes or system access instructions or file data, intentional alteration or destruction of data, or unauthorized access or updating of Employees own or any other file can lead to immediate dismissal and federal prosecution under the Fair Credit Reporting Act, the Counterfeit Access Device

and Computer Fraud and Abuse Act, or prosecution under other state and federal laws. Should Employee ever be approached by anyone to commit unauthorized or illegal acts or to disclose confidential materials or data, Employee will immediately report this directly to Equifax management.

(e) Except as set forth in a separate written agreement executed by an officer of Equifax, ownership of all programs, systems, inventions, discoveries, developments, modifications, procedures, ideas, innovations, know-how or designs developed by Employee relating to his or her employment with Equifax will be Equifax's property. Employee will cooperate in applying for patents or copyrights on those developments as Equifax requests, and assign those patents or copyrights to Equifax. The confidentiality requirements of the preceding paragraphs will apply to all of the above.

(f) At Equifax's request or on termination of Employee's employment with Equifax, Employee will deliver promptly to Equifax all Equifax property in his or her possession or control, including all Trade Secrets and Confidential Information and all materials containing them.

4. **Remedies**. Employee agrees that his or her promises in this Agreement are reasonable and necessary to protect and preserve the interests and assets of Equifax, and that Equifax will suffer irreparable harm if Employee breaches any of his or her promises. Therefore, in addition to all the remedies provided at law or in equity, Equifax will be entitled to a temporary restraining order and permanent injunctions to prevent a breach or contemplated breach of any of Employee's promises. While Employee will retain the absolute right to pursue any claim, demand, action or cause of action that he or she may have against Equifax, if not otherwise compromised or released, the existence of any claim, demand, action or cause of action by Employee against Equifax, if any, will not constitute a defense to the enforcement by Equifax of any of Employee's promises in this Agreement.

5. **Severability**. Each provision of this Agreement is separate and severable from the remaining provisions, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of any other provisions. Further, if any provision is ruled invalid or unenforceable by a court of competent jurisdiction because of a conflict between that provision and any applicable law or regulation, that provision will be curtailed only to the extent necessary to make it consistent with that law or regulation.

6. **Assignment**. Equifax may assign its rights and obligations under this Agreement. Employee may not assign his or her rights and obligations under this Agreement.

7. **Waiver**. Equifax's waiver of any breach of this Agreement will not be effective unless in writing, and will not be a waiver of the same or another breach on a subsequent occasion.

8. **Governing Law**. This Agreement will be governed and construed in accordance with the laws of the State of Georgia without reference to its conflicts of laws provisions.

9. **Entire Agreement**. This Agreement contains Employee's entire agreement with Equifax regarding the subject matter covered by this Agreement. No amendment or modification of this Agreement will be valid or binding on Equifax or Employee unless in writing signed by both parties. All prior understandings and agreements regarding the subject matter of this Agreement are terminated.

THIS AGREEMENT, AS A CONDITION OF EMPLOYEE'S EMPLOYMENT OR CONTINUED EMPLOYMENT WITH EQUIFAX, IMPOSES UPON EMPLOYEE CERTAIN CONFIDENTIALITY RESTRICTIONS WITH RESPECT TO TRADE SECRETS AND CONFIDENTIAL INFORMATION BELONGING TO EQUIFAX. BY SIGNING BELOW, EMPLOYEE ACKNOWLEDGES THAT HE OR SHE HAS READ AND UNDERSTANDS THIS AGREEMENT.

EMPLOYEE: _____     EQUIFAX

                        Signature                                  By: _____

Print Name: _____     Title: _____

Date: _____     Company/Department: _____

20S304R — 6·08 USA

## FIRST SUPPLEMENT TO EMPLOYEE AGREEMENT

This **FIRST SUPPLEMENT TO EMPLOYEE AGREEMENT** (this "Supplement") is entered into as of this ⎩ day of August, 2002, between Naviant, Inc., a Florida corporation (the "Company"), and the undersigned ("Employee").

1. This Supplement is intended to supplement the terms of the Employee Agreement between the undersigned and the Company dated August 12, 2002 (the "Employee Agreement").

2. The undersigned understands and acknowledges that the Conditional Option Consideration is part of an escrow fund (the "Escrow Fund") set aside to satisfy potential claims against and liabilities of the Company, Equifax and Merger Sub for a minimum of two (2) years following the closing of the Merger. In addition, the undersigned hereby acknowledges that there are certain other obligations due by the Company and payable in connection with the Company's acquisition of certain assets of Sweepsclub.com, Inc. (the "Sweepsclub Payments") that shall also be paid out of the Conditional Option Consideration. Following the satisfaction of such claims and the making of such Sweepsclub Payments, the Escrow Fund may be depleted in its entirety or impaired to such an extent that it contains insufficient funds to pay the undersigned any portion of or, all of the Conditional Option Consideration. The undersigned hereby acknowledges that he shall have no right (a) to demand the Conditional Option Consideration, (b) to influence the payment of amounts from the Escrow Fund, (c) to influence the amount of Sweepsclub Payments, or (d) to influence whether or not any such consideration shall be paid, and if so, how much shall be paid.

3. Except as expressly provided herein, the Employee Agreement shall continue unmodified and shall remain in full force and effect. All capitalized terms not defined herein shall have the meanings ascribed to them in the Employee Agreement. This Supplement may be executed simultaneously in two (2) or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. This Supplement shall be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

**NAVIANT, INC.**

By:
Title:

Employee Name: *Michael Brauser*

# EXHIBIT 5

## (TO DECLARATION OF GREGORY K. CINNAMON)

## EXCHANGE AGREEMENT

    **THIS EXCHANGE AGREEMENT** is entered into as of August 15, 2002, by and among **EQUIFAX INC.**, a corporation incorporated under the laws of the State of Georgia ("**EFX**"), **SUNTRUST BANK**, a banking corporation incorporated under the laws of the State of Georgia ("**Exchange Agent**") and **SOFTBANK CAPITAL PARTNERS LP**, a limited partnership organized under the laws of the State of Delaware, as representative (the "**Shareholders' Representative**") of the Company Shareholders (as defined in the Merger Agreement, as defined below) and Former Option Holders (as defined in the Merger Agreement, as defined below) of Naviant, Inc. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Merger Agreement (as defined herein).

## W I T N E S S E T H :

    **WHEREAS**, pursuant to the Agreement and Plan of Merger, dated as of August 14, 2002 (the "**Merger Agreement**"), by and among EFX, Armagh Acquisition Corporation, a Florida corporation and a direct wholly owned subsidiary of EFX ("**Merger Sub**"), Naviant, Inc., a Florida corporation formerly known as eDirect, Inc. ("**Company**"), and the Shareholders' Representative, a copy of which is attached hereto as **Exhibit A**, Merger Sub will be merged with and into Company (the "**Merger**") and Company will become a wholly owned subsidiary of EFX; and

    **WHEREAS**, EFX has entered into an Escrow Agreement, dated as of August 15, 2002 (the "**Escrow Agreement**"), by and among EFX, the Shareholders' Representative, and **SUNTRUST BANK**, a Georgia banking corporation, as Escrow Agent (the "**Escrow Agent**"), a copy of which is attached hereto as **Exhibit B**, pursuant to which, among other things, the Escrow Agent will hold $10,000,000 (the "**Escrowed Amount**") for purposes of securing the indemnification obligations of the Company Shareholders and Former Option Holders set forth in the Merger Agreement and $100,000 (the "**Shareholders' Representative Fund**") to be used by the Shareholders' Representative to defend the Escrow Fund against claims by the Indemnitees, and will distribute portions of the Escrow Fund and the Shareholders' Representative Fund from time to time; and

    **WHEREAS**, as set forth in **Paragraph 4.9** of the Merger Agreement, by their approval of the Merger Agreement and the Merger, the Company Shareholders have authorized the Shareholders' Representative to act as their representative under this Exchange Agreement, the Escrow Agreement and the Merger Agreement with the powers and authority provided herein and therein; and

    **WHEREAS,** the Former Option Holders have in writing authorized the Shareholders' Representative to act as their representative under this Exchange Agreement, the Escrow Agreement and the Merger Agreement with the powers and authority provided herein and therein; and

    **WHEREAS**, pursuant to the Merger, all Company Shares (other than Dissenting Shares) shall, by virtue of the Merger and without any action on the part of the Merger Sub, EFX,

Company or the Company Shareholders, be cancelled and converted into the right to receive the consideration referred to in the Final Allocation Schedule; and

WHEREAS, pursuant to the Merger, all Company Options that are outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the Merger Sub, Company, the Company Shareholders or the Former Option Holders, be cancelled and converted into the right to receive the consideration referred to in the Final Allocation Schedule; and

WHEREAS, pursuant to the terms of this Agreement, the Exchange Agent, on behalf of the Shareholders' Representative, is willing to facilitate payments of the Exchange Fund to be made to the Company Shareholders and Former Option Holders and certain other Persons in accordance with the Merger Agreement; and

WHEREAS, the Shareholders' Representative desires that the Exchange Agent act as "Exchange Agent" and the Exchange Agent has indicated its willingness to do so;

NOW, THEREFORE, in consideration of the premises and the mutual promises, covenants and agreements contained herein and in the Merger Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties' hereto, intending to be legally bound, agree as follows:

Section 1.    **Appointment of Exchange Agent**.  The Shareholders' Representative hereby confirms the appointment of SunTrust Bank as Exchange Agent, and SunTrust Bank hereby agrees to serve as Exchange Agent, upon the terms and conditions set forth herein.

Section 2.    **Merger Consideration Schedule**. Attachment A hereto (the "**Merger Consideration Schedule**") sets forth (i) the name, address and tax identification number or social security number of each (x) Company Shareholder (other than the holders of Dissenting Shares) and (y) Former Option Holder (collectively, the "**Company Equity Holders**", and individually, a "**Company Equity Holder**"), (ii) the number of Company Shares or Company Options, as the case may be, held of record by each Company Equity Holder as of the Effective Time, (iii) the amount of cash payable to each Company Equity Holder at the Closing ("**Closing Merger Consideration**"), and (iv) each Company Equity Holder's Pro Rata Share.

Section 3.    **Deposit by EFX or Merger Sub**.  As of the date hereof, EFX or the Merger Sub shall have deposited with the Exchange Agent the sum of $121,274,000.00 (the "**Exchange Fund**") for distribution in accordance with the provisions of Section 5 hereof.  Upon receipt of the Exchange Fund, the Exchange Agent shall deliver to EFX and the Shareholders' Representative an acknowledgment of receipt of the Exchange Fund and shall hold the Exchange Fund and all interest earned thereon, if any, pursuant to the terms of this Exchange Agreement.

Section 4.    **Transmittal Letter**.  To the extent not provided by EFX to any Company Equity Holder prior to the Effective Time, as soon as practicable after the effectiveness of the Merger, the Exchange Agent will provide to each Company Equity Holder (i) a letter of transmittal, substantially in the form attached hereto as **Attachment B** (the "**Transmittal Letter**"), and (ii) instructions for use in effecting the surrender of a certificate or certificates or other securities documentation which immediately prior to the Effective Time represented a

2

share or shares of Company Shares (the "<u>Certificates</u>") or, in the case of Company Equity Holders holding Company Options, a duly authenticated copy of the executed relevant "Employee Agreement" relating to the cancellation and termination of stock option grants to such Company Equity Holder (the "<u>Option Notices</u>"), in each case in exchange for payments of the Merger Consideration payable to such Company Equity Holder.

      **Section 5.**    **<u>Disbursements from the Exchange Fund</u>.**

      (a)    ***Payments to Company Equity Holders***.  Upon the receipt by the Exchange Agent of (i)(A) the Certificate(s) in the case of a Company Shareholder, and (B) Option Notice(s) (collectively referred to as the "<u>Securities Documentation</u>"), (ii) properly completed and executed Transmittal Letter from each Company Equity Holder, (iii) a Form W-9 (or a Form W-8 in the case of non-U.S. persons) properly completed and signed by a Company Equity Holder, and (iv) such other documents as may be reasonably required by the Exchange Agent (each such Company Equity Holder who has delivered all of the applicable documents being a "<u>Documented Company Equity Holder</u>"), the Exchange Agent will pay to such Documented Company Equity Holder from the Exchange Fund the amount of cash set forth in accordance with the Merger Consideration Schedule, subject to any withholding pursuant to either Section 13 hereof or Paragraphs 4.3(b) or 4.15 of the Merger Agreement. Subject to Section 20 hereof, the Exchange Agent shall reserve for future payment to each Company Equity Holder that has not submitted completed Securities Documentation and a Transmittal Letter (each, an "<u>Undocumented Company Equity Holder</u>") the amounts payable to such Company Equity Holder in accordance with the Merger Consideration Schedule.

      (b)    ***Payments to Other Persons***.  The Exchange Agent shall, as soon as reasonably practicable after receipt of written authorization signed by each of EFX and the Shareholders' Representative after the Effective Time, make the disbursements from the Exchange Funds set forth on **Attachment C** hereto (the "<u>Other Disbursements Schedule</u>").

      (c)    ***Wire Transfer Agreement***.  It shall be a condition to the Exchange Agent's obligation to disburse any funds to a Person entitled to receive amounts from the Exchange Fund via wire transfer, that such recipient execute and deliver an Agreement Regarding Request for Wire Transfers in substantially the form attached hereto as **Attachment D** (a "<u>Wire Transfer Agreement</u>").

      **Section 6.**    **<u>Discrepancies</u>.** The Exchange Agent will use its reasonable best efforts to reconcile any discrepancies between the number of Company Shares which any Transmittal Letter may indicate are owned by a surrendering Company Equity Holder and the number of Company Shares that the Merger Consideration Schedule indicates was owned by the Company Equity Holder immediately prior to the Effective Time. In any instance where the Exchange Agent cannot reconcile such discrepancies, the Exchange Agent will promptly consult with the Shareholders' Representative and EFX for instructions as to the number of Company Shares, if any, the Exchange Agent is authorized to accept for payment and shall act only in accordance with the joint written instructions of the Shareholders' Representative and EFX regarding resolution of such discrepancy. In the absence of such joint instructions, the Exchange Agent is instructed not to make any payment.

**Section 7.**   **Processing Transmittal Letter**.  The Exchange Agent will examine the Transmittal Letters and Securities Documentation delivered or mailed to the Exchange Agent to ascertain whether they have been completed and executed in accordance with the instructions set forth in the Transmittal Letter and are in proper form for surrender.  In the event any Transmittal Letter has not been properly completed or executed, or the Securities Documentation is not in proper form for surrender or there is some other irregularity in connection with the surrender, the Exchange Agent will use its reasonable best efforts to cause such irregularity to be corrected.  In instances where any such irregularity is neither corrected nor waived, the Exchange Agent shall first consult promptly with the Shareholders' Representative and EFX to reconcile any issue of improper form or irregularity and shall act in accordance with the joint written instructions of the Shareholders' Representative and EFX regarding resolution of such issue.  If no joint instructions are received from the Shareholders' Representative and EFX within ten (10) days of notice by the Exchange Agent to such parties, the Exchange Agent shall, as soon as practicable, return to the surrendering Company Equity Holder (by first class mail under a blanket surety bond or insurance protecting the Exchange Agent and Company Equity Holder or by registered mail insured separately for replacement value, as the Exchange Agent in its sole discretion determines) any Securities Documentation in connection therewith, whether with the Transmittal Letters and any other documents relating thereto and a letter of notice explaining the reasons for the return of the Securities Documentation and other documents.                                               .

**Section 8.**   **Date and Time Stamp**.  The Exchange Agent shall date and time stamp each document received by it under this Exchange Agreement.

**Section 9.**   **Payment or Delivery to Person Other Than Registered Holder**.  If any portion of the Exchange Fund is to be delivered to a person other than the person in whose name the Securities Documentation surrendered in exchange therefor is registered, it shall be a condition to the delivery of such portion of the Exchange Fund that (i) the Securities Documentation so surrendered shall be transferable, and shall be properly assigned, endorsed or accompanied by appropriate stock powers, (ii) such transfer shall otherwise be proper and (iii) the person requesting such transfer shall pay to the Exchange Agent any transfer or other taxes payable by reason of the foregoing or establish to the satisfaction of the Exchange Agent that such taxes have been paid or are not required to be paid.  Notwithstanding the foregoing, neither the Exchange Agent nor any other party hereto shall be liable to a Company Equity Holder for any portion of the Exchange Fund payable to such holder pursuant to the Final Allocation Schedule that is delivered by the Exchange Agent to a public official pursuant to applicable abandoned property, escheat or similar laws.

**Section 10.**   **Lost Securities Documentation**.  If any Company Equity Holder reports to the Exchange Agent that his, her or its failure to surrender the Securities Documentation registered in his, her or its name immediately prior to the Effective Time according to the Merger Consideration Schedule is due to the loss, theft or destruction of the Securities Documentation, such Company Equity Holder shall furnish an affidavit for such lost, stolen or destroyed Securities Documentation in a form acceptable to the Exchange Agent and EFX.  The Exchange Agent will, as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed Securities Documentation to deliver to the Exchange Agent a bond for the benefit of the Exchange Agent and EFX in such sum as the Exchange Agent or EFX may reasonably direct as indemnity against any claim that may be made against the Exchange Agent and/or EFX with

4

respect to the Securities Documentation alleged to have been lost, stolen or destroyed, and upon receipt of any such affidavit (and bond), the Exchange Agent may effect payment to the Company Equity Holder pursuant to Section 5(a) above as though he, she or it had surrendered his, her or its Securities Documentation without any liability to the Exchange Agent.

Section 11.    **Cancellation of Securities Documentation Relating to Certificates**. Upon the Exchange Agent's payment to a Company Equity Holder of the portion of the Exchange Fund attributable to the Securities Documentation pursuant to the Merger Consideration Schedule, the Securities Documentation relating to any Certificate surrendered by such Company Equity Holder will be physically cancelled by the Exchange Agent and delivered to EFX.

Section 12.    **Exchange Reports**. The Exchange Agent will forward to EFX and the Shareholders' Representative reports of the Securities Documentation surrendered and the aggregate amount of cash paid as may be requested by Shareholders' Representative and EFX from time to time.

Section 13.    **Tax Reporting**. On or before January 31, 2003 and January 31, 2004, as applicable, the Exchange Agent will prepare and mail to each Company Equity Holder who has received or is entitled to receive upon delivery of properly executed Securities Documentation disbursements from the Exchange Fund during the preceding calendar year, other than Company Shareholders who demonstrate their status as nonresident aliens in accordance with United States Treasury Regulations, a Form 1099-B in accordance with Treasury Regulations. The Exchange Agent will also prepare and file copies of such Form 1099-B by magnetic tape with the Internal Revenue Service, in accordance with Treasury Regulations. If the Exchange Agent has not received notice from the surrendering Company Equity Holder of that Company Equity Holder's certified Taxpayer Identification Number, the Exchange Agent shall deduct and withhold backup withholding tax from any cash payment pursuant to Treasury Regulations. In the event that any issue arises regarding federal income tax reporting or withholding, the Exchange Agent will take such action as EFX and the Shareholders' Representative jointly instruct the Exchange Agent in writing. The Shareholders' Representative and EFX jointly may modify or supplement the federal tax reporting instructions to the Exchange Agent at any time by notice in writing and the Exchange Agent shall comply with such modified or supplemented instructions.

Section 14.    **Dissenting Shareholders**. As promptly as practicable after the Effective Time, EFX will cause Company to provide the Exchange Agent with a list of the names of all holders of Dissenting Shares ("**Dissenting Shareholders**"), if any, and the number of Dissenting Shares with respect to which dissenters rights have been perfected. No payment will be made with respect to any Dissenting Shares owned of record by a Company Shareholder perfecting appraisal rights under Florida law. EFX will cause Company to notify the Exchange Agent promptly in writing of the receipt of any certificates from a Dissenting Shareholder, forward such Certificates to EFX, and provide such further information about the Certificates surrendered by a Dissenting Shareholder and the documents accompanying such surrender as EFX may reasonably request. The Exchange Agent shall, upon the receipt of Certificates from a Dissenting Shareholder, forward such Certificates to EFX. To the extent the Exchange Fund includes monies payable in respect of Dissenting Shares, the Exchange Agent shall pay to EFX

the portion of the Exchange Fund held by or at any time received by the Exchange Agent allocable to such Dissenting Shares.

Section 15.   **Interest.**   No interest shall be paid to any Company Equity Holder in respect of any amounts payable to any such Company Equity Holder.

Section 16.   **Actions of the Exchange Agent.**   The Exchange Agent:

(a)   shall perform its duties and obligations hereunder in accordance with the terms and conditions hereof and shall have no duties or obligations other than those specifically set forth herein or as may subsequently be requested of the Exchange Agent by the Shareholders' Representative with respect to the Merger;

(b)   may rely on and shall be held harmless by the Shareholders' Representative and EFX in acting in good faith upon any certificate, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and reasonably believed by it to be genuine and to have been signed by the proper party or parties, but the Exchange Agent shall not be held harmless for its gross negligence, bad faith or willful misconduct;

(c)   may rely on and shall be held harmless in acting upon written instructions from Shareholders' Representative and EFX with respect to any matter relating to its acting as Exchange Agent specifically covered by this Agreement; and

(d)   may consult with counsel satisfactory to it (including counsel for Shareholders' Representative or EFX) and shall be held harmless in relying in good faith on the written advice or opinion of such counsel in respect of any action taken, suffered or omitted by it hereunder and in accordance with such advice or opinion of such counsel.

Section 17.   **Compensation of the Exchange Agent by the Shareholders' Representative.**   The Shareholders' Representative shall pay fees for the services rendered hereunder, as set forth in **Attachment E** attached hereto from the Shareholders' Representative Fund.   The Exchange Agent shall also be entitled to reimbursement from the Shareholders' Representative out of the Shareholders' Representative Fund for all reasonable and necessary expenses paid or incurred by it in connection with the administration by the Exchange Agent of its duties hereunder.

Section 18.   **Indemnification.**   The Shareholders' Representative and EFX covenants and agrees to indemnify and to hold the Exchange Agent harmless against any costs, expenses (including reasonable fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Exchange Agent pursuant hereto; provided, that such covenant and agreement does not extend to, and the Exchange Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Exchange Agent as a result of, or arising out of, its gross negligence, bad faith or willful misconduct.   Promptly after the receipt by the Exchange Agent of notice of any demand or claim or the commencement of any action, suit, proceeding or investigation, the Exchange Agent shall, if a claim in respect thereof is to be made against the Shareholders' Representative or EFX,

6

notify the Shareholders' Representative and EFX thereof in writing. The Shareholders' Representative and EFX shall be entitled to participate at its own expense in the defense of any such claim or proceeding, and, if it so elects at any time after receipt of such notice, it may assume the defense of any suit brought to enforce any such claim or of any other legal action or proceeding. In the event of such assumption, the Shareholders' Representative shall not be liable for any fees and expenses of counsel thereafter incurred by the Exchange Agent. For the purposes of this Section 18, the term "expense or loss" means any amount paid or payable to satisfy any claim, demand, action, suit or proceeding settled with the express written consent of the Exchange Agent, and all reasonable costs and expenses, including, but not limited to, reasonable counsel fees and disbursements, paid or incurred in investigating or defending against any such claim, demand, action, suit, proceeding or investigation.

**Section 19.    Investment of Exchange Fund**. The Exchange Agent agrees to maintain the undistributed portion of the Exchange Fund in either the STI Classic U.S. Treasury Securities Money Market Fund or Classic Institutional U.S. Treasury Securities Money Market Fund. The Exchange Agent shall pay to EFX any interest and other earnings on the Exchange Fund upon the termination of said funds pursuant to Section 20. The parties acknowledge that the Exchange Agent shall not be responsible for any diminution in the Exchange Fund due to losses resulting from investments. The Exchange Agent may use its own bond department in executing, purchases and sales of permissible investments.

**Section 21.    Termination of Exchange Fund**. The Exchange Agent shall deliver to EFX upon demand any portion of the Exchange Fund (including interest and other earnings thereon) which remains undistributed to Undocumented Company Equity Holders six (6) months after the Closing Date (the "**Exchange Period**"), and any Undocumented Company Equity Holder that has not previously complied with the provisions of Section 4 shall thereafter look only to EFX, as a general unsecured creditor, for payment of its portion of the Exchange Fund. Notwithstanding the foregoing, EFX may, at its election and with the consent of the Exchange Agent, which consent shall not be unreasonably withheld or delayed, extend the Exchange Period (the "**Extended Exchange Period**"), in which event, EFX shall provide prompt written notice thereof to the Shareholders' Representative. Notwithstanding the immediately foregoing sentence, any amounts returned to EFX in respect of a Former Option Holder who is over the age of 40 as of the Effective Time of the Merger that either does not execute and deliver an Employee Agreement or who after execution and delivery of an Employee Agreement rescinds such Employee Agreement in accordance with its terms, shall become and remain the sole and exclusive property of EFX and without any right, title or interest thereto on the part of such Company Equity Holder.

**Section 22.    Further Assurance.** From time to time and after the date hereof, the Shareholders' Representative and EFX shall deliver or cause to be delivered to the Exchange Agent such further documents and instruments and shall do and cause to be done such further acts as the Exchange Agent shall reasonably request (it being understood that the Exchange Agent shall have no obligation to make any such request) to carry out more effectively the provisions and purposes of this Agreement, to evidence compliance herewith or to assure itself that it is protected in acting hereunder.

**Section 23.   Termination of Exchange Agreement**.   EFX and the Shareholders' Representative may jointly terminate this Exchange Agreement at any time by so notifying the Exchange Agent in writing. Unless so terminated, this Exchange Agreement shall continue in effect until the date that the Exchange Fund has been finally distributed pursuant to the terms of this Exchange Agreement. In the event of a termination of this Exchange Agreement by EFX and the Shareholders' Representative prior to the date that the Exchange Fund has been finally distributed, EFX and the Shareholders' Representative shall appoint a successor exchange agent and inform the Exchange Agent of the name and address of any successor exchange agent, provided that no failure by EFX and the Shareholders' Representative to appoint such a successor exchange agent shall affect the termination of this Exchange Agreement or the discharge of the Exchange Agent as the exchange agent hereunder. Upon any such termination, the Exchange Agent shall be relieved and discharged of any further responsibilities with respect to its duties hereunder (other than the Exchange Agent's responsibility to deliver the Exchange Fund to the successor exchange agent and to forward documents to the successor exchange agent pursuant to the following sentence hereof). Upon payment of all of the Exchange Agent's outstanding fees and expenses (other than fees and expenses of counsel of the Exchange Agent arising from any dispute under this Exchange Agreement), the Exchange Agent will, upon EFX's and the Shareholders' Representative's joint written instruction, deliver to the successor exchange agent any remaining funds which have been deposited with the Exchange Agent pursuant to this Exchange Agreement, deliver to the successor exchange agent any records concerning prior payments to and distributions from the Exchange Fund, and promptly forward to the successor exchange agent, any Securities Documentation, Transmittal Letters, or other documents relating to its previous duties hereunder that the Exchange Agent may receive after its appointment has so terminated. Sections 16, 17 and 18 of this Exchange Agreement shall survive the termination of this Exchange Agreement. In the event of a termination of the Exchange Agent's obligations under this Exchange Agreement, the Exchange Agent will promptly notify any Company Equity Holders who have not been paid hereunder of such termination, and, if a successor exchange agent has been appointed, of the name and address of such successor.

**Section 24.   Notices.**   All notices, communications and deliveries required or permitted hereunder shall be made in writing signed by the party making the same, shall specify the Section hereunder pursuant to which the same is given or being made, and shall be delivered personally or sent by telecopy transmission, registered or certified mail, return receipt requested, or by any internationally recognized express mail or courier delivery service (in each case, with postage and other fees prepaid), as follows:

if to the Exchange Agent:　　　　SunTrust Bank
　　　　　　　　　　　　　　　　Stock Transfer Department
　　　　　　　　　　　　　　　　58 Edgewood Avenue, Room 225
　　　　　　　　　　　　　　　　Atlanta, Georgia 30303
　　　　　　　　　　　　　　　　Attn: Department Manager
　　　　　　　　　　　　　　　　Telephone No.: (404) 588-7622
　　　　　　　　　　　　　　　　Facsimile No.: (404) 332-3875

8

if to EFX:

Equifax Inc.
1550 Peachtree Street, N.W.
Atlanta, Georgia  30309
Tel:    (404) 885-8009
Fax:    (404) 885-8988
Attn:   Kent E. Mast, Chief Development
        Officer and General Counsel

with a copy, which shall not
constitute notice:

Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309
Tel:    404-815-6500
Fax:    404-815-6555
Attn:   Gregory K. Cinnamon

ff to Shareholders' Representative:

Softbank Capital Partners LP
1188 Centre Street
Newton Center, MA 02459
Phone: 617-928-9300
Facsimile: 617-928-9301

with a copy, which shall not
constitute notice:

Sullivan & Cromwell
1870 Embarcadero Road
Palo Alto, California  94303
Tel:  650-461-5600
Fax:  650-461-5700
Attn:  John L. Savva

Brobeck, Phleger & Harrison LLP
2100 Reston Parkway, Suite 203
Reston, VA  20191
Tel:  703-621-3000
Fax:  703-621-3001
Attn:  Kevin Lavin

Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103-2799
Tel:  215-981-4000
Fax:  215-981-4750
Attn:  Lisa R. Jacobs

or to such other representative or at such other address of a party of which a party hereto may
hereafter give notice to the other parties in writing.  Notices shall be effective upon the date of

9

delivery or refusal of delivery, if given by personal delivery, registered, certified or express mail or courier delivery, or upon transmission by telecopy transmission, if the addressee (a) confirms by telephone or electronic means that the telecopy in question was received in legible form or (b) responds to the communication in the telecopy in question without indicating that it was not received in legible form.

Section 25.    **Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Georgia without regard to its conflicts of law principals.

Section 26.    **Assignment.**    Neither this Agreement nor any rights or obligations hereunder may be assigned by any party without the written consent of each other party.  This agreement shall inure to the benefit of and be binding upon the parties and their respective permitted successors and assigns.

Section 27.    **Amendment.**  This Agreement may not be changed orally or modified, amended or supplemented without an express written agreement executed by each of the parties hereto.

Section 28.    **Counterparts.**  This Agreement may be executed in separate counterparts, each of which when executed and delivered shall be an original, which, taken together, shall constitute one binding agreement.

Section 29.    **Third Parties.**  This Agreement does not constitute an agreement for a partnership or joint venture between or among any of the Exchange Agent, EFX and the Shareholders' Representative.  No party shall make any commitments with third parties that are binding on the other party without the other party's prior written consent.

Section 30.    **Force Majeure.**    In the event any party is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, such party shall not be liable for damages to any other party for any damages resulting from such failure to perform or otherwise from such causes.  Performance under this Agreement shall resume when the affected party or parties are able to perform substantially that party's duties.

Section 31.    **Consequential Damages.**  No party to this Agreement shall be liable to any other party for any consequential, indirect, special or incidental damages under any provision of this Agreement or for any consequential, indirect, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

Section 32.    **Severability.**  If any provision of this Agreement shall be held invalid, unlawful or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

10

Section 33.    **Merger of Agreement.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supercedes any prior agreement with respect to the subject matter hereof whether oral or written.

Section 34.    **Interpretation.**  In the event that any claim of inconsistency between this Agreement and the Merger Agreement arises, the terms of the Merger Agreement shall control, except with respect to the duties, liabilities and rights of the Exchange Agent, which shall be controlled by the terms of this Agreement.

11

IN WITNESS WHEREOF, the parties hereto have caused this Exchange Agreement to be signed, effective on the date first above written.

EFX:

EQUIFAX INC

By: _____

Name: Kent E. Mast

Title:   Chief Development Officer and
General Counsel


EXCHANGE AGENT:

SUNTRUST BANK


By: _____
Name:
Title:


SHAREHOLDERS' REPRESENTATIVE:

SOFTBANK CAPITAL PARTNERS LP

By:   SOFTBANK CAPITAL PARTNERS
L.L.C., its general partner


By: _____
Name:   Steven J. Murray
Title:     Adminstrative Member


[Signature Page to Exchange Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Exchange Agreement to be signed, effective on the date first above written.

EFX:

EQUIFAX INC.

By:_____
Name:_____
Title:_____

EXCHANGE AGENT:

SUNTRUST BANK

By:_____
Name:   BRYAN ECHOLS
Title:   Group Vice President

SHAREHOLDERS' REPRESENTATIVE:

SOFTBANK CAPITAL PARTNERS LP

By:_____
Name:_____
Title:_____

4

IN WITNESS WHEREOF, the parties hereto have caused this Exchange Agreement to be signed, effective on the date first above written.

EFX:

EQUIFAX INC.

By:_____
Name: Kent E. Mast
Title:  Chief Development Officer and
        General Counsel

EXCHANGE AGENT:

SUNTRUST BANK

By: _____
Name:
Title:

SHAREHOLDERS' REPRESENTATIVE:

SOFTBANK CAPITAL PARTNERS LP

By:     SOFTBANK CAPITAL PARTNERS
        L.L.C., its general partner

By: _____
Name:   Steven J. Murray
Title:    Adminstrative Member

**[Signature Page to Exchange Agreement]**

**Attachment A**

**Merger Consideration Schedule**

**Attached.**

III. Allocation of Aggregate Series B Preference Amount, Net Participation Amount and Termination Payments Among Company Shareholders, Former Option Holders and Reci...

| PBNPA | $ | 8.79 |
|---|---|---|

| Shareholder/Optionholder | SERIES B | | | SERIES A | | COMMON | | OPTIONS | | PAYMENTS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Preference Amount | Participation Amount | Number of Shares | Participation Amount | Number of Shares | Participation Amount | Number of Shares | Cash Consideration | Cash Severance | Gross | Special Holdback | Withholding | Net |
| Austin Ventures VII, L.P. | 810,600 | $5,252,688 | $7,125,775 | | | | | | | | $12,378,463 | | | $12,378,462.96 |
| Austin Ventures VIII, L.P. | 1,505,400 | $9,754,982 | $13,233,582 | | | | | | | | $22,988,574 | | | $22,988,574.07 |
| Softbank Capital Partners LP | 640,735 | $4,151,963 | $5,632,538 | | | | | | | | $9,784,498 | | | $9,784,498.40 |
| Softbank Capital Advisors LP | 11,059 | $71,662 | $97,217 | | | | | | | | $168,879 | | | $168,879.13 |
| Softbank Capital LP | 629,720 | $4,080,624 | $5,535,759 | | | | | | | | $9,616,383 | | | $9,616,382.68 |
| TL Ventures III LP | 412,862 | $2,675,540 | $3,629,827 | | | | | | | | $6,305,167 | | | $6,305,166.95 |
| TL Ventures III Interfund LP | 13,481 | $87,351 | $118,506 | | | | | | | | $205,864 | | | $205,864.95 |
| TL Ventures III Offshore, LP | 86,428 | $560,053 | $759,786 | | | | | | | | $1,319,820 | | | $1,319,819.84 |
| TL Ventures IV L.P. | 508,246 | $3,293,454 | $4,467,889 | | | | | | | | $7,761,339 | | | $7,761,339.03 |
| TL Ventures IV Interfund, L.P. | 13,430 | $87,028 | $118,060 | | | | | | | | $205,098 | | | $205,098.09 |
| BERJ, Inc. | | | | | | 250,000 | $2,197,885 | | | | | | | |
| SweepsClub.com, Inc. | | | | | | 1,050,000 | $9,230,278 | | | | $14,316,363 | | $4,456,344 | $9,860,018.96 |
| Michael Deuser | | | | 1,850,000 | $18,262,872 | | | | | | $18,262,872 | | $5,000,000.85 | $13,262,871.15 |
| Saisani, Inc. | | | | 450,000 | $3,965,834 | 12,000 | $105,489 | | | | $105,489 | | | $105,489.10 |
| Scott Hirsch | | | | | | | | 470,397 | $4,135,138 | | $4,135,138 | | $1,176,446.87 | $2,958,691.52 |
| Rick Scheil | | | | | | | | 199,439 | $1,753,191 | | $1,753,191 | | $468,782.97 | $1,284,408.02 |
| Venture Dev. Corp | | | | | | | | 192,003 | $1,687,652 | | $1,687,652 | | | $1,687,651.77 |
| Richard Kaufman | | | | | | | | 129,914 | $1,142,037 | $90,397.75 | $1,232,435 | | $350,627.69 | $881,807.07 |
| Roger Berman | | | | | | | | 71,470 | $628,270 | $97,463.47 | $725,739 | | $205,412.28 | $520,327.54 |
| Derek Dubner | | | | | | | | 60,150 | $528,785 | $841.78 | $529,627 | | $150,807.28 | $378,819.99 |
| Steve Slowell | | | | | | | | 40,000 | $351,630 | | $351,630 | | $100,038.94 | $251,591.02 |
| Tom Hickey | | | | | | | | 21,988 | $193,289 | $54,418.59 | $247,707 | | $88,679.16 | $159,027.99 |
| John Logan | | | | | | | | 25,000 | $219,769 | | $219,769 | | $62,765.55 | $157,002.99 |
| Lou Noble | | | | | | | | 25,000 | $219,769 | | $219,769 | | $62,524.15 | $157,244.39 |
| Richard Hill | | | | | | | | 25,000 | $219,769 | | $219,769 | | $62,524.15 | $157,244.39 |
| Elder Ripper | | | | | | | | 21,788 | $191,538 | $8,119.27 | $199,657 | | $57,773.74 | $141,963.54 |
| Scott Frohman | | | | | | | | 19,971 | $174,710 | $22,128.84 | $196,837 | | $55,000.02 | $141,953.12 |
| Marc Rona | | | | | | | | 20,000 | $175,815 | | $175,815 | | $62,941.71 | $112,873.12 |
| David Marcil | | | | | | | | 15,000 | $131,861 | | $131,861 | | $37,514.40 | $94,346.63 |
| Phil Davis | | | | | | | | 8,944 | $78,641 | $17,912.20 | $96,553 | | $31,230.80 | $65,322.13 |
| Adam Milleberg | | | | | | | | 10,000 | $87,907 | | $87,907 | | $25,000.66 | $62,887.75 |
| Charles Eline | | | | | | | | 10,000 | $87,907 | | $87,907 | | $25,611.55 | $62,296.89 |
| Kevan Fleming | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,021.26 | $60,065.15 |
| Scott Thaler | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,292.70 | $60,014.72 |
| Steve Siccone | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,888.64 | $60,018.57 |
| Jeff Killeen | | | | | | | | 10,000 | $87,907 | | $87,907 | | | $87,907.41 |
| Frank Sweeney | | | | | | | | | | $78,000.00 | $78,000 | | $24,362.00 | $53,638.00 |
| Robert Conley | | | | | | | | 5,000 | $43,954 | | $43,954 | | $14,813.24 | $29,140.47 |
| Dan Babb | | | | | | | | 2,500 | $21,977 | | $21,977 | | $6,979.32 | $15,097.54 |
| Ty Baines | | | | | | | | 2,500 | $21,977 | | $21,977 | | $7,614.99 | $14,361.81 |
| David Wood | | | | | | | | 2,000 | $17,581 | | $17,581 | | $6,091.06 | $11,489.50 |
| Mark Eddy | | | | | | | | 2,000 | $17,581 | | $17,581 | | $6,091.06 | $11,489.57 |
| TOTAL | 4,632,000 | 30,015,360 | 40,718,714 | 2,300,000 | 20,218,705 | 1,312,000 | 11,533,453 | 1,999,540 | 17,589,848 | 368,119.81 | 120,424,000 | 4,463,500.00 | 4,588,086.43 | 111,372,413.57 |

| Shareholder/Optionholder | Status | Address | SS#/EIN | Shares/Options |
|---|---|---|---|---|
| Austin Ventures VII, L.P. | Shareholder (No Witholding) | 701 Brazos Street, Suite 1400, Austin, Texas, 78701 | FEIN# 74-2926894 | 810,600 |
| Austin Ventures VIII, L.P. | Shareholder (No Witholding) | 701 Brazos Street, Suite 1400, Austin, Texas, 78701 | FEIN# 84-5391996 | 1,505,400 |
| Softbank Capital Partners LP | Shareholder (No Witholding) | 28 E. 28th St., 15th Fl, New York, NY 10016 | FEIN# 04-3473351 | 840,735 |
| Softbank Capital Advisors LP | Shareholder (No Witholding) | 28 E. 28th St., 15th Fl, New York, NY 10016 | FEIN# 04-3473358 | 11,059 |
| Softbank Capital LP | Shareholder (No Witholding) | 28 E. 28th St., 15th Fl, New York, NY 10016 | FEIN# 51-0403405 | 829,726 |
| TL Ventures III LP | Shareholder (No Witholding) | 435 Devon Park Drive, The 700 Building, Wayne, PA, 19087 | FEIN# 23-2871371 | 412,892 |
| TL Ventures III Interfund, LP | Shareholder (No Witholding) | 435 Devon Park Drive, The 700 Building, Wayne, PA, 19087 | FEIN# 23-2923730 | 13,481 |
| TL Ventures III Offshore, LP | Shareholder (No Witholding) | 435 Devon Park Drive, The 700 Building, Wayne, PA, 19087 | FEIN# 98-0204293 | 96,428 |
| TL Ventures IV LP | Shareholder (No Witholding) | 435 Devon Park Drive, The 700 Building, Wayne, PA, 19087 | FEIN# 23-2996490 | 508,248 |
| TL Ventures IV Interfund, LP | Shareholder (No Witholding) | 435 Devon Park Drive, The 700 Building, Wayne, PA, 19087 | FEIN# 31-1479210 | 13,430 |
| BERJ, LLC | Shareholder (No Witholding) | Attn: Barbara Pasalar/Client Services, P&C Bank, MA | | 1,850,000 |
| SweepsClub.com, Inc. | Shareholder (No Witholding) | 1600 Market Street, 19th Floor, Philadelphia, PA 19013 | FEIN# 23-2869732 | 700,000 |
| Mike Brauser | Shareholder/Optionholder | 550 Fairway Drive, Suite 201, Deerfield Beach, FL 33441 | FEIN# 65-0849975 | 1,928,573 |
| Savant, Inc. | Shareholder (No Witholding) | 3164 NE 31st Avenue, Lighthouse Point FL | 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 | 12,000 |
| Scott Hirsch | Shareholder (No Witholding) | 6601 Park of Commerce Boulevard, Boca Raton, FL 33487 | FEIN# 65-0932445 | 475,397 |
| Rick Schell | Optionholder | 6366 Old Madrian Circle, Lake Worth FL 33463 | 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 | 199,436 |
| Charles Stryker (Venture Development Corp ) | Consultant (no witholding) | 1731 NE 27th Street, Lighthouse Point FL 33064 | 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 | 192,003 |
| Richard Kaufman | Optionholder | 21169 Falls Ridge Way, Boca Raton FL 33428 | FEIN# 23-3274609 | 128,914 |
| Roger Berman | Optionholder | 1195 Bowman Road, Suite 200, Mt. Pleasant, SC 29464 | 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 | 71,470 |
| Derek Dubner | Optionholder | 19509 Planters Point Drive, Boca Raton FL | 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 | 60,150 |
| Steve Stowell | Optionholder | 2665 Eagle Lane, West Palm Beach, FL 33409 | 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 | 40,000 |
| Tom Hickey | Optionholder | 1063 SW 2nd Avenue, Boca Raton FL 33432 | 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 | 21,988 |
| John Logan | Optionholder | 73 Parkway West, Fleetwood NY 10552 | 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 | 25,000 |
| Lou Noble | Optionholder | 6071 Newport Village Way, Lake Worth FL 33463 | 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 | 28,000 |
| Richard Hill | Non-Employee Consultant | 620 Lost Rd., Deerfield Beach FL 33442 | 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 | 25,000 |
| Elder Ripper | Optionholder | 2141 N University Drive #375, Coral Springs FL 33071 | 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 | 28,000 |
| Scott Frooman | Optionholder | 383 Gibson Court, Heathrow FL 32746 | 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 | 21,789 |
| Marc Roca | Optionholder | 631 Dover Street, Boca Raton FL 33487 | 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 | 18,674 |
| David Marcil | Optionholder | 108 Fifth Avenue #12E, New York NY 10011 | 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 | 20,000 |
| Phil Davis | Optionholder | 883 SW Bimini Drive, Stuart FL 33497 | 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 | 10,000 |
| Adam Milesberg | Optionholder | 4770 Glenn Pine Lane, Boynton Beach FL 33436 | 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 | 8,844 |
| Charles Estis | Optionholder | 1172 Birchwood Rd., Weston FL 33327 | 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 | 10,000 |
| Keran Fleming | Optionholder | 4998 N Andrews Avenue, Fort Lauderdale FL 33309 | 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 | 10,000 |
| Scott Thaler | Optionholder | 4725 SW 150th Terrace, Fort Lauderdale FL 33330 | 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 | 10,000 |
| Steve Siccore | Optionholder | 13284 NW 19th Terrace, Pembroke Pines FL 33028 | 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 | 10,000 |
| Jeff Klassen | Optionholder | 2943 NW 89th Street, Margate FL 33063 | 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 | 10,000 |
| Frank Sweeney | Director (No Witholding) | 21 Woodside Lane, Westport CT 06880 | 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 | 10,000 |
| Robert Conley | Optionholder | 918 Spring Circle #108, Deerfield Beach FL 33441 | 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 | - |
| Dan Babb | Optionholder | 10730 Pines Pine Drive, Lake Worth FL 33467 | 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 | 5,000 |
| Ty Banks | Optionholder | 2354 Aspen Manor, Weston FL 33327 | 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 | 2,500 |
| David Wood | Optionholder | 400 Via Lugano Circle #307, Boynton Beach FL 33436 | 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 | 2,500 |
| Mark Estey | Optionholder | 7660 Ambleside Way, Lake Worth FL 33467 | 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 | 2,000 |
| | Optionholder | 148 Crystal Key Way, Boynton Beach FL 33426 | 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 | 2,000 |
| Total | | | | 10,342,540 |

* Excludes $4,000,000 witholding from BERJ and $483,500 witholding from Sweepsclub.com. Includes $389,120 of severance payment.

**Attachment B**

**Transmittal Letter**

**Attached.**

**DELIVER BY MAIL TO:**

**SunTrust Bank**
**Stock Transfer Department**
**58 Edgewood Avenue, Room 225**
**Atlanta, Georgia**
**Attn.: Department Manager**
**Telephone No.: (404) 588-7622**
**Facsimile No.: (404) 332-3875**

## SUNTRUST BANK

### LETTER OF TRANSMITTAL

**DELIVER IN PERSON TO:**

**SunTrust Bank**
**Stock Transfer Department**
**58 Edgewood Avenue, Room 225**
**Atlanta, Georgia**
**Attn.: Department Manager**
**Telephone No.: (404) 588-7622**
**Facsimile No.: (404) 332-3875**

To accompany certificate(s) representing shares of the capital stock of

# NAVIANT, INC.

This Letter of Transmittal is to be completed by shareholders surrendering certificates evidencing the capital stock of Naviant, Inc. pursuant to the merger of Armagh Acquisition Corporation, a wholly owned subsidiary of Equifax Inc., with and into Naviant, Inc.

### LIST ALL CERTIFICATES SUBMITTED
(Attach additional signed list if necessary. See Instruction 3)

| NAME AND ADDRESS OF RECORD HOLDER | CERTIFICATE NUMBER | SHARES |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**PLEASE READ THE ACCOMPANYING INSTRUCTIONS CAREFULLY. SIGN ON THE REVERSE SIDE AND COMPLETE THE W-9 FORM BELOW.**

## REGISTRATION
IF CHECKS ARE TO BE ISSUED IN A NAME OTHER THAN THAT SHOWN AT THE TOP OF THIS FORM OR ARE TO BE SENT TO AN ADDRESS OTHER THAN THAT SHOWN AT THE TOP OF THIS FORM, PLEASE CHECK THE BOX AT THE LEFT AND COMPLETE THE INFORMATION ON THE REVERSE SIDE OF THIS FORM.

## LOST CERTIFICATES
IF YOUR SECURITIES HAVE BEEN LOST, STOLEN, MUTILATED OR DESTROYED, PLEASE GIVE WRITTEN NOTIFICATION TO SUNTRUST BANK, STOCK TRANSFER DEPARTMENT, 58 EDGEWOOD AVENUE, ROOOM 225, ATLANTA, GEORGIA 30303, ATTENTION: LOST SECURITIES DEPT.

---

**SUBSTITUTE FORM W-9 REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION**
**(PLEASE REFER TO ACCOMPANYING GUIDELINES)**

**PART 1 – PLEASE ENTER YOUR SOCIAL SECURITY NUMBER OR EMPLOYER IDENTIFICATION NUMBER**

**PART 2 – CERTIFICATION – Under Penalties of Perjury, I certify that:**

(1)   The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me)

(2)   I am not subject to backup withholding either because I am exempt from backup withholding or have not been notified by the Internal Revenue Service ("IRS") that I am subject to backup withholding as a result of failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding and

(3)   I am a U.S. person (or U.S. resident alien).

Certification instructions – You must cross out item (2) in Part 2 above if you have been notified by the IRS that you were subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received another notification from the IRS stating that you are no longer subject to backup withholding, do not cross out item (2).

SIGNATURE_____   DATE_____

**NOTE:  FAILURE TO COMPLETE AND RETURN THIS SUBSTITUTE FORM W-9 MAY RESULT IN BACKUP WITHHOLDING OF 31% OF ANY PAYMENTS MADE TO YOU.**

ATL/JB01 1394323.1

# METHOD OF PAYMENT

(Please check the appropriate box.  If you check the box indicating that you wish to receive payment by wire transfer, you will be required to complete the attached Agreement Regarding Requests for Wire Transfers )

☐      The undersigned wishes to receive payment for his, her or its shares by check, mailed to the address indicated below.

☐      The undersigned wishes to receive payment for his, her or its shares by wire transfer of immediately available funds to the following account:_____.

| SPECIAL ISSUANCE INSTRUCTIONS (SEE INSTRUCTIONS) | SPECIAL DELIVERY INSTRUCTIONS (SEE INSTRUCTIONS) |
|---|---|
| To be completed ONLY if check(s) are to be issued in the name of someone other than the registered holder(s) | To be completed ONLY if check(s) are to be mailed to someone other than the registered holder(s), or to such registered holder(s) at an address other than shown on the reverse side of this form. |
| Name:_____ | Name:_____ |
| Address:_____ | Address:_____ |
| _____ | _____ |
| _____ | _____ |
| **EMPLOYER IDENTIFICATION OR SOCIAL SECURITY NUMBER** | |

# SIGN HERE

SIGNATURE(S) OF SHAREHOLDER(S): _____

DATED:_____

Must be signed by registered holder(s) exactly as name(s) on the Certificate(s) or a security position listing or by person(s) authorized to become registered holder(s) by certificates and documents transmitted herewith.  If signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, please set forth the following information and see Instructions.

NAME(S)_____

CAPACITY (full title)_____

ADDRESS      _____

_____

AREA CODE AND TELEPHONE NO._____

**GUARANTEE OF SIGNATURE(S)**
**(SEE INSTRUCTIONS)**

NAME OF FIRM_____

ADDRESS_____

_____

AUTHORIZED SIGNATURE_____

NAME_____

AREA CODE AND TELEPHONE NO._____

*Questions and requests for assistance or for additional copies of this Letter of Transmittal may be directed to Bryan Echols of SunTrust Bank at (404) 588-7622.*

## INSTRUCTIONS FOR LETTER OF TRANSMITTAL

1.    *Guarantee of Signatures.*   Signatures on all Letters of Transmittal must be guaranteed by a financial institution that is a member of a Securities Transfer Association approved medallion program such as STAMP, SEMP, or MSP (an "Eligible Institution"), except in cases where securities are surrendered (i) by a registered holder of the securities who has not completed either the box entitled "Special Issuance Instructions" or the box entitled "Special Delivery Instructions" on the Letter of Transmittal or (ii) for the account of an Eligible Institution.  See Instruction 4.

2.    *Delivery of Letter of Transmittal and Certificates.*  The Letter of Transmittal, properly completed and duly executed, together with the certificate(s) for the securities described should be delivered to the address set forth below.  A return envelope addressed to SunTrust Bank ("SunTrust") is enclosed for convenience.

**THE METHOD OF DELIVERY OF CERTIFICATE(S) AND ALL OTHER REQUIRED DOCUMENTS IS AT THE ELECTION AND RISK OF THE OWNER, BUT IF SENT BY MAIL, IT IS RECOMMENDED THAT THEY BE SENT BY REGISTERED MAIL WITH RETURN RECEIPT REQUESTED.**

3.    *Inadequate Space.*   If the space provided on the Letter of Transmittal is inadequate, the certificate numbers and the number of securities should be listed on a separate schedule to be attached thereto.

4.    *Signatures of Letter of Transmittal, Stock Powers and Endorsements.*  When the Letter of Transmittal is signed by the registered owner(s) of the certificate(s) listed and surrendered thereby, no endorsements of certificates or separate stock powers are required.

If the certificate(s) surrendered is (are) owned of record by two or more joint owners, all such owners must sign the Letter of Transmittal.

If any surrendered certificates are registered in different names, it will be necessary to complete, sign and submit as many separate Letters of Transmittal as there are different registrations of certificates.

If the Letter of Transmittal is signed by a person other than the registered owner of the certificate(s) listed, such certificate(s) must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered owner or owners appear on the certificate(s).  Signatures on such certificates or stock powers must be guaranteed by an Eligible Institution.

If the Letter of Transmittal or any certificate or stock power is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, such persons should so indicate when signing, and proper evidence, satisfactory to SunTrust, of their authority to do so must be submitted.

5.    *Stock Transfer Taxes.*   If payment for securities is to be made to any person other than the registered holder, or if surrendered certificates are registered in the name of any person other than the person(s) signing the Letter of Transmittal, the amount of any stock transfer taxes (whether imposed on the registered holder or such person) payable as a result of the transfer to such person will be deducted from the payment for such securities if satisfactory evidence of the payment of such taxes, or exemption therefrom, is not submitted.

Except as provided in this Instruction 5, it will not be necessary for transfer tax stamps to be affixed to the certificates listed in the Letter of Transmittal.

6.   *Special Issuance and Delivery Instructions.*  Indicate the name and address to which payment for the securities is to be sent if different from the name and address of the person(s) signing the Letter of Transmittal.

7.   *Substitute Form W-9.*  Enter your social security or taxpayer identification number, complete, sign and date the Substitute W-9 certification.

8.   *Additional Copies*  Additional copies of the Letter of Transmittal may be obtained from SunTrust at the address listed below.

9.   *Lost, Stolen or Destroyed Certificates.*  Any securityholder whose certificates have been lost, stolen, mutilated or destroyed should contact SunTrust to make arrangements (which may include the posting of a bond or other satisfactory indemnification and an affidavit of loss) to replace lost, stolen, mutilated or destroyed certificates.  Such arrangements should be made with SunTrust.

All questions as to the validity, form and eligibility of any surrender of certificates will be determined by SunTrust and the Issuer and such determination shall be final and binding. SunTrust and the Issuer reserve the right to waive any irregularities or defects in the surrender of any certificates.  A surrender will not be deemed to have been made until all irregularities have been cured or waived.

**SunTrust Bank**
Stock Transfer Department
58 Edgewood Avenue, Room 225
Atlanta, Georgia 30303
Attn: Department Manager
Telephone No.: (404) 588-7622
Facsimile No.: (404) 332-3875

### IMPORTANT TAX INFORMATION

1.      Under U.S. federal income tax law, a holder whose shares of Outstanding Securities are accepted for exchange, unless an exemption applies, is required by law to provide the Exchange Agent with such holder's correct TIN on Substitute Form W-9 (provided above). If such holder is an individual, the TIN is his or her social security number. If the Exchange Agent is not provided with the correct TIN, the holder may be subject to a $50 penalty imposed by the Internal Revenue Service (the "IRS"). In addition, payments that are made to such holder pursuant to this Letter may be subject to backup withholding.

2.      Certain holders (including, among others, all corporations and certain foreign individuals and entities) are not subject to these backup withholding and reporting requirements. In order for a foreign individual to qualify as an exempt recipient, that holder must submit a statement, signed under penalties of perjury, attesting to that individual's exempt status. Such statements can be obtained from the Exchange Agent. Exempt holders, other than foreign holders, should furnish their TIN, write "EXEMPT" on the face of their Substitute Form W-9 and sign, date and return the Substitute Form W-9 to the Exchange Agent. See the enclosed Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9 for additional instructions.

3.      If backup withholding applies, the Exchange Agent may be required to backup withhold on any such payments made to the holder. Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained from the IRS.

*Purpose of Substitute Form W-9*

4.      To prevent backup withholding on payments that are made to a holder, the holder is required to notify the Exchange Agent of his or her correct TIN (or the TIN of another payee) by completing the section of Form W-9 (Part 2) certifying that the taxpayer identification number provided on Substitute Form W-9 is correct (or that such holder is awaiting a taxpayer identification number) and that (1) the holder has not been notified by the IRS that he or she is subject to backup withholding as a result of failure to report all interest or dividends or (2) the IRS has notified the holder that he or she is no longer subject to backup withholding.

*What Number to Give the Exchange Agent*

5.      The holder is required to give the Exchange Agent the TIN, generally the social security number or employer identification number, of the record owner of the tendered shares of Outstanding Securities. If shares of Outstanding Securities are in more than one name or are not in the name of the actual owner, consult the enclosed Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9 for additional guidelines on which number to report. If the holder has not been issued a TIN and has applied for a number or intends to apply for a number in the near future, he or she should check the box in Part 3 of the Substitute Form W-9, sign and date the Substitute Form W-9. If the box in Part 3 is checked and the Exchange Agent is not provided with a TIN within 60 days, the Exchange Agent will backup withhold on all cash payments until a TIN is provided to the Exchange Agent.

**Attachment C to Exchange Agreement**
**Other Disbursements Schedule**

| DESCRIPTION | AMOUNT | METHOD OF PAYMENT |
|---|---|---|
| **Additional Disbursements From the Exchange Fund[1]:** | | |
| Series B Warrant Consideration | $400,000.00 | Payable in accordance with the following instructions upon surrender of Series B Warrant and receipt of acceptable cancellation documentation: **Wire Transfer:** **Bank:** Comerica Incorporated **ABA#:** 0720 0009 6 **Acct#:** 184 009 342 9 **Credit to:** Rob Shorkey |
| Excess Expenses | $150,000.00 | Payments to be made pursuant to the joint written notice of Company and Shareholders' Representative delivered pursuant to Paragraph 4.9 of the Merger Agreement (the "**Joint Written Notice**") |
| Shareholders' Representative Fund | $100,000.00 | Payments to be made pursuant to the Joint Written Notice |
| Termination Payments | $369,119.81 | Payments to be made in accordance with the "Cash Severance" column of Merger Consideration Schedule (Attachment A to Exchange Agreement) |
| Unpaid Covered Expenses | $200,000.00 | Payments to be made pursuant to Written Notice of the Shareholders' Representative delivered in accordance with Paragraph 5(a)(iii) of the Merger Agreement |
| BERJ Special Holdback | $4,000,000.00 | **Wire Transfer:** **Bank:** Wachovia Bank of Georgia 191 Peachtree St., N.E. Atlanta, Georgia 30303 **ABA#:** 061000010 **Account Name: Equifax Inc.** **Acct#:** 13-657-648 **Regarding :** Naviant/BERJ |

---

[1] All disbursements from the Exchange Fund via wire transfer are conditioned upon, among other things, the Exchange Agent's receipt of a Wire Transfer Agreement (in the form attached to the Exchange Agreement among EFX, SunTrust and the Shareholders' Representative), duly executed by the recipient thereof.

| DESCRIPTION | AMOUNT | METHOD OF PAYMENT |
|---|---|---|
| SweepsClub Special Holdback | $463,500.00 | **Wire Transfer:**<br>**Bank:      Wachovia Bank of Georgia**<br>**191 Peachtree St., N.E. Atlanta, Georgia 30303**<br>**ABA#:    061000010**<br>**Account Name: Equifax Inc.**<br>**Acct#:    13-657-648**<br>**Regarding : Naviant/ SweepsClub** |
| Estimated Applicable Withholding (The sum of estimated applicable withholding on (a) payments to Former Option Holders in respect of cancelled Company Options and (b) the $369,119.8 of Termination Payments) | $4,588,086.43 | **Wire Transfer:**<br>**Bank:      Wachovia Bank of Georgia**<br>**191 Peachtree St., N.E. Atlanta, Georgia 30303**<br>**ABA#:    061000010**<br>**Account Name: Equifax Inc.**<br>**Acct#:    13-657-648**<br>**Regarding:  Naviant/ Withholding Taxes** |

**Attachment D**

**Wire Transfer Agreement**

**Attached.**

## ATTACHMENT D

### AGREEMENT REGARDING REQUESTS FOR WIRE TRANSFERS

The Private Client Services Department of SunTrust Bank ["the Bank"] is serving as Exchange Agent pursuant to an Exchange Agreement, dated as of August _____, 2002 among the Bank, Equifax Inc., a Georgia corporation and Softbank Captial Partners LP, as Shareholders' Representative.  Under the terms of that agreement the Bank may be requested or required to make payments to the undersigned or to third parties designated by the undersigned.  Some parties to the Agreement may ask that the Bank make those payments by electronic Funds Transfers, also known as "Wires" to be issued from the deposit account of the Trust Department.

The undersigned acknowledges that such transfers may cause the almost instantaneous transfer of significant sums of money, without the opportunity to recall the transfer, upon the basis of relatively little contact between themselves, or an intended beneficiary of the transfer, and the Bank, and that it is a common and wise practice for banks and those dealing with them by means of such transfers to institute security procedures to protect against errors or fraud in transfers.  In order to induce the Bank to make payments by means of Funds Transfers the undersigned selects the Security Procedure, or Waiver of Security Procedure initialed below [the "Procedure"] and agree(s) that:

1.      The undersigned will cause all requests for transfers, and changes or cancellations to such requests ["Requests"] to be delivered to the Bank in a manner which complies with the Procedure ["In Compliance"].

2.      If the Bank receives a Request which is not In Compliance it shall not make the transfer so requested, but shall make a reasonable effort to cure the lack of Compliance or inform the person making the Request that the Bank will not act upon it and inform the undersigned by telephone call to Mr./Mrs./Ms._____ at _____ that a Request which was not In Compliance has been received by the Bank.

3.      If the Bank makes a transfer pursuant to a Request which it reasonably believes it received In Compliance it shall not be liable to the undersigned or to any person for whose benefit the undersigned intended to make the Request.

4.      The undersigned will indemnify the Bank against claims arising from transfers made as a result of Requests delivered In Compliance and transfers not made pursuant to Requests not delivered In Compliance, and will defend the Bank, or at the Bank's option pay for the cost of defending the Bank, against such claims.

---

☐        **Security Procedure #1 Call Back Procedure**

Upon receipt of a Request the Bank, regardless of the means by which the request was transmitted, will initiate a telephone call to

_____ at phone # _____, or

_____ at phone # _____, or

_____ at phone # _____

If any person reached at the number described above shall identify themselves as the designated person for that number and shall confirm the request in all its terms, the Bank shall treat the request as being In compliance.  If the Bank is unable to obtain confirmation of the request after reasonable efforts, the Bank shall treat the Request as not In Compliance.  The designations of persons and phone numbers made above may be changed only by a writing signed  by the undersigned and referring to this agreement.

---

☐        **Security Procedure #2  Mutually Agreed Procedure**

The Undersigned and the Bank agree that they will use the security procedure described in the attached writing which refers to this paragraph of this agreement and is signed by the Bank and the Undersigned.

---

☐        **Waiver of Security Procedure**

The Undersigned chooses not to use the security procedures described above and asks the Bank to comply with Requests which it receives by any means, which the Bank reasonably believes to have been issued by the undersigned.  The limitations on and protections against liability of the Bank provided by Paragraphs 3 & 4 above will apply to Requests which the Bank honors, or declines to honor in good faith, pursuant to this waiver.

**I/We select the Procedure or Waiver which I/We have initialled above and agree to be bound by the terms of this agreement.**

**For a Business or Institution**

**For an Individual**

_____

_____

**Sign here** _____

**Sign here** _____

**Print Name and Title here**

**Print Name here** _____

_____

**Date** _____

**Date** _____

**Sign here** _____

**Sign here** _____

**Print Name and Title here**

**Print Name here** _____

_____

**Date** _____

**Date** _____

**Sign here** _____

**Sign here** _____

**Print Name and Title here**

**Print Name here** _____

_____

**Date** _____

**Date** _____

Revised 9/96

## Attachment E

### Schedule of Fees

- Exchange Agent Fee - $15 per Letter of Transmittal with a minimum of $2,500

- Wire Transfer Fee- $25.00 per wire

All out-of-pocket expenses including checks, postage, courier charges, mail insurance premiums, forms, stationery, and supplies and advances to others on your behalf will be billed in addition to fees indicated above.

# EXHIBIT 6

## (TO DECLARATION OF GREGORY K. CINNAMON)

**Annex A to Agreement and Plan of Merger dated August 15, 2002**
**Final Allocation Schedule**

I.   **Calculation of Per Share Net Participation Amount; Per Share Escrow Amount; Per Share Contingent Payment and Exchange Fund Deposit**

| DESCRIPTION | AMOUNT |
| --- | --- |
| Merger Consideration | $135,000,000.00 |
| Less Adjustments: | |
| (Funded Indebtedness) | |
| Acquisition Indebtedness | ($3,500,000.00) |
| Other (e.g. overdue A/Ps) | ($426,000.00) |
| Termination Payments | ($369,119.81) |
| (Series B Warrant Consideration) | ($400,000.00) |
| (Excess Expenses) | ($150,000.00) |
| (Shareholders' Representative Fund) | ($100,000.00) |
| Total Net Merger Consideration | $130,054,880.00 |
| Less Aggregate Series B Preference Amount | ($30,015,360.00) |
| Aggregate Participation Amount | $100,039,520.19 |
| Less Escrowed Amount | ($10,000,000.00) |
| Net Participation Amount: | $90,039,520.00 |
| Per Share Net Participation Amount[1]: | $8.79 |
| Per Share Escrow Amount[2]: | $0.98 |
| Maximum Per Share Contingent Payment[3] | $0.34 |
| Total Maximum Potential Per Share Payments | $10.11 |
| Exchange Fund Components: | |
| Termination Payments | $369,119.81 |
| Series B Warrant Consideration | $400,000.00 |
| Excess Expenses | $150,000.00 |
| Shareholders' Representative Fund | $100,000.00 |
| Aggregate Series B Preference Amount | $30,015,360.00 |
| Net Participation Amount | $90,039,520.19 |
| Unpaid Covered Expenses | $200,000.00 |
| Total Exchange Fund Deposit: | $121,274,000.00 |

[1] Quotient of the Net Participation Amount as of the Effective Time divided by the number of Outstanding Company Shares (net of any Dissenting Shares) immediately prior to the Effective Time.

[2] Quotient of the Escrow Fund as of the Effective Time divided by the number of Outstanding Company Shares (net of any Dissenting Shares) immediately prior to the Effective Time.

[3] Quotient of the Contingent Payment as of the Effective Time divided by the number of Outstanding Company Shares (net of any Dissenting Shares) immediately prior to the Effective Time.

{MI831116;1}
ATL.LIB01 1390098 8

II.    **Deposits Prior to Effective Time and Disbursements After Effective Time**

| DESCRIPTION | AMOUNT | METHOD OF PAYMENT |
|---|---|---|
| **Deposit of Escrowed Amount with Escrow Agent** | $10,000,000.00 | **Wire Transfer:**<br>  **Bank:**    **SunTrust Bank**<br>  **ABA#:**   061000104<br>  **Corporate Trust Department**<br>  **Center #008**<br>  **Attn.: Rebecca Fischer**<br>  **Acct#:**   **9088000008**<br>  **Ref: Equifax** |
| **Deposit of Exchange Fund with Exchange Agent** | $121,274,000.00 | **Wire Transfer:**<br>  **Bank:**    **SunTrust Bank**<br>  **ABA#:**   061000104<br>  **Stock Transfer Department**<br>  **Acct#:**   **8801847172**<br>  **Checks on Demand – Reorg**<br>  **Ref: Equifax/Naviant Merger**<br>  **Attn.: Bryan Echols** |
| **Total Deposit** | **$131,274,000.00** | |
| **Disbursements from Exchange Fund[4]:** | | |
| Series B Warrant Consideration | $400,000.00 | Payable in accordance with the following instructions upon surrender of Series B Warrant and receipt of acceptable cancellation documentation:<br>**Wire Transfer:**<br>  **Bank:**    Comerica Incorporated<br>  **ABA#:**   0720 0009 6<br>  **Acct#:**   184 009 342 9<br>  **Credit to:**  Rob Shorkey |
| Excess Expenses | $150,000.00 | Payments to be made pursuant to the joint written notice of Company and Shareholders' Representative delivered pursuant to Paragraph 4.9 of the Merger Agreement (the "**Joint Written Notice**") |
| Shareholders' Representative Fund | $100,000.00 | Payments to be made pursuant to the Joint Written Notice |
| Termination Payments | $369,119.81 | Payments to be made in accordance with the "Cash Severance" column of Merger Consideration Schedule (Attachment A to Exchange Agreement) |

<hr>

[4] All disbursements from the Exchange Fund via wire transfer are conditioned upon, among other things, the Exchange Agent's receipt of a Wire Transfer Agreement (in the form attached to the Exchange Agreement among EFX, SunTrust and the Shareholders' Representative), duly executed by the recipient thereof.

MIB31116;1}

| DESCRIPTION | AMOUNT | METHOD OF PAYMENT |
|---|---|---|
| Unpaid Covered Expenses | $200,000.00 | Payments to be made pursuant to Written Notice of the Shareholders' Representative delivered in accordance with Paragraph 5(a)(iii) of the Merger Agreement |
| Estimated distribution of *Aggregate Series B Preference Amount* and *Net Participation Amounts* in accordance with allocations set forth on spreadsheet attached as Section III (Net of Termination Payments set forth therein under Cash Severance Column, BERJ Special Holdback amount, SweepsClub Special Holdback amount and Applicable Withholding Taxes) | $111,003,293.76 | Payments to be made to "Documented Company Equity Holders" (as such term is defined in the Exchange Agreement) in accordance with Exchange Agreement and pursuant to the disbursement instructions in set forth in a duly executed Wire Transfer Agreement. |
| BERJ Special Holdback | $4,000,000.00 | Wire Transfer:<br>**Bank:   Wachovia Bank of Georgia**<br>**191 Peachtree St., N.E. Atlanta, Georgia 30303**<br>**ABA#:   061000010**<br>**Account Name: Equifax Inc.**<br>**Acct#:   13-657-648**<br>**Regarding : Naviant/BERJ** |
| SweepsClub Special Holdback | $463,500.00 | Wire Transfer:<br>**Bank:   Wachovia Bank of Georgia**<br>**191 Peachtree St., N.E. Atlanta, Georgia 30303**<br>**ABA#:   061000010**<br>**Account Name: Equifax Inc.**<br>**Acct#:   13-657-648**<br>**Regarding : Naviant/ SweepsClub** |
| Estimated Applicable Withholding (The sum of estimated applicable withholding on (a) payments to Former Option Holders in respect of cancelled Company Options and (b) the $369,119.8 of Termination Payments) | $4,588,086.43 | Wire Transfer:<br>**Bank:   Wachovia Bank of Georgia**<br>**191 Peachtree St., N.E. Atlanta, Georgia 30303**<br>**ABA#:   061000010**<br>**Account Name: Equifax Inc.**<br>**Acct#:   13-657-648**<br>**Regarding:  Naviant/ Withholding Taxes** |
| **Total Maximum Possible Disbursements from Exchange Fund** | **$121,274,000.00** | |

III.  **Allocation of Aggregate Series B Preference Amount, Net Participation Amount and Termination Payments Among Company Shareholders, Former Option Holders and Recipients of Termination Payments (a/k/a Cash Severance) – Including Allocation of Applicable Withholding on payments to Former Option Holders and Recipients of Termination Payments.**

**See Attached Spreadsheet.**

III. Allocation of Aggregate Series B Preference Amount, Net Participation Amount and Termination Payments Among Company Shareholders, Former Option Holders and F...

PMPA $ 6.78

| Shareholder/Optionholder | SERIES B | | | SERIES A | | COMMON | | OPTIONS | | Cash Severance | PAYMENTS | | | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Preference Amount | Participation Amount | Number of Shares | Participation Amount | Number of Shares | Participation Amount | Number of Shares | Cash Consideration | | Gross | Special Holdback | Withholding | |
| Austin Ventures VII, L.P | 810,600 | $5,252,680 | $7,125,775 | | | | | | | | $12,378,463 | | | $12,378,462.96 |
| Austin Ventures VIII, L.P | 1,505,400 | $9,754,982 | $13,233,582 | | | | | | | | $22,988,574 | | | $22,988,574.07 |
| Softbank Capital Partners LP | 640,735 | $4,151,963 | $5,632,536 | | | | | | | | $9,784,498 | | | $9,784,498.48 |
| Softbank Capital Advisors LP | 11,059 | $71,662 | $97,217 | | | | | | | | $168,879 | | | $168,879.13 |
| Softbank Capital LP | 628,726 | $4,090,624 | $5,536,758 | | | | | | | | $9,616,383 | | | $9,616,382.88 |
| TL Ventures III L.P | 412,892 | $2,675,540 | $3,629,627 | | | | | | | | $6,305,167 | | | $6,305,166.95 |
| TL Ventures III Interfund, LP | 13,481 | $87,357 | $118,508 | | | | | | | | $205,865 | | | $205,864.86 |
| TL Ventures III Offshore, LP | 86,428 | $560,053 | $759,766 | | | | | | | | $1,319,820 | | | $1,319,819.64 |
| TL Ventures IV, L.P | 508,249 | $3,293,454 | $4,467,886 | | | | | | | | $7,761,339 | | | $7,761,339.03 |
| TL Ventures IV Interfund, L.P | 13,430 | $87,026 | $118,060 | | | | | | | | $205,086 | | | $205,086.06 |
| BERU, Inc | | | | 1,850,000 | $16,262,872 | | | | | | $16,262,872 | $4,000,000.00 | | $12,262,871.55 |
| SweepsClub.com, Inc | | | | 450,000 | $3,965,834 | 250,000 | $2,197,985 | | $5,988,086 | | $9,153,519 | $465,500.00 | | $5,960,018.98 |
| Michael Breuer | | | | | | 1,050,000 | $9,230,278 | | | | $14,316,365 | | $1,416,991.53 | $12,899,373.13 |
| Seisent, Inc | | | | | | 12,000 | $105,489 | | | | 105,489 | | | $105,488.90 |
| Scott Hirsch | | | | | | | | 470,397 | $4,135,138 | | $4,135,138 | | $1,176,446.67 | $2,958,691.52 |
| Rick Scheil | | | | | | | | 199,436 | $1,753,191 | | $1,753,191 | | $498,782.97 | $1,254,408.50 |
| Venture Dev. Corp | | | | | | | | 192,003 | $1,687,852 | | $1,687,852 | | | $1,687,851.77 |
| Richard Kaufman | | | | | | | | 129,914 | $1,142,037 | $90,397.75 | $1,232,435 | | $350,627.69 | $881,807.07 |
| Roger Berman | | | | | | | | 71,470 | $628,275 | $87,483.47 | $725,739 | | $206,472.68 | $519,266.08 |
| Derek Dubner | | | | | | | | 60,160 | $528,795 | $681.78 | $529,447 | | $150,827.54 | $378,818.99 |
| Steve Stowell | | | | | | | | 40,000 | $351,630 | | $351,630 | | $100,038.84 | $251,591.02 |
| Tom Hickey | | | | | | | | 21,988 | $193,289 | $54,416.39 | $247,707 | | $88,679.18 | $159,027.99 |
| John Logan | | | | | | | | 25,000 | $216,769 | | $216,769 | | $62,765.95 | $157,002.59 |
| Lou Noble | | | | | | | | 25,000 | $216,769 | | $216,769 | | $62,524.15 | $157,244.39 |
| Richard Hill | | | | | | | | 25,000 | $216,769 | | $219,788 | | | $219,788.53 |
| Elder Fripse | | | | | | | | 21,788 | $191,533 | $8,119.37 | $190,867 | | $57,773.74 | $141,853.64 |
| Michael Brewen | | | | | | | | 19,874 | $174,710 | $22,126.84 | $190,837 | | $56,000.02 | $140,836.62 |
| Marc Rona | | | | | | | | 20,000 | $175,815 | | $175,815 | | $62,941.71 | $112,873.12 |
| David Marcil | | | | | | | | 15,000 | $131,861 | | $131,861 | | $37,514.49 | $94,346.63 |
| Phil Davis | | | | | | | | 8,949 | $78,641 | $17,912.20 | $96,653 | | $31,230.80 | $65,322.13 |
| Adam Milselberg | | | | | | | | 10,000 | $87,907 | | $87,907 | | $25,009.88 | $62,897.12 |
| Charles Eissa | | | | | | | | 10,000 | $87,907 | | $87,907 | | $25,611.53 | $62,295.47 |
| Kevan Fleming | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,012.26 | $60,805.15 |
| Scott Trotter | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,292.70 | $60,614.72 |
| Steve Siccone | | | | | | | | 10,000 | $87,907 | | $87,907 | | $27,888.84 | $60,018.57 |
| Jeff Killeen | | | | | | | | 10,000 | $87,907 | | $87,907 | | | $87,007.41 |
| Frank Sweeney | | | | | | | | | | $78,000.00 | $78,000 | | $24,382.00 | $53,838.00 |
| Robert Conley | | | | | | | | 5,000 | $43,964 | | $43,964 | | $14,813.24 | $29,140.47 |
| Dan Babb | | | | | | | | 2,500 | $21,977 | | $21,977 | | $6,879.32 | $15,097.54 |
| Ty Barnes | | | | | | | | 2,500 | $21,977 | | $21,977 | | $7,614.98 | $14,361.87 |
| Darlene Good | | | | | | | | 2,000 | $17,681 | | $17,681 | | | $8,091.99 |
| Marc Eddy | | | | | | | | 2,000 | $17,681 | | $17,681 | | $6,091.86 | $11,589.50 |
| TOTAL | 4,632,000 | $30,015,360 | 40,718,714 | 2,300,000 | 20,218,705 | 1,312,000 | 11,533,453 | 1,999,640 | $17,668,948 | $359,119.81 | $120,424,000 | $4,465,500.00 | $4,596,086.43 | $111,372,415.57 |

# EXHIBIT 7

## (TO DECLARATION OF GREGORY K. CINNAMON)

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

## R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

## R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

## R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

## R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one

# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn
Clerk

For rules and forms visit
www.ca11.uscourts.gov

June 29, 2006

Elliot B. Kula
Greenberg Traurig,, P.A.
1221 BRICKELL AVE
MIAMI FL 33131-3224

**Appeal Number: 05-14990-HH**
Case Style: Softbank Capital Partners LP v. Equifax, Inc.
District Court Number: 04-20994 CV-DLG

The enclosed certified copy of this Court's Order of Dismissal is issued as the mandate of
this court. See 11th Cir. R. 41-4. Counsel and pro se parties are advised that pursuant
to 11th Cir. R. 27-2, "a motion to reconsider, vacate, or modify an order must be filed
within 21 days of the entry of such order. No additional time shall be allowed for mailing."

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Regina Veals-Gillis (404) 335-6163

Encl.

Exhibit  D

DIS-4 (3-2005)

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

JUN 2 9 2006

THOMAS K. KAHN
CLERK

No. 05-14990-HH

SOFTBANK CAPITAL PARTNERS, LP,
SOFTBANK CAPITAL ADVISORS, LP,
ET AL.,

                              Plaintiffs-Counter-defendants-Appellants,

versus

EQUIFAX, INC.,
NAVIANT, INC.,

                              Defendants-Counter-claimants-Appellees.

-----------------------------

On Appeal from the United States District Court for the
Southern District of Florida

-----------------------------

BEFORE: TJOFLAT, and HULL, Circuit Judges, and RESTANI*, Judge.

BY THE COURT:

    The motion by Michael Brauser to intervene in this appeal is DENIED.

    The parties' joint motion to dismiss this appeal with prejudice, due to

settlement, with the parties bearing their own costs and attorneys' fees, is

GRANTED.

_____

* Honorable Jane A. Restani, United States Court of International Trade Chief
Judge, sitting by designation.

## ESCROW RESOLUTION AGREEMENT

THIS ESCROW RESOLUTION AGREEMENT is made among Softbank Capital Partners, L.P., acting solely in its capacity as the Shareholders' Representative (as defined below), Equifax Inc., and Equifax eMarketing Solutions, Inc. f/k/a Naviant, Inc.

WHEREAS, a subsidiary of Equifax merged with and into Naviant in the Merger governed by the Merger Agreement on August 15, 2002;

WHEREAS, on December 30, 2003, Claimants transmitted to the Shareholders' Representative a Notice of Claim, in which they alleged that the Merger had been tainted by fraud, and asserted causes of action for rescission under the Florida Securities and Investor Protection Act, breach of contract, violations of the Federal Racketeering Influenced Corrupt Organizations Act, violations of the Florida Criminal Practices Act, fraud, deceit and misrepresentation, and violations of § 10 of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder;

WHEREAS, on March 22, 2004, Claimants commenced the Arbitration, asserting causes of action for rescission under the Florida Securities and Investor Protection Act, breach of contract, violations of the Federal Racketeering Influenced Corrupt Organizations Act, violations of the Florida Criminal Practices Act, fraud, deceit and misrepresentation, and violations of § 10 of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder;

WHEREAS, on June 29, 2004, Claimants amended their Demand for Arbitration to dismiss claims for breach of contract, violations of the Federal Racketeering Influenced Corrupt Organizations Act, violations of the Florida Criminal Practices Act, fraud, deceit and misrepresentation, and violations of § 10 of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder against the Venture Capital Shareholders;

WHEREAS, on August 13, 2004, Equifax commenced the Preservation of Rights Action against all Respondents, and asserted causes of action for rescission under the Florida Securities and Investor Protection Act, indemnification under the Merger Agreement and other claims;

WHEREAS, also on August 13, 2004, Claimants filed counterclaims in a related action against the Venture Capital Shareholders, and asserted causes of action for rescission under the Florida Securities and Investor Protection Act and indemnification under the Merger Agreement;

WHEREAS, on September 2, 2005, Equifax filed the Amended Demand, and asserted causes of action for rescission under the Florida Securities and Investor Protection Act, indemnification under the Merger Agreement, fraud and punitive damages;

WHEREAS, on October 6, 2005, Equifax filed the Additional Claims;

WHEREAS, on December 20, 2005, Equifax and the Shareholders' Representative agreed to consolidation of the Additional Claims into the Arbitration already before the Panel;



Exhibit ___ E

WHEREAS, there is presently in existence the Escrow Fund, which has a balance of $8,855,696.75 as of May 31, 2006;

WHEREAS, the members of the Shareholders' Representative Committee were provided notice of this proposed settlement and of a meeting, and such meeting was held and this proposed settlement was approved; and

WHEREAS, Claimants and the Shareholders' Representative desire to settle certain claims as set forth herein;

NOW, THEREFORE, each of the parties hereto agrees as follows:

1.     *Definitions.*  These definitions shall apply to this entire Agreement, including the preamble above.

A.     "Additional Claims" shall mean the Demand for Arbitration filed October 6, 2005.

B.     "Agreement" shall mean this Escrow Resolution Agreement.

C.     "Amended Demand" shall mean the Amended Demand for Arbitration filed by Claimants in the Arbitration on September 2, 2005.

D.     "Arbitration" shall mean *Equifax Inc., et al.* v. *Austin Ventures VII, L.P., et al.,* American Arbitration Association Case No. 32 Y 168 00240 04, including all consolidated claims.

E.     "Claimants" shall mean, collectively, Equifax and Naviant.

F.     "Equifax" shall mean Equifax Inc.

G.     "Escrow Agreement" shall mean Escrow Agreement by and among Equifax Inc., SunTrust Bank, and Softbank Capital Partners LP, as Shareholders' Representative, dated as of August 15, 2002.

H.     "Escrow Fund" shall have the same meaning as it does in Paragraph 4.10(a) of the Merger Agreement.

I.     "Group A Respondents" shall mean, collectively, Rodger Berman, Michael Brauser, Robert Conley, Charles Eissa, Scott Hirsch, Richard Kaufman, Lou Nobile, Marc Rona, Rick Schell, and Steven Stowell.

J.     "Group B Respondents" shall mean, collectively, Austin Ventures VII, L.P., Austin Ventures VIII, L.P., BERJ, LLC, Softbank Capital Partners LP, Softbank Capital Advisors Fund, LP, Softbank Capital LP, Sweepsclub.com, TL Ventures III L.P., TL Ventures III Interfund, L.P., TL Ventures III Offshore, L.P., TL Ventures IV L.P., TL Ventures IV Interfund, L.P., Venture Development Center, Dan Babb, Ty Baines, Phil Davis, Derek Dubner, Mark Eddy, Kevan Fleming, Scott Frohman, Tom Hickey, Richard

Hill, Jeff Killeen, John Logan, David Marcil, Adam Mittelburg, Elder Ripper, Steve Siccone, Scott Thaler, David Wood.

K.      "Merger" shall mean the transaction effected by the Merger Agreement.

L.      "Merger Agreement" shall mean Agreement and Plan of Merger, dated as of August 15, 2002, by and among Equifax Inc., Armagh Acquisition Corporation, Naviant, Inc. and Softbank Capital Partners LP as Shareholders' Representative.

M.      "Naviant" shall mean Equifax eMarketing Solutions, Inc. f/k/a Naviant, Inc.

N.      "Panel" shall mean the panel of adjudicators appointed in the Arbitration.

O.      "Post-Closing Balance Sheet Audit Procedure" shall mean the post-closing adjustment procedure specified in Paragraph 4.7 of the Merger Agreement.

P.      "Preservation of Rights Action" shall mean *Equifax Inc.* v. *Austin Ventures VII, L.P., et al.*, No. 04-80754 (S.D. Fl.).

Q.      "Preservation of Rights Complaint" shall mean the complaint filed by Equifax in the Preservation of Rights Action on August 13, 2004.

R.      "Protective Order" shall mean the stipulation and protective order governing confidentiality entered in the Arbitration on October 5, 2005.

S.      "Respondents" shall mean, collectively, the Group A Respondents and the Group B Respondents.

T.      "Shareholders' Representative Agreement" shall mean Shareholders' Representative Agreement of August 15, 2002.

U.      "Shareholders' Representative" shall mean Softbank Capital Partners LP, acting in its capacity as Shareholders' Representative under Paragraph 4.9(a) of the Merger Agreement.

V.      "Venture Capital Shareholders" shall mean Austin Ventures VII, L.P., Austin Ventures VIII, L.P., BERJ, LLC, Softbank Capital Partners LP, Softbank Capital Advisors Fund, LP, Softbank Capital LP, TL Ventures III L.P., TL Ventures III Interfund, L.P., TL Ventures III Offshore, L.P., TL Ventures IV L.P., TL Ventures IV Interfund, L.P.

2.      *Escrow Fund.*  Immediately, the Shareholders' Representative shall direct in writing the Escrow Agent (as defined in the Escrow Agreement), to disburse the entirety of the Escrow Fund in immediately available funds to Claimants, inclusive of interest, as of the execution hereof (the "Escrow Funds").  Claimants shall endorse the request to the Escrow Agent with their agreement to the disbursement and provide all information to the Escrow Agent (as defined in the Escrow Agreement) necessary to ensure the Escrow Funds are immediately

– 3 –

transferred and concerning wiring instructions. The Shareholders' Representative shall thereafter take all further steps that are reasonable and necessary to effectuate, facilitate or confirm the transfer.

3. **Return of Merger Consideration.** The parties to this Agreement acknowledge and agree that the payment of the Escrow Funds pursuant to this Agreement reflects a negotiated reduction of the Merger Consideration paid for Naviant stock and options, which were converted into the right to receive cash when Equifax acquired Naviant via merger. No party to this Agreement shall take any position inconsistent with that characterization for Federal, state or local tax purposes, unless required pursuant to a final determination of a court of competent jurisdiction.

4. **Completion of Duties of Shareholders' Representative.** Upon the execution and completion of all duties under this Agreement, including Equifax's timely receipt of payment in full of the Escrow Funds, the Shareholders' Representative will have fulfilled and discharged all of its duties under the Merger Agreement with respect to Equifax and Naviant.

5. **Dismissal of Claims.**

   A.   Immediately, Claimants shall (i) dismiss without prejudice from the Arbitration all of the Group B Respondents and (ii) dismiss without prejudice as to all of the Group A Respondents Count Two of the Amended Demand.

   B.   Immediately, Claimants shall (i) dismiss without prejudice from the Preservation of Rights Action all such Defendants who are identified herein as the Group B Respondents and (ii) dismiss without prejudice as to the Defendants who are identified herein as the Group A Respondents Count Two of the Preservation of Rights Complaint.

   C.   Immediately, the Shareholders' Representative shall dismiss without prejudice its counterclaims in the Arbitration.

6. **Further Conduct of the Arbitration.** Immediately, Claimants and the Shareholders' Representative shall notify the Panel of this Agreement, with notice to all Respondents. Claimants shall also seek a scheduling and re-organization conference as soon as possible. Claimants agree to pause in taking or providing discovery by all parties for 30 days or until the Panel orders otherwise. The Shareholders' Representative shall also inform the Panel, with notice to all Respondents, that it shall no longer be responsible for compensation to Judge Stettin, and shall pay in full through the date of such notice all fees and expenses associated with Judge Stettin.

7. **Release and Covenant Not to Sue by Claimants.**

   A.   Except as excluded by 7.C and 7.E below, Claimants (individually and collectively), on their own behalf and on behalf of their present or former parents, subsidiaries, members, affiliates, directors, officers, employees, stockholders, successors and assigns, attorneys and agents, or any person acting by, through, or under any of them, but not including any Respondent (collectively, the "Equifax Releasors"), hereby release, discharge and covenant not to sue the Shareholders' Representative, the Group B

– 4 –

Respondents and (except as provided in 7.C below) their present or former parents, subsidiaries, members, partners (limited and general), affiliates, directors, officers, employees, stockholders, successors and assigns, attorneys and agents, or any person acting by, through, or under any of them (the "Respondent Releasees"), for any and all claims or liabilities at law or in equity, known or unknown, suspected or unsuspected, concealed or hidden, heretofore or hereafter suffered or alleged to be suffered by the Equifax Releasors, arising from or related or attributable to any act, omission, event, fact, circumstance or condition concerning Naviant (i) from the beginning of time through August 15, 2002 and (ii) all conduct or liability associated with, or amounts claimed to be due or due as a result of, the Post-Closing Balance Sheet Audit Procedure (notwithstanding 7.C(i) below).  References to "directors, officers, employees, stockholders" shall mean only in their respective, official capacities and not in their individual capacities.

B.     To ensure that the release in 7.A above is fully enforceable in accordance with its terms, Claimants affirm that they intend to release all claims specified therein (subject to 7.C and 7.E below), whether known, or unknown, concealed or hidden, and hereby knowingly and voluntarily waive any benefits under, and any protection by virtue of, any statute or principles of common law of the United States or any State of the United States that would operate to limit the release in any fashion.

C.     Neither the release in 7.A above nor any other provision of this Agreement is intended to be or shall be construed as or constitute a release or covenant, in whole or in part, of or as to (i) any claim or cause of action Claimants or either of them may have against any person arising out of conduct occurring after August 15, 2002 (except as specifically identified in the last clause in 7.A with respect to the Post-Closing Balance Sheet Audit Procedure and the Respondent Releasees) or (ii) any claim or cause of action against the Group A Respondents or any of them or any of the following individuals or entities:  Mark Baldinger, Ty Burger, Contactlens.com, Dentalplans.com, Inc., eDemographic, Inc., Elite Data Direct, Inc., Alex Ellis, Mark E. Felstein, Pam Hall, Steve Hardigree, H20 Media, Inc., 186k, I-C Optical, Inmar, LLC, Lendinghand.com Inc., Joyce Lewis, Matthew Ligon, MailCreations.com, Inc., Eddie Marin, Martin Global Media, LLC, Lynda Martin, Shawn McNamara, OneRoute, LLC, One Stop Data, LLC, Optin, Inc., Opt-In Services, LLC, Kimberly Seebach, Silver Carrot, Target Email Direct, Tel3.com, Michael R. Tiezzi, Tri Media Partners, LLC, Venture Direct, Inc., David White, Madie Wunrow and Edward Smith.

D.     Equifax covenants not to pursue further or hereafter sue the Group A Respondents for any claim for indemnification under Article 11 of the Merger Agreement; and, further, Equifax will not assert a claim under the Florida Securities and Investor Protection Act claiming that any Group A Respondent is jointly liable for rescission or damages with any other Respondent, but Equifax may claim that each and any Group A Respondent is liable individually under the Florida Securities and Investor Protection Act for rescission and/or damages and may claim that any Group A Respondent is jointly and/or severally liable with respect to any other claim.  With respect to any Florida Securities and Investor Protection Act claim, Equifax will only seek to recover against a Group A Respondent an amount not greater than the Merger

– 5 –

Consideration received by that Group A Respondent plus interest and attorneys fees. Equifax and Naviant shall otherwise maintain and may continue to pursue any and all claims and causes of action against the Group A Respondents, including, without limitation, claims for relief under the Florida Securities and Investor Protection Act, claims for common law fraud (whether directly, or by way of aiding and abetting or conspiracy liability), claims for punitive damages, claims for or arising out of fraud, deceit, misrepresentation, criminal conduct, willful misconduct, recklessness or negligence or claims for breach of any duties as an employee, officer or director of Naviant.

E.       Except as to the release by the Equifax Releasors of any claim for indemnification under Article 11 of the Merger Agreement (as to which the provisions of 7.A above are unconditional and irrevocable), the releases and covenants in 7.A above do not apply and are ineffectual as to any Respondent Releasee who asserts against Equifax or Naviant any claims arising prior to or in connection with the entry into this Agreement, and 7.A above shall have no effect with respect to any Respondent Releasee who asserts such a claim.

8.       *Release and Covenant Not to Sue by the Shareholders' Representative.*

A.       Softbank Capital Partners, LP, solely in its role as Shareholders' Representative, hereby releases and discharges Claimants (individually and collectively) and their present or former parents, subsidiaries, members, partners (limited and general), affiliates, directors, officers, employees, stockholders, successors and assigns, attorneys and agents, or any person acting by, through, or under any of them, but not including any Respondent (the "Claimant Releasees"), from any and all claims or liabilities at law or in equity, known or unknown, suspected or unsuspected, concealed or hidden, heretofore or hereafter suffered or alleged to be suffered by Softbank Capital Partners, LP, solely in its role as Shareholders' Representative, arising from or related or attributable to any act, omission, event, fact, circumstance or condition concerning Naviant or the conduct of either the Arbitration or the Preservation of Rights Action, from the beginning of time through the date of this Agreement (the "Shareholders' Representative Released Items"). References to "directors, officers, employees, stockholders" shall mean only in their respective, official capacities and not in their individual capacities.

B.       Softbank Capital Partners, LP, solely in its role as Shareholders' Representative, covenants not to sue any Claimant Releasee for the Shareholders' Representative Released Items.

C.       To ensure that the release and covenant in 8.A and 8.B above are fully enforceable in accordance with their terms, Softbank Capital Partners, LP affirms that it intends to release all claims specified therein, whether known, or unknown, concealed or hidden, and hereby knowingly and voluntarily waives any benefits under, and any protection by virtue of, any statute or principles of common law of the United States or any State of the United States that would operate to limit the release in any fashion.

9.      *Confidentiality.*

A.      This Agreement contains no Confidential Information as defined in the Protective Order.

B.      Notwithstanding the Protective Order, counsel to Claimants and counsel to the Shareholders' Representative may maintain any and all pleadings, papers filed or deposition transcripts taken in the Arbitration or the Preservation of Rights Action, as well as attorney/client privileged and work product materials that reference or include Confidential Information (as defined in the Protective Order). All other provisions of the Protective Order shall remain in effect, including with respect to maintaining any of the foregoing information in confidence.

10.     *Third Party Beneficiaries.* Each of the Respondents and the parties released or covenanted not to be sued pursuant to Paragraphs 7 and 8 above are third-party beneficiaries of this Agreement, with full and complete rights to enforce all obligations owing to them as set forth in this Agreement.

11.     *Construction and Interpretation.*

A.      This Agreement shall be binding on and for the benefit of each party's successors, assigns, agents, administrators, and other representatives.

B.      This Agreement sets forth the entire agreement and understanding among the Shareholders' Representative, Equifax and Naviant concerning the subject matter hereof. Nothing outside this Agreement may affect the interpretation of this Agreement. The Shareholders' Representative, Equifax and Naviant may modify, amend or supplement this Agreement only through a writing signed by all of them.

C.      The laws of the State of Florida shall govern this Agreement, without application of any rules of conflict of laws. If one or more provisions of this Agreement are deemed void by law, the remaining provisions will nevertheless continue in full force and effect.

D.      This Agreement will be executed in counterparts, each of which shall be deemed an original.

12.     *Time of Essence; Dates.* Time is of the essence of this Agreement. Anywhere a day certain is stated for payment or for performance of any obligation, the day certain so stated enters into and becomes a part of the consideration for this Agreement. If any date set forth in this Agreement shall fall on, or any time period set forth in this Agreement shall expire on, a day that is a Saturday, Sunday, federal or state holiday or other non-business day, such date shall automatically be extended to, and the expiration of such time period shall automatically be extended to, the next day that is not a Saturday, Sunday, federal or state holiday or other non-business day. The final day of any time period under this Agreement or any deadline under this Agreement shall be the specified day or date, and shall include the period of time through and including such specified day or date.

–7–

13.     *Authority.*  Each party hereto represents and warrants that such party has full and complete authority to enter into this Agreement and each person executing this Agreement on behalf of a party represents and warrants that he has been fully authorized to execute this Agreement on behalf of such party and that such party is bound by the signature of such representative.

14.     *Defined Terms.*  Capitalized terms used in this Agreement shall have the meanings ascribed to them at the point where first defined, irrespective of where their use occurs, with the same effect as if the definitions of such terms were set forth in full and at length every time such terms are used.

15.     *Further Assurances.*  Each party to this Agreement will cooperate with each other party in order to ensure the orderly fulfillment of all obligations under this Agreement.

16.     *Binding.*  This Agreement is fully binding and effective upon an exchange of facsimiles of the signed Agreement.  The parties will promptly thereafter provide executed originals.

17.     *No Admission of Liability.*  The parties to this Agreement acknowledge and agree that the decision by the Shareholders' Representative to agree to the payment of the Escrow Fund to Claimants does not include an admission of liability on behalf of itself or any respondent.

Executed this ___ day of June, 2006.

EQUIFAX INC.

By: _____

Its: CORPORATE VICE PRESIDENT + GENERAL COUNSEL

EQUIFAX EMARKETING SOLUTIONS, INC. F/K/A NAVIANT, INC.

By: _____

Its: VICE PRESIDENT + GENERAL COUNSEL

SOFTBANK CAPITAL PARTNERS LP, SOLELY AS SHAREHOLDERS' REPRESENTATIVE

By:     SOFTBANK CAPITAL PARTNERS LLC,
         its general partner

         By: _____
              Steve Murray
              Administrative Member

– 8 –

13.    *Authority.* Each party hereto represents and warrants that such party has full and complete authority to enter into this Agreement and each person executing this Agreement on behalf of a party represents and warrants that he has been fully authorized to execute this Agreement on behalf of such party and that such party is bound by the signature of such representative.

14.    *Defined Terms.* Capitalized terms used in this Agreement shall have the meanings ascribed to them at the point where first defined, irrespective of where their use occurs, with the same effect as if the definitions of such terms were set forth in full and at length every time such terms are used.

15.    *Further Assurances.* Each party to this Agreement will cooperate with each other party in order to ensure the orderly fulfillment of all obligations under this Agreement.

16.    *Binding.* This Agreement is fully binding and effective upon an exchange of facsimiles of the signed Agreement. The parties will promptly thereafter provide executed originals.

17.    *No Admission of Liability.* The parties to this Agreement acknowledge and agree that the decision by the Shareholders' Representative to agree to the payment of the Escrow Fund to Claimants does not include an admission of liability on behalf of itself or any respondent.

Executed this __ day of June, 2006.

EQUIFAX INC.

By: _____
        Its: _____

EQUIFAX EMARKETING SOLUTIONS, INC.
F/K/A NAVIANT, INC.

By: _____
        Its: _____

SOFTBANK CAPITAL PARTNERS LP, SOLELY
AS SHAREHOLDERS' REPRESENTATIVE


By:    SOFTBANK CAPITAL PARTNERS LLC,
        its general partner

        By: _____
        Steve Murray
        Administrative Member


—8—